## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| **KERRIE CAMPBELL,** | ) | |
| **On Behalf of Herself and Others** | ) | |
| **Similarly Situated,** | ) | |
| | ) | |
| | ) | |
| | ) | |
| **Plaintiff,** | ) | **CLASS ACTION COMPLAINT** |
| | ) | |
| **v.** | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| | ) | **Civ. No. _____** |
| **CHADBOURNE & PARKE LLP** | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

Plaintiff Kerrie Campbell, by her attorneys Sanford Heisler, LLP, brings this action in her individual capacity and on behalf of a class of current and former female Partners ("the Class") of Chadbourne & Parke LLP ("Chadbourne," "the Firm" or "Defendant") to redress the Firm's systematic gender discrimination. Campbell alleges upon knowledge as to herself and her own acts, and otherwise upon information and belief, as follows:

### I.    INTRODUCTION

1.    Plaintiff Kerrie Campbell ("Plaintiff" or "Campbell") is a seasoned trial lawyer and leading practitioner in the defamation/product disparagement, First Amendment and consumer product safety fields. Campbell joined Chadbourne, an international law firm employing over 300 attorneys in 10 offices worldwide, in January 2014 as a lateral Partner in the

1

Litigation Department, resident in the Firm's Washington, D.C. office.  The *American Law Journal* now lists Chadbourne as the 124th largest revenue-grossing firm in the United States.

2.    In just over two years since joining Chadbourne in 2014, Campbell originated no less than 40 new matters for over 20 clients she brought to the Firm, altogether generating as billing partner over $5 million in total collections for the Firm.  Campbell's broad client base includes global manufacturers of iconic brands, public and political figures, high-net worth individuals and innovative companies comprising 80% of the multi-billion dollar "As Seen on TV" market.

3.    From the time of her arrival at Chadbourne through 2016, Campbell has garnered positive attention for the Firm through articles published in *The American Lawyer*, *Bloomberg BNA's Product Safety & Liability Reporter* and *Law360*.  In 2015, Campbell was selected as a Member of the *Law 360 Media & Entertainment* Editorial Advisory Board.  She was recognized as a "Best Lawyer" in America for First Amendment litigation in 2014, 2015, and 2016.  On June 15, 2016, Campbell testified before the United States Consumer Product Safety Commission regarding *"The Need for Transparency in the Commission's Civil Penalty Determinations."*

4.    Campbell's productivity and revenue generation have been consistent with the Firm's top performing male Partners but her pay consistently places her at the bottom ranks of male Partners who have originated far less, and in some instances, zero revenue as a billing Partner. Campbell has called out and opposed gender-based pay and power inequities at Chadbourne and asked the Firm's all-male five-member Management Committee, Managing Partner, and Head of the Litigation Department to address and rectify these issues.

5.      On February 19, 2016, while Campbell was in the midst of extensive post-trial briefing on a litigation matter that already had generated over $1.34 million in revenue for the Firm, Chadbourne's Managing Partner, Andy Giaccia, and Head of the Litigation Department, Abbe Lowell, came to Campbell's office to deliver a shocking pronouncement: the Firm's all-male, five-member Management Committee in New York had decided in its secret "deliberations" – months earlier in 2015 – that Campbell's practice did not "fit" with the "strategic direction" of the Firm.  Giaccia and Lowell told Campbell she must quietly leave the Firm as soon as possible to "preserve" her reputation.  Giaccia and Lowell added that the Management Committee decided to "incentivize" Campbell's speedy ouster from the Firm by slashing her pay, effective immediately, to less than that of a first-year associate.

6.      On June 30, 2016, Campbell filed a class-wide charge with the Equal Employment Opportunity Commission (EEOC) to investigate deeply ingrained and systemic gender discrimination at Chadbourne.  She files this lawsuit to put an end to gender inequities at the Firm and seeks relief on behalf of herself and other female Partners who have been disparately underpaid, systematically shut out of Firm leadership, demoted, de-equitized and terminated.

### A.      Chadbourne Discriminates Against Female Partners in Terms of Pay and Power

7.      Women continue to encounter the "glass ceiling" at large law firms.  A recent American Bar Association study found that at law firms nationwide, female attorneys comprise 44.7 percent of law firm associates, but only 18 percent of equity partners.[1] In the last decade, large law firms have made almost no progress towards increasing women's paltry representation

---

[1] Commission on Women in the Profession, American Bar Association, *A Current Glance at Women in the Law 2016* (May 2016), *available at*  http://www.americanbar.org/groups/women/resources/statistics.html.

among the ranks of equity partners – the current 18% figure is only 2 percent higher than the 16% rate in 2006.[2]

8.      The small percentage of women who do advance to law firm partnership discover that they are often paid significantly less than their male counterparts. A 2015 survey by the National Association for Women Lawyers found that the typical female equity partner earns only 80 percent of what a typical male equity partner earns.[3] The survey found that the median compensation, as reported by surveyed law firms, was $504,000 for female equity partners and $629,407 for male equity partners.[4] The difference, more than $125,000, represents approximately 25% (one-quarter) of the median female partner's salary as well as an entire associate-level position at many firms.  In other words, many firms could hire a female partner *and* an associate for what it pays an equivalent male partner.

9.      Yet even in a field where inequities between male and female attorneys persist, Chadbourne stands out for its culture of discrimination against female attorneys.  While the Firm advertises a commitment to equal opportunity for female attorneys, the reality is far different. Notably, Chadbourne is conspicuously absent from both the *National Law Journal*'s list of the top 100 law firms on its most recent "Women in Law Scorecard"[5] and *Law360*'s most recent list of 100 large law firms recognized for being "Best Law Firms for Female Attorneys."[6] Female Partners at Chadbourne regularly receive less compensation than similarly-situated male

[2] National Association of Women Lawyers, *Women Lawyers Continue to Lag Behind Male Colleagues: Report of the Ninth Annual NAWL National Survey on Retention and Promotion of Women in Law Firms* (2015), *available at* http://www.nawl.org/p/cm/ld/fid=506.

[3] *Id.*

[4] *Id.*

[5] The American Lawyer, *The Best Firms in Big Law for Women*, AMERICANLAWYER.COM (August 30, 2016, 7:58 PM), http://www.americanlawyer.com/home/id=1202762963381 (citing the top 100 firms on the *National Law Journal*'s Women in Law scorecard).

[6] Jacqueline Bell, *The 100 Best Law Firms for Female Attorneys*, LAW360.COM (August 15, 2016, 2:35 PM), http://www.law360.com/articles/784729/the-100-best-law-firms-for-female-attrneys.

Partners.   This pay disparity is the direct result of Chadbourne's male-dominated Firm leadership.  Women in the Partnership at Chadbourne earn less than men and are virtually shut out of influential decision-making positions at the Firm.

10.   The experience appears to be no better for female associates at the Firm.  In the two-year period from January 2014 through December 2015, in the Litigation Department alone, no less than approximately 20 non-partner attorneys left the firm.   Of these 20 departing attorneys, approximately 17 were female and only three were male.  Female attorneys comprised a substantially disproportionate percentage – approximately 85% – of the attorneys who left Chadbourne's Litigation Department in 2014 and 2015 under the leadership of Abbe Lowell.

11.   Chadbourne's gender disparities are neither coincidental nor limited to any one office.  Throughout the relevant time period, a Committee of five men in Chadbourne's New York office made all compensation decisions for **each and every** Chadbourne Partner worldwide. Together, these five men made up Chadbourne's Management Committee, a centralized brotherhood with complete control over Partner compensation.

12.   The 114-year-old Firm only recently elected its first female Partner to the Management Committee in July 2016 – after Campbell filed a class charge of discrimination with the EEOC.

13.   Chadbourne's all-male dictatorship makes its decisions regarding Firm Partners in a black box, generally without input or scrutiny from the Partnership at large.  The Management Committee renders a number of influential decisions in complete secrecy, including decisions to open costly and unprofitable foreign offices and hire/fire international partners, decisions regarding potential mergers with other firms that Partners learn about only from media reports, and decisions to terminate the employment of female attorneys, such as Campbell, who

challenge the Committee's decisions.  Its decision-making processes and methodology are kept under wraps.  This wall of silence reinforces the Firm's glass ceiling by shielding the Management Committee from meaningful oversight and giving it unchecked dominion over the compensation and employment of Firm Partners. And it also enables the Committee to routinely disfavor female Partners – including by granting them disproportionately fewer Partnership "points," purportedly a key component of the secret formula used to determine base salary for Chadbourne Partners.

* * *

14.     This action arises out of Chadbourne's systematic, Firm-wide discriminatory treatment of its female Partners on the basis of their gender.  Chadbourne discriminates against female Partners through its policies, practices, and procedures with respect to the compensation of female Partners, in violation of Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991 and the Lilly Ledbetter Fair Pay Act of 2009 ("Fair Pay Act"), 42 U.S.C. §§ 2000e, *et. seq.* ("Title VII"); the Equal Pay Act, 29 U.S.C. § 206(d) ("EPA"); and the District of Columbia Human Rights Act ("DCHRA").

15.     Chadbourne also unlawfully discriminated and retaliated against Campbell by terminating her employment after she complained about pay discrimination.  Furthermore, the Firm breached its fiduciary duty to Campbell by failing to share important information related to the Firm's finances with her and by terminating her employment in breach of the procedures specified in the Firm's Partnership Agreement. Finally, the Firm was unjustly enriched when it reaped the financial benefits of Campbell's work and her multiple capital contributions to the Firm, without fairly compensating her and providing her the benefits of her Partnership Agreement and withholding over $440,000 in Campbell's capital account.

16.     On behalf of herself and the Class she seeks to represent, Class Representative Campbell requests declaratory and injunctive relief to redress Chadbourne's pervasive and discriminatory employment policies, practices, and procedures. Plaintiff and the Class further seek back pay; front pay; compensatory damages; nominal, liquidated and punitive damages; and attorneys' fees and costs.

17.     Campbell also brings individual claims based on Chadbourne's retaliation against her, the Firm's wrongful termination of her employment, the Firm's breach of its fiduciary duties owed to her, and unjust enrichment.

**II.     PARTIES**

18.     Plaintiff Kerrie Campbell has been a resident and citizen of Montgomery County, Maryland at all times relevant to this action.  Campbell began her employment at Chadbourne's Washington, D.C. office as a lateral Partner in January 2014.  In February 2016, the Management Committee informed Campbell that she was being terminated; she is currently employed as a "Partner in Transition" out of the Firm with no shares in the Firm's profits.  At all relevant times, Campbell has been a female "employee" as defined by Title VII, the EPA, and the DCHRA.

19.     Defendant Chadbourne is a limited liability partnership with offices worldwide, including in New York, New York and Washington, D.C. Chadbourne's New York office is the Firm's largest, with approximately 173 attorneys.  The New York office represents nearly all of the Firm's major practices – including corporate transactional work, financial restructuring and bankruptcy, litigation, real estate, and intellectual property.  Chadbourne's New York office is also the home office of Firm Managing Partner Andrew Giaccia and the locus of operations of the Management Committee, comprised exclusively of five males at all times relevant.  At all

7

times relevant herein, Chadbourne has been an "employer" as defined by Title VII, the EPA, and the DCHRA.

### III.  JURISDICTION AND VENUE

20.    This Court has subject matter jurisdiction over this suit pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 2000e-5(f)(3). This Court has personal jurisdiction over Defendant under N.Y. CPLR § 302(a), *inter alia* because Defendant transacts significant business in the State of New York.  This Court may exercise supplemental jurisdiction over Campbell's DCHRA claims pursuant to 28 U.S.C. § 1367(a).

21.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and 42 U.S.C. § 2000e-5(f)(3) because Defendant transacts a substantial portion of its business in this District, maintains its largest office in this District, and governs the Firm and its operations from its New York office.  From this District, Defendant sent Campbell her employment offer letter, and, once hired, reviewed her performance on at least an annual basis. Defendant also committed the alleged unlawful employment practices at issue in this case in this District. The Firm's New York-based Management Committee made all of the decisions relevant to this action – including systematically discriminating against Campbell and the Class in compensation and terminating Campbell after she complained about pay discrimination.

22.    Additionally, a substantial part of the events or omissions giving rise to the claims in this action occurred in the Southern District of New York.

23.    Campbell has exhausted her administrative remedies by timely filing an EEOC charge and requesting a Right to Sue letter.

IV.   **FACTUAL ALLEGATIONS**

A.   **Background**

24.   Campbell is a graduate of George Mason University, with distinction, and of the Washington College of Law of the American University, *cum laude*.

25.   Campbell has 29 years of litigation experience.  She is a recognized expert in the consumer product safety and defamation/product disparagement fields.  Prior to joining Chadbourne, she spent 17 years at Collier Shannon (now Kelley Drye), where she worked her way up from litigation associate, to counsel, and finally to partner and chair of the Consumer Product Safety group.  Following Collier Shannon's merger with Kelley Drye in 2007, Campbell moved her growing practice to Manatt, Phelps, and Phillips, LLC ("Manatt"), where she spent seven years as a partner and chair of the Consumer Product Safety group and was designated as a "Best Lawyer in America" for First Amendment Litigation.

26.   After bumping into conflicts at Manatt, Campbell undertook a focused search to join a firm where she could fully realize her professional objective to nationally brand her highly specialized reputation protection, First Amendment, and Consumer Product Safety expertise.

27.   In November 2014, Chadbourne extended an offer to Campbell to join the Firm as an "equity" partner.  All partners who join Chadbourne are deemed "equity" partners; there are no "income" or "non-equity" partners.  Before and after receiving Chadbourne's offer, Campbell requested and received confirmation about her expected base compensation and the availability of merit bonuses.

28.   As a new lateral Partner, Campbell performed exceptionally well at Chadbourne. She generated over $5 million in revenue for the Firm in less than three years, and clients praised the quality of her work.

B.    **Marc Alpert, Andrew Giaccia, Lawrence Rosenberg, Howard Seife, and Paul Weber Wield Complete Control Over the Firm as the Management Committee**

29.    During the relevant time period, five men; Marc Alpert, Andrew Giaccia, Lawrence Rosenberg, Howard Seife, and Paul Weber sat on the Firm's Management Committee. All five men were Partners based in the Firm's New York office.

30.    The Management Committee controlled all significant aspects of the Firm's operations.  In addition to compensation decisions, the Committee made all decisions regarding the Firm's finances including expenditures related to opening expensive and unprofitable foreign offices.   The Committee managed membership on Firm committees – a gateway to Firm leadership.  The Committee signed off on and was privy to information related to the Firm's rankings in various legal trade publications that was not available to Partners, such as Campbell. Discussions regarding mergers with other firms, a decision with significant implications for the Partners, were and are under the complete purview of the Management Committee.

31.    The Management Committee also exercised control over Partners with regard to management of their individual matters.  For example, Campbell was not permitted to take on any client engagement that deviated from a certain hourly rate without Management Committee approval.  She also was not permitted to write-off time and/or fees without the approval of the billing person designated by the Management Committee.

32.    The Management Committee also heavily supervised Campbell's performance at the Firm.  Campbell was required to submit annual performance evaluations for the Management Committee's consideration.

33.    Despite repeated attempts to take on leadership roles at the Firm, Campbell was refused positions on Firm committees.   Giaccia also denied Campbell's requests to be named

10

head of the Firm's Consumer Product Safety & Risk Management practice group or Reputation

Protection and Defamation practice group.

### C.     Chadbourne Regularly Assigns Female Partners Less Base Pay than Similarly or Less Productive Male Partners

34.     At Chadbourne, base compensation for Partners is largely determined by the

number of Partnership "points" awarded by the Management Committee. These points are

multiplied by other factors to determine a Partner's salary.  Chadbourne typically awards female

Partners fewer points than it awards to comparable male Partners even when female Partners

substantially outperform their male peers.

35.     Partnership points are supposed to be tied to the anticipated revenues that a

Partner will generate for the Firm, or "collections." However, the Management Committee

routinely overvalues the anticipated contributions of male Partners, even where female Partners

have a demonstrated record of outperforming them. Point allocation is left entirely to the

subjective will of the Management Committee.

36.     Point distribution directly affects a Partner's long-term compensation.  Partners

who are assigned a low number of points generally do not have an opportunity to make up the

deficit, even if their collection levels increase, because the Management Committee rarely

increases point totals in a significant amount from year to year.  Upon information and belief, the

Committee has even *decreased* point totals for female Partners from year to year, further limiting

their opportunity to obtain a higher level of compensation.

37.     Chadbourne routinely awards female Partners low numbers of points while

assigning similarly or less-productive males higher point values.

38.     Upon information and belief, in 2013, the number of points allotted to male

Partners ranged from 250 to 2,250, while those allotted to female Partners ranged from 400-900.

Chadbourne compensated 8 of 15 female Partners at or below 600 points.

39.    Upon information and belief, in 2014, the number of points allotted to male Partners ranged from 250-2,250, while those allotted to female Partners ranged from 375-1,000. Chadbourne compensated 10 of 17 female Partners at or below 600 points.

40.    Upon information and belief, in 2015, the number of points allotted to male Partners ranged from 250-2,100, while those allotted to female Partners ranged from 375-1,000. Chadbourne compensated 11 of 18 female Partners at or below 600 points

41.    In 2014, when Chadbourne hired Campbell, it awarded her 500 points, even though she demonstrated that she could generate in excess of $2 million in revenues for the Firm based on her collections at Manatt. (She exceeded that estimate by a considerable margin in 2014). At the same time, the Firm assigned similarly or less productive male Partners points in the 1,000-1,400 range.  From her first day at the Firm, the deck was stacked against Campbell. She was destined to make two to three times less than her male counterparts did.

42.    Upon information and belief, in 2014, when Campbell joined Chadbourne, another male Partner in the Litigation Department, Andrew Coronios, had only $253,000 in collections for the previous year and yet was awarded 850 points.

43.    By assigning women low numbers of points, the Firm denies its female Partners compensation to which they are otherwise entitled.

44.    Chadbourne management has demonstrated that it has no objective, equitably-administered criteria for awarding points.  For example, Campbell asked for a point increase at the end of 2014 after generating more than $2.5 million for the Firm.  Giaccia responded that Campbell had to "prove" her ability to generate revenue at Chadbourne for an indeterminate period before the Management Committee would consider giving her a significant point increase.

Chadbourne has no similar expectations for male Partners.

45.     Chadbourne's "system" for awarding points to its Partners lacks sufficient standards, quality controls, implementation metrics, transparency, and oversight.  On information and belief, Chadbourne has never conducted a pay equity analysis to determine whether or to what extent female attorneys are underpaid relative to their male peers.

46.     Accordingly, Chadbourne's Management Committee can and does exploit the system to offer higher compensation to male Partners who are often less productive than their female counterparts.   The Management Committee awards underperforming male Partners more points than female Partners like Campbell with higher collections rates, more significant and lucrative client relationships, and a better record of business development.

47.     To justify its discriminatory decisions, Chadbourne often makes pretextual excuses such as claiming female lateral Partners need to be at the Firm longer before their collections potential can be assessed adequately (despite having no similar tenure requirements for lateral male Partners) or contending that male Partners make other contributions to the Firm unrelated to their collections totals.

### D.     Chadbourne Awards Larger Merit Bonuses to Male Partners than to Female Partners

48.     Defendant Chadbourne routinely compensates female Partners less than similarly situated male Partners in terms of merit bonus pay.  Female Partners often receive smaller bonuses than their lower-performing male peers.

49.     Chadbourne's system for awarding merit bonus pay lacks sufficient standards, quality controls, implementation metrics, transparency, and oversight.

50.     During the relevant period, the five-man Management Committee made the exclusive determination as to whether a Partner was awarded a merit bonus and in what amount. Partners were not informed of the reasons for the Management Committee's decisions.

51.     Chadbourne's policies and practices ensure that male Partners will have higher total compensation than female Partners.  For example, although Campbell is one of the Firm's top performers, she has never received a merit bonus.  The Management Committee awarded other less productive men merit bonuses in the same years that Campbell was denied such bonuses.

52.     Moreover, the Firm disproportionally allocates resources to male Partners at the expense of female Partners.  As a result of male Partners' monopoly of staff and associates, female Partners are often forced to delegate work to outside counsel or to forgo profitable matters due to a lack of staffing.

**E.     Chadbourne Refuses to Implement its Existing Compensation Policies Fairly or Consistently Even When a Female Partner Provides Exemplary Performance**

53.     During her tenure at Chadbourne since January 2014, Campbell generated more than $5,000,000 in revenue for the Firm.  Despite her exemplary performance, the Firm underpaid her relative to her male peers.

54.     During the lateral hiring process, Campbell provided Chadbourne with documentation confirming her ability to produce collections upwards of $2 million a year for Manatt.  Specifically, Campbell's collections at Manatt were above $2 million for 2013 and just over $3 million for 2012.  Campbell conservatively informed Chadbourne that she would bring in upwards of $1.5 million during her first transition year with the Firm.

55.     Unbeknownst to Campbell, her predicted collections would place her in the top ranks of the Firm's most productive partners.  The Firm disregarded Campbell's demonstrated

ability to generate high collections and awarded her 500 points.  Upon information and belief, this point total relegated Campbell to the bottom 20 percent of Partners at Chadbourne.  This decision resulted in her being compensated among the bottom third of Partners from 2014 to the present even though she has performed in the top quintile.

56.   For the 10-month period from March to December 2014, Campbell's total collections surpassed $2.8 million. Even though Campbell originated almost *twice* her predicted collections goal, Chadbourne only increased her points by 50 for a total 550 points in 2015. Her points still lagged behind comparable male Partners by a considerable margin.

57.   The disparity in points resulted in Campbell earning significantly less than similarly productive male Partners and even those she substantially outperformed.

58.   Campbell's experience is hardly unique. The distribution of Partner compensation at Chadbourne is heavily skewed in favor of men.  Upon information and belief, female Partners are generally in the bottom half of Partners in terms of compensation even though they often outperform their male counterparts.

**F.   Chadbourne Retaliates Against Female Attorneys Who Question Discriminatory Compensation Practices**

59.   Chadbourne dismisses or retaliates against female attorneys who dare to question or raise concerns about its discriminatory compensation practices.

60.   For example, after Campbell raised complaints of discrimination, Chadbourne retaliated against her by actively undermining Campbell – taking actions to affirmatively undercut her client relationships, frustrate her work on existing matters, and deprive her of collections and compensation she rightfully earned.

61.   As discussed above, the Management Committee exercises complete control over compensation decisions.  This means any female attorney with concerns about her compensation

during the relevant period was forced to confront the all-male Committee at its seat in New York. Partners are provided scant information about the secret process used to determine compensation, further frustrating their ability to advocate for themselves.

62.     Chadbourne actively retaliates against female attorneys who question the Firm's gender discrimination practices, thereby sending a message to women that complaining about gender discrimination will negatively impact their career at the Firm and professional reputation.

63.     The Firm purports to have a system in place to receive and investigate complaints of discrimination but the process is woefully inadequate because the ultimate arbiters of such complaints are the wrongdoers themselves – the Management Committee.

64.     As a result, female attorneys are left with the untenable options of (a) not challenging deeply ingrained and systematic gender discrimination or (b) risking their careers by challenging the practices and decisions of the Management Committee.

**1.     Campbell Raises Well-Founded Concerns Regarding Gender-Based Pay and Power Disparities**

65.     In her 2014 year-end memorandum, Campbell raised her concerns to the Management Committee about her assigned Partnership points and the resulting disparities in compensation.  In both her memorandum and at an in-person January 2015 meeting with the Management Committee in New York, Campbell requested a substantial point increase and noted that most partners at the 500-point level did not possess the significant client relationships or collections history that she brought to the Firm.  Based on her review of the Partners' 2014 compensation (published by the Management Committee in April of each year), Campbell explained to the Management Committee that the average number of points for a Partner who generated comparable collections to her was about 950 points – almost two times the 500 points allotted to her.

66.    Campbell again raised these concerns in a meeting with Giaccia on February 13, 2015.  Campbell brought to his attention the fact that her 500-point level was not in line with the points and compensation of comparable male Partners.  She explained that her point level was disparately and unjustifiably low, and that it would remain so even at 550 points.  Expressing her desire to be a part of the solution to a significant problem, Campbell conservatively requested that her points for 2015 be increased to 850.

67.    Giaccia dismissed Campbell's request and represented that the Management Committee viewed her 2014 collections as nothing more than a "fluke."  Giaccia informed Campbell that she would have to "prove" her ability to generate revenue at Chadbourne for an indeterminate period before she would be allotted any more than the 50 points the Firm was required to give her for hitting her $2 million collections marker in 2014. Giaccia chided Campbell, telling her "you're no Andrei Baev," a new lateral Partner recently sponsored by Giaccia after a previously failed effort to nominate him for Partnership.  In the second go-round, the Firm guaranteed Baev 1,350 points for two years, along with significant additional bonuses based on collections markers.  Giaccia explained that Campbell was no Baev because according to Giaccia, Baev would generate annual revenues at or above $5 million.

68.    While Campbell's total collections originated for the Firm to date exceed $5 million, Plaintiff is informed and believes that Baev's total collections over a similar period are approximately $101,000 – or about 2% of her contributions to the Firm's revenues. Nevertheless, under Chadbourne's male-dominated leadership and compensation system, Baev easily has made many hundreds of thousands of dollars more than Campbell.

69.    The Firm's respective treatment of Campbell and Baev exemplifies Giaccia's and the Management Committee's entrenched gender bias.

70.     Giaccia and the Management Committee were empowered to significantly increase Campbell's points for 2015 to bring her into parity with similarly performing male Partners yet declined to do so.

### 2.      Chadbourne Retaliates Against Campbell

71.     The Firm actively retaliated against Campbell because she stood up to Chadbourne's discrimination.

72.     Following her complaints of discrimination, Lowell affirmatively sabotaged Campbell's compensation and status with the Firm in a litigation matter she brought from Manatt. Over Campbell's objections based on a clear fee arrangement, Lowell wrongly wrote-off hundreds of thousands of dollars in collections due to Campbell as the originating and billing partner in the matter.  Lowell did this with Management's blessing, despite the agreement by all parties at the initial stages of Chadbourne's work on the case that Campbell was designated the originating and billing attorney.

73.     To increase his own collections, Lowell later incorrectly argued, with Giaccia agreeing, that Campbell did not originate the case.  Lowell's write-offs were uniformly approved by the all-male Management Committee over Campbell's reasonable objections.  These overt actions prevented Campbell from hitting the $2 million bench mark that guaranteed her a $150,000 bonus in 2015 and 50 additional points in 2016.   The male leadership's manipulation of Campbell's collections was imperative to prevent her guaranteed bonus and additional points because even in the face of the Firm's retaliation, Campbell's total collections for 2015 still exceeded $1.9 million.

74.     Campbell also undertook a high-value litigation matter for which she repeatedly asked Lowell and Giaccia for adequate staffing.   Campbell notified Lowell and other Firm

leaders that the Firm would likely lose the client if the staffing issue was not addressed.  Despite her efforts and warnings, Campbell's requests were ignored.

75.    In further retaliation for Campbell's complaints, the Firm refused the marketing support it had promised to Campbell and failed to acknowledge her successes in its publicity materials.  For example, the Firm's 2015-2016 "Litigation Highlights" brochure, touts the fact that Chadbourne received recognition as a "Best Law Firm" and "Best DC Office" for First Amendment Litigation.  What the Firm failed to acknowledge, however, is the fact that only one attorney in the entire Firm has been recognized as a "Best Lawyer" for First Amendment litigation:  Kerrie Campbell.  While recognizing male Partners' "Best Lawyer" recognition, the Firm and Lowell omitted recognition that had been earned by Campbell.   Similarly, in 2014, 2015, and 2016, the Firm's internal "In the Know" publication applauded the "Best Lawyers" recognition received by male Partners – but conspicuously omitted Campbell who each year had received such recognition.

76.    As another example, while Chadbourne touted Campbell's status as Chair of Manatt and Collier Shannon's Product Safety Practice groups, Giaccia refused to designate Campbell as the Chair or Head of the Firm's Consumer Product Safety & Risk Management practice group or Reputation Protection and Defamation practice group.  When Campbell repeated her request, Giaccia responded that he did not want a "proliferation" of practice group Chairs because it was embarrassing if they left the Firm.   Giaccia and the Management Committee had no problem; however, bestowing similar titles on similarly situated or less experienced male Partners.

77.    Increasingly, Campbell was isolated and ignored by her colleagues following her requests for fair and non-discriminatory treatment.  As the Head of Litigation, Lowell not only

tolerated, but facilitated, derogatory gossip with and among his cadre of male lieutenants, about the sole remaining female Partner in the Litigation Department in the D.C. office.

### 3. Chadbourne Punctuates Its Campaign of Retaliation by Secretly Terminating Campbell's Employment

78.     Despite Campbell's demonstrable productivity at the Firm, on February 19, 2016, Chadbourne wrongfully terminated her employment.

79.     On that date, Giaccia and Lowell came to Campbell's office to inform her that the Management Committee had determined her practice did not fit with Chadbourne and she had to leave the Firm as soon as possible and could take "no more than six months" to find another Firm.   Giaccia told her that the Committee had reached this decision during its 2015 deliberations – at a time while Campbell was logging over 200 billable hours per month.

80.     Giaccia also informed Plaintiff that her pay would be decreased to about $9,000 a month and the Firm would no longer pay tax distributions paid to Partners of the Firm.  Despite Campbell's 29 years of experience and established record of success, the Management Committee slashed her pay to well below that of a first-year associate at the Firm, without any benefits and while the Firm has retained her capital account exceeding approximately $440,000 as of December 2015.

81.     During the termination meeting, Giaccia specifically instructed Campbell that she was not to take on new matters.  He instructed her to "bill" her time looking for a new job as "business development" and that was to be her "sole focus."

82.     Campbell's involuntary discharge is the Firm's final act of retaliation against the only female Litigation Department Partner in the D.C. office.

83.     Shocked by her unexpected termination, Campbell sent Giaccia an email on February 23, 2016, in which she expressed her astonishment at the "extraordinary turn of events" and sought clarity about the details of "whatever remaining tenure [she had] with the Firm."

84.     In a February 25, 2016 email, Giaccia reiterated to Campbell that her tenure at the Firm had reached its end: "the goal," he wrote, "is for you to move your practice successfully to another Firm as soon as possible, and this will be our sole focus."   Campbell was to remain a "Partner" in name only to facilitate her "transition" to a new employer.

85.     On March 29, 2016, Campbell traveled to New York City to meet with the all-male Management Committee and Chadbourne's Chief Operating Officer to attempt to save her job.

86.     In the meeting with the Management Committee, Campbell emphasized her successes at Chadbourne including her ongoing high collections during the first quarter of 2016 and recent positive publicity her practice had garnered for the Firm.   Within the first quarter of 2016, Campbell had already generated another $700,000 in total collections for the Firm – notwithstanding the hostile environment.

87.     The Management Committee disregarded Campbell's successes and the business she had generated, and criticized her for not setting up interviews for positions at other firms.

88.     Three days later, on April 1, 2016, Campbell met with Giaccia and Management Committee-member Marc Alpert. Again, they reiterated that the Management Committee's decision was "final."   Chadbourne then laid out two "options" for Campbell, one of which required her to depart before April 15 and the other which would require her departure by the end of August.

89.     Giaccia stressed once again that these "options" were designed to "incentivize"

Campbell to leave the Firm as soon as possible. Giaccia again scolded Campbell for working on behalf of her clients instead of devoting her time to seeking other employment.  Giaccia insisted that Campbell's quiet "transition" out of the firm was integral to preserving her reputation in the legal marketplace.

90.     Upon information and belief, Giaccia, Lowell, and other members of the Management Committee actively concealed Campbell's "final" termination from other Partners and attorneys at the Firm.

91.     The Management Committee terminated Campbell in violation of the procedures required to expel a Partner per the Firm's Partnership Agreement.  The Partnership Agreement states that a "major action," such as expulsion of a Partner, requires an affirmative vote of Partners (or their proxies) whose total profit percentage interests exceeds two-thirds of the total of the profit percentage interests of all Partners entitled to vote on the action.

92.     Again, in an April 13, 2016 email, Giaccia restated Chadbourne's position that Campbell was expected to depart the Firm no later than the end of August 2016.

93.     Between February 19, 2016 and April 13, 2016, Chadbourne had informed Campbell that she had to leave the Firm by the end of August 2016 on no fewer than five occasions.

94.     Chadbourne's discrimination and retaliation, culminating in her unlawful termination, caused Campbell to suffer significant emotional distress and substantially diminished her quality of life in myriad ways. In addition to causing Campbell financial hardship, Defendant's actions have had a materially adverse impact on Campbell's health and her family and personal relationships.

95.     In response to the Firm's discriminatory termination of her employment, Campbell has been forced to look for a position at another firm.  Campbell's diligent efforts to secure comparable employment have been thwarted by the Firm's conduct including its disparate and substantial under-compensation of Campbell compared to her productivity, total collections, and client base.  Furthermore, prospective firms and recruiters are reluctant to work with a partner in a dispute with her current law firm.  The Firm's conduct not only caused significant financial, physical, and emotional harm to Campbell but also threatens to completely undermine her 29-year legal career.

## V.    CLASS ALLEGATIONS

96.     Class Representative Campbell incorporates allegations from previous paragraphs of the Complaint alleging class-based discrimination against female Partners.

97.     Plaintiff represents a class consisting of all female Partners who are, have been or will be employed by Chadbourne in the United States from August 2013 to the date of judgment. She and the Class of Chadbourne Partners she seeks to represent have been subjected to a systemic pattern and practice of gender discrimination and disparate impact gender discrimination by Chadbourne.

98.     Class Representative Campbell brings this action pursuant to Fed. R. Civ. P. 23 seeking injunctive and monetary relief for the systemic pattern and practice of gender discrimination to which Defendant has subjected her and a Class of female Partners.

99.     Defendant Chadbourne tolerates and cultivates a work environment that discriminates against female Partners.  Since the Firm's inception and through the relevant time period, the Firm has been managed by a five-member Management Committee, comprised entirely of male executives. Furthermore, a disproportionately large percentage of the Firm's

Committees and Department Heads are men.

100.    Chadbourne's discriminatory policies, practices, and procedures include vesting the Committee with total dominion over Partner compensation, resulting in systematic gender-based disparities in "points" allocation, base pay, merit bonuses, and other forms of compensation. Consequently, female Partners routinely make less than their male colleagues. Further, Chadbourne ignores disregards, minimizes, covers up, mishandles or otherwise fails to properly respond to evidence of gender discrimination in the workplace.

101.    In general, the policies, practices, and procedures that govern the management of the Firm lack the sufficient standards, quality controls, implementation metrics, transparency and oversight to ensure equal opportunity at Chadbourne.

102.    Chadbourne's uniform nationwide policies, practices, and procedures result in lower compensation for female Partners than similarly situated male Partners.

103.    Female Partners are subjected to continuing unlawful disparate treatment. Moreover, Chadbourne's policies and procedures, while facially neutral, have an ongoing disparate impact on female Partners.

104.    Because Chadbourne's management does not provide sufficient oversight or safety measures to protect against intentional and overt discrimination or the disparate impact of facially neutral policies and procedures, female Partners suffering from discrimination are without recourse.  Where complaint and compliance policies exist, they lack meaningful controls, standards, implementation metrics and means of redress such that upper management may ignore, disregard, minimize, cover up, mishandle or otherwise fail to properly respond to evidence of discrimination in the workplace.

105.    There is no meaningful separation between complaint reporting channels and the

Firm management (including the Committee) responsible for creating discriminatory conditions for women. This means that complaints do not remain confidential and victims of discrimination often face retaliation or are dissuaded from raising concerns altogether.  Chadbourne's failure to address rampant retaliation leaves victims of discrimination further vulnerable.

106.    Chadbourne thus condones, fosters, and encourages discrimination.  Within this environment, female Partners who question the Firm's norms or raise concerns about its practices are pushed out of the Firm, demoted, or terminated.

107.    Chadbourne demonstrates a reckless disregard—a deliberate indifference—to its female Partners by overlooking or otherwise dismissing even blatant evidence of gender discrimination.

108.    Chadbourne's policies, practices, and procedures are not valid, job-related or justified by business necessity.  Alternative, objective and more valid procedures are available to Chadbourne that would avoid such a disparate impact on female Partners.  Chadbourne has failed or refused to use such alternative procedures.

109.    Upon information and belief, the discriminatory employment policies, practices and procedures to which Class Representative Campbell and Class she seeks to represent are subject are centrally established and implemented at Chadbourne's corporate level in New York. The Management Committee, based in the New York office, made the relevant decisions regarding Class Representative Campbell and the Class Members she seeks to represent.

110.    Upon information and belief, the Management Committee makes final compensation decisions, including base pay and merit bonus determinations, for all Partners at Chadbourne.  From January 2014 to July 2016, the Committee consisted of the same five men.

111.    It is Chadbourne's standard operating procedure to discriminate against female

Partners.  Chadbourne's employment policies, practices, and procedures are not unique or limited to any office or practice group; rather, they apply uniformly and systematically to Chadbourne Partners throughout the Firm, occurring as a pattern and practice throughout all office locations and practice groups.

112.    Because of Chadbourne's systemic pattern and practice of gender discrimination, the Class Representative and members of the proposed Class have suffered harm including lost compensation, back pay, employment benefits, and emotional distress.

113.    Chadbourne has failed to enact policies to ensure the Management Committee does not violate the Firm's fair employment policies and equal opportunity laws and has failed to create adequate incentives for others in Firm leadership to comply with such policies and laws.

114.    The Class Representative and members of the Class have no plain, adequate or complete remedy at law to redress the rampant and pervasive wrongs alleged herein, and this suit is their only means of securing adequate relief.  The Class Representative and members of the Class have suffered and are now suffering irreparable injury from Chadbourne's ongoing, unlawful policies, practices, and procedures set forth herein, and they will continue to suffer unless those policies, practices, and procedures are enjoined by this Court.

A.    **Class Definition**

115.    The proposed Rule 23 Class consists of all female Partners who are, have been or will be employed by Chadbourne in the United States from August 2013 until the date of judgment.  Upon information and belief, there are approximately 26 members of the proposed Class.

116.    The Class Representative is a member of the Class she seeks to represent.

117.    The systemic gender discrimination described in this Complaint has been, and is,

continuing in nature.

118.    Plaintiff reserves the right to amend the class definition based on discovery or legal developments.

**B.      Efficiency of Class Prosecution of Class Claims**

119.    Certification of a nationwide class of female Partners similarly situated to the Class Representative is the most efficient and economical means of resolving the questions of law and fact that are common to the claims of Plaintiff and the proposed Class.

120.    The individual claims of the Class Representative require resolution of the common questions of whether Chadbourne has engaged in a systemic pattern and practice of gender discrimination against female Partners.  Plaintiff seeks remedies to eliminate the adverse effects of such discrimination in her own life and career, to eliminate the adverse effects of gender discrimination in the lives and working conditions of the proposed Class members and to prevent Chadbourne's continued gender discrimination in the future.

121.    The Class Representative has standing to seek such relief because of the adverse effect that such discrimination has on her individually and on female Partners generally. Chadbourne caused Campbell's injuries through its discriminatory practices, policies, and procedures and through the disparate impact its policies, practices, and procedures have on female Partners.  These injuries are redressable through systemic relief, such as equitable and injunctive relief and other remedies sought in this action.   In addition, proper relief for Campbell's individual termination claim can include reinstatement.  As such, she has a personal interest in the policies, practices, and procedures implemented at Chadbourne.

122.    To obtain relief for herself and the Class members, the Class Representative will first establish the existence of systemic gender discrimination as the premise for the relief she

seeks.  Without class certification, the same evidence and issues would be subject to relitigation in a multitude of individual lawsuits with an attendant risk of inconsistent adjudications and conflicting obligations.

123.    The Class Representative's individual and class claims are premised upon the traditional bifurcated method of proof and trial for disparate impact and systemic disparate treatment claims of the type at issue in this case.  Such a bifurcated method of proof and trial is the most efficient method of resolving such common issues.

124.    Certification of the proposed Class is the most reasonable and efficient means of presenting the evidence and arguments necessary to resolve such questions for the Class Representative, the Class members and Chadbourne.

### C.    Numerosity and Impracticability of Joinder

125.    The Title VII Class that the Class Representative seeks to represent is so numerous that joinder of all members is impracticable.  The members of the proposed Class are diffused throughout the country.  Fear of retaliation on the part of Chadbourne's female Partners is also likely to undermine the possibility of joinder. Campbell's colleagues are aware of her situation and may be unlikely to come forward and assert their own claims.  In addition, joinder is impractical as the Partners are dispersed throughout the United States and, indeed, some female Partners may be employed in some of the Firm's international offices.

### D.    Common Questions of Law and Fact

126.    The prosecution of the claims of the Class Representative will require the adjudication of numerous questions of law and fact common to her individual claims and those of the Class she seeks to represent.

127.    The common issues of law include, *inter alia*: (a) the proper standards for proving

a pattern and practice of discrimination by Chadbourne against its female Partners under both a disparate treatment and disparate impact theory of liability; (b) whether Chadbourne has engaged in unlawful, systemic gender discrimination through its policies, practices, and procedures affecting compensation and other terms and/or conditions of employment; (c) whether Chadbourne's failure to institute adequate standards, quality controls, implementation metrics or oversight of those policies, practices, and procedures violates Title VII and/or other statutes; (d) whether the lack of transparency and of opportunities for redress at Chadbourne violates Title VII and/or other statutes; (e) whether Chadbourne's failure to prevent, investigate, or properly respond to evidence and complaints of discrimination in the workplace violates Title VII and other statutes; and (f) whether Chadbourne is liable for continuing systemic violations of Title VII and/or other statutes.

128.   The common questions of fact include, *inter alia*: whether Chadbourne has: (a) used a compensation system that lacks meaningful or appropriate standards, implementation metrics, quality controls, transparency, and opportunities for redress; (b) through the use of that compensation system compensated female Partners less than similarly-situated male Partners in base salary and/or merit bonuses; (c) systematically, intentionally, or knowingly compensated female Partners less than similarly-situated male Partners, including in base salary and/or merit bonus pay; (d) allocated Firm resources, including staff, in ways that undermined and/or frustrated  the work of female Partners; (e) minimized, ignored, or covered-up evidence of gender discrimination in the workplace and/or otherwise mishandled the investigation of and response to complaints of discrimination brought to the attention of the Management Committee; (f) systematically, intentionally, knowingly, or deliberately sowed an indifference to evidence of discrimination in the workplace or otherwise minimized, ignored, mishandled, or covered up

evidence of or complaints of gender discrimination; and (g) otherwise discriminated against female Partners in the terms and conditions of employment.

129.    The employment policies, practices, and procedures to which the Class Representative and the Class members are subjected were and are set by the Firm's Management Committee and apply universally to all Class members nationwide.  These employment policies, practices, and procedures are not unique or limited to any office or practice group; rather they apply to all offices and practice groups and, thus, affect the Class Representative and Class members in the same ways regardless of the office location or practice group in which they work.   Discrimination in compensation occurs as a pattern and practice throughout all Chadbourne offices and practice groups.

**E.     Typicality of Claims and Relief Sought**

130.    The Class Representative's claims are typical of the claims of the proposed Class. The Class Representative possesses and asserts each of the claims she asserts on behalf of the proposed Class. She pursues the same factual and legal theories and seeks similar relief.

131.    Like members of the proposed Class, the Class Representative is a female Partner who was an employee of Chadbourne during the liability period.

132.    Differential treatment between male and female Partners occurs as a pattern and practice throughout all office and practice groups of Chadbourne.  Chadbourne discriminates against female Partners in compensation and subjects them to a work culture predominated by an executive circle comprised of men. This differential treatment has affected the Class Representative and the Class members in the same or similar ways.

133.    Chadbourne has failed to respond adequately or appropriately to evidence and complaints of discrimination.  The Class Representative and Class members have been affected

in the same or similar ways by Chadbourne's failure to implement adequate procedures to detect, monitor, and correct this pattern and practice of discrimination.

134.    Chadbourne has failed to create adequate procedures to ensure its Management Committee complies with equal employment opportunity laws regarding each of the policies, practices, and procedures referenced in this Complaint, and the Firm has failed to discipline adequately others in Firm leadership when they violate anti-discrimination laws.  These failures have affected the Class Representative and the Class members in the same or similar ways.

135.    The relief necessary to remedy the claims of the Class Representative is the same as that necessary to remedy the claims of the proposed Class members.

136.    The Class Representative seeks the following relief for her individual claims and for the claims of the members of the proposed Class: (a) a declaratory judgment that Chadbourne has engaged in systemic gender discrimination against female Partners by (i) paying female Partners less than their male counterparts in base compensation and/or merit bonuses, (ii) failing to investigate or respond to evidence of discrimination in the workplace against female Partners, and (iii) otherwise exposing female Partners to differential treatment; (b) a permanent injunction against such continuing discriminatory conduct; (c) injunctive relief that effects a restructuring of Chadbourne's policies, practices and procedures for awarding compensation to female Partners; (d) equitable relief that effects a restructuring of the Chadbourne compensation system so female Partners receive the compensation they would have been paid in the absence of Chadbourne's gender discrimination; (e) back pay, front pay, reinstatement and other equitable remedies necessary to make female Partners whole from Chadbourne's past discrimination; (f) compensatory damages; (g) punitive damages to deter Chadbourne from engaging in similar discriminatory practices in the future; and (h) attorneys' fees, costs and expenses.

### F.        Adequacy of Representation

137.    The Class Representative's interests are coextensive with those of the members of the proposed Class.  The Class Representative seeks to remedy Chadbourne's discriminatory policies, practices, and procedures so female Partners will not receive disparate pay and differential treatment.

138.    The Class Representative is willing and able to represent the proposed Class fairly and vigorously as she pursues her similar individual claims in this action.

139.    The Class Representative has retained counsel sufficiently qualified, experienced, and able to conduct this litigation and to meet the time and fiscal demands required to litigate an employment discrimination class action of this size and complexity.  The combined interests, experience, and resources of the Class Representative and her counsel to litigate competently the individual and class claims at issue in this case clearly satisfy the adequacy of representation requirement of Federal Rule of Civil Procedure 23(a)(4).

### G.        Requirements of Rule 23(b)(2)

140.    Chadbourne has acted or refused to act on grounds generally applicable to the Class Representative and the proposed Class.

141.    Chadbourne has acted on grounds generally applicable to the Class Representative and the proposed Class by adopting and following systemic policies, practices, and procedures that are discriminatory on the basis of gender.  Gender discrimination is Chadbourne's standard operating procedure rather than a sporadic occurrence.

142.    Chadbourne has also acted or refused to act on grounds generally applicable to the Class Representative and the proposed Class by, *inter alia*: (a) using a compensation system that lacks meaningful or appropriate standards, implementation metrics, quality controls,

transparency and opportunities for redress; (b) through the use of that compensation system compensating female Partners less than similarly situated males in base salary and/or merit bonuses; (c) systematically, intentionally, or knowingly compensating female Partners less than similarly situated male Partners, including less base salary and/or in merit bonus pay; (d) minimizing, ignoring, or covering up evidence of gender discrimination in the workplace and/or otherwise mishandling the investigation of and response to complaints of discrimination brought to the attention of the Management Committee; (e) systematically, intentionally, knowingly, or deliberately sowing an indifference to evidence of discrimination in the workplace or otherwise minimizing, ignoring, mishandling, or covering up evidence of or complaints of gender discrimination; and (f) otherwise discriminating against female Partners in the terms and conditions of employment.

143.    Chadbourne's policies, practices, and procedures with respect to compensation have led to gender discrimination and stratification.  The systemic means of accomplishing such gender-based stratification include, but are not limited to, Chadbourne's policies, practices, and procedures for awarding base compensation and merit bonus pay to female attorneys.  These practices and procedures all suffer from a lack of: transparency; adequate quality standards, and controls; sufficient implementation metrics; and opportunities for redress or challenge.  As a result, female Partners are compensated within a system that is insufficiently designed, articulated, explained or implemented to consistently, reliably or fairly manage or reward female Partners.

144.    Chadbourne's systemic discrimination and refusals to act on nondiscriminatory grounds justify the requested injunctive and declaratory relief with respect to the Class as a whole.

145.   Injunctive, declaratory, and affirmative relief are a predominant form of relief sought in this case.  Entitlement to declaratory, injunctive, and affirmative relief flows directly and automatically from proof of Chadbourne's systemic gender discrimination.  In turn, entitlement to declaratory, injunctive, and affirmative relief forms the factual and legal predicate for recovery by the Class Representative and Class members of monetary and non-monetary remedies for individual losses caused by the systemic discrimination, as well as their recovery of compensatory and punitive damages.

**H.**     **Requirements of Rule 23(b)(3)**

146.   The common issues of fact and law affecting the claims of the Class Representative and proposed Class members—including, but not limited to, the common issues identified above—predominate over any issues affecting only individual claims.  The common issues include whether Chadbourne has engaged in gender discrimination against female Partners by paying female Partners less than their male counterparts.

147.   A class action is superior to other available means for fairly and efficiently adjudicating the claims of the Class Representative and members of the proposed Class.

148.   By virtue of the pattern and practice of discrimination at Chadbourne, the Class Representative and Class members are eligible for monetary remedies for losses caused by the systemic discrimination, including back pay, front pay, reinstatement, compensatory damages and other relief.

149.   Additionally or in the alternative, the Court may grant "partial" or "issue" certification under Rules 23(c)(4). Resolution of common questions of fact and law would materially advance the litigation for all Class members.

## VI.   <u>COLLECTIVE ALLEGATIONS UNDER THE EQUAL PAY ACT</u>

150.   Campbell incorporates all allegations of the Complaint alleging class-based discrimination against female Partners.

151.   Campbell brings collective claims under the Equal Pay Act pursuant to Section 16(b) of the Fair Labor Standards Act (FLSA), 29 U.S.C. § 216(b), on behalf of all members of the EPA Collective Action Class, which consists of: all current, former and future female Partners of Chadbourne during the applicable liability period, who opt into the EPA action by filing a Consent to Join with the Court.

152.   Plaintiff and the Collective Action members are similarly situated with respect to their claims that Chadbourne paid them less than their male counterparts.

153.   There is a common nexus of fact and law suggesting that Plaintiffs and the Collective Action members were discriminated against in the same manner. Questions at issue in the case include:

(a)   Whether Defendant unlawfully awarded less in base pay to female Partners than to similarly-qualified male Partners;

(b)   Whether Defendant unlawfully awarded less in merit bonuses to female Partners than similarly-qualified male Partners;

(c)   Whether Defendant's resulting failure to compensate female Partners on a par with comparable male Partners was willful within the meaning of the EPA.

154.   Counts for violations of the EPA may be brought and maintained as an "opt-in" collective action pursuant to 29 U.S.C. § 216(b), for all claims asserted by the EPA Collective Action Plaintiffs who opt-in to this action because the claims of the Plaintiff are similar to the claims of the EPA Collective Action Class.

155.    Campbell and the EPA Collective Action Plaintiffs (a) are similarly situated and (b) are subject to Defendant's common policy and practice of gender discrimination in failing to compensate female Partners on par with male Partners who perform substantially equal work.

**VII.    COUNTS**

**CLASS AND COLLECTIVE ACTION COUNTS**

**COUNT I**

**VIOLATION OF TITLE VII,**
**42 U.S.C. §§ 2000e,** *et seq.*
**PAY DISCRIMINATION**
**(On behalf of Class Representative Campbell and all Class members)**

156.    Class Representative Campbell re-alleges and incorporates each and every allegation in this Complaint as if fully set forth herein.

157.    This Count is brought on behalf of the Class Representative and all members of the Class.

158.    Defendant, an employer of Class Representative and Class members within the meaning of Title VII, has discriminated against the Class Representative and the Class by treating them differently from, and less preferably than, similarly situated males by subjecting them to discriminatory pay in violation of Title VII.

159.    Defendant's policies, practices and procedures have produced a disparate impact on the Class Representative and the Class with respect to their terms and conditions of employment.

160.    Defendant's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of the Class Representative and the Class, entitling the Class Representative and the members of the Class to punitive damages.

161.    By reason of the continuous nature of Defendant's discriminatory conduct

regarding compensation, which persisted throughout the employment of the Class Representative and the Class, the Class Representative and the Class are entitled to application of the continuing violations doctrine to all violations alleged herein.

162.    As a result of Defendant's conduct alleged in this Complaint, the Class Representative and the Class have suffered and continue to suffer harm, including but not limited to lost earnings, lost benefits and other financial loss, including interest.

163.    By reason of Defendant's discrimination, the Class Representative and the Class are entitled to all legal and equitable remedies available for violations of Title VII, including an award of punitive damages.

164.    As a further result of Defendant's unlawful conduct, the Class Representative and the members of the Class have suffered and continue to suffer, *inter alia*, impairment to their name and reputation, humiliation, embarrassment, emotional and physical distress, and mental anguish.  Plaintiffs are entitled to recover damages for such injuries from Defendant under Title VII.

165.    Attorneys' fees and costs should be awarded under 42 U.S.C. § 2000e-5(k).

## COUNT II

**VIOLATION OF THE FAIR LABOR STANDARDS ACT OF 1938, AS AMENDED BY THE EQUAL PAY ACT OF 1963, 29 U.S.C. § 206(d); 29 U.S.C. § 216(b) (On Behalf of the Plaintiff and EPA Collective Action Plaintiffs)**

166.    Plaintiff re-alleges and incorporates each and every allegation of this Complaint.

167.    This Count is brought on behalf of the Plaintiff and the EPA Collective Action Class, including all EPA Collective Action Plaintiffs who "opt in" to this action.

168.    Defendant has discriminated against the Plaintiff and all EPA Collective Action Plaintiffs within the meaning of the Equal Pay Act of 1963 in violation of the Fair Labor

Standards Act of 1938, 29 U.S.C. §§ 206, *et seq*., as amended by the EPA, by providing them with lower pay than similarly situated male colleagues on the basis of their gender, female, even though Plaintiff and all others similarly situated performed similar duties requiring the same skill, effort, and responsibility as their male counterparts.

169.     Plaintiff, all EPA Collective Action Plaintiffs, and similarly situated male Partners all perform similar job duties and functions as Chadbourne attorneys.  Plaintiff, all EPA Collective Action Plaintiffs, and similarly situated male Partners all performed jobs that required equal skill, effort, and responsibility.

170.     Defendant discriminated against Plaintiff and all EPA Collective Action Plaintiffs by subjecting them to discriminatory pay in violation of the Equal Pay Act.

171.     The differential in pay between male and female Partners was not due to seniority, merit, quantity or quality of production, or a factor other than sex, but was due to gender.

172.     Defendant caused, attempted to cause, contributed to or caused the continuation of pay discrimination based on gender, in violation of the EPA.

173.     The foregoing conduct constitutes a willful violation of the EPA within the meaning of 29 U.S.C. § 255(a).  Because Defendant has willfully violated the EPA, a three-year statute of limitations applies to such violations, pursuant to 29 U.S.C. § 255.

174.     As a result of Defendant's conduct as alleged in this Complaint, Plaintiff and all EPA Collective Action Plaintiffs have suffered and continue to suffer harm, including but not limited to: lost earnings, lost benefits and other financial loss, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

175.    By reason of Defendant's discrimination, Plaintiff and all EPA Collective Action Plaintiffs are entitled to all legal and equitable remedies available for violations of the EPA, including liquidated damages, interest, and other compensation pursuant to 29 U.S.C. § 216(b).

176.    Attorneys' fees should be awarded under 29 U.S.C. §216(b).

## INDIVIDUAL COUNTS

## COUNT III

### VIOLATION OF TITLE VII,
### 42 U.S.C. § 2000e-3(a), 42 U.S.C. § 2000e-5(f)(3)
### RETALIATION
### (On behalf of Campbell)

177.    Campbell re-alleges and incorporates each and every allegation contained in this Complaint.

178.    Campbell engaged in protected activity that included, but is not limited to, complaining to Chadbourne about gender discrimination in compensation.  She complained to members of the Firm on numerous occasions, including but not limited to, Management Committee member and Managing Partner Andrew Giaccia; Management Committee member Marc Alpert; Management Committee member Lawrence Rosenberg; Management Committee member Howard Seife; Chief Operating Officer Lisa Palestine; Head of Litigation Abbe Lowell; and former Managing Partner of the D.C. office Dana Frix.  She also engaged in protected activity by filing an EEOC Charge alleging gender discrimination on June 30, 2016.

179.    Chadbourne terminated Campbell's employment in retaliation for her discrimination complaints.  Chadbourne also retaliated against Campbell by, *inter alia*: undermining her client relationships; refusing her staffing on her matters; failing to promote her practice; and denying her the ability to participate in Firm committees.  These adverse employment actions materially and adversely changed Campbell's overall terms and conditions of employment.

180.    Chadbourne's retaliatory acts against Campbell were a direct and proximate result of her protected activities.

181.    A reasonable employee would find Chadbourne's retaliatory acts materially adverse and such acts would dissuade a reasonable person from making or supporting a charge of discrimination.

182.    Defendant's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard to Campbell's rights, entitling her to punitive damages.

183.    Defendant's actions and failures to act have caused Campbell to suffer harm, including without limitation lost earnings, lost benefits and other severe financial losses, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

184.    Campbell is therefore entitled to all legal and equitable remedies available for violations of Title VII, including an award of punitive damages.

185.    Attorneys' fees should be awarded under 42 U.S.C. § 2000e-5(k).

<u>**COUNT IV**</u>

**VIOLATION OF TITLE VII
WRONGFUL TERMINATION
(On behalf of Campbell)**

186.    Campbell re-alleges and incorporates each and every allegation contained in this Complaint.

187.    Chadbourne wrongfully terminated Campbell's employment because of her gender and in retaliation for her discrimination complaints.

188.    Chadbourne's wrongful termination of Campbell was a direct, proximate and pretextual result of gender discrimination and her protected activities.

189.    Defendant's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard to Campbell's rights, entitling her to punitive damages.

190.    Chadbourne's wrongful termination of Campbell has caused her to suffer harm, including without limitation lost earnings, lost benefits and other severe financial losses, as well

as humiliation, embarrassment, emotional and physical distress, and mental anguish.

191.   Campbell is therefore entitled to all legal and equitable remedies available for violations of Title VII, including an award of punitive damages.

192.   Attorneys' fees should be awarded under 42 U.S.C. § 2000e-5(k).

## COUNT V

### VIOLATION OF THE FAIR LABOR STANDARDS ACT OF 1938, AS AMENDED BY THE EQUAL PAY ACT OF 1963, 29 U.S.C. § 215(a)(3); 29 U.S.C. § 216(b) RETALIATION (On Behalf of Campbell)

193.   Campbell re-alleges and incorporates each and every allegation contained in this Complaint.

194.   Campbell engaged in protected activity under the Equal Pay Act by complaining to Chadbourne about gender discrimination in compensation.

195.   Because of these complaints, Chadbourne discriminated against and terminated Campbell in violation of 29 U.S.C. § 215(a)(3) – slashing her compensation, ousting her from the partnership ranks, and then discharging her from the Firm.

196.   Under 29 U.S.C. § 216(b), Campbell is entitled to reinstatement, back pay, liquidated damages, and other relief.

197.   Attorneys' fees should be awarded under 29 U.S.C. §216(b).

## COUNT VI

### VIOLATION OF THE DISTRICT OF COLUMBIA HUMAN RIGHTS ACT D.C. Code §§ 2-1401 et seq. AS AMENDED PAY DISCRIMINATION (On behalf of Campbell)

198.   Campbell re-alleges and incorporates each and every allegation of this Complaint.

199.   Defendant, an employer within the meaning of the DCHRA, has discriminated

against Campbell by treating her differently from, and less preferably than, similarly situated males by subjecting her to pay discrimination in violation of the DCHRA.

200.    Defendant's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of the Plaintiff entitling her to punitive damages.

201.    As a result of Defendant's conduct alleged in this Complaint, the Plaintiff has suffered and continues to suffer harm, including but not limited to lost earnings, lost benefits, and other financial loss, including interest.

202.    By reason of Defendant's discrimination, the Plaintiff is entitled to all legal and equitable remedies available for violations of the DCHRA, including an award of punitive damages.

203.    Attorneys' fees should be awarded under D.C. Code §2-1403.13(e).

**COUNT VII**

**VIOLATION OF THE DISTRICT OF COLUMBIA HUMAN RIGHTS ACT**
**D.C. Code § 2-1401 *et seq.* AS AMENDED**
**RETALIATION**
**(On behalf of Campbell)**

204.    Campbell re-alleges and incorporates each and every allegation of this Complaint.

205.    Defendant, an employer within the meaning of the DCHRA, has discriminated against Campbell by retaliating against her for opposing the discriminatory compensation of women in violation of the DCHRA.

206.    Defendant's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of the Plaintiff entitling her to punitive damages.

207.    As a result of Defendant's conduct alleged in this Complaint, the Plaintiff has suffered and continues to suffer harm, including but not limited to lost earnings, lost benefits and other financial loss, including interest.

208.    By reason of Defendant's discrimination, the Plaintiff is entitled to all legal and equitable remedies available for violations of the DCHRA, including an award of punitive damages.

209.    Attorneys' fees should be awarded under D.C. Code §2-1403.13(e).

<u>COUNT VIII</u>

**VIOLATION OF THE DISTRICT OF COLUMBIA HUMAN RIGHTS ACT
D.C. Code §§ 2-1401 *et seq.* AS AMENDED
WRONGFUL TERMINATION
(On behalf of Campbell)**

210.    Campbell re-alleges and incorporates each and every allegation of this Complaint.

211.    Defendant, an employer within the meaning of the DCHRA, wrongfully terminated Campbell's employment due to gender discrimination and in retaliation for her discrimination complaints.  Chadbourne's wrongful termination was an adverse employment action that materially and adversely affected Campbell's employment in violation of the DCHRA.

212.    Defendant's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of the Plaintiff entitling her to punitive damages.

213.    As a result of Defendant's conduct alleged in this Complaint, the Plaintiff has suffered and continues to suffer harm, including but not limited to lost earnings, lost benefits and other financial loss, including interest.

214.    By reason of Defendant's discrimination, the Plaintiff is entitled to all legal and equitable remedies available for violations of the DCHRA, including an award of punitive damages.

215.    Attorneys' fees should be awarded under D.C. Code §2-1403.13(e).

## COUNT IX

**BREACH OF FIDICUARY DUTY**
**(On behalf of Campbell)**

216.     Campbell re-alleges and incorporates each and every allegation of this Complaint.

217.     A fiduciary relationship existed between Campbell and Chadbourne based on Campbell's status as a member of the Firm partnership.

218.     Chadbourne had a duty to disclose essential information affecting the Partnership to Campbell and to deal fairly, honestly, and openly with her.

219.     Chadbourne breached its fiduciary duty by failing to disclose material financial information, including information related to Partner compensation, to Campbell.

220.     The Firm had a duty to deal with Campbell in an open and honest manner. Instead, Chadbourne covertly terminated Campbell's employment without providing her with the benefit of demonstrating the profitability and fit of her practice to her fellow Partners.

221.     Chadbourne further violated its duty to Campbell by firing her without following the expulsion procedures articulated in the Firm's Partnership Agreement.

222.     Campbell suffered substantial damages as a result of Chadbourne's breach of its fiduciary duties.

## COUNT X

### UNJUST ENRICHMENT
### (On behalf of Campbell)

223.    Campbell re-alleges and incorporates each and every allegation of this Complaint.

224.    Under the common law doctrine of unjust enrichment, Chadbourne, by its policies and actions, benefited from, and increased its profits by failing to pay Campbell all compensation due to her.

225.    Furthermore, Chadbourne received $217,250 in capital contributions from Campbell, is altogether holding more than $440,000 in Campbell's capital account, and yet failed to provide her the compensation and benefits promised to her as a Partner of the Firm.

226.    Chadbourne accepted and received the benefits of the work performed by Campbell, the business and revenues she generated for the Firm, and her annual capital contribution and was unjustly enriched. It is inequitable and unjust for Chadbourne to reap the benefits of Campbell's work and financial contribution without proper remuneration.

227.    Campbell is entitled to relief for this unjust enrichment in an amount equal to the benefits and contribution unjustly retained by Chadbourne, plus interest on these amounts.

## VIII.   PRAYER FOR RELIEF

WHEREFORE, Class Representative Campbell, on behalf of herself and the members of the Class she seeks to represent, requests the following relief:

A.      Certification of this case as a class action under Federal Rule of Civil Procedure 23, on behalf of the proposed Plaintiff Class; designation of the proposed Class Representative as representative of this Class; and designation of Plaintiff's counsel of record as Class Counsel;

B.      Designation of this action as a collective action on behalf of the proposed EPA Collective Plaintiffs (asserting EPA claims) and

(i) promptly issuing notice pursuant to 29 U.S.C. § 216(b) to all similarly situated members of the EPA Opt-In Class, which (a) apprises them of the pendency of this action and (b) permits them to assert timely EPA claims in this action by filing individual Consent to Sue forms pursuant to 29 U.S.C. § 216(b); and

(ii) tolling the statute of limitations on the claims of all members of the FLSA Opt-In Class from the date the original Complaint was filed until the Class members are provided with reasonable notice of the pendency of this action and a fair opportunity to exercise their right to opt in as Plaintiffs;

C.      Designation of Campbell as representative of the EPA Collective Action;

D.      A declaratory judgment that Chadbourne's employment policies, practices, and procedures challenged herein are illegal and in violation of the rights of Class Representative and Class members under Title VII;

E.      A permanent injunction against Chadbourne and its officers, owners, agents, successors, employees, and/or representatives, and any and all persons acting in concert with them, from engaging in any further unlawful practices, policies, customs, usages and gender

discrimination as set forth herein, and order such injunctive relief as will prevent Defendant from continuing its discriminatory practices and protect others similarly situated;

F.     An Order requiring Chadbourne to initiate and implement programs that will (i) provide equal employment opportunities for female Partners; (ii) remedy the effects of its past and present unlawful employment policies, practices, and procedures; and (iii) eliminate the continuing effects of the discriminatory and retaliatory practices described above;

G.     An Order requiring Chadbourne to initiate and implement systems for compensating female Partners in a non-discriminatory manner;

H.     An Order directing Chadbourne to adjust the compensation for Class Representative Campbell and the Class members to the level that they would be enjoying but for the Defendant's discriminatory policies, practices, and procedures;

I.     An award of back pay, front pay, liquidated damages, lost benefits, preferential rights to jobs, and other damages for lost compensation and job benefits suffered by the Class Representative and the Class, to be determined at trial;

J.     Any other appropriate equitable relief to which the Class Representative and the Class members are entitled;

K.     An award of back pay and front pay in an amount not less than 25 million dollars;

L.     An award of compensatory damages in an amount not less than 25 million dollars;

M.     An award of punitive damages in an amount not less than 50 million dollars;

N.     An award of litigation costs and expenses, including reasonable attorneys' fees, to the Class Representative and the Class;

O.     Pre-judgment interest;

P.     Such other and further relief as the Court may deem just and proper; and

Q.      Retention of jurisdiction by the Court until such time as the Court is satisfied that the Defendant has remedied the practices, policies, and procedures complained of herein and has determined that the Defendant's practices, policies, and procedures are in full compliance with the law.

### IX.     DEMAND FOR JURY

The Plaintiff demands trial by jury of all issues triable of right to a jury.

Respectfully submitted,

_____

**Jeremy Heisler (JH-0145)**
**David W. Sanford***
**Andrew Melzer (AM-7649)**
**Alexandra Harwin***
**Saba Bireda***
**Jennifer Siegel (JS-0270)**
**SANFORD HEISLER, LLP**
1350 Avenue of the Americas, 31st Floor
New York, New York 10019
Telephone: (646) 402-5656
Facsimile: (646) 402-5650
jheisler@sanfordheisler.com
dsanford@sanfordheisler.com
amelzer@sanfordheisler.com
aharwin@sanfordheisler.com
sbireda@sanfordheisler.com
jsiegel@sanfordheisler.com

***pending pro hac vice admission**

***Counsel for Plaintiff and the Class**