## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **KERRIE CAMPBELL and JAROSLAWA Z. JOHNSON, individually, and on behalf of others similarly situated,** | |
| **Plaintiffs,** | **FIRST AMENDED CLASS ACTION COMPLAINT** |
| **v.** | **JURY TRIAL DEMANDED** |
| | **Civ. No. 1:16-cv-06832 (JPO)** |
| **CHADBOURNE & PARKE LLP, MARC ALPERT, ANDREW GIACCIA, ABBE LOWELL, LAWRENCE ROSENBERG, HOWARD SEIFE, and PAUL WEBER** | |
| **Defendants.** | |

Plaintiffs Kerrie Campbell and Jaroslawa Z. Johnson (collectively "Plaintiffs" or "Class Representatives"), by their attorneys Sanford Heisler, LLP, bring this action in their individual capacities and on behalf of a class of female attorneys defined below (the "Class") at Chadbourne & Parke LLP ("Chadbourne" or "the Firm") to redress the Firm's systematic gender discrimination.  Plaintiffs allege upon knowledge as to themselves and their own acts, and otherwise upon information and belief, as follows:

I.   **INTRODUCTION**

1.     Plaintiff Kerrie Campbell ("Campbell") is a seasoned trial lawyer and leading practitioner in the defamation/product disparagement, First Amendment, and consumer product safety fields.   Campbell joined Chadbourne, an international law firm employing over 300 attorneys in 10 offices worldwide, in January 2014 as a lateral Partner in the Litigation Department, resident in the Firm's Washington, D.C. office.   *The American Lawyer* now lists Chadbourne as the 124th largest revenue-grossing firm in the United States.

2.     In just over two years since joining Chadbourne in 2014, Campbell originated no fewer than 40 new matters for over 20 clients she brought to the Firm, altogether generating as billing Partner over $5 million in total collections for the Firm.   Campbell's broad client base includes global manufacturers of iconic brands, public and political figures, high-net worth individuals and innovative companies comprising 80% of the multi-billion dollar "As Seen on TV" market.

3.     From the time of her arrival at Chadbourne through 2016, Campbell has garnered positive attention for the Firm through articles published in *The American Lawyer*, *Bloomberg BNA's Product Safety & Liability Reporter*, and *Law360*.   In 2015, Campbell was selected as a Member of the *Law 360 Media & Entertainment* Editorial Advisory Board.   She was recognized as a "Best Lawyer" in America for First Amendment litigation in 2014, 2015, and 2016.   On June 15, 2016, Campbell testified before the United States Consumer Product Safety Commission regarding "*The Need for Transparency in the Commission's Civil Penalty Determinations.*"

4.     Campbell's productivity and revenue generation have been consistent with the Firm's top performing male Partners but her pay consistently places her at the bottom ranks of

male Partners who have originated far less, and in some instances, zero revenue as a billing Partner.  Campbell has called out and opposed gender-based pay and power inequities at Chadbourne and asked the Firm's all-male five-member Management Committee, Managing Partner, and Head of the Litigation Department to address and rectify these issues.

5.     On February 19, 2016, while Campbell was in the midst of extensive post-trial briefing on a litigation matter that already had generated over $1.34 million in revenue for the Firm, Chadbourne's Managing Partner, Andrew Giaccia, and Head of the Litigation Department, Abbe Lowell, came to Campbell's office to deliver a shocking pronouncement: the Firm's all-male, five-member Management Committee in New York had decided in its secret "deliberations" – months earlier in 2015 – that Campbell's practice did not "fit" with the "strategic direction" of the Firm.  Giaccia and Lowell told Campbell she must quietly leave the Firm as soon as possible to "preserve" her reputation.  Giaccia and Lowell added that the Management Committee decided to "incentivize" Campbell's speedy ouster from the Firm by slashing her pay, effective immediately, to less than that of a first-year associate.

6.     On April 1, 2016, Giaccia and Management Committee Member Marc Alpert informed Campbell that the Committee's decision that she must leave the Firm was "final" and would not be revisited.

7.     Thereafter, in an April 6, 2016 memorandum distributed to Partners Firm-wide, the Management Committee disclosed its secret action to de-equitize and oust Campbell from the Firm.  In its April 6 memorandum, the Management Committee specifically called out Campbell's de-equitized status by specially designating her as a "Partner in transition." Clarifying the import of its "Partner in transition" designation, the Management Committee specifically noted that its list of "2016 total [shares and points by partner] excludes partners in

transition" and excluded Campbell from tax distributions made to Firm Partners. Notwithstanding the fact that the all-male Management Committee explicitly demoted, de-equitized, and excluded Campbell from the Partnership, the Committee nevertheless required Campbell to make all mandatory payments required of so-called "equity" Partners.

8.      A specter haunts the halls of Chadbourne: a "boys' club" atmosphere and its standard operating procedure that discriminates against the Firm's female attorneys in the terms and conditions of employment.  The boys' club atmosphere at Chadbourne is very real—as real as what the Firm inflicted on Campbell when its leadership demeaned, de-equitized, and discarded her.  To Chadbourne's male leadership, camaraderie and networking among male attorneys outweighed the superior performance and impressive revenue that Campbell generated. The existence of a boys' club atmosphere is more than a mere allegation; ocular proof provides confirmation.

9.      After Campbell filed the Complaint, upon information and belief, Defendant Abbe Lowell, Head of Chadbourne's Litigation Department, tore down a postcard on Campbell's office wall containing the words of Nelson Mandela: "*It will forever remain an accusation and a challenge to all men and women of conscience that it took as long as it has before all of us stood up to say: 'enough is enough.'*" In its place, upon information and belief, Lowell affixed a large smiley face graphic on Campbell's office wall.  Subsequent to this juvenile and harassing action, Lowell was video recorded engaging in further retaliatory acts against Campbell.  Thumbing his nose at Mandela's call for equality, Lowell placed an 8.5" by 11" cartoon figure of a fat man wearing a bowler hat next to the smiley face graphic in an attempt to make a mockery of Mandela's words.  The message Lowell and Chadbourne conveyed to women at the Firm was

clear—at this law firm, men run the show.  Women at Chadbourne who refuse to smile in the face of gender inequality will suffer the same fate as Campbell.

10.     Campbell's experience is emblematic of the experience of other female Partners at Chadbourne.   For example, Plaintiff Jaroslawa Z. Johnson ("Johnson"), an experienced attorney with more than 20 years leading corporate expansion in emerging markets, brought in millions of dollars as the Head of the Firm's Kiev office, yet was paid less than male Partners without managerial responsibilities and lower collections.

11.     Throughout Johnson's impressive career, including partnership in four major law firms, she has represented and advised many Fortune 500 companies, such as Philip Morris, McDonald's, and AT&T, doing business in Europe, Asia, and North America.

12.     In the ten years she served as Managing Partner of the Firm's Kiev office, Johnson represented more than 16 high-profile domestic and international companies that make up a significant portion of the global economic market.

13.     Johnson's commanding ability and expertise garnered positive attention in the international legal community.   *Chambers Global* characterized her as a "US-educated '*powerhouse*'" who is seen as "an important and well-connected figure in the market."  In 2013, *IFLR 1000* described Johnson in her capacity as Managing Partner of Chadbourne's Ukraine office, writing that "lawyers have a great deal of respect for Johnson and emphasize her importance to the US Firm's Kiev office."

14.     Johnson's success and prominence earned her an appointment by President Clinton to the Western NIS Enterprise Fund in 1994.  She now serves as President and Chief Executive Officer of the Fund.

15.     Like Campbell, Johnson generated significant revenues for the Firm.  Johnson collected more than $24 million for the Firm as a billing Partner before leaving in 2014, including, in 2008, when she made the Firm $5 million as billing Partner in that year alone. During her productive tenure at Chadbourne, Johnson consistently ranked in the top 20 of Partners in terms of collections yet, like Campbell, her compensation consistently ranked her among the Firm's lowest paid Partners.  Johnson repeatedly raised the issue of her pay disparity with the all-male Management Committee.  Her complaints were brushed aside and ignored.

16.     In fact, instead of increasing her compensation, the Management Committee reduced her base compensation and repeatedly denied her merit bonuses.  At the end of her tenure at Chadbourne, Johnson was making about the same compensation as when she first started at the Firm ten years earlier.   Similarly, by 2016, Campbell's compensation at Chadbourne was drastically less than she earned as a non-equity partner at her previous firm.

17.     On or about April 6, 2016, Campbell notified Giaccia and the Management Committee of her claims of wrongful termination, including gender-based discrimination claims. Consistent with the punishing "boys' club" culture that is Chadbourne, Giaccia dismissed Campbell and her alleged claims with the back of the hand, dubbing her well-founded gender-based discrimination claims to be "an empty threat."

18.     On June 30, 2016, Campbell filed a class-wide charge with the Equal Employment Opportunity Commission (EEOC) to investigate deeply ingrained and systemic gender discrimination at Chadbourne.

19.     Plaintiffs file this lawsuit to put an end to gender inequities at the Firm and seek relief on behalf of themselves and other female attorneys who have been disparately underpaid, systematically shut out of Firm leadership, demoted, de-equitized, and terminated.

A.      **Chadbourne Discriminates Against Female Partners in Terms of Pay and Power**

20.      Women continue to encounter the "glass ceiling" at large law firms.  A recent American Bar Association study found that at law firms nationwide, female attorneys comprise 44.7 percent of law firm associates, but only 18 percent of equity partners.[1]  In the last decade, large law firms have made almost no progress towards increasing women's paltry representation among the ranks of equity partners – the current 18% figure is only 2 percent higher than the 16% rate in 2006.[2]

21.      The small percentage of women who do advance to law firm partnership discover that they are often paid significantly less than their male counterparts.  A 2016 survey by Major, Lindsey, & Africa found a 44 percent pay gap between female partners and their male counterparts.[3]  The survey found that female partners earned an average of $659,000 annually compared with an average of $949,000 for male partners.[4]

22.      Yet even in a field where inequities between male and female attorneys persist, Chadbourne stands out for its culture of discrimination against female attorneys.  While the Firm advertises a commitment to equal opportunity for female attorneys, the reality is far different. Notably, Chadbourne is conspicuously absent from both the *National Law Journal*'s list of the

---

[1] Commission on Women in the Profession, American Bar Association, *A Current Glance at Women in the Law 2016* (May 2016), *available at*  http://www.americanbar.org/groups/women/resources/statistics.html.

[2] National Association of Women Lawyers, *Women Lawyers Continue to Lag Behind Male Colleagues: Report of the Ninth Annual NAWL National Survey on Retention and Promotion of Women in Law Firms* (2015), *available at* http://www.nawl.org/p/cm/ld/fid=506.

[3] Major, Lindsey, & Africa, *2016 Partner Compensation Survey, available at* https://www.mlaglobal.com/publications/research/compensation-survey-2016.

[4] *Id.*

top 100 law firms on its most recent "Women in Law Scorecard"[5] and *Law360*'s most recent list of 100 large law firms recognized for being "Best Law Firms for Female Attorneys."[6] Female attorneys at Chadbourne regularly receive less compensation than similarly-situated male attorneys. This pay disparity is the direct result of Chadbourne's male-dominated Firm leadership. Women in the Firm Partnership at Chadbourne earn less than men and are virtually shut out of influential decision-making positions at the Firm.

23.    Chadbourne's gender disparities are neither coincidental nor limited to any one office. Throughout the relevant time period, a Committee of five men in Chadbourne's New York office made all compensation decisions for **each and every** Chadbourne Partner worldwide. Together, these five men made up Chadbourne's Management Committee, a centralized brotherhood with complete control over Partner compensation and Firm decisions.

24.    At Chadbourne, base compensation for Partners is largely determined by the number of Partnership "points" awarded by the Management Committee. These points are multiplied by other factors to determine a Partner's salary. Chadbourne typically awards female Partners fewer points than it awards comparable male Partners even when female Partners substantially outperform their male peers.

25.    Partnership points are supposed to be tied to the anticipated revenues that a Partner will generate for the Firm, or "collections." However, the Management Committee routinely overvalues the anticipated contributions of male Partners, even where female Partners have a demonstrated record of outperforming them. Point allocation is left entirely to the

---

[5] The American Lawyer, *The Best Firms in Big Law for Women*, AMERICANLAWYER.COM (August 30, 2016, 7:58 PM), http://www.americanlawyer.com/home/id=1202762963381 (citing the top 100 firms on the *National Law Journal*'s Women in Law scorecard).

[6] Jacqueline Bell, *The 100 Best Law Firms for Female Attorneys*, LAW360.COM (August 15, 2016, 2:35 PM), http://www.law360.com/articles/784729/the-100-best-law-firms-for-female-attrneys.

subjective will of the Management Committee.

26.     Point distribution directly affects a Partner's long-term compensation.  Partners who are assigned a low number of points generally do not have an opportunity to make up the deficit, even if their collection levels increase, because the Management Committee rarely increases point totals by a significant amount from year to year.  Upon information and belief, the Committee has even *decreased* point totals for female Partners from year to year, further limiting their opportunity to obtain a higher level of compensation.

27.     Chadbourne routinely awards female Partners low numbers of points while assigning similarly or less productive males higher point values.

28.     Upon information and belief, in 2013, the number of points allotted to male Partners ranged from 250-2,250, while those allotted to female Partners ranged from 400-900. Chadbourne compensated 8 of 15 female Partners at or below 600 points.

29.     Upon information and belief, in 2014, the number of points allotted to male Partners ranged from 250-2,250, while those allotted to female Partners ranged from 375-1,000. Chadbourne compensated 10 of 17 female Partners at or below 600 points.

30.     Upon information and belief, in 2015, the number of points allotted to male Partners ranged from 250-2,100, while those allotted to female Partners ranged from 375-1,000. Chadbourne compensated 11 of 18 female Partners at or below 600 points.  Chadbourne also routinely compensates female Partners less than similarly situated male Partners in terms of merit bonus pay.  Female Partners often receive smaller bonuses than their lower-performing male peers or no bonus at all.

31.     The experience appears to be no better for female associates at the Firm.  Women in the associate ranks are subject to discriminatory pay decisions and their success is hampered

by an inability to move into Counsel and Partner positions. Chadbourne's hostility towards women has resulted in the significant attrition of female associates and counsel. In the two-year period from January 2014 through December 2015, in the Litigation Department alone, no less than approximately 20 non-partner attorneys left the firm. Of these 20 departing attorneys, approximately 17 were female and only three were male. Female attorneys comprised a substantially disproportionate percentage – approximately 85% – of the attorneys who left Chadbourne's Litigation Department in 2014 and 2015 under the leadership of the Litigation practice group.

32.    The 114-year-old Firm only recently elected its first female Partner to the Management Committee in July 2016 – after Campbell notified Giaccia and the Management Committee of her gender-based discrimination claims and after Campbell filed a class charge of discrimination with the EEOC.

33.    Chadbourne's all-male dictatorship makes its decisions regarding Firm Partners in a black box, generally without input or scrutiny from the Partnership at large. The Management Committee renders a number of influential decisions in complete secrecy, including decisions to open costly and unprofitable foreign offices and hire/fire international Partners, decisions regarding potential mergers with other firms that Partners learn about only from media reports, and decisions to terminate the employment of female attorneys, such as Campbell, who challenge the Committee's decisions. Its decision-making processes and methodology are kept under wraps. This wall of silence reinforces the Firm's glass ceiling by shielding the Management Committee from meaningful oversight and giving it unchecked dominion over the compensation and employment of Firm Partners. And it also enables the Committee to routinely disfavor female Partners – including by granting them disproportionately fewer Partnership

10

"points," purportedly a key component of the secret formula used to determine base salary for Chadbourne Partners.

34.     Upon information and belief, Chadbourne male leadership has created and facilitated an inequitable "boys' club" culture, in which a deeply ingrained and pervasive double standard is applied to male and female Partners.  As one example, upon information and belief, Firm management has not only permitted, it has facilitated a male senior Partner's unlawful tobacco smoking in the Firm's New York office, in violation of New York law, explicit Firm policy, and notwithstanding the valid objections of female personnel who are forced to put up with illegal second-hand smoke if they want to keep their jobs.  In the D.C. office, the Head of the Litigation Department publicly displays fifths of liquor on a cocktail tray in his office.

35.     As another example of the double standard created and perpetuated by the all-male five-member Management Committee, male Partners are permitted to be involved in business concerns outside Chadbourne, while female Partners are scolded, de-equitized, demoted, and demeaned if they have any business interests outside of Chadbourne.  Upon information and belief, rather than de-equitizing a male Partner who not only was involved in another business but was sued in litigation based upon his involvement in the outside business, the Firm actively used Firm resources to defend that male Partner's interests in the lawsuit.

36.     As yet another example of the double standard created and perpetuated by male leadership at Chadbourne, on information and belief, male Partners' purported business-related expenses are reimbursed at a disproportionately high level compared to female Partners.

* * *

37.     This action arises out of Chadbourne's systematic, Firm-wide discriminatory treatment of its female attorneys on the basis of their gender.  Chadbourne discriminates against

female attorneys through its policies, practices, and procedures, in violation of Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991 and the Lilly Ledbetter Fair Pay Act of 2009 ("Fair Pay Act"), 42 U.S.C. §§ 2000e, *et seq.* ("Title VII"); the Equal Pay Act, 29 U.S.C. § 206(d) ("EPA"); and the District of Columbia Human Rights Act ("DCHRA"), D.C. Code §§ 2-1401, *et seq.*

38.     Chadbourne unlawfully discriminated and retaliated against Johnson and Campbell.  The Firm retaliated against Johnson by reducing her points and compensation in response to her complaints about gender discrimination.  The Firm retaliated against Campbell by notifying her that her employment at the Firm was being terminated after she complained about pay discrimination.  The individual defendants aided and abetted the Firm's discriminatory acts against Campbell.

39.     Furthermore, the Firm, and each of the named individual Defendants, engaged in bad faith, knowing, and intentional acts and omissions in breach of their fiduciary duties of honesty, loyalty, transparency, and fairness to Campbell, including by failing to share important information related to the Firm's finances with her, and by terminating her employment in breach of the procedures specified in the Firm's Partnership Agreement.  Finally, the Firm was unjustly enriched when it reaped the financial benefits of Campbell's work and her multiple capital contributions to the Firm, without fairly compensating her and providing her the benefits of her Partnership Agreement and withholding over $440,000 in Campbell's capital account as of December 2015.

40.     On behalf of themselves and the class they seek to represent, the Class Representatives request declaratory and injunctive relief to redress Chadbourne's pervasive and discriminatory employment policies, practices, and procedures.  Plaintiffs and the Class further

12

seek back pay; front pay; nominal, liquidated, and punitive damages; and attorneys' fees and costs.

**II.   PARTIES**

41.   **Plaintiff Kerrie Campbell** has been a resident and citizen of Montgomery County, Maryland at all times relevant to this action.   Campbell began her employment at Chadbourne's Washington, D.C. office as a lateral Partner in January 2014.   In February 2016, the Management Committee informed Campbell that she was being terminated; she is currently employed as a "Partner in Transition" out of the Firm with no shares in the Firm's profits.   At all relevant times, Campbell has been a female "employee" as defined by Title VII, the EPA, and the DCHRA.

42.   **Plaintiff Jaroslawa Z. Johnson** maintained a home in Chicago, Illinois and worked part-time in her office in Washington, D.C. at all times relevant to this action.   Johnson managed the Kiev office until the end of 2013 when she asked to step down as Managing Partner, turning over managerial responsibility for the office to another attorney.   She then transitioned to Senior Counsel and continued to work in the Kiev office on a reduced schedule.   In April 2014, the Firm informed Johnson that it was closing the Kiev office and, thereafter, Johnson performed wind-down activities until the Kiev office formally closed in October 2014.   At all relevant times, Johnson has been a female "employee" as defined by the EPA.

43.   Defendant Chadbourne is a limited liability partnership with offices worldwide, including in New York, New York and Washington, D.C.   Chadbourne's New York office is the Firm's largest, with approximately 173 attorneys.   The New York office represents nearly all of the Firm's major practices – including corporate transactional work, financial restructuring and

bankruptcy, litigation, real estate, and intellectual property.  Chadbourne's New York office is also the home office of Firm Managing Partner Andrew Giaccia and the locus of operations of the Management Committee, comprised exclusively of five males at all times relevant.  At all times relevant herein, Chadbourne has been an "employer" as defined by Title VII, the EPA, and the DCHRA.

44.     Defendant Marc Alpert ("Alpert") was a Partner at Chadbourne and a member of the Firm's Management Committee until July 2016.  Upon information and belief, Alpert actively and knowingly engaged in acts or omissions in breach of his fiduciary duties to Campbell and took actions that aided and/or abetted discriminatory actions against Campbell.

45.     Defendant Andrew Giaccia ("Giaccia") is Managing Partner of Chadbourne and a member of the Firm's Management Committee.  Upon information and belief, Giaccia actively and knowingly engaged in acts or omissions in breach of his fiduciary duties to Campbell and took actions that aided and/or abetted discriminatory actions against Campbell.

46.     Defendant Abbe Lowell ("Lowell") is the Head of the Litigation Practice Group at Chadbourne.  Upon information and belief, Lowell actively and knowingly engaged in acts or omissions in breach of his fiduciary duties to Campbell and took actions that aided and/or abetted discriminatory actions against Campbell.

47.     Defendant Lawrence Rosenberg ("Rosenberg") is a Partner at Chadbourne and a member of the Firm's Management Committee.  Upon information and belief, Rosenberg actively and knowingly engaged in acts or omissions in breach of his fiduciary duties to Campbell and took actions that aided and/or abetted discriminatory actions against Campbell.

48.     Defendant Howard Seife ("Seife") is a Partner at Chadbourne and a member of the Firm's Management Committee.  Upon information and belief, Seife actively and knowingly

14

engaged in acts or omissions in breach of his fiduciary duties to Campbell and took actions that aided and/or abetted discriminatory actions against Campbell.

49.     Defendant Paul Weber ("Weber") is a Partner at Chadbourne and a member of the Firm's Management Committee.  Upon information and belief, Weber actively and knowingly engaged in acts or omissions in breach of his fiduciary duties to Campbell and took actions that aided and/or abetted discriminatory actions against Campbell.

### III.     JURISDICTION AND VENUE

50.     This Court has subject matter jurisdiction over this suit pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 2000e-5(f)(3).  This Court has personal jurisdiction over Defendant under N.Y. CPLR § 302(a), *inter alia* because Defendant transacts significant business in the State of New York.  This Court may exercise supplemental jurisdiction over Campbell's DCHRA claims pursuant to 28 U.S.C. § 1367(a).

51.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and 42 U.S.C. § 2000e-5(f)(3) because Defendant transacts a substantial portion of its business in this District, maintains its largest office in this District, and governs the Firm and its operations from its New York office.  From this District, Defendant Chadbourne sent Plaintiffs their employment offer letters, and, once hired, reviewed their performance on at least an annual basis.  Defendant Chadbourne also committed the alleged unlawful employment practices at issue in this case in this District.  The Firm's New York-based Management Committee and other members of the male Firm leadership made all of the decisions relevant to this action – including systematically discriminating against the Class Representatives and the Class in compensation and terminating Campbell after she complained about pay discrimination.

52.     Additionally, a substantial part of the events or omissions giving rise to the claims

in this action occurred in the Southern District of New York.

53.     Campbell has exhausted her administrative remedies by timely filing an EEOC charge and obtaining a Right to Sue letter.

### IV.     FACTUAL ALLEGATIONS

#### A.     KERRIE CAMPBELL'S FACTUAL ALLEGATIONS

##### 1. Background

54.     Campbell is a graduate of George Mason University, with distinction, and of the Washington College of Law of the American University, *cum laude*.

55.     Campbell has 29 years of litigation experience.  She is a recognized expert in the consumer product safety and defamation/product disparagement fields.   Prior to joining Chadbourne, she spent 17 years at Collier Shannon (now Kelley Drye), where she worked her way up from litigation associate, to counsel, and finally to partner and chair of the Consumer Product Safety group.  Following Collier Shannon's merger with Kelley Drye in 2007, Campbell moved her growing practice to Manatt, Phelps, and Phillips, LLC ("Manatt"), where she spent seven years as a partner and chair of the Consumer Product Safety group and was designated as a "Best Lawyer in America" for First Amendment Litigation.

56.     After bumping into conflicts at Manatt, Campbell undertook a focused search to join a firm where she could fully realize her professional objective to nationally brand her highly specialized First Amendment, reputation protection, and consumer product safety expertise.

57.     In November 2013, Chadbourne extended an offer to Campbell to join the Firm as an "equity" Partner.  Before and after receiving Chadbourne's offer, Campbell requested and received confirmation about her expected base compensation and the availability of merit bonuses.

58.     In the November 26, 2013 offer extended to Campbell, Giaccia represented that Campbell's base annual compensation would be 500 points, and that she would also receive a signing bonus and additional guaranteed compensation based on collections markers.  Campbell would be entitled to a signing bonus of $50,000, a guaranteed bonus of $150,000 if her collections for 2014 were $2.0 million, and a total guaranteed bonus of $200,000 if her collections were $2.5 million.  Giaccia also informed Campbell that she would be eligible for "merit bonus" consideration at the discretion of the Management Committee.

59.     After receiving the offer, Campbell sought clarification about the value of the points with Chadbourne's Chief Operating Officer, Lisa Palestine.  Palestine explained that the value of 500 points equaled $500,000.  By meeting the collections markers, the compensation offer for 2014 totaled $750,000, plus the availability of a merit bonus based on performance.

60.     Campbell joined the Firm on January 8, 2014.  As a new lateral Partner, Campbell performed exceptionally well at Chadbourne.  She generated over $5 million in revenue for the Firm in less than three years, and clients praised the quality of her work.

### 2. Marc Alpert, Andrew Giaccia, Lawrence Rosenberg, Howard Seife, and Paul Weber Wield Complete Control Over Campbell's Practice and Compensation

61.     For the majority of Campbell's tenure, five men—Marc Alpert, Andrew Giaccia, Lawrence Rosenberg, Howard Seife, and Paul Weber—sat on the Firm's Management Committee.  All five men were Partners based in the Firm's New York office.

62.     The Management Committee controlled all significant aspects of the Firm's operations.  In addition to compensation decisions, the Committee made all decisions regarding the Firm's finances, including expenditures related to opening expensive and unprofitable foreign offices.  The Committee managed membership on Firm committees – a gateway to Firm

leadership.  The Committee signed off on and was privy to information related to the Firm's

rankings in various legal trade publications that it refused to make available to Partners, such as

Campbell.   Discussions regarding mergers with other firms, decisions with significant

implications for all Partners, were and are under the complete purview of the Management

Committee.

63.     The Management Committee also exercised control over Partners with regard to

management of their individual matters.  For example, Campbell was not permitted to take on

any client engagement that deviated from a certain hourly rate without Management Committee

approval.  She was not permitted to write-off time and/or fees without the approval of the billing

person designated by the Management Committee.  She also was not permitted to hold off on

sending out any bills for any reason without Management Committee approval.

64.     The Management Committee also heavily supervised Campbell's performance at

the Firm.  Campbell was required to submit annual performance evaluations for the Management

Committee's consideration.

65.     Despite repeated attempts to take on leadership roles at the Firm, Campbell was

refused positions on Firm committees.  Giaccia also denied Campbell's requests to be named

chair of the Firm's Consumer Product Safety & Risk Management practice group or Reputation

Protection and Defamation practice group, even though she held that title at two previous law

firms, a fact touted by the Firm in its press release announcing Campbell's lateral move to

Chadbourne.

### 3.  Chadbourne Assigns Campbell Less Base Pay than Similarly or Less Productive Male Partners

66.     In 2014, when Chadbourne hired Campbell, it awarded her 500 points, even

though she demonstrated that she could generate in excess of $2 million in revenues for the Firm

based on her collections at Manatt.  She exceeded that estimate by a considerable margin in 2014.  At the same time, the Firm assigned similarly or less productive male Partners points in the 1,000-1,400 range.  From her first day at the Firm, the deck was stacked against Campbell. She was destined to make two to three times less than her male counterparts did.

67.     Upon information and belief, in 2014, when Campbell joined Chadbourne, a male Partner with similar collections in the previous year ($1.9 million), William Cavanagh, was awarded 1,475 points.

68.     Male Partners with significantly lower collections were still awarded more points than Campbell in 2014.  For example, another male Partner in the New York office, Frank Vellucci, had only $193,000 in collections in the previous year and was awarded 725 points. Claude Serfillipi, a male Partner in the Firm's New York office, had 650 points yet only brought $336,000 in collections.

69.     Campbell asked for a point increase at the end of 2014 after generating more than $2.5 million in collections for the Firm.  Giaccia responded that Campbell had to "prove" her ability to generate revenue at Chadbourne for an indeterminate period before the Management Committee would consider giving her a significant point increase.  Chadbourne has no similar expectations for male Partners.

### 4.  Chadbourne Fails to Award Merit Bonuses to Campbell

70.     During the relevant period, the all-male Management Committee made the exclusive determination as to whether a Partner was awarded a merit bonus and in what amount. Partners were not informed of the reasons for the Management Committee's decisions.

71.     Although Campbell is one of the Firm's top performers, she has never received a discretionary merit bonus.   The Management Committee awarded other less productive men discretionary merit bonuses in the same years that Campbell was denied such bonuses.

### 5. Chadbourne Refuses to Implement its Existing Compensation Policies Fairly or Consistently Even As Campbell Provides Exemplary Performance

72.     During her tenure at Chadbourne since January 2014, Campbell generated more than $5,000,000 in collections for the Firm.   Despite her exemplary performance, the Firm underpaid her relative to her male peers.

73.     During the lateral hiring process, Campbell provided Chadbourne with documentation confirming her ability to produce collections upwards of $2 million a year for Manatt.  Specifically, Campbell's collections at Manatt were above $2 million for 2013 and just over $3 million for 2012.  Campbell conservatively informed Chadbourne that she would bring in upwards of $1.5 million during her first transition year with the Firm.

74.     Unbeknownst to Campbell, her predicted collections would place her in the top ranks of the Firm's most productive business-generating Partners.   The Firm disregarded Campbell's demonstrated ability to generate business that produced high collections and awarded her only 500 points.  Upon information and belief, this point total relegated Campbell to the bottom 20 percent of Partners at Chadbourne.   This decision resulted in her being compensated among the bottom third of Partners from 2014 to the present even though she has performed in the top quintile.

75.     For the 10-month period from March to December 2014, Campbell's total collections surpassed $2.8 million.  Even though Campbell originated almost *twice* her predicted collections goal, Chadbourne only increased her points by 50 for a total 550 points in 2015.  Her points still lagged behind comparable male Partners by a considerable margin.

76.     The disparity in points resulted in Campbell earning significantly less than similarly productive male Partners and even those she substantially outperformed.

77.     Furthermore, the Firm significantly undervalued Campbell's points in contravention of her offer letter.  In 2014, the Management Committee valued Campbell's 500 points at approximately $200,000 – $250,000, about half of what she was promised in the November 26, 2013 offer letter and was told she could expect after she sought clarification on the terms of the offer.

78.     Even though she made more than $2.8 million in collections for the Firm in 2014, the Firm refused to pay Campbell the guaranteed bonus of $200,000 it promised in her offer letter for "collections over $2.5 million."

### 6.  Campbell Raises Well-Founded Concerns Regarding Gender-Based Pay and Power Disparities

79.     In her 2014 year-end memorandum, Campbell raised her concerns to the Management Committee about her assigned Partnership points and the resulting disparities in compensation.  In both her memorandum and at an in-person January 2015 meeting with the Management Committee in New York, Campbell requested a substantial point increase and noted that most partners at the 500-point level did not possess the significant client relationships or collections history that she brought to the Firm.  Based on her review of the Partners' 2014 compensation (apparently published by the Management Committee in December of each year), Campbell explained to the Management Committee that the average number of points for a Partner who generated comparable collections to her was about 950 points – almost two times the 500 points allotted to her.

80.     Campbell again raised these concerns in a meeting with Giaccia on February 13, 2015.  Campbell brought to his attention the fact that her 500-point level was not in line with the

points and compensation of comparable male Partners.  She explained that her point level was disparately and unjustifiably low, and that it would remain so even at 550 points.  Expressing her desire to be a part of the solution to a significant problem, Campbell conservatively requested that her points for 2015 be increased to 850.  She also expressed her strong interest in participating on Firm committees and having a role in Firm leadership, particularly because it was apparent that female partners were under-represented in Firm leadership.

81.    Giaccia rejected Campbell's requests and dismissively represented that the Management Committee viewed her 2014 collections as nothing more than a "fluke."  Giaccia informed Campbell that she would have to "prove" her ability to generate revenue at Chadbourne for an indeterminate period before she would be allotted any more than the 50 points the Firm was required to give her for hitting her $2 million collections marker in 2014. Giaccia chided Campbell, telling her "you're no Andrei Baev," a new lateral Partner recently sponsored by Giaccia after a previously failed effort to nominate him for Partnership.  In the second go-round, the Firm guaranteed Baev 1,350 points for two years, along with significant additional guaranteed compensation based on collections markers.  Giaccia explained that Campbell was no Baev because according to Giaccia, Baev would generate annual revenues at or above $5 million.

82.    While Campbell's total collections originated for the Firm to date exceed $5 million, Campbell is informed and believes that Baev's total collections since he became a Partner are approximately $101,000 – or about 2% of her contributions to the Firm's revenues.  Nevertheless, under Chadbourne's male-dominated leadership and compensation system, Baev easily has made many hundreds of thousands of dollars more than Campbell.

83.    The Firm's respective treatment of Campbell and Baev exemplifies Giaccia's and the Management Committee's entrenched gender bias.

84.    Giaccia and the Management Committee were empowered to significantly increase Campbell's points for 2015 to bring her into parity with similarly performing male Partners yet declined to do so.

### 7.   Chadbourne Retaliates Against Campbell

85.    The Firm actively retaliated against Campbell because she stood up to Chadbourne's and Lowell's discrimination and retaliatory conduct.

86.    Following her complaints of discrimination, Lowell affirmatively sabotaged Campbell's compensation and status with the Firm in a litigation matter she brought from Manatt.  Over Campbell's objections based on a clear fee arrangement, Lowell wrongly wrote-off hundreds of thousands of dollars in collections due to Campbell as the originating and billing Partner in the matter.  Lowell did this with Management's blessing, notwithstanding Lowell's explicit agreement at the initial stages of Chadbourne's work on the case that Campbell should be and, in fact, was designated the originating and billing attorney.

87.    To increase his own collections, Lowell later incorrectly argued, with Giaccia agreeing, that Campbell did not originate the case.  Lowell's write-offs were uniformly approved by the all-male Management Committee over Campbell's reasonable objections.  These overt actions prevented Campbell from hitting the $2 million bench mark that guaranteed her a $150,000 bonus in 2015.   The male leadership's manipulation of Campbell's collections was imperative to prevent her from receiving her guaranteed $150,000 bonus for 2015, because even in the face of the Firm's and Lowell's retaliation and huge write-offs, Campbell's total collections for 2015 still exceeded $1.9 million.  Moreover, had Campbell hit the $2 million collections mark in 2015 – as she should and would have absent the Firm's discriminatory and

23

retaliatory acts – the Management Committee would have been required by the terms of the Firm's offer letter to grant Campbell an additional 50 point increase for 2016.

88.     Campbell also undertook a high-value litigation matter for which she repeatedly asked Lowell and Giaccia for adequate staffing.  Campbell notified Lowell and other Firm leaders that the Firm would likely lose the client and substantial work in the pending litigation if the staffing issue was not satisfactorily addressed.  Despite her efforts and warnings, Lowell and Giaccia disregarded Campbell's requests and concerns.  Instead, without any valid basis, Lowell and Giaccia questioned and criticized Campbell's evaluation of claims and defenses at issue, which, in fact, have been advanced in the litigation by three other law firms.

89.     In further retaliation for Campbell's complaints, the Firm refused the marketing support it had promised to Campbell and failed to acknowledge her successes in its marketing materials.  As one example, the Firm's 2015-2016 "Litigation Highlights" brochure, touts the fact that Chadbourne received recognition as a "Best Law Firm" and "Best DC Office" for First Amendment Litigation.  What the Firm failed to acknowledge, however, is the fact that only one attorney in the entire Firm has been recognized as a "Best Lawyer" for First Amendment litigation: Kerrie Campbell.  Additionally, in 2014, 2015, and 2016, the Firm's internal "In the Know" publication applauded male Partners' "Best Lawyers" recognition – but conspicuously omitted Campbell who each year had received such recognition.

90.     As another example, while Chadbourne touted Campbell's status as Chair of Manatt and Collier Shannon's Product Safety Practice groups, Giaccia refused to designate Campbell as the Chair or Head of the Firm's Consumer Product Safety & Risk Management practice group or Reputation Protection and Defamation practice group.  When Campbell repeated her request, Giaccia responded that he did not want a "proliferation" of practice group

Chairs because it was embarrassing if they left the Firm. Giaccia and the Management Committee had no problem, however, bestowing similar titles on similarly situated or less experienced male Partners.

91.     Increasingly, Campbell was isolated and ignored by her colleagues following her requests for fair and non-discriminatory treatment. During Campbell's tenure at Chadbourne, litigation associates that were once in offices near Campbell's office have all been relocated to the other side of the office where Lowell's office is located. Litigation associates in the D.C. office are now aligned in a row of offices on the opposite side of the building from Campbell, anchored on one end by Lowell and the other by Giaccia. Moreover, as the Head of Litigation, Lowell not only tolerated, but facilitated, derogatory gossip with and among his cadre of male lieutenants, to demean, diminish, and disrespect the sole remaining female Partner in the Litigation Department in the D.C. office, Kerrie Campbell.

### 8. Chadbourne Punctuates Its Campaign of Retaliation by Secretly Terminating Campbell's Employment

92.     Despite Campbell's demonstrable productivity at the Firm, on February 19, 2016, Chadbourne wrongfully terminated her employment.

93.     On that date, Giaccia and Lowell came to Campbell's office to inform her that the Management Committee had determined her practice did not fit with Chadbourne and she had to leave the Firm as soon as possible and could take "no more than six months" to find another Firm. Giaccia told her that the Committee had reached this decision during its 2015 deliberations – at a time while Campbell was logging over 200 billable hours per month.

94.     Giaccia also informed Campbell that her pay would be decreased to about $9,000 a month and the Firm would no longer pay her tax distributions paid to Partners in the Firm. Despite Campbell's 29 years of experience and established record of success, the Management

Committee punitively slashed her pay to well below that of a first-year associate at the Firm, without any benefits and while the Firm has retained her capital account exceeding approximately $440,000 as of December 2015.

95.    During the termination meeting, Giaccia specifically instructed Campbell that she was not to take on new matters.  He instructed her to "bill" her time looking for a new job as "business development" and that was to be her "sole focus."

96.    Campbell's involuntary discharge is the Firm's final act of retaliation against the only female Litigation Department Partner in the D.C. office.

97.    Shocked by her unexpected termination, Campbell sent Giaccia an email on February 23, 2016, in which she expressed her astonishment at the "extraordinary turn of events" and sought clarity about the details of "whatever remaining tenure [she had] with the Firm."

98.    In a February 25, 2016 email, Giaccia reiterated to Campbell that her tenure at the Firm had reached its end: "the goal," he wrote, "is for you to move your practice successfully to another Firm as soon as possible, and this will be our sole focus."   Campbell was to remain a "Partner" in name only to facilitate her "transition" out of the Firm "without incident."

99.    On March 29, 2016, Campbell traveled to New York City to meet with the all-male Management Committee and Chief Operating Officer Palestine to attempt to save her job.

100.    In the meeting with the Management Committee, Campbell emphasized her successes at Chadbourne including her ongoing high collections during the first quarter of 2016 and recent positive publicity her practice had garnered for the Firm.  Within the first quarter of 2016, Campbell had already generated another $700,000 in total collections for the Firm – notwithstanding the hostile environment.

101.    The Management Committee disregarded Campbell's successes and the business she had generated, criticized her for not setting up interviews for positions at other firms and laughed out loud as she left the meeting.

102.    Three days later, on April 1, 2016, Campbell met with Giaccia and Management Committee Member Marc Alpert.   Again, they reiterated that the Management Committee's decision was "final."   Chadbourne then laid out two "options" for Campbell, one of which required her to depart before April 15 and the other which would require her departure by the end of August.

103.    Giaccia stressed once again that these "options" were designed to "incentivize" Campbell to leave the Firm as soon as possible.   Giaccia again scolded Campbell for working on behalf of her clients instead of devoting her time to seeking other employment.   Giaccia insisted that Campbell's quiet "transition" out of the Firm was integral to preserving her reputation in the legal marketplace.

104.    Upon information and belief, Giaccia, Lowell, and other members of the Management Committee actively concealed Campbell's "final" termination from other Partners and attorneys at the Firm.

105.    The Management Committee terminated Campbell in violation of the procedures required to expel a Partner per the Firm's Partnership Agreement.   The Partnership Agreement states that a "major action," such as expulsion of a Partner, requires an affirmative vote of Partners (or their proxies) whose total profit percentage interests exceeds two-thirds of the total of the profit percentage interests of all Partners entitled to vote on the action.

106.    Again, in an April 13, 2016 email, Giaccia restated Chadbourne's position that Campbell was expected to depart the Firm no later than the end of August 2016.

107.    Between February 19, 2016 and April 13, 2016, Chadbourne informed Campbell that she had to leave the Firm by the end of August 2016 on no fewer than five occasions.

108.    In response to the Firm's discriminatory termination of her employment, Campbell has been forced to look for a position at another firm.  Campbell's diligent efforts to secure comparable employment have been thwarted by the Firm's conduct including its disparate and substantial under-compensation of Campbell compared to her productivity, total collections, and client base.  Furthermore, prospective firms and recruiters are reluctant to work with a partner in a dispute with her current law firm.  The Firm's conduct not only caused Campbell significant financial hardship and irreparably damaged her client relationships and book of business but also threatens to completely undermine her 29-year legal career.

### 9.    Chadbourne, Giaccia, and Lowell Continue Retaliation Against Campbell After Complaint is Filed

109.    Since the Complaint was filed in August 2016, Chadbourne, Giaccia, and Lowell have continued to engage in recalcitrant discriminatory, retaliatory, and demeaning conduct against Campbell, including by failing to timely or adequately respond to multiple communications from Campbell seeking Giaccia's and Firm management's direction regarding staffing for client matters and billing protocol as a so-called "Partner in Transition" out of the Firm – a circumstance of management's own making.

110.    Additionally, Firm management, Giaccia, and Lowell have refused to engage in any direct verbal communication with Campbell since April 1, 2016, when Giaccia and Alpert informed Campbell that the Management Committee's decision to terminate her tenure with the Firm was "final."  On information and belief, Firm management has admonished attorneys not to talk to, and to stay away from, Campbell.

111.   Chadbourne's punishing "boys' club" culture is perpetuated and facilitated by Firm management and Lowell.  Since the Complaint was filed, actions have been taken to harass Campbell and thwart her First Amendment rights to express legitimate concerns about gender disparities at the Firm.

112.   After Campbell filed her suit against Chadbourne, she arrived at her office one morning to discover that after she had left the previous evening, someone had anonymously torn down a 5" by 7" postcard Campbell had placed next to her nameplate beside the door to her office.  The postcard contained the eloquent words of the legendary social justice leader Nelson Mandela: "*It will forever remain an accusation and a challenge to all men and women of conscience that it took as long as it has before all of us stood up to say: 'enough is enough.'*" Upon information and belief, Lowell removed the postcard, without Campbell's knowledge or consent, and then he taped an 8 ½" by 11" piece of paper with a large smiley face graphic onto Campbell's office wall.

113.   Video footage from the evening of September 16, 2016 then shows that Lowell personally taped onto Campbell's office wall an 8 ½" by 11" piece of paper with a cartoon figure of a fat man in a bowler hat alongside the smiley face that had previously been taped to Campbell's office wall.  Lowell taped the cartoon below a 5" by 7" postcard with the Mandela quote that Campbell had replaced next to her nameplate.

114.   Subsequent video footage shows Lowell then returned to Campbell's office and removed both the cartoon image of the fat man and the smiley face graphic.

115.   Video from the same evening shows Lowell ultimately tore down the replacement postcard with the Mandela quote as well.  Lowell returned to Campbell's office for a third time, the video shows, apparently to remove tape he had left behind on Campbell's office wall.

**B.      JAROSLAWA Z. JOHNSON'S FACTUAL ALLEGATIONS**

      **1.  Background**

116.    Johnson is a graduate of Goucher College and of the University of Wisconsin-Madison Law School.   She served as the first female editor-in-chief of the *Wisconsin Law Review*.

117.    After law school, Johnson served as a law clerk to Chief Judge Thomas E. Fairchild of the U.S. Court of Appeals for the Seventh Circuit.

118.    Johnson has practiced law for more than 35 years.   As an attorney, Johnson represented and advised Fortune 500 clients on a variety of transactional matters.   Johnson is recognized for her expertise in counseling clients on expansions and operations in emerging markets such as the Ukraine and other locations in Eastern Europe.

119.    Prior to joining Chadbourne, Johnson was a partner at Hinshaw & Culbertson and partner and director of the Kiev office of Altheimer & Gray.   Chadbourne attempted to recruit Johnson while she was at Altheimer but she was not looking to change firms at that time.   A few years later, as Altheimer was closing down its operations, Johnson reached out to a contact at Chadbourne, Laura Brank, then Head of the Moscow office, to determine whether a position might still be available.

120.    In August 2003, Chadbourne extended an offer to Johnson to join the Firm as a "guarantee" Partner.   Johnson was not granted equity Partner status, and, therefore, was not provided with Partnership shares in the Firm.   Instead, she was to receive a guaranteed compensation of $325,000 in 2004 and 2005 with an annual bonus of $25,000 if revenues at the Kiev office were at least $1.75 million and $50,000 if revenues were $2.5 million.  Johnson was

also entitled to an additional $25,000 bonus annually for 2004 and 2005 if the Firm performed at 135% of par.

121.    After two years of the Kiev office performing at exemplary levels, Johnson was granted an offer to join the Partnership in 2006.

122.    Johnson successfully led the Kiev office for approximately ten years.   She managed a staff of 15-20 attorneys (and 10 support staff) who regularly provided indispensable support for Chadbourne's Moscow, London, New York, and Washington offices.   Johnson collected over $24 million dollars in revenue for the Firm including collecting over $5 million in a single year (2008).

### 2.   The Management Committee Wielded Complete Control Over Johnson's Practice

123.    The Management Committee, composed only of men during Johnson's entire tenure, controlled significant aspects of the Firm's operations including Johnson's practice and management of the Kiev office during the relevant time period.

124.    The Management Committee determined staffing for Johnson's matters and for the Kiev office in general.   She was often overruled on decisions related to budgets for her matters and the Management Committee had complete control over the budget for the Kiev office.

125.    Despite the success of the Kiev office, the Management Committee determined, without Johnson's input, to close the Kiev office and, in April 2014, informed Johnson of its intent to do so.

### 3.   Chadbourne Assigns Johnson Less Base Pay than Similarly or Less Productive Male Partners

126.    In 2006, when Chadbourne hired Johnson as an equity Partner, it awarded her 450

points.  Upon information and belief, Johnson was never awarded more than 675 points during her tenure at Chadbourne even as she collected more than $24 million in revenues as a billing Partner.  The Management Committee decreased Johnson's points several time despite her strong performance.

127.    In 2013, her last year as a Partner at Chadbourne, the Management Committee granted her 450 points—the same amount she was awarded seven years earlier as a first-time Partner and a decrease from the 525 points it awarded her in 2012.  Johnson received a demotion in points after collecting $1.465 million in 2012.  Upon information and belief, Johnson received fewer points, and therefore less in base compensation, than males with lower collections and fewer achievements at the Firm.

128.    Similar to Campbell, Johnson asked the Management Committee for a point increase *every year* she was a Partner and provided data to justify her request.  For example, in 2012, she noted that she ranked ninth in revenue production but was 67th in points.  None of the partners with higher revenues than Johnson had managerial duties and none of the other partners with the same number of points as Johnson had managerial duties.

129.    The Management Committee ignored Johnson's justified requests for pay increases.

### 4.  Chadbourne Awards Low Merit Bonuses to Johnson or None at All

130.    During Johnson's entire tenure, the all-male Management Committee made the exclusive determination as to whether a Partner was awarded a merit bonus and in what amount.

131.    Johnson was repeatedly one of the Firm's top performers but received lower bonuses than her male counterparts or was denied bonuses altogether.  The Management Committee did not award Johnson a merit bonus in 2013 despite her bringing in more than $1.4

million in 2012.  Notably, in 2013, Chadbourne refused to grant Johnson a bonus when she completed the type of managerial and business activities other male attorneys were rewarded for performing.  For example, in 2013, male Partners received bonuses for reasons such as "increased responsibility," "for extensive work" on particular matters, and "office management."

### 5.  Chadbourne Retaliates Against Johnson for Questioning Discriminatory Compensation Practices

132.    Johnson questioned her comparatively low pay year after year in the annual reviews she was required to provide to the Management Committee.  Each year, Johnson would point out her collections and responsibilities in comparison to lower performing male Partners.

133.    In 2012, Johnson once again questioned her pay in her annual review.  In 2013, Chadbourne retaliated against Johnson by reducing her points from 525 to 450 even though she brought in over $1.4 million in 2012.  Upon information and belief, Johnson's points were decreased as other male Partners with lower collections, and few, if any, managerial responsibilities saw their points increase or maintained at the same level.

134.    There was no justifiable reason for the reduction in Johnson's points. Chadbourne reduced Johnson's points as punishment for her repeated questioning of the Firm's discriminatory compensation practices.

135.    In April 2014, Giaccia called Johnson to tell her that the Firm planned to close the Kiev office.  Johnson was not consulted prior to this decision.  Upon information and belief, the Management Committee made the decision to close the Kiev office without informing the Partnership.

136.    Johnson transitioned from Partner to Senior Counsel at the beginning of 2014.  In the transition, Johnson lost her equity shares and was instead paid $250,000 to shut down the Kiev office.

V.  **CLASS ALLEGATIONS**

137.   The Class Representatives incorporate allegations from previous paragraphs of the Complaint alleging class-based discrimination against female attorneys.

**1.  Chadbourne Systematically Underpays Female Partners**

138.   By assigning women low numbers of points, the Firm denies its female Partners, such as Campbell and Johnson, compensation to which they are otherwise entitled.

139.   Chadbourne management has demonstrated that it has no objective, equitably-administered criteria for awarding points to Partners.

140.   Chadbourne's "system" for awarding points to its Partners lacks sufficient standards, quality controls, implementation metrics, transparency, and oversight.  On information and belief, Chadbourne has never conducted a pay equity analysis to determine whether or to what extent female Partners are underpaid relative to their male peers.

141.   Accordingly, Chadbourne's Management Committee can and does exploit the system to offer higher compensation to male Partners who are often less productive than their female counterparts.  The Management Committee awards underperforming male Partners more points than female Partners like Campbell and Johnson with higher collections rates, more significant and lucrative client relationships, managerial responsibilities, and a better record of business development.

142.   To justify its discriminatory decisions, Chadbourne often makes pretextual excuses such as claiming female lateral Partners need to be at the Firm longer before their collections potential can be assessed adequately (despite having no similar tenure requirements for lateral male Partners) or contending that male Partners make other contributions to the Firm unrelated to their collections totals.

34

143.     Chadbourne's system for awarding merit bonus pay to Partners lacks sufficient standards, quality controls, implementation metrics, transparency, and oversight.

144.     Moreover, the Firm disproportionally allocates resources to male Partners at the expense of female Partners.  As a result of male Partners' monopoly of staff and associates, female Partners are often forced to delegate work to outside counsel or to forgo profitable matters due to a lack of staffing.

145.     The Firm also underpays female Partners by depriving them of credit for their work on matters that are shared with other male Partners.  By assigning various designations, such as "Billing Partner" and "Responsible Partner" to male Partners, the Firm can systematically deny female Partners revenues that they are rightfully owed.

146.     The distribution of Partner compensation at Chadbourne is heavily skewed in favor of men.  Upon information and belief, female Partners are generally in the bottom half of Partners in terms of compensation even though they often outperform their male counterparts.

### 2.   Chadbourne Retaliates Against Female Partners Who Question the Firm's Discriminatory Practices

147.     Chadbourne dismisses, demeans, harasses, and retaliates against female attorneys who dare to question or raise concerns about the Firm's discriminatory compensation practices.

148.     As discussed above, the Management Committee exercises complete control over compensation decisions for Partners.  This means any female Partner with concerns about her compensation during the relevant period was forced to confront the all-male Committee at its seat in New York. Partners are provided scant information about the secret process used to determine compensation, further frustrating their ability to advocate for themselves.  Chadbourne male leadership bullies and actively retaliates against female attorneys who question the Firm's gender discrimination practices, thereby sending a message to women that complaining about

gender discrimination will negatively impact their career at the Firm and professional reputation in the legal marketplace.

149.    The Firm purports to have a system in place to receive and investigate complaints of discrimination, but the process is woefully inadequate because the ultimate arbiters of such complaints are the wrongdoers themselves – the Management Committee.

150.    As a result, female Partners are left with the untenable options of (a) not challenging deeply ingrained and systematic gender discrimination or (b) risking their careers by challenging the practices and decisions of the Management Committee.

151.    Class Representatives represent a class consisting of all female Partners who are, have been or will be employed by Chadbourne from August 2013 to the date of judgment.  The Class Representatives and Class of Chadbourne attorneys they seek to represent have been subjected to a systemic pattern and practice of gender discrimination and disparate impact gender discrimination by Chadbourne.

152.    Class Representatives bring this action pursuant to Fed. R. Civ. P. 23 seeking injunctive and monetary relief for the systemic pattern and practice of gender discrimination to which Defendant has subjected Plaintiffs and the class of female attorneys.

153.    Defendant Chadbourne tolerates and cultivates a work environment that discriminates against female attorneys.  Since the Firm's inception and through the relevant time period, the Firm has been managed by a five-member Management Committee, comprised entirely of male executives.  Furthermore, a disproportionately large percentage of the Firm's Committees and Department Heads are men.

154.    Chadbourne's discriminatory policies, practices, and procedures include vesting the Committee with total dominion over Partner compensation, resulting in systematic gender-

based disparities in "points" allocation, base pay, merit bonuses, and other forms of compensation.  Consequently, female Partners routinely make less than their male colleagues. Further, Chadbourne ignores, disregards, minimizes, covers up, mishandles, or otherwise fails to respond properly to evidence of gender discrimination in the workplace.

155.    In general, the policies, practices, and procedures that govern the management of the Firm lack the sufficient standards, quality controls, implementation metrics, transparency, and oversight to ensure equal opportunity at Chadbourne.

156.    Chadbourne's uniform nationwide policies, practices, and procedures result in lower compensation for female Partners than similarly situated male Partners.

157.    Female Partners are subjected to continuing unlawful disparate treatment. Moreover, Chadbourne's policies and procedures, while facially neutral, have an ongoing disparate impact on female Partners.

158.    Because Chadbourne's management does not provide sufficient oversight or safety measures to protect against intentional and overt discrimination or the disparate impact of facially neutral policies and procedures, female Partners suffering from discrimination are without recourse.  Where complaint and compliance policies exist, they lack meaningful controls, standards, implementation metrics, and means of redress such that upper management may ignore, disregard, minimize, cover up, mishandle, or otherwise fail to respond properly to evidence of discrimination in the workplace.

159.    There is no meaningful separation between complaint reporting channels and Firm management (including the Committee) responsible for creating discriminatory conditions for women. This means that complaints do not remain confidential and victims of discrimination often face retaliation or are dissuaded from raising concerns altogether.  Chadbourne's failure to

address rampant retaliation leaves the targets of discrimination further vulnerable.

160.    Chadbourne thus condones, fosters, and encourages discrimination.  Within this environment, female Partners who question the Firm's norms or raise concerns about its practices are pushed out of the Firm, demoted, or terminated.

161.    Chadbourne demonstrates a reckless disregard—a deliberate indifference—to its female Partners by overlooking or otherwise dismissing even blatant evidence of gender discrimination.

162.    Chadbourne's policies, practices, and procedures are not valid, job-related, or justified by business necessity.  Alternative, objective, and more valid procedures are available to Chadbourne that would avoid such a disparate impact on female Partners.  Chadbourne has failed or refused to use such alternative procedures.

163.    Upon information and belief, the discriminatory employment policies, practices, and procedures to which Class Representatives and the Class they seek to represent are subject are centrally established and implemented at Chadbourne's corporate headquarters in New York.  The Management Committee, based in the New York office, made the relevant decisions regarding Class Representatives and the Class Members they seek to represent.  All practice group heads report to the Management Committee.

164.    Upon information and belief, the Management Committee makes final compensation decisions, including base pay and merit bonus determinations, for all Partners at Chadbourne.

165.    It is Chadbourne's standard operating procedure to discriminate against female Partners.  Chadbourne's employment policies, practices, and procedures are not unique or limited to any office or practice group; rather, they apply uniformly and systematically to

Chadbourne attorneys throughout the Firm, occurring as a pattern and practice throughout all office locations and practice groups.

166.    Because of Chadbourne's systemic pattern and practice of gender discrimination, the Class Representatives and members of the proposed Class have suffered harm including lost compensation, back pay, and employment benefits.

167.    Chadbourne has failed to enact policies to ensure the Management Committee does not violate the Firm's fair employment policies and equal opportunity laws and has failed to create adequate incentives for others in Firm leadership to comply with such policies and laws.

168.    The Class Representatives and members of the Class have no plain, adequate or complete remedy at law to redress the rampant and pervasive wrongs alleged herein, and this suit is their only means of securing adequate relief.  The Class Representatives and members of the Class have suffered and are now suffering irreparable injury from Chadbourne's ongoing, unlawful policies, practices, and procedures set forth herein, and they will continue to suffer unless those policies, practices, and procedures are enjoined by this Court.

### A.    Class Definition

169.    The proposed Rule 23 Class consists of all female Partners who are, have been or will be employed by Chadbourne in the United States from August 2013 until the date of judgment.  Upon information and belief, there are at least 26 members of the proposed Class.

170.    The Class Representatives are members of the Class they seek to represent.

171.    The systemic gender discrimination described in this Complaint has been, and is, continuing in nature.

172.    Plaintiffs reserve the right to amend the class definition based on discovery or legal developments.

B.      **Efficiency of Class Prosecution of Class Claims**

173.    Certification of a nationwide class of female Partners similarly situated to the Class Representatives is the most efficient and economical means of resolving the questions of law and fact that are common to the claims of the Plaintiffs and the proposed Class.

174.    The individual claims of the Class Representatives require resolution of the common questions of whether Chadbourne has engaged in a systemic pattern and practice of gender discrimination against female Partners. Plaintiffs seek remedies to eliminate the adverse effects of such discrimination in their own lives and careers, to eliminate the adverse effects of gender discrimination in the lives and working conditions of the proposed Class members, and to prevent Chadbourne's continued gender discrimination in the future.

175.    The Class Representatives have standing to seek such relief because of the adverse effect that such discrimination has on them individually and on female Partners generally. Chadbourne caused Plaintiffs' injuries through its discriminatory practices, policies, and procedures and through the disparate impact its policies, practices, and procedures have on female attorneys. These injuries are redressable through systemic relief, such as equitable and injunctive relief and other remedies sought in this action. In addition, proper relief for Campbell's individual termination claim can include reinstatement. As such, the Class Representatives have personal interest in the policies, practices, and procedures implemented at Chadbourne.

176.    To obtain relief for themselves and the Class members, the Class Representatives will first establish the existence of systemic gender discrimination as the premise for the relief they seek. Without class certification, the same evidence and issues would be subject to relitigation in a multitude of individual lawsuits with an attendant risk of inconsistent

adjudications and conflicting obligations.

177.    The Class Representatives' individual and class claims are premised upon the traditional bifurcated method of proof and trial for disparate impact and systemic disparate treatment claims of the type at issue in this case.  Such a bifurcated method of proof and trial is the most efficient method of resolving such common issues.

178.    Certification of the proposed Class is the most reasonable and efficient means of presenting the evidence and arguments necessary to resolve such questions for the Class Representatives, the Class members, and Chadbourne.

### C.    Numerosity and Impracticability of Joinder

179.    The Title VII Class that Class Representative Campbell seeks to represent is so numerous that joinder of all members is impracticable.  The members of the proposed Class are diffused throughout the country.  Fear of retaliation on the part of Chadbourne's female attorneys is also likely to undermine the possibility of joinder.  The Class Representatives' colleagues are aware of their situations and may be unlikely to come forward and assert their own claims.  In addition, joinder is impractical as Chadbourne's female attorneys are dispersed throughout the United States and, indeed, some female attorneys are employed in some of the Firm's international offices.

### D.    Common Questions of Law and Fact

180.    The prosecution of the claims of the Class Representatives will require the adjudication of numerous questions of law and fact common to their individual claims and those of the Class they seek to represent.

181.    The common issues of law include, *inter alia*: (a) the proper standards for proving a pattern and practice of discrimination by Chadbourne against its female Partners under both a

disparate treatment and disparate impact theory of liability; (b) whether Chadbourne has engaged in unlawful, systemic gender discrimination through its policies, practices, and procedures affecting compensation and other terms and/or conditions of employment; (c) whether Chadbourne's failure to institute adequate standards, quality controls, implementation metrics or oversight of those policies, practices, and procedures violates Title VII and/or other statutes; (d) whether the lack of transparency and of opportunities for redress at Chadbourne violates Title VII and/or other statutes; (e) whether Chadbourne's failure to prevent, investigate, or properly respond to evidence and complaints of discrimination in the workplace violates Title VII and other statutes; and (f) whether Chadbourne is liable for continuing systemic violations of Title VII and/or other statutes.

182.    The common questions of fact include, *inter alia*: whether Chadbourne has: (a) used a compensation system that lacks meaningful or appropriate standards, implementation metrics, quality controls, transparency, and opportunities for redress; (b) through the use of that compensation system compensated female Partners less than similarly-situated male Partners in base salary and/or merit bonuses; (c) systematically, intentionally, or knowingly compensated female Partners less than similarly-situated male Partners, including in base salary and/or merit bonus pay; (d) allocated Firm resources, including staff, in ways that undermined and/or frustrated  the work of female Partners; (e) minimized, ignored, or covered-up evidence of gender discrimination in the workplace and/or otherwise mishandled the investigation of and response to complaints of discrimination brought to the attention of the Management Committee and other Firm leadership; (h) systematically, intentionally, knowingly, or deliberately sowed an indifference to evidence of discrimination in the workplace or otherwise minimized, ignored, mishandled, or covered up evidence of or complaints of gender discrimination; and (g) otherwise

discriminated against female attorneys in the terms and conditions of employment.

183.    The employment policies, practices, and procedures to which the Class Representatives and the Class members are subjected were and are set by the Firm's Management Committee and apply universally to all Class members nationwide.    These employment policies, practices, and procedures are not unique or limited to any office or practice group; rather they apply to all offices and practice groups and, thus, affect the Class Representatives and Class members in the same ways regardless of the office location or practice group in which they work.    Discrimination in compensation occurs as a pattern and practice throughout all Chadbourne offices and practice groups.

**E.    Typicality of Claims and Relief Sought**

184.    The Class Representatives' claims are typical of the claims of the proposed Class. The Class Representatives possess and assert each of the claims they assert on behalf of the proposed Class.    They pursue the same factual and legal theories and seek similar relief.

185.    Like members of the proposed Class, the Class Representatives are female Partners who were employees of Chadbourne during the liability period.

186.    Differential treatment between male and female attorneys occurs as a pattern and practice throughout all office and practice groups of Chadbourne.    Chadbourne discriminates against female Partners in compensation and subjects them to a work culture predominated by an executive circle comprised of men.    This differential treatment has affected the Class Representatives and the Class members in the same or similar ways.

187.    Chadbourne has failed to respond adequately or appropriately to evidence and complaints of discrimination.    The Class Representatives and Class members have been affected in the same or similar ways by Chadbourne's failure to implement adequate procedures to detect,

monitor, and correct this pattern and practice of discrimination.

188.    Chadbourne has failed to create adequate procedures to ensure its Management Committee complies with equal employment opportunity laws regarding each of the policies, practices, and procedures referenced in this Complaint, and the Firm has failed to discipline adequately others in Firm leadership when they violate anti-discrimination laws.  These failures have affected the Class Representatives and the Class members in the same or similar ways.

189.    The relief necessary to remedy the claims of the Class Representatives is the same as that necessary to remedy the claims of the proposed Class members.

190.    The Class Representatives seek the following relief for their individual claims and for the claims of the members of the proposed Class: (a) a declaratory judgment that Chadbourne has engaged in systemic gender discrimination against female Partners by (i) paying female Partners less than their male counterparts in base compensation and/or merit bonus pay, (ii) failing to investigate or respond to evidence of discrimination in the workplace against female attorneys, and (iii) otherwise exposing female Partners to differential treatment; (b) a permanent injunction against such continuing discriminatory conduct; (c) injunctive relief that effects a restructuring of Chadbourne's policies, practices, and procedures for awarding pay, including merit pay, to female Partners; (d) equitable relief that effects a restructuring of the Chadbourne compensation system so female Partners receive the compensation they would have been paid in the absence of Chadbourne's gender discrimination; (e) back pay, front pay, reinstatement, and other equitable remedies necessary to make female Partners whole from Chadbourne's past discrimination; (f) punitive and nominal damages to deter Chadbourne from engaging in similar discriminatory practices in the future; and (g) attorneys' fees, costs, and expenses.

**F.      Adequacy of Representation**

191.      The Class Representatives interests are coextensive with those of the members of the proposed Class.   The Class Representatives seek to remedy Chadbourne's discriminatory policies, practices, and procedures so female attorneys will not receive disparate pay and differential treatment.

192.      The Class Representatives are willing and able to represent the proposed Class fairly and vigorously as they pursue their similar individual claims in this action.

193.      The Class Representatives have retained counsel sufficiently qualified, experienced, and able to conduct this litigation and to meet the time and fiscal demands required to litigate an employment discrimination class action of this size and complexity.   The combined interests, experience, and resources of the Class Representatives and their counsel to litigate competently the individual and class claims at issue in this case clearly satisfy the adequacy of representation requirement of Federal Rule of Civil Procedure 23(a)(4).

**G.      Requirements of Rule 23(b)(2)**

194.      Chadbourne has acted or refused to act on grounds generally applicable to the Class Representatives and the proposed Class.

195.      Chadbourne has acted on grounds generally applicable to the Class Representatives and the proposed Class by adopting and following systemic policies, practices, and procedures that are discriminatory on the basis of gender.   Gender discrimination is Chadbourne's standard operating procedure rather than a sporadic occurrence.

196.      Chadbourne has also acted or refused to act on grounds generally applicable to the Class Representatives and the proposed Class by, *inter alia*: (a) using a compensation system that lacks meaningful or appropriate standards, implementation metrics, quality controls,

transparency, and opportunities for redress; (b) through the use of that compensation system, compensating female Partners less than similarly situated males in base salary and/or merit bonuses; (c) systematically, intentionally, or knowingly compensating female Partners less than similarly situated male Partners, including less base salary and/or in merit bonus pay; (d) denying female attorneys opportunities to advance; (e) minimizing, ignoring, or covering up evidence of gender discrimination in the workplace and/or otherwise mishandling the investigation of and response to complaints of discrimination brought to the attention of the Management Committee; (f) systematically, intentionally, knowingly, or deliberately sowing an indifference to evidence of discrimination in the workplace or otherwise minimizing, ignoring, mishandling, or covering up evidence or complaints of gender discrimination; and (g) otherwise discriminating against female Partners in the terms and conditions of employment.

197.    Chadbourne's policies, practices, and procedures have led to gender discrimination and stratification.  The systemic means of accomplishing such gender-based stratification include, but are not limited to, Chadbourne's policies, practices, and procedures for awarding base compensation and merit bonus pay to female Partners.  These practices and procedures all suffer from a lack of: transparency; adequate quality standards, and controls; sufficient implementation metrics; and opportunities for redress or challenge.  As a result, female Partners are compensated within a system that is insufficiently designed, articulated, explained or implemented to consistently, reliably or fairly manage or reward female attorneys.

198.    Chadbourne's systemic discrimination and refusals to act on nondiscriminatory grounds justify the requested injunctive and declaratory relief with respect to the Class as a whole.

199.    Injunctive, declaratory, and affirmative relief are the predominant forms of relief sought in this case.  Entitlement to declaratory, injunctive, and affirmative relief flows directly and automatically from proof of Chadbourne's systemic gender discrimination.  In turn, entitlement to declaratory, injunctive, and affirmative relief forms the factual and legal predicate for recovery by the Class Representatives and Class members of monetary and non-monetary remedies for individual losses caused by Chadbourne's systemic discrimination, as well as their recovery of punitive damages.

**H.      Requirements of Rule 23(b)(3)**

200.    The common issues of fact and law affecting the claims of the Class Representative and proposed Class members—including, but not limited to, the common issues identified above—predominate over any issues affecting only individual claims.  The common issues include; (1) whether Chadbourne has engaged in gender discrimination against female Partners by paying female Partners less than their male counterparts and (2) whether Chadbourne has engaged in gender discrimination against female Partners by denying female Partners opportunities for advancement.

201.    A class action is superior to other available means for fairly and efficiently adjudicating the claims of the Class Representatives and members of the proposed Class.

202.    By virtue of the pattern and practice of discrimination at Chadbourne, the Class Representatives and Class members are eligible for monetary remedies for losses caused by the systemic discrimination, including back pay, front pay, reinstatement, and other relief.

203.    Additionally or in the alternative, the Court may grant "partial" or "issue" certification under Rule 23(c)(4).  Resolution of common questions of fact and law would materially advance the litigation for all Class members.

## VI.   COLLECTIVE ALLEGATIONS UNDER THE EQUAL PAY ACT

204.   Plaintiffs incorporate all allegations of the Complaint alleging class-based discrimination against female Partners.

205.   Plaintiffs bring collective claims under the Equal Pay Act pursuant to Section 16(b) of the Fair Labor Standards Act (FLSA), 29 U.S.C. § 216(b), on behalf of all members of the EPA Collective Action Class, which consists of: all current, former and future female Partners of Chadbourne during the applicable liability period, who opt into the EPA action by filing a Consent to Join with the Court.

206.   Plaintiffs and the Collective Action members are similarly situated with respect to their claims that Chadbourne paid them less than their male counterparts.

207.   There is a common nexus of fact and law suggesting that Plaintiffs and the Collective Action members were discriminated against in the same manner.  Questions at issue in the case include:

(a)   Whether Defendant unlawfully awarded less in base pay to female Partners, thus affecting their compensation, than similarly qualified male Partners;

(b)   Whether Defendant unlawfully awarded less in merit bonus pay to female Partners, thus affecting their compensation, than similarly qualified male Partners;

(c)   Whether Defendant's resulting failure to compensate female Partners on par with comparable male Partners was willful within the meaning of the EPA.

208.   Counts for violations of the EPA may be brought and maintained as an "opt-in" collective action pursuant to 29 U.S.C. § 216(b), for all claims asserted by the EPA Collective Action Plaintiffs who opt-in to this action because the claims of the Plaintiffs are similar to the claims of the EPA Collective Action Class.

209.    Campbell and the EPA Collective Action Plaintiffs (a) are similarly situated and (b) are subject to Defendant's common policy and practice of gender discrimination in failing to compensate female attorneys on par with male attorneys who perform substantially equal work.

## VII.    COUNTS

### CLASS AND COLLECTIVE ACTION COUNTS

### COUNT I

**VIOLATION OF TITLE VII,**
**42 U.S.C. §§ 2000e,** *et seq.*
**PAY DISCRIMINATION**
**(On behalf of Class Representative Campbell and Class members)**

210.    Class Representative Campbell re-alleges and incorporates each and every allegation in this Complaint as if fully set forth herein.

211.    This Count is brought on behalf of the Class Representative and all members of the Class.

212.    Defendant, an employer of Class Representative and Class members within the meaning of Title VII, has discriminated against the Class Representative and the Class by treating them differently from, and less preferably than, similarly situated males by subjecting them to discriminatory pay in violation of Title VII.

213.    Defendant's policies, practices, and procedures have produced a disparate impact on the Class Representative and the Class with respect to their terms and conditions of employment.

214.    Defendant's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of the Class Representative and the Class, entitling the Class Representative and the members of the Class to punitive damages.

215.    By reason of the continuous nature of Defendant's discriminatory conduct

regarding compensation, which persisted throughout the employment of the Class Representative and the Class, the Class Representative and the Class are entitled to application of the continuing violations doctrine to all violations alleged herein.

216.    As a result of Defendant's conduct alleged in this Complaint, the Class Representative and the Class have suffered and continue to suffer harm, including but not limited to lost earnings, lost benefits and other financial loss, including interest.

217.    By reason of Defendant's discrimination, the Class Representative and the Class are entitled to all legal and equitable remedies available for violations of Title VII, including an award of punitive damages.

218.    As a further result of Defendant's unlawful conduct, the Class Representative and the members of the Class have suffered and continue to suffer, *inter alia*, impairment to their name and reputation, humiliation, embarrassment, emotional and physical distress, and mental anguish.  Plaintiffs are entitled to recover damages for such injuries from Defendant under Title VII.

219.    Attorneys' fees and costs should be awarded under 42 U.S.C. § 2000e-5(k).

## COUNT II

### VIOLATION OF THE FAIR LABOR STANDARDS ACT OF 1938, AS AMENDED BY THE EQUAL PAY ACT OF 1963, 29 U.S.C. § 206(d); 29 U.S.C. § 216(b) (On Behalf of the Plaintiffs and EPA Collective Action Plaintiffs)

220.    Plaintiffs Campbell and Johnson re-allege and incorporate each and every allegation of this Complaint.

221.    This Count is brought on behalf of the Plaintiffs and the EPA Collective Action Class, including all EPA Collective Action Plaintiffs who "opt in" to this action.

222.    Defendant has discriminated against the Plaintiffs and all EPA Collective Action

Plaintiffs within the meaning of the Equal Pay Act of 1963 in violation of the Fair Labor Standards Act of 1938, 29 U.S.C. §§ 206, *et seq*., as amended by the EPA, by providing them with lower pay than similarly situated male colleagues on the basis of their gender even though Plaintiffs and all others similarly situated performed similar duties requiring the same skill, effort, and responsibility as their male counterparts.

223.    Plaintiffs, all EPA Collective Action Plaintiffs, and similarly situated male Partners all perform similar job duties and functions as Chadbourne attorneys.  Plaintiffs, all EPA Collective Action Plaintiffs, and similarly situated male attorneys all performed jobs that required equal skill, effort, and responsibility.

224.    Defendant discriminated against Plaintiffs and all EPA Collective Action Plaintiffs by subjecting them to discriminatory pay in violation of the Equal Pay Act.

225.    The differential in pay between male and female attorneys was not due to seniority, merit, quantity or quality of production, or a factor other than sex, but was due to gender.

226.    Defendant caused, attempted to cause, contributed to or caused the continuation of pay discrimination based on gender, in violation of the EPA.

227.    The foregoing conduct constitutes a willful violation of the EPA within the meaning of 29 U.S.C. § 255(a).  Because Defendant has willfully violated the EPA, a three-year statute of limitations applies to such violations, pursuant to 29 U.S.C. § 255.

228.    As a result of Defendant's conduct as alleged in this Complaint, Plaintiffs and all EPA Collective Action Plaintiffs have suffered and continue to suffer harm, including but not limited to: lost earnings, lost benefits and other financial loss, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

229.    By reason of Defendant's discrimination, Plaintiffs and all EPA Collective Action Plaintiffs are entitled to all legal and equitable remedies available for violations of the EPA, including liquidated damages, interest, and other compensation pursuant to 29 U.S.C. § 216(b).

230.    Attorneys' fees should be awarded under 29 U.S.C. §216(b).

**INDIVIDUAL COUNTS**

**COUNT III**

**VIOLATION OF TITLE VII,**
**42 U.S.C. § 2000e-3(a), 42 U.S.C. § 2000e-5(f)(3)**
**RETALIATION**
**(On behalf of Campbell)**

231.    Campbell re-alleges and incorporates each and every allegation contained in this Complaint.

232.    Campbell engaged in protected activity that included, but is not limited to, complaining to Chadbourne about gender discrimination in compensation.  She complained to members of the Firm on numerous occasions, including but not limited to, Management Committee member and Managing Partner Andrew Giaccia; Management Committee member Marc Alpert; Management Committee member Lawrence Rosenberg; Management Committee member Howard Seife; Chief Operating Officer Lisa Palestine; Head of Litigation Abbe Lowell; and former Managing Partner of the D.C. office Dana Frix.  She also engaged in protected activity by filing an EEOC Charge alleging gender discrimination on June 30, 2016.

233.    Chadbourne terminated Campbell's employment in retaliation for her discrimination complaints.  Chadbourne also retaliated against Campbell by, *inter alia*: undermining her client relationships; refusing her staffing on her matters; failing to promote her practice; and denying her the ability to participate in Firm committees.  Chadbourne further retaliated against Campbell by facilitating and maintaining an environment in which Firm

leadership engaged in acts intended to humiliate and demean her.  These adverse employment actions materially and adversely changed Campbell's overall terms and conditions of employment.

234.    Chadbourne's retaliatory acts against Campbell were a direct and proximate result of her protected activities.

235.    A reasonable employee would find Chadbourne's retaliatory acts materially adverse and such acts would dissuade a reasonable person from making or supporting a charge of discrimination.

236.    Defendant's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard to Campbell's rights, entitling her to punitive damages.

237.    Defendant's actions and failures to act have caused Campbell to suffer harm, including without limitation lost earnings, lost benefits, and other severe financial losses, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

238.    Campbell is therefore entitled to all legal and equitable remedies available for violations of Title VII, including an award of punitive damages.

239.    Attorneys' fees should be awarded under 42 U.S.C. § 2000e-5(k).

### COUNT IV

**VIOLATION OF TITLE VII**
**WRONGFUL TERMINATION**
**(On behalf of Campbell)**

240.    Campbell re-alleges and incorporates each and every allegation contained in this Complaint.

241.    Chadbourne wrongfully terminated Campbell's employment because of her gender and in retaliation for her discrimination complaints.

242.    Chadbourne's wrongful termination of Campbell was a direct, proximate and

pretextual result of gender discrimination and her protected activities.

243.    Defendant's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard to Campbell's rights, entitling her to punitive damages.

244.    Chadbourne's wrongful termination of Campbell has caused her to suffer harm, including without limitation lost earnings, lost benefits, and other severe financial losses, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

245.    Campbell is therefore entitled to all legal and equitable remedies available for violations of Title VII, including an award of punitive damages.

246.    Attorneys' fees should be awarded under 42 U.S.C. § 2000e-5(k).

## COUNT V

**VIOLATION OF THE FAIR LABOR STANDARDS ACT OF 1938,**
**AS AMENDED BY THE EQUAL PAY ACT OF 1963,**
**29 U.S.C. § 215(a)(3); 29 U.S.C. § 216(b)**
**RETALIATION**
**(On Behalf of Campbell)**

247.    Campbell re-alleges and incorporates each and every allegation contained in this Complaint.

248.    Campbell engaged in protected activity under the Equal Pay Act by complaining to Chadbourne about gender discrimination in compensation.

249.    Because of these complaints, Chadbourne discriminated against Campbell by denying her staffing on her matters, writing off client bills without her permission, and refusing to publicize her practice in Firm materials  in violation of 29 U.S.C. § 215(a)(3).  Chadbourne further discriminated against Campbell by facilitating and tolerating an environment where she was targeted for harassment and humiliation by Firm leadership.

250.    Furthermore, Chadbourne terminated Campbell in violation of 29 U.S.C. § 215(a)(3) – slashing her compensation, ousting her from the partnership ranks, and then

discharging her from the Firm.

251.    Under 29 U.S.C. § 216(b), Campbell is entitled to back pay, liquidated damages, reinstatement, and other relief.

252.    Attorneys' fees should be awarded under 29 U.S.C. §216(b).

## COUNT VI

**VIOLATION OF THE FAIR LABOR STANDARDS ACT OF 1938,
AS AMENDED BY THE EQUAL PAY ACT OF 1963,
29 U.S.C. § 215(a)(3); 29 U.S.C. § 216(b)
RETALIATION
(On Behalf of Johnson)**

253.    Johnson re-alleges and incorporates each and every allegation contained in this Complaint.

254.    Johnson engaged in protected activity under the Equal Pay Act by complaining to Chadbourne about gender discrimination in compensation.

255.    Because of these complaints, Chadbourne discriminated against Johnson by decreasing her base compensation and denying her discretionary merit bonuses in violation of 29 U.S.C. § 215(a)(3).

256.    Under 29 U.S.C. § 216(b), Johnson is entitled to back pay, liquidated damages, and other relief.

257.    Attorneys' fees should be awarded under 29 U.S.C. §216(b)

## COUNT VII

**VIOLATION OF THE DISTRICT OF COLUMBIA HUMAN RIGHTS ACT
D.C. Code §§ 2-1401, *et seq.* AS AMENDED
PAY DISCRIMINATION
(On behalf of Campbell)**

258.    Campbell re-alleges and incorporates each and every allegation of this Complaint.

259.    Defendant, an employer within the meaning of the DCHRA, has discriminated

against Campbell by treating her differently from, and less preferably than, similarly situated males by subjecting her to pay discrimination in violation of the DCHRA.

260.   Defendant's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of the Plaintiff entitling her to punitive damages.

261.   As a result of Defendant's conduct alleged in this Complaint, the Plaintiff has suffered and continues to suffer harm, including but not limited to lost earnings, lost benefits, and other financial loss, including interest.

262.   By reason of Defendant's discrimination, the Plaintiff is entitled to all legal and equitable remedies available for violations of the DCHRA, including an award of punitive damages.

263.   Attorneys' fees should be awarded under D.C. Code §2-1403.13(e).

## COUNT VIII

**VIOLATION OF THE DISTRICT OF COLUMBIA HUMAN RIGHTS ACT**
**D.C. Code § 2-1401, *et seq.* AS AMENDED**
**RETALIATION**
**(On behalf of Campbell)**

264.   Campbell re-alleges and incorporates each and every allegation of this Complaint.

265.   Defendant, an employer within the meaning of the DCHRA, has discriminated against Campbell by retaliating against her for opposing the discriminatory compensation of women in violation of the DCHRA.

266.   Defendant's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of the Plaintiff entitling her to punitive damages.

267.   As a result of Defendant's conduct alleged in this Complaint, the Plaintiff has suffered and continues to suffer harm, including but not limited to lost earnings, lost benefits and other financial loss, including interest.

268.    By reason of Defendant's discrimination, the Plaintiff is entitled to all legal and equitable remedies available for violations of the DCHRA, including an award of punitive damages.

269.    Attorneys' fees should be awarded under D.C. Code §2-1403.13(e).

### COUNT IX

**VIOLATION OF THE DISTRICT OF COLUMBIA HUMAN RIGHTS ACT**
**D.C. Code §§ 2-1401, *et seq.* AS AMENDED**
**WRONGFUL TERMINATION**
**(On behalf of Campbell)**

270.    Campbell re-alleges and incorporates each and every allegation of this Complaint.

271.    Defendant, an employer within the meaning of the DCHRA, wrongfully terminated Campbell's employment due to gender discrimination and in retaliation for her discrimination complaints.  Chadbourne's wrongful termination was an adverse employment action that materially and adversely affected Campbell's employment in violation of the DCHRA.

272.    Defendant's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of the Plaintiff entitling her to punitive damages.

273.    As a result of Defendant's conduct alleged in this Complaint, the Plaintiff has suffered and continues to suffer harm, including but not limited to lost earnings, lost benefits and other financial loss, including interest.

274.    By reason of Defendant's discrimination, the Plaintiff is entitled to all legal and equitable remedies available for violations of the DCHRA, including an award of punitive damages.

275.    Attorneys' fees should be awarded under D.C. Code §2-1403.13(e).

## COUNT X

**VIOLATION OF THE DISTRICT OF COLUMBIA HUMAN RIGHTS ACT**
**D.C. Code §§ 2-1401, *et seq.* AS AMENDED**
**AIDING AND ABETTING**
**(On behalf of Campbell against Individual Defendants)**

276.    Plaintiff Campbell re-alleges and incorporates each and every allegation of this Complaint.

277.    On information and belief, Individual Defendants Alpert, Giaccia, Lowell, Rosenberg, Seife, and Weber all actively and knowingly participated in practices that resulted in pay discrimination, retaliation, and wrongful termination based on Plaintiff Campbell's gender.

278.    By aiding, abetting,  inviting, compelling and/or coercing Defendant Chadbourne in its discriminatory practices and decisions, each Individual Defendant has aided and abetted both Defendant Chadbourne and each of the other Individual Defendant's discrimination against Plaintiff Campbell, in violation of D.C. Code §§ 2-1402.62.

279.    Defendants' conduct has been intentional, deliberate, willful, reckless, and conducted in callous disregard of Plaintiff Campbell's rights.

280.    By reason of Defendants' discrimination, the Plaintiff is entitled to all legal and equitable remedies available for violations of the DCHRA, including an award of punitive damages.

281.    Attorneys' fees should be awarded under D.C. Code §2-1403.13(e).

## COUNT XI

**BREACH OF CONTRACT**
**(On Behalf of Campbell)**

282.    Campbell re-alleges and incorporates each and every allegation of this Complaint.

283.     In the November 26, 2013 offer letter extended to Campbell, Chadbourne represented that Campbell's base annual compensation would be 500 points.  CFO Lisa Palestine verbally committed that the 500 points equaled $500,000.

284.     The Firm intentionally withheld information regarding the power of the Management Committee to determine the value of points and the fact that Campbell's salary could fluctuate based upon the Committee's valuation of her points.  The Firm later significantly undervalued Campbell's points at approximately $200,000— $300,000 less than she was promised in the November 26, 2013 Letter Offer.

285.     The Firm also committed to paying Campbell a total guaranteed bonus of $200,000 if her collections were $2.5 million in 2014.  Campbell collected more than $2.8 million in revenues but the Firm refused to pay her the full $200,000 guaranteed bonus per her offer letter.

286.     The Firm breached its agreement to pay Campbell a base salary of $500,000 annually and pay a guaranteed bonus of $200,000 for meeting her collections markers.

287.     Campbell suffered substantial damages as a result of Chadbourne's breach.

<u>**COUNT XII**</u>

**BREACH OF FIDUCIARY DUTY**
**(On behalf of Campbell against Individual Defendants)**

288.     Campbell re-alleges and incorporates each and every allegation of this Complaint.

289.     A fiduciary relationship existed between Campbell and the individual defendants based on Campbell's status as a member of the Firm Partnership.

290.     The individual defendants had a duty to disclose essential information affecting the Partnership to Campbell and to deal fairly, honestly, and openly with her.

291.     The individual defendants breached their fiduciary duty to Campbell by failing to

disclose material financial information, including information related to Partner compensation, to her.

292.     The individual defendants had a duty to deal with Campbell in an open and honest manner.  Instead, the individual defendants covertly terminated Campbell's employment without providing her with the benefit of demonstrating the profitability and fit of her practice to her fellow Partners.

293.     The individual defendants further violated their duty to Campbell by firing her without following the expulsion procedures articulated in the Firm's Partnership Agreement.

294.     Campbell suffered substantial damages as a result of the individual defendants' breach of their fiduciary duties.

## COUNT XIII

### UNJUST ENRICHMENT
### (On behalf of Campbell and Johnson)

295.     Campbell and Johnson re-allege and incorporate each and every allegation of this Complaint.

296.     Under the common law doctrine of unjust enrichment, Chadbourne, by its policies and actions, benefited from, and increased its profits by failing to pay Campbell and Johnson all compensation due to them as Partners.

297.     Furthermore, Chadbourne received $217,250 in capital contributions from Campbell, is altogether holding more than $440,000 in Campbell's capital account, and yet failed to provide her the compensation and benefits promised to her as a Partner of the Firm.

298.     Chadbourne accepted and received the benefits of the work performed by Campbell and Johnson, the business and revenues they generated for the Firm, and their annual capital contributions and were unjustly enriched.  It is inequitable and unjust for Chadbourne to

reap the benefits of Plaintiffs' work and financial contribution without proper remuneration.

299.   Campbell and Johnson are entitled to relief for this unjust enrichment in an amount equal to the benefits and contribution unjustly retained by Chadbourne, plus interest on these amounts.

## VIII.   PRAYER FOR RELIEF

WHEREFORE, the Class Representatives, on behalf of themselves and the members of the Class they seek to represent, requests the following relief:

A.   Certification of this case as a class action under Federal Rule of Civil Procedure 23, on behalf of the proposed Plaintiff Class; designation of the proposed Class Representatives as representatives of this Class; and designation of Plaintiffs' counsel of record as Class Counsel;

B.   Designation of this action as a collective action on behalf of the proposed EPA Collective Plaintiffs (asserting EPA claims) and

(i) promptly issuing notice pursuant to 29 U.S.C. § 216(b) to all similarly situated members of the EPA Opt-In Class, which (a) apprises them of the pendency of this action and (b) permits them to assert timely EPA claims in this action by filing individual Consent to Sue forms pursuant to 29 U.S.C. § 216(b); and

(ii) tolling the statute of limitations on the claims of all members of the FLSA Opt-In Class from the date the original Complaint was filed until the Class members are provided with reasonable notice of the pendency of this action and a fair opportunity to exercise their right to opt in as Plaintiffs;

C.   Designation of Campbell and Johnson as representatives of the EPA Collective Action;

D.   A declaratory judgment that Chadbourne's employment policies, practices, and

procedures challenged herein are illegal and in violation of the rights of Class Representative and Class members under Title VII;

E.      A permanent injunction against Chadbourne and its officers, owners, agents, successors, employees, and/or representatives, and any and all persons acting in concert with them, from engaging in any further unlawful practices, policies, customs, usages, and gender discrimination as set forth herein, and other such injunctive relief as will prevent Defendant from continuing its discriminatory practices and protect others similarly situated;

F.      An Order requiring Chadbourne to initiate and implement programs that will (i) provide equal employment opportunities for female attorneys; (ii) remedy the effects of its past and present unlawful employment policies, practices, and procedures; and (iii) eliminate the continuing effects of the discriminatory and retaliatory practices described above;

G.      An Order requiring Chadbourne to initiate and implement systems for compensating female Partners in a non-discriminatory manner;

H.      An Order directing Chadbourne to adjust the compensation for the Class Representatives and the Class members to the level that they would be enjoying but for the Defendant's discriminatory policies, practices, and procedures;

I.      An award of back pay, front pay, liquidated damages, lost benefits, preferential rights to jobs, and other damages for lost compensation and job benefits suffered by the Class Representatives and the Class, to be determined at trial;

J.      Any other appropriate equitable relief to which the Class Representatives and the Class members are entitled;

K.      An award of back pay and front pay in an amount not less than 25 million dollars;

L.      An award of punitive damages in an amount not less than 125 million dollars;

M.     An award of compensatory damages (such damages exclude any claim for emotional, mental, or psychological distress or pain and suffering) in an amount not less than 5 million dollars;

N.     An award of litigation costs and expenses, including reasonable attorneys' fees, to the Class Representatives and the Class;

O.     Pre-judgment interest;

P.     Such other and further relief as the Court may deem just and proper; and

Q.     Retention of jurisdiction by the Court until such time as the Court is satisfied that the Defendant has remedied the practices, policies, and procedures complained of herein and has determined that the Defendant's practices, policies, and procedures are in full compliance with the law.

## IX.     DEMAND FOR JURY

The Plaintiffs demand trial by jury of all issues triable of right to a jury.


Respectfully submitted,

**David W. Sanford (admitted** *pro hac vice***)**
**Jeremy Heisler (JH-0145)**
**Andrew Melzer (AM-7649)**
**Alexandra Harwin\***
**Saba Bireda (admitted** *pro hac vice***)**
**Kevin Love Hubbard\***
**SANFORD HEISLER, LLP**
1350 Avenue of the Americas, 31st Floor
New York, New York 10019
Telephone: (646) 402-5650
Facsimile: (646) 402-5651
dsanford@sanfordheisler.com
jheisler@sanfordheisler.com

63

amelzer@sanfordheisler.com
aharwin@sanfordheisler.com
sbireda@sanfordheisler.com
khubbard@sanfordheisler.com

**\*Pro Hac Vice Admission Pending*

**Counsel for Plaintiffs and the Class**