PROSKAUER ROSE LLP
Kathleen M. McKenna
Evandro C. Gigante
Rachel S. Fischer
Eleven Times Square
New York, NY 10036-8299
(212) 969-3000
kmckenna@proskauer.com
egigante@proskauer.com
rfischer@proskauer.com
*Attorneys for Defendants*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

KERRIE CAMPBELL and
JAROSLAWA Z. JOHNSON, Individually,
and on behalf of others similarly situated,

                Plaintiffs,

    v.

CHADBOURNE & PARKE LLP, MARC ALPERT,
ANDREW GIACCIA, ABBE LOWELL, LAWRENCE
ROSENBERG, HOWARD SEIFE, and PAUL WEBER,

                Defendants.

-------------------------------------------------------------------X

Civ. No. 1:16-cv-06832 (JPO)

---

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND MOTION TO DISMISS CLASS ALLEGATIONS

## <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ...................................................................................1

STATEMENT OF FACTS ........................................................................................2

    A.    The Firm.........................................................................................................2

    B.    Campbell's Ongoing Tenure as a Litigation Partner of the Firm ...........................6

    C.    Johnson's Tenure as a Partner in the Firm's Kiev Office ....................................7

ARGUMENT .........................................................................................................7

I.    PLAINTIFFS' STATUTORY CLAIMS SHOULD BE DISMISSED BECAUSE CHADBOURNE PARTNERS ARE NOT EMPLOYEES UNDER THE ANTI-DISCRIMINATION LAWS .................................................................................7

    A.    Legal Standard ................................................................................................7

    B.    Plaintiffs Are Not Employees Under the Relevant Statutes ...................................8

        1.    The *Clackamas* Six-Factor Test.................................................................8

        2.    Plaintiffs are Employers Under the First *Clackamas* Factor Because Chadbourne Cannot "Hire" or "Fire" or Set Rules and Regulations for Equity Partners ...........................................................9

        3.    Plaintiffs are Employers Under the Second *Clackamas* Factor Because the Firm Does Not Supervise the Work of Equity Partners ........11

        4.    Plaintiffs are Employers Under the Third *Clackamas* Factor Because Equity Partners Do Not Report To Someone at the Firm............12

        5.    Plaintiffs are Employers Under the Fourth *Clackamas* Factor Because Equity Partners Are Able to Influence the Firm..........................13

        6.    Plaintiffs are Employers Under the Fifth *Clackamas* Factor Because the Partnership Agreement Evidences the Parties' Intent that Equity Partners Not Be Employees......................................................16

        7.    Plaintiffs are Employers Under the Sixth *Clackamas* Factor Because Equity Partners Share in the Profits, Losses and Liabilities of the Firm...................................................................................16

II.    PLAINTIFFS' CLASS CLAIMS FAIL AS A MATTER OF LAW ................................18

    A.    The Proposed Class Is Not Sufficiently Numerous ...............................................18

    B.    There Are No Common Questions of Law or Fact................................................21

    C.    The Proposed Class Contains Unavoidable Intraclass Conflicts ..........................22

D.      Plaintiffs' Collective Action Allegations Are Insufficient ....................................23

III.    THE COURT SHOULD NOT EXERCISE JURISDICTION OVER PLAINTIFFS' STATE LAW CLAIMS ...........................................................................24

CONCLUSION.................................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Anderson v. Liberty Lobby,*
  477 U.S. 242 (1986)...................................................................................................7

*Block v. First Blood Assocs.,*
  125 F.R.D. 39 (S.D.N.Y. 1989) ...............................................................................23

*Bluestein v. Cent. Wis. Anesthesiology,*
  769 F.3d 944 (7th Cir. 2014) ....................................................................................11

*Bluestein v. Cent. Wis. Anesthesiology,*
  986 F. Supp. 2d 937 (W.D. Wisc. 2013), *aff'd,* 769 F.3d 944 (7th Cir. 2014)...........10, 12, 17

*Bowers v. Ophthalmology Grp., LLP,*
  No. 5:12-CV-00034-JHM, 2012 WL 3637529 (W.D. Ky. Aug. 22, 2012),
  *vacated and remanded,* 733 F.3d 647 (6th Cir. 2013)......................................15, 16

*Bragg v. Orthopaedic Assocs. of Va.,*
  No. 2:06cv347, 2007 WL 702786 (E.D. Va. Mar. 2, 2007) .............................10, 17

*Carnegie-Mellon Univ. v. Cohill,*
  484 U.S. 343 (1988)..................................................................................................24

*Carr v. NYSE, Inc.,*
  414 F. Supp. 1292 (N.D. Cal. 1976) .........................................................................19

*Castellano v. Bd. of Trs. of Police Officers' Variable Supplements Fund,*
  752 F. Supp. 98 (S.D.N.Y. 1990), *aff'd,* 937 F.2d 752 (2d Cir. 1991)...................25

*Clackamas Gastroenterology Associates, P.C. v. Wells,*
  538 U.S. 440 (2003)........................................................................................ *passim*

*Cowell v. Utopia Home Care, Inc.,*
  No. 14-cv-736 (LDW)(SIL), 2016 WL 4186976 (E.D.N.Y. Aug. 8, 2016)...........23

*Cronkhite v. Unity Physician Grp., P.C.,*
  No. 1:05-CV-1577-SEBJMS, 2007 WL 1035091 (S.D. Ind. Mar. 30, 2007) ............10, 12, 17

*Denney v. Deutsche Bank AG,*
  443 F.3d 253 (2d Cir. 2006).....................................................................................22

*Edge v. C Tech Collections, Inc.,*
  203 F.R.D. 85 (E.D.N.Y. 2001) ...............................................................................19

*EEOC v. Sidley Austin Brown & Wood*,
    315 F.3d 696 (7th Cir. 2002) ............................................... 14

*Ewh v. Monarch Wine Co.*,
    73 F.R.D. 131 (E.D.N.Y. 1977) ........................................... 19

*Fitzgibbons v. Putnam Dental Assocs., P.C.*,
    368 F. Supp. 2d 339 (S.D.N.Y. 2005) ..................................... 8

*Forde v. Waterman S.S. Corp.*,
    No. 12 Civ. 3396 (KBF), 2013 WL 5309453 (S.D.N.Y. Sept. 18, 2013) .............. 18

*Garcia v. Gloor*,
    618 F.2d 264 (5th Cir. 1980) ............................................. 20

*Gilchrist v. Bolger*,
    89 F.R.D. 402 (S.D. Ga. 1981), *aff'd*, 733 F.2d 1551 (11th Cir. 1984) .................. 20

*Hart v. Dresdner Kleinwort Wasserstein Sec., LLC*,
    No. 06 Civ. 0134 (DAB), 2006 WL 2356157 (S.D.N.Y. Aug. 9, 2006) ............... 19

*Hishon v. King & Spalding*,
    467 U.S. 69 (1984) ....................................................... 8

*In re W.T. Grant Co.*,
    24 B.R. 421 (Bankr. S.D.N.Y. 1982) ..................................... 19

*J.B.D.L. Corp. v. Wyeth-Ayerst Labs., Inc.*,
    225 F.R.D. 208 (S.D. Ohio 2003) ....................................... 21

*Jiang v. Allstate Ins. Co.*,
    199 F.R.D. 267 (N.D. Ill. 2001) ......................................... 18

*Jordan (Bermuda) Inv. Co. v. Hunter Green Investments Ltd.*,
    154 F. Supp. 2d 682 (S.D.N.Y. 2001) ................................... 24

*Kirleis v. Dickie, McCamey & Chilcote, P.C.*,
    No. 06CV1495, 2009 WL 3602008 (W.D. Pa. Oct. 28, 2009),
    *aff'd*, No. 09-4498, 2010 WL 2780927 (3d Cir. July 15, 2010) ..................... *passim*

*MacNamara v. New York*,
    275 F.R.D. 125 (S.D.N.Y. Sept. 18, 2011) ............................... 18

*Mariotti v. Mariotti Bldg. Prods., Inc.*,
    714 F.3d 761 (3d Cir. 2013) ............................................. 13

*McGugan v. Aldana-Bernier*,
   No. 11-CV-00342 TLM, 2012 WL 1514777 (E.D.N.Y. Apr. 30, 2012),
      *aff'd*, 752 F.3d 224 (2d Cir. 2014) ........................................................................24

*Mechigian v. Art Capital Corp.*,
   612 F. Supp. 1421 (S.D.N.Y. 1985) ...........................................................................23

*Mehta v. HCA Health Servs. of Fla., Inc.*,
   No. 8:05-CV-27-T24-TGW, 2006 WL 3133327 (M.D. Fla. Oct. 31, 2006) ...........17

*Mithani v. Lehman Bros., Inc.*,
   No. 01 Civ. 5927 (JSM), 2002 WL 14359 (S.D.N.Y. Jan. 4, 2002) ........................19

*Myers v. Crouse Healthcare Sys., Inc.*,
   274 F.R.D. 404 (N.D.N.Y. 2011) ...............................................................................18

*Myers v. Hertz Corp.*,
   624 F.3d 537 (2d Cir. 2010) .......................................................................................23

*Pennsylvania Pub. Sch. Emps.' Ret. Sys. v. Morgan Stanley & Co.*,
   772 F.3d 111 (2d Cir. 2014) .......................................................................................20

*Pickett v. Iowa Beef Processors*,
   209 F.3d 1276 (11th Cir. 2000) ..................................................................................23

*Primavera Familienstiftung v. Askin*,
   178 F.R.D. 405 (S.D.N.Y. 1998) ................................................................................20

*Pruitt v. Chicago*,
   472 F.3d 925 (7th Cir. 2006) ......................................................................................19

*Reese v. Arrow Fin. Servs., LLC*,
   202 F.R.D. 83 (D. Conn. 2001) ..................................................................................19

*Rodal v. Anesthesia Grp. of Cent. N.Y.*,
   No. 00-CV-1386, 2006 WL 208835 (N.D.N.Y. Jan. 23, 2006) ...................................8

*Ruggles v. Wellpoint, Inc.*,
   253 F.R.D. 61 (N.D.N.Y. 2008) ..................................................................................18

*Schmidt v. Ottawa Med. Ctr., P.C.*,
   322 F.3d 461 (7th Cir. 2003) ......................................................................................11

*Seabrook v. Jacobson*,
   153 F.3d 70 (2d Cir. 1998) .........................................................................................24

*Solon v. Kaplan*,
   398 F.3d 629 (7th Cir. 2005) .......................................................................10, 13, 15

*Stoudt v. E.F. Hutton & Co., Inc.*,
　　121 F.R.D. 36 (S.D.N.Y. 1988) ........................................................................20

*Uniondale Beer Co. v. Anheuser-Busch, Inc.*,
　　117 F.R.D. 340 (E.D.N.Y. 1987) ......................................................................19

*Valley Drug Co. v. Geneva Pharms., Inc.*,
　　350 F.3d 1181 (11th Cir. 2003) ........................................................................23

*Wal-Mart Stores, Inc. v. Dukes*,
　　564 U.S. 338 (2011)................................................................................ *passim*

*Wash. Convention Ctr. Auth. v. Johnson*,
　　953 A.2d 1064 (D.C. 2008) ................................................................................9

*Weir v. Holland & Knight, LLP*,
　　No. 603204/07, 2011 WL 6973240 (Sup. Ct. N.Y. Cty. Dec. 9, 2011)............14, 16

*Wright v. Family Dollar, Inc.*,
　　No. 10C4410, 2010 WL 4962838 (N.D. Ill. Nov. 30, 2010)................................18

*Ziegler v. Anesthesia Assocs. of Lancaster, Ltd.*,
　　74 F. App'x 197 (3d Cir. 2003) ........................................................................17

**STATUTES**

28 U.S.C. § 1367(c)(3)................................................................................................24

29 U.S.C. § 203(e)(1)..................................................................................................9

29 U.S.C. § 213(f)......................................................................................................19

29 U.S.C. § 216(b) ....................................................................................................23

42 U.S.C. § 2000e(f) ..................................................................................................9

D.C. Code § 2-1401.02(9)..........................................................................................9

**OTHER AUTHORITIES**

Fed. R. Civ. P. 23(a)(1)..............................................................................................18

Fed. R. Civ. P. 56 ......................................................................................................7

## PRELIMINARY STATEMENT

Defendants Chadbourne & Parke LLP ("Chadbourne" or the "Firm"), Andrew Giaccia,

Marc Alpert, Abbe Lowell, Lawrence Rosenberg, Howard Seife and Paul Weber (collectively,

"Defendants") respectfully submit this memorandum of law in support of their motion to dismiss

and for summary judgment of the claims in the Amended Complaint filed by Chadbourne partner

Plaintiff Kerrie Campbell ("Campbell"), and former Chadbourne partner Jaroslawa Johnson

("Johnson").  As a threshold legal matter, the Court does not have authority to adjudicate the

merits of these utterly baseless claims for a simple reason:  the entire premise of Plaintiffs'

complaint – that they were or are employees who fall under employment discrimination laws – is

wrong.  Plaintiffs are or were equity partners of the Firm and therefore are not entitled to bring

suit against their own Firm under the employment discrimination laws.

Chadbourne is a partnership.  Equity partners of Chadbourne are business owners who

share in the profits and losses of the Firm, exercise influence and control over the Firm's

business, and operate free from excessive supervision.  As such, under the controlling test set

forth by the Supreme Court in *Clackamas Gastroenterology Associates, P.C. v. Wells*, 538 U.S.

440 (2003), Plaintiffs were assuredly *not* employees entitled to coverage and redress under Title

VII of the Civil Rights Act ("Title VII"), the Equal Pay Act ("EPA"), the Fair Labor Standards

Act ("FLSA") and the Washington D.C. Human Rights Act ("DCHRA").

Equally flawed is Plaintiffs' attempt to bring their claims as a class.  Their class claims

should be dismissed for the separate and additional reasons that their putative class does not meet

Rule 23's numerosity requirement and they fail to proffer common questions of law or fact

required for class certification under the Supreme Court's decision in *Wal-Mart Stores, Inc. v.*

*Dukes*, 564 U.S. 338 (2011).

After dismissing Plaintiffs' federal claims, the Court should decline to exercise supplemental jurisdiction over their state law claims because this litigation has just begun, and therefore judicial economy is not served by retaining federal jurisdiction.

## STATEMENT OF FACTS [1]

### A.     The Firm

Chadbourne & Parke LLP, a New York limited liability partnership, is an international law firm of over 300 attorneys with eighty-eight (88) partners, which has 10 offices in 8 countries around the world.  (Giaccia Aff. ¶¶ 1, 3; 56.1 ¶¶ 1, 7.)[2]  Each Chadbourne partner is a signatory to a Partnership Agreement, which states clearly that the "property and business of the firm shall be managed by the partners."  (Giaccia Aff. Ex. A, Section 5(a).)   Through express provision in the Partnership Agreement, the partners have delegated operational management of the Firm to a five-member Management Committee, whose members are directly elected by the partnership.  (Giaccia Aff. ¶ 17; 56.1 ¶ 27.)  Any Firm partner is eligible to run for a seat on and be elected to the Management Committee.  (Giaccia Aff. ¶ 19; 56.1 ¶ 33.)

While some operational responsibilities of the Firm have been delegated to the Management Committee, the partners retain direct responsibility for a significant number of important Firm matters.  (Giaccia Aff. ¶ 10; 56.1 ¶ 19.)  For example, under the Partnership Agreement, partners vote on the admission of new partners as well as the termination of a partner's membership interest.  (Giaccia Aff. Ex. A, Sections 3 and 4.)  Partners must also vote

---

[1] The relevant facts are set forth in further detail in the Affidavit of Andrew Giaccia, Esq., dated November 14, 2016 ("Giaccia Aff."), and in Defendants' Local Rule 56.1 Statement ("56.1 ¶ ___").

[2] In the First Amended Complaint, Campbell and Johnson asserted claims on behalf of a purported class of present and former female U.S. partners since August 2013, which they allege amounted to a purported class of 26 women. (First Amended Complaint ¶ 169.)   However, two of Chadbourne's current female partners, and four of Chadbourne's former female partners, are non-U.S. citizens who are or were based outside the United States.  In addition, effective November 1, 2016, the Firm elected to the partnership a new group of internally-promoted attorneys, three of whom were women and all of whom are located in the United States.   Thus, the number of current and former female partners at the Firm since August 2013 who are U.S. citizens or based in the United States presently totals 23. (Giaccia Aff. ¶ 2; 56.1 ¶¶ 4-6.)

on amending the terms of the Partnership Agreement, changing the name of the Firm, or terminating the Firm itself.  (Giaccia Aff. Ex. A, Section 12.)

The partner-elected Management Committee oversees the operations of the Firm, and pursuant to the Partnership Agreement has delegated certain of those operations to the Managing Partner of the Firm.  (Giaccia Aff. Ex. A, Sec. 5(e), amended Nov. 18, 2010.)  The Managing Partner, who is elected by an affirmative vote of the partnership for a 3-year term, oversees day-to-day operations, management and administration of the Firm.  (*Id.*)  Specifically, the Management Committee develops and implements the Firm's strategic goals (including, *inter alia*, such matters as whether to add practice areas, open or close offices or merge with other firms).  (Giaccia Aff. ¶ 18; 56.1 ¶ 29.)  The Committee does select partners to serve in leadership positions for offices outside the New York headquarters and for practice groups and certain committees.  (*Id.*)

In addition, the elected Management Committee is vested by the partnership with the responsibility of setting partner compensation.  (Giaccia Aff. ¶ 23; Ex. A, Section 8; 56.1 ¶ 40.)  Under the Partnership Agreement, the Firm's partners all share in the profits and losses of the Firm "in accordance with their respective profit percentage interests."  (Giaccia Aff. Ex. A, Section 8.)  The profit percentage interests are "fixed from time to time by the firm . . . or by the Management Committee to the extent authority therefor has been delegated by the firm."  (*Id.*)

Under longstanding practice at the Firm, compensation decisions are made by the Management Committee through a process that provides each partner with insight and input into how the Committee determines compensation for the partners.  The annual process begins with the request (not requirement) that partners submit memoranda describing their performance and that of other partners over the year.  (Giaccia Aff. ¶ 26; 56.1 ¶ 44.)  Each partner also receives two large books of data (known in the Firm as the "matrix"), one containing extensive and

3

detailed financial data on the Firm and the performance of its partners individually, and another

containing a 5-year look back on partner compensation and performance history.  (Giaccia Aff. ¶

27; 56.1 ¶ 45.)  Any partner can know the origination and supervision of work by any other

partner and each partner's total compensation for the previous five years.  (Giaccia Aff. ¶ 27;

56.1 ¶ 46.)  The Management Committee is then available to meet with partners to discuss

compensation issues.  (Giaccia Aff. ¶ 27; 56.1 ¶ 47.)  In fact, both Campbell and Johnson availed

themselves of such opportunities.  (Giaccia Aff. ¶ 27; 56.1 ¶ 48.)

       In making individual compensation decisions, the Management Committee considers (as

it annually reminds the partners) many factors beyond the "matrix" statistical data.   These

factors include, but are not limited to: efforts undertaken by partners to enhance revenues;

instances of teamwork yielding new business or other positive results; instances where partners

have referred work to other groups or attorneys in other U.S. or international offices; partners

who have been of help to one another; client-related activities, including service to existing

clients, obtaining new work from existing clients, obtaining new clients, and any other activities

deemed noteworthy in this regard; assumption of Firm responsibilities and participation in Firm

activities; efforts made by partners to attract lateral partners and other senior attorneys to the

Firm; *pro bono* activities; activities aimed at improving attorney competence, including

recruiting and training, diversity efforts, and morale; and activities outside the Firm that serve to

enhance the reputation of the Firm and its partners. (Giaccia Aff. ¶ 29; 56.1 ¶ 52.)

       After the partner memos are submitted and the meetings are held, the Committee

additionally gathers information from practice group heads and managing partners of the Firm's

international offices and formulates a preliminary allocation of the Firm's income among the

partners.  (Giaccia Aff. ¶ 30; 56.1 ¶ 53.)   Individual partner compensation is expressed using a

"points" system.  In this system, each point has a nominal estimated value of $1,000 in year-end

4

compensation as a starting point, which will be subject to upward or downward variation

depending on the Firm's financial performance through the end of the coming year.[3]   (Giaccia

Aff. ¶ 28; 56.1 ¶¶ 49-50.)

Following all the data gathering and meetings described above, the Management

Committee distributes a memorandum to the partners (known as the "draft points list") showing

the preliminary allocation of points for each partner.   (Giaccia Aff. ¶ 31; 56.1 ¶ 54.)   Thereafter,

partners have an opportunity to provide the Management Committee with comments, or raise

concerns, about the preliminary allocation of points before a final list (the "points list") is

distributed to each partner showing the points allocated to them and to other partners of the Firm

for the coming year.[4]   (Giaccia Aff. ¶ 31; 56.1 ¶ 55.)   When that year is over, all of the

compensation paid to partners for that year is reported on a Form K-1, which is the IRS form

used to report income paid to partners who are responsible for paying their individual share of

taxes on the Firm's overall income.   (Giaccia Aff. ¶ 33; 56.1 ¶ 61.)

Firm partners also set the terms and conditions of employment for non-partner attorneys

through the Firm's Professional Staff Committee ("PSC").   (Giaccia Aff. ¶ 40; 56.1 ¶ 79.)   The

partners on the PSC are not on the Management Committee, and among the PSC's primary

functions is setting (and when necessary, adjusting) compensation for non-partner attorneys,

including base compensation and bonuses.   The PSC also works on setting billable hour

requirements and other policies for non-partner attorneys.   (Giaccia Aff. ¶ 41; 56.1 ¶¶ 80-81.)

The Firm's partners also enjoy all the benefits of a true partnership.   Under the

Partnership Agreement, partners are entitled to receive the Firm's audited financial statements.

---

[3] In 2016, the Firm slightly modified this system such that partners each have "shares" rather than "points."
(Giaccia Aff. ¶ 28; 56.1 ¶ 51.)

[4] Throughout the year, partners receive a monthly draw toward their year-end compensation.   (Giaccia Aff. ¶ 32;
56.1 ¶ 59.)

(Giaccia Aff. Ex. A, Section 7(c).)  Partners also routinely receive weekly, monthly and annual reports on the Firm's finances, including information about business generation, billings and collections, realization rates, hours worked, and the inventory of accounts receivable and work-in-progress, as well as the Firm's payroll expenses, disbursements and account balances. (Giaccia Aff. ¶ 38; 56.1 ¶ 73.)   Firm partners meet at least once a month, and sometimes more than once a month, to receive reports concerning and to discuss Firm matters.  (Giaccia Aff. ¶ 9; 56.1 ¶ 16.)  At such meetings, partners receive reports from the Managing Partner and from other partners about Firm performance, policies or initiatives under development, events relating to the Firm, and other topics or issues that partners may wish to raise.  (Giaccia Aff. ¶ 9; 56.1 ¶ 17.) Partners ask questions or participate in discussions concerning matters raised at partnership meetings. (Giaccia Aff. ¶ 9; 56.1 ¶ 18.)  There is also a financial report given at the monthly partnership meetings.  (Giaccia Aff. ¶ 38; 56.1 ¶ 74.)

Partners receive information on the compensation paid to the Firm's non-partner attorneys and also have access on their Firm computers to a software program that contains comprehensive real-time Firm-wide, client, matter and individual attorney financial data, including realization and utilization data. (Giaccia Aff. ¶ 39; 56.1 ¶ 77.)

The Partnership Agreement also requires that – as true owners of the Firm – all partners make capital contributions "proportionately according to [his/her] profit percentage interest" (Giaccia Aff. Ex. A, Section 7(d)), and provides for them to have their capital returned after they cease to be a partner in the Firm.  (*Id.* at Ex. A, Section 7(e)(3).)

**B.**    **Campbell's Ongoing Tenure as a Litigation Partner of the Firm**

Campbell joined Chadbourne in January 2014 and is to this day an equity partner of the Firm resident in the Washington, D.C. office.  (Giaccia Aff. ¶¶ 42-43; 56.1 ¶¶ 82, 88.)  Her shares level, while reduced from what it was previously, is still higher than that of certain other

6

partners at the Firm, both male and female, and as with all partners at the Firm, the ultimate

value of her shares will only be known at year-end based on the Firm's performance.  (Giaccia

Aff. ¶ 43; 56.1 ¶¶ 84, 86.)  While the Partnership Agreement provides that a partner can be

expelled following a vote of the partnership, no such action has been taken with respect to

Campbell.  (Giaccia Aff. ¶ 43; 56.1 ¶ 87.)

> ### C.   Johnson's Tenure as a Partner in the Firm's Kiev Office

Johnson joined the Firm as a partner in December 2003 in the Kiev, Ukraine office.

(Giaccia Aff. ¶ 44; 56.1 ¶ 89.)  Johnson managed the Kiev office until the end of 2013 and

remained a partner of the Firm until April 2014 when she resigned, and thereafter was a Senior

Counsel of the Firm until December 31, 2014.  (Giaccia Aff. ¶¶ 46-47; 56.1 ¶¶ 91, 99-100.)  As a

partner, Johnson enjoyed the same privileges of partnership described above.  (Giaccia Aff. ¶ 45;

56.1 ¶ 90.)  In addition, because of her position as head of the Kiev office, Johnson had wide

latitude over the management of the office.  (Giaccia Aff. ¶ 46; 56.1 ¶ 92.)

## ARGUMENT

### I.   PLAINTIFFS' STATUTORY CLAIMS SHOULD BE DISMISSED BECAUSE CHADBOURNE PARTNERS ARE NOT EMPLOYEES UNDER THE ANTI-DISCRIMINATION LAWS

Plaintiffs' claims under the FLSA, Title VII, the EPA and the DCHRA (*see* Counts I – X)

should be dismissed because equity partners, such as Plaintiffs, may not bring suit under these

statutes under the Supreme Court's decision in *Clackamas Gastroenterology Associates, P.C. v.*

*Wells*, 538 U.S. 440 (2003).

> ### A.   Legal Standard

Under Fed. R. Civ. P. 56, summary judgment is appropriate where there are no genuine

issues of material fact and the movant is entitled to judgment as a matter of law.  *See Anderson v.*

*Liberty Lobby*, 477 U.S. 242, 247-50 (1986).  Here, summary judgment is warranted because the

undisputed facts show that plaintiffs are not "employees" under the law.[5]

### B.  Plaintiffs Are Not Employees Under the Relevant Statutes

It is axiomatic that to assert statutory discrimination claims Plaintiffs must first

demonstrate that they are "employees."  The incontrovertible evidence shows that as partners –

who share in the Firm's profits and losses – Plaintiffs are business owners and employers and not

employees.  Among other things, the Firm's partners have a bona fide ownership interest in the

Firm, the right to control important Firm decisions under the Partnership Agreement, and are not

subject to excessive supervision and oversight.[6]

### 1.  The *Clackamas* Six-Factor Test

The guiding case which controls the analysis of this complaint is *Clackamas*, where the

Supreme Court held that the "common-law element of control is the principal guidepost" for

determining employee status.  538 U.S. at 448.  In so holding, the Court set forth the following

six-factor test to assess whether an individual is an "employee" under the law:

> (1) Whether the organization can hire or fire the individual or set the rules and
> regulations of the individual's work;
>
> (2) Whether and, if so, to what extent the organization supervises the individual's
> work;
>
> (3) Whether the individual reports to someone higher in the organization;
>
> (4) Whether and, if so, to what extent the individual is able to influence the

---

[5] *See Fitzgibbons v. Putnam Dental Assocs., P.C.*, 368 F. Supp. 2d 339, 342-43 (S.D.N.Y. 2005) (dismissing discrimination claim on summary judgment and finding that the shareholder of a professional corporation was not an employee under the law); *Rodal v. Anesthesia Grp. of Cent. N.Y.*, No. 00-CV-1386, 2006 WL 208835, at *6 (N.D.N.Y. Jan. 23, 2006) ("the evidence supports only the conclusion that the doctor/shareholders are essentially 'partners' and, therefore, are not employees of the firm.").

[6] *See Hishon v. King & Spalding*, 467 U.S. 69, 79-80 (1984) (J. Powell, concurring) ("[t]he relationship among law partners differs markedly from that between employer and employee—including that between the partnership and its associates. . . . The essence of the law partnership is the common conduct of a shared enterprise. The relationship among law partners contemplates that decisions important to the partnership normally will be made by common agreement.").

organization;

    (5) Whether the parties intended that the individual be an employee, as expressed in written agreements or contracts; and

    (6) Whether the individual shares in the profits, losses, and liabilities of the organization.

538 U.S. at 449-50.  An employer, according to the Court, is "the person, or group of persons, who owns and manages the enterprise."  *Id*. at 450.  The Court also cautioned that the factors are not exhaustive, and that "all of the incidents of the relationship" should be taken into account.  *Id*.  (quoting *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 324 (1992)).[7]

      **2.**     **Plaintiffs are Employers Under the First *Clackamas* Factor Because Chadbourne Cannot "Hire" or "Fire" or Set Rules and Regulations for Equity Partners**

      As equity partners, Plaintiffs are not employees under the first *Clackamas* factor because they are not subject to hiring or firing authority of the Firm without a vote by the partnership (in which they are included and have a vote), and any governing policies are set by the Management Committee that the partners themselves elected.

      Partners are admitted to the Firm only after a vote of the partners, and they cannot be expelled without an affirmative vote by the partners.  Under the Partnership Agreement, the admission of new partners requires an affirmative two-thirds vote of the partnership, which is also subject to a veto by the partners.  (Giaccia Aff. Ex. A, Section 12(f).)  Expulsion also requires an affirmative two-thirds vote of the partners.  (*Id.*)

      The case law applying *Clackamas*, where voting authority on the admission or expulsion of partners rests with the partnership group, has been held to weigh strongly in favor of employer

---

[7] *Clackamas* applies to claims arising under the DCHRA because: (1) the definition of an "employee" under the DCHRA mirrors the definition of an employee under federal law (42 U.S.C. § 2000e(f); 29 U.S.C. § 203(e)(1); D.C. Code § 2-1401.02(9)); and (2) courts applying the DCHRA have looked to cases interpreting Title VII, and other analogous federal statutes, for guidance.  *See, e.g.*, *Wash. Convention Ctr. Auth. v. Johnson*, 953 A.2d 1064, 1073 n.7 (D.C. 2008) (explaining that D.C. courts have looked to federal court decisions interpreting federal law when evaluating DCHRA claims).

status.  This is the way it is at Chadbourne, and the first factor is satisfied.  *See Solon v. Kaplan*, 398 F.3d 629, 633 (7th Cir. 2005) (employer status found where law firm partner could not be involuntarily terminated without a two-thirds vote by the general partners); *Bluestein v. Cent. Wis. Anesthesiology*, 986 F. Supp. 2d 937, 944 (W.D. Wisc. 2013) ("[p]laintiff was not subject to the hiring and firing authority of an organization; she was part of the independently operating group of shareholder-directors that made those decisions"), *aff'd*, 769 F.3d 944 (7th Cir. 2014); *Kirleis v. Dickie, McCamey & Chilcote, P.C.*, No. 06CV1495, 2009 WL 3602008 (W.D. Pa. Oct. 28, 2009), *aff'd*, No. 09-4498, 2010 WL 2780927 (3d Cir. July 15, 2010); *Cronkhite v. Unity Physician Grp., P.C.*, No. 1:05-CV-1577-SEBJMS, 2007 WL 1035091, at *7 (S.D. Ind. Mar. 30, 2007); *Bragg v. Orthopaedic Assocs. of Va.*, No. 2:06cv347, 2007 WL 702786, at *4 (E.D. Va. Mar. 2, 2007).

Plaintiffs also cannot proffer any evidence that they are unwillingly subject to the Firm's policies.  Like all partners, by signing the Partnership Agreement, they authorized the Firm (through its Management Committee) to establish such policies, which obviously exist for the partners' mutual benefit and protection.  (Giaccia Aff. ¶ 22; 56.1 ¶¶ 38-39.)  Equity partners have autonomy over their work, including the business that they bring into the Firm and the rates they charge for their work (subject to conflict checks, the Firm's client intake procedures, billing guidelines, collections and similar policies), as well as the manner in which they service clients.  (Giaccia Aff. ¶¶ 34-35; 56.1 ¶¶ 62, 65.)  To the extent partners are subject to any such Firm policies, such rules are necessary to ensure that the Firm operates ethically and consistently so that it provides top-tier legal services to all its clients, and is financially fair to all partners who share in the Firm's profits and losses.  As such, these policies do not suggest in the least that the Firm's equity partners are employees.  A policy that ensures that the Firm does not represent a client who it is also suing, for example, does not make any partner an employee.  *See, e.g.,*

10

*Kirleis*, 2009 WL 3602008, at *20-21 ("[a] reasonable juror could not find plaintiff to be an employee based upon rules and regulations governing every attorney handling the Firm's largest client's cases").   More importantly, Firm policies are either established or reviewed by the partner-elected Management Committee, which has been delegated the authority to manage the day-to-day operations of the Firm.  (Giaccia Aff. ¶ 34; 56.1 ¶ 64.)  Given this delegation of authority, and the ability of partners to elect or remove Management Committee members, and to run for a two-year term on the Management Committee themselves, Plaintiffs have – in effect – agreed to the rules affecting their work at the Firm.  *See e.g., Bluestein v. Cent. Wis. Anesthesiology*, 769 F.3d 944, 953 (7th Cir. 2014) (plaintiff "was one of the decision-makers who determined the rules and regulations that governed her own work and the work of others at the organization").

### 3.  Plaintiffs are Employers Under the Second *Clackamas* Factor Because the Firm Does Not Supervise the Work of Equity Partners

The Firm does not assign work to equity partners, nor does it review their work before it is submitted to clients or to courts or other tribunals.  (Giaccia Aff. ¶ 36; 56.1 ¶ 68.)  In fact, neither Plaintiff can point to a supervisor who oversees how they practice law or controls the details of their work.  *See Bluestein*, 769 F.3d at 954 ("[t]he salient point is that Bluestein could point to no supervisor…who dictated how Bluestein practiced anesthesiology."); *Schmidt v. Ottawa Med. Ctr., P.C.*, 322 F.3d 461, 467 (7th Cir. 2003) (even where a corporation's board assigns patients to physicians, so long as the plaintiff physician has discretion over the treatment of those patients, the plaintiff was an employer).

Rather, partners, including the Plaintiffs, set their own work schedules and decide where and when they will work.  (Giaccia Aff. ¶ 35; 56.1 ¶ 67.)  This, alone, demonstrates that their work is not supervised by the Firm.  *See Kirleis*, 2009 WL 3602008, at *21 (plaintiff "set her

own hours and work schedule, within the minimum and maximum billing hours adopted by the

Board of Directors, could work from home, and could work on weekends or not" and noting that

"[a]ssociate attorneys and staff employees did not have the same flexibility in scheduling.").

Neither Plaintiff can dispute the substantial discretion they have over the manner in which they

come and go, serve clients, the advice they give and the strategies they follow when working on

their matters, and a host of other issues (e.g., what trips to take or how to solicit business, etc.).

The existence of the Management Committee does not in any way alter the conclusion

that Plaintiffs are employers.  Courts have recognized that a certain amount of administrative

supervision is to be expected even in a true partnership, so long as the individual partners decide

how to perform their work.  *See, e.g., Bluestein*, 986 F. Supp. 2d at 944; *Cronkhite*, 2007 WL

1035091, at *7-8.

> **4.     Plaintiffs are Employers Under the Third *Clackamas* Factor Because
> Equity Partners Do Not Report To Someone at the Firm**

The third *Clackamas* factor also favors Defendants because equity partners do not report

to anyone at the Firm.  As explained above, partners operate autonomously by setting their own

hours of work and determining the manner in which they practice law.

As with the second *Clackamas* factor, courts have found that where certain high-level

decision-making may be delegated to upper level committees of management, no loss of

employer status occurs where the individual partners retain autonomy over their work.  *See, e.g.,*

*Kirleis*, 2009 WL 3602008, at *21 (finding that although the firm's executive committee

mandatorily vetted new matters for conflicts and financial viability, such fact did not weigh

against employer status where plaintiff was otherwise able to control the manner of work that

was performed on matters once they are approved); *Cronkhite*, 2007 WL 1035091, at *7-8.

Here, Firm partners work independently and are the only ones to supervise the work performed on their matters.  (Giaccia Aff. ¶ 36; 56.1 ¶ 68.)  While it is true that the Firm's organizational structure vests certain partners with managerial responsibilities, including the Management Committee, Plaintiffs do not *report* to those partners in the same way that an employee would report to a supervisor in the employment context.  Neither the Management Committee nor even practice group leaders review the work of the partners – what is sent to clients, what is filed in courts, and what is said to adversaries.  Given the lack of any reporting relationship, partners are clearly not employees.

### 5.   Plaintiffs are Employers Under the Fourth *Clackamas* Factor Because Equity Partners Are Able to Influence the Firm

The fourth *Clackamas* factor also compels a finding that Plaintiffs are not employees because they can exercise their voting authority to influence the management of the Firm.

Under the Partnership Agreement, Firm partners (including the Plaintiffs) elect the Firm's Management Committee, including the Managing Partner, and also have a direct vote on matters of significance, including the admission of new partners, the termination of a partner's membership, amendments to the Partnership Agreement, and termination of the Firm itself (all defined as "Major Actions" under the Partnership Agreement).  The right to vote on these highly significant Firm matters strongly supports the finding that Plaintiffs are employers.  *See Solon*, 398 F.3d at 633 (law firm partner's voting rights meant he "exercised substantial control over how to allocate the firm's profits, and whether to require additional capital contributions, make financial commitments, amend the partnership agreement, and dissolve the firm."); *Mariotti v. Mariotti Bldg. Prods., Inc.*, 714 F.3d 761, 768 (3d Cir. 2013) (shareholder status gave plaintiff "both substantial authority at [defendant] and the right to control the enterprise").

Equity partners also influence the Firm by electing the Managing Partner and other members of the Management Committee, to whom certain managerial responsibilities are delegated.  *See* Giaccia Aff. Ex. A, Section 5; *Weir v. Holland & Knight, LLP*, No. 603204/07, 2011 WL 6973240, at *7 (Sup. Ct. N.Y. Cty. Dec. 9, 2011) (finding employer status where law firm partner "had the right to elect the Managing Partner and Directors Committee and, indeed, was eligible for election to such positions").  *Cf. EEOC v. Sidley Austin Brown & Wood*, 315 F.3d 696, 702-03 (7th Cir. 2002) (noting that the defendant law firm concentrated all power on compensation and other major decisions with a small, *unelected* – i.e., self-perpetuating – committee).  As explained above, the Firm's Management Committee sets out and implements the Firm's strategic goals and objectives, including objectives regarding Firm office locations, practice groups and potential mergers.  The Committee's oversight of these matters, however, does not render the Firm's partners employees because the partners – including Plaintiffs – agreed to delegate this authority to the Management Committee in the Firm's Partnership Agreement.  Moreover, the Committee manages the Firm on behalf of the partnership, and the partners can always vote to change or rescind that authority.  *See Kirleis*, 2009 WL 3602008, at *22 (stating that a partnership's reliance on an elected executive committee for administrative or governance matters "[a]t most, this reflects the economic and political realities of the practice of law and divisions of labor at a large law firm.").

The Management Committee's role in setting partner compensation does not compel a different result.  As explained above, all equity partners are entitled to share in the profits and losses of the Firm, and the manner in which profits are distributed is delegated to the Management Committee.  And, the partners (including Plaintiffs) elect the Management Committee and can vote on the composition of the Committee or the delegation of authority to the Committee.  *See Kirleis*, 2009 WL 3602008, at *19 (explaining that because the shareholders

14

delegated responsibility for compensation to the Executive Committee, and can amend that delegation through a vote, the shareholders "retain the ultimate control over matters of compensation, unlike mere employees of a corporation.")

Of particular importance is also the fact that partners have broad access to the Firm's financial information, including information on every partner's compensation.  In addition to audited financial statements, which partners receive under the Partnership Agreement, partners also receive regular reports on the Firm's finances and have available to them real-time client, matter and attorney financial data.  They receive, among other things, detailed reports on the business generated by partners, hours worked, realization rates, and the profits distributed to their partners each year.  By contrast, the Firm does not share this sensitive financial information with its employees.

As the court in *Kirleis* found, plaintiff and his peer shareholders at the firm "have access to a great deal of financial information about the Firm that those coming behind them in the hierarchy are not privy to."  2009 WL 3602008, at *18.  *See also Solon*, 398 F.3d at 633 (citing plaintiff's access to "private financial information"); *Bowers v. Ophthalmology Grp., LLP*, No. 5:12-CV-00034-JHM, 2012 WL 3637529, at *6 (W.D. Ky. Aug. 22, 2012) (citing plaintiff's ability to "request and view sensitive financial information"), *vacated and remanded*, 733 F.3d 647 (6th Cir. 2013).   In fact, while plaintiff in *Kirleis* (like Plaintiffs here) had available to him detailed information on the revenues, billings and collections, Kirleis did *not* have access to compensation paid to individual shareholders, to which equity partners at Chadbourne have access.  *See* 2009 WL 3602008, at *18 n.21.  Plaintiffs' unfettered access to almost every piece of financial information within the Firm strongly supports the conclusion that they are not employees of the Firm.

**6.      Plaintiffs are Employers Under the Fifth *Clackamas* Factor Because the Partnership Agreement Evidences the Parties' Intent that Equity Partners Not Be Employees**

The fifth *Clackamas* factor also compels dismissal of Plaintiffs' claims because the Partnership Agreement makes clear that partners are, and are treated as, owners rather than employees.  As explained above, the Partnership Agreement – to which Plaintiffs agreed – contains all the hallmarks of a true partnership arrangement.  Partners share in the profits and losses of the Firm, make capital contributions in proportion to their percentage interests, and are entitled to the return of their capital after they cease to be a partner in the Firm.  Partners also vote on the admission of new partners and motions to expel a current partner, elect the Firm's Managing Partner and Management Committee,  amend the terms of the Partnership Agreement, change the name of the Firm,  or decide to dissolve the Firm altogether.  The right of partners to vote on these important matters shows the Firm's intent to treat partners as owners, and not as employees. *See Kirleis*, 2009 WL 3602008, at *23; *Weir,* 2011 WL 6973240, at *7 (under the partnership agreement, equity partners could elect and remove the managing partner, override the managing partner on major decisions, and vote on whether to dissolve the firm).

As further evidence of the fact partners are not employees, their partnership distributions are reported annually on an IRS Form K-1, which is used to report partnership income, and not a W-2.  (Giaccia Aff. ¶ 33; 56.1 ¶ 61.)  *See Bowers*, 2012 WL 3637529, at *5 (noting as significant that plaintiff "used a schedule K-1 form in reporting income, losses and dividends").

**7.      Plaintiffs are Employers Under the Sixth *Clackamas* Factor Because Equity Partners Share in the Profits, Losses and Liabilities of the Firm**

The sixth *Clackamas* factor also compels a finding that Plaintiffs are employers because partners share in the profits, losses, and liabilities of the Firm.  They are not salaried as the real employees of the Firm are.  The Partnership Agreement requires that profits and losses "be

shared or borne, as the case may be, by partners in accordance with their respective profit

percentage interests." (Giaccia Aff. Ex. A, Section 8.) Firm partners share in profits and losses

through their receipt of distributions based on a "points" system, whereby each partner is

allocated a number of points that translate into a percentage share of the Firm's profits and

losses. (Giaccia Aff. ¶ 28; 56.1 ¶ 49.) The points list distributed to partners also lists each

partner's percentage of ownership. (Giaccia Aff. ¶ 31; 56.1 ¶ 56.) Because partner

compensation is based on this point system, there is no doubt that partners share in the Firm's

profits and losses and therefore are employers under the law. *See, e.g., Bluestein*, 986 F. Supp.

2d at 945 (finding the fact that plaintiff "shared in the profits and losses of the organization" to

"weigh[] heavily in finding that she was an employer and not an employee of defendant at the

times relevant to her complaint"); *Kirleis*, 2009 WL 3602008, at *25 (finding no genuine issue of

fact with regard to this factor where shareholder compensation fluctuates with the firm's profits);

*Bragg*, 2007 WL 702786, at *5 (finding employer status where "plaintiff had an equity interest

and was entitled to share in the profits of the corporation); *Cronkhite,* 2007 WL 1035091, at *10

(plaintiff shared in profits); *Mehta v. HCA Health Servs. of Fla., Inc.*, No. 8:05-CV-27-T24-

TGW, 2006 WL 3133327, at *6 (M.D. Fla. Oct. 31, 2006) (sixth *Clackamas* factor satisfied

where plaintiff "shared in the profits and liabilities of [the partnership]").

   Finally, equity partners also make capital contributions to (and therefore invest in) the

Firm, where such contributions are based on their profit percentage interests. The actual

employees of the Firm do not do that. Under the cases applying *Clackamas*, these capital

contributions make clear that partners are not employees. *See Ziegler v. Anesthesia Assocs. of

Lancaster, Ltd.*, 74 F. App'x 197, 200 (3d Cir. 2003) (contributions to firm capital and profit-

based compensation indicate employer status); *Kirleis*, 2009 WL 3602008, at *26 (capital

contributions "weigh[] heavily" in favor of employer status).

## II.   PLAINTIFFS' CLASS CLAIMS FAIL AS A MATTER OF LAW

Even if the Court were to find that Plaintiffs are employees (which they are not), their class allegations cannot continue and should be dismissed because they fail to plead (let alone proffer) facts sufficient to satisfy: (1) Rule 23's numerosity requirement; and (2) the commonality requirement under the Supreme Court's decision in *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011).[8]   The class allegations are also subject to dismissal because they reflect a patent intra-class conflict where money awarded to one partner would necessarily reduce the recovery of others.   The collective claims also fail because the collective action plaintiffs are not "similarly situated."

Any purported class action complaint must set forth sufficient factual allegations to establish each of the four prerequisites set forth in Rule 23(a)(1)-(4).   *See Ruggles v. Wellpoint, Inc.*, 253 F.R.D. 61, 66 (N.D.N.Y. 2008).   If a complaint fails to establish these fundamental prerequisites, the class allegations should be dismissed.   *See, e.g., Wright v. Family Dollar, Inc.*, No. 10C4410, 2010 WL 4962838, at *1 (N.D. Ill. Nov. 30, 2010); *Jiang v. Allstate Ins. Co.*, 199 F.R.D. 267, 269 (N.D. Ill. 2001).

### A.   The Proposed Class Is Not Sufficiently Numerous

Plaintiffs' proposed class fails to meet the most basic requirement of class litigation: that the proposed class be "so numerous that joinder of all members is impracticable."   Fed. R. Civ. P. 23(a)(1).   Courts in this Circuit have regularly held that a presumption of numerosity arises only when a putative class contains at least forty (40) members.   *See Forde v. Waterman S.S. Corp.*, No. 12 Civ. 3396 (KBF), 2013 WL 5309453, at *4 (S.D.N.Y. Sept. 18, 2013); *MacNamara v. New York*, 275 F.R.D. 125, 141 (S.D.N.Y. Sept. 18, 2011); *Myers v. Crouse*

---

[8] Additionally, if the Court were to find that Plaintiffs, as equity partners of the Firm, are not employees, then the class claims fail as a matter of law because they rest on the very statutory claims that Plaintiffs are unable to assert.

*Healthcare Sys., Inc.,* 274 F.R.D. 404, 413-14 (N.D.N.Y. 2011) (affidavits from plaintiff and 18 potential class members not sufficient to establish numerosity).[9]

Here, the number of potential class members as alleged by Plaintiffs is only 26 – well under the forty class-member threshold set forth in the caselaw, and clearly too few to justify class treatment.  (Giaccia Aff. ¶ 2; 56.1 ¶ 3.)  The actual number is lower.  Although Plaintiffs vaguely refer to the possibility that "some female attorneys are employed in some of the Firm's international offices" (Am. Compl. ¶ 179), they expressly limited the proposed class to "female Partners who are, have been or will be employed by Chadbourne *in the United States*."  (*Id.*, ¶ 169) (emphasis added).[10]  Here, 2 of the current partners and 4 of the former partners who would comprise the class were non-U.S. citizens based outside the United States, such that of the 26 partners in Plaintiffs' self-proposed class, only 20 are (or were) even U.S. based or U.S. citizens. With recent partner elections at Chadbourne, the number would now be 23.  (Giaccia Aff. ¶ 2; 56.1 ¶¶ 4-6.)

Plaintiffs claim that, despite the modest class size, joinder would be impracticable because the "members of the proposed Class are diffused [sic] throughout the country."  (Am. Compl. ¶ 179).[11]  Yet, the face of the complaint and uncontestable reference to the Firm's

---

[9] *See also Pruitt v. Chicago*, 472 F.3d 925 (7th Cir. 2006) (proposed class of 40 insufficiently numerous); *Edge v. C Tech Collections, Inc.* 203 F.R.D. 85, 89 (E.D.N.Y. 2001); *Reese v. Arrow Fin. Servs., LLC*, 202 F.R.D. 83, 90 (D. Conn. 2001); *Uniondale Beer Co. v. Anheuser-Busch, Inc.*, 117 F.R.D. 340, 345 (E.D.N.Y. 1987) (proposed class of 100 members insufficient to establish numerosity); *In re W.T. Grant Co.*, 24 B.R. 421, 424 (Bankr. S.D.N.Y. 1982) (proposed class of 33 insufficient); *Ewh v. Monarch Wine Co.*, 73 F.R.D. 131, 132 (E.D.N.Y. 1977) (proposed class of 34 insufficient).

[10] Non-U.S. citizen partners who were based outside the U.S. cannot bring suit under U.S. employment laws, and thus cannot be included in the putative class or collective action. *See* 29 U.S.C. § 213(f); *Hart v. Dresdner Kleinwort Wasserstein Sec., LLC*, No. 06 Civ. 0134 (DAB), 2006 WL 2356157, at *6 (S.D.N.Y. Aug. 9, 2006) ("Congress specifically stated that the FLSA was not to be applied in foreign countries"); *Mithani v. Lehman Bros., Inc.*, No. 01 Civ. 5927 (JSM), 2002 WL 14359, at *1 (S.D.N.Y. Jan. 4, 2002) ("Title VII does not apply to the employment of aliens outside of the United States").

[11] Indeed, "[i]n a case where the number of class members is at best fairly small, plaintiffs must demonstrate additional reasons why joinder is impracticable." *Carr v. NYSE, Inc.*, 414 F. Supp. 1292, 1304 (N.D. Cal. 1976).

website belie this assertion. In reality, 12 female partners work in the Firm's New York City office, which is within this Court's jurisdiction, and the remaining four U.S. based female partners work in the Firm's Washington D.C. office, which is hardly remote or inaccessible. (Giaccia Aff. ¶ 50; 56.1 ¶ 104.)   More importantly, the names, addresses, and contact information of these individuals are publicly posted on Chadbourne's website, are known to Plaintiff Campbell as her law partners, and three of them work in the same office as Campbell. (Giaccia Aff. ¶ 51; 56.1 ¶ 105.)   As a result, the class is *not* "diffused" and joinder is *not* impracticable. *See Garcia v. Gloor*, 618 F.2d 264, 267 (5th Cir. 1980) (certification where the 31 putative class members' "identity and addresses were readily ascertainable" and they "all lived in a compact geographical area."); *Primavera Familienstiftung v. Askin*, 178 F.R.D. 405, 410-11 (S.D.N.Y. 1998) ("Knowledge of names and existence of members has been called the most important factor [in establishing numerosity], precisely because it renders joinder practicable."); *Gilchrist v. Bolger*, 89 F.R.D. 402, 410 (S.D. Ga. 1981), *aff'd*, 733 F.2d 1551 (11th Cir. 1984) (where records showed the identity and addresses of all 21 to 24 potential class members, the "number of putative class members is not so large as to make joinder impracticable.")

The putative class members are also aware of the existence of this lawsuit and are sophisticated attorneys who currently work, or previously worked, at an international law firm and who are capable of joining the lawsuit if they wish. *See Pennsylvania Pub. Sch. Emps.' Ret. Sys. v. Morgan Stanley & Co.,* 772 F.3d 111, 120 (2d Cir. 2014) (holding that joinder was practicable because the potential class members were "limited and identifiable, and composed of sophisticated … investors . . . and were able to pursue their own claims.").[12]  Plaintiffs'

---

[12] *See also Stoudt v. E.F. Hutton & Co., Inc.*, 121 F.R.D. 36, 38 (S.D.N.Y. 1988) (finding joinder not impracticable and holding that Rule 23 was not intended to allow claimants "who are fully capable of proceeding on their own, to

allegation that joinder is impracticable because of "[f]ear of retaliation" is nothing but unsupported conjecture.  (Am. Compl. ¶ 179).

Finally, Plaintiffs also fail on numerosity because 14 of the Firm's female partners (U.S. and foreign based) have expressed, in writing, their strong disapproval of Campbell's decision to file a class action seeking to represent their rights as female partners.  (Giaccia Aff. Ex. E.)  In this letter, the female partners "reject . . . [counsel's] claim to represent a class that purportedly includes [them]", and insist that the class allegations be withdrawn.  (*Id*.; *see J.B.D.L. Corp. v. Wyeth-Ayerst Labs., Inc.*, 225 F.R.D. 208, 220 (S.D. Ohio 2003)).

### B.        There Are No Common Questions of Law or Fact

Still another dispositive flaw to the complaint is that there are no common questions of law or fact as required by Rule 23(a)(2).  As the Supreme Court explained, a plaintiff seeking class certification must identify at least one question (1) that is susceptible to a common answer for the entire class in one stroke; and (2) whose resolution materially pushes the litigation forward.  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).  Plaintiffs' own allegations – for example that they are "better" than other partners – show that the resolution of this case depends on highly individualized decisions related to each partner's compensation.

When read carefully, the purported common questions identified in Paragraph 181 of the Amended Complaint are all just restatements of the same basic themes – *i.e.*, is Chadbourne liable under Title VII or should the Firm's female partners be paid more?  This type of superficially "common" question of law or fact is not enough to meet the exacting standard set by the Supreme Court in *Dukes*.  As the Supreme Court recognized, "[a]ny competently crafted class complaint literally raises common 'questions.' For example:  Do all of us plaintiffs indeed

---

strengthen their bargaining position by threatening their adversaries with the prospect of class-wide relief and large attorney fee awards.").

work for Wal-Mart?  Do our managers have discretion over pay?  Is that an unlawful

employment practice?  What remedies should we get?"  *Dukes,* 564 U.S. at 348 (internal

citations omitted).  The kinds of supposedly "common" questions raised by Plaintiffs are, like the

examples set forth in *Dukes*, simply too abstract and do not meet the commonality test required

by Rule 23(a).

The allegations in the Amended Complaint show why the class-wide claims fail at the

outset.  The Amended Complaint contains literally dozens of paragraphs setting forth allegations

regarding each *Plaintiff's* individual circumstances and how they believe those factors did or

should have affected their own compensation.  (Am. Compl. at ¶¶ 54-136.)  Yet, such claims

cannot be extrapolated across the class, where different partners have widely differing

professional resumes, performed at different levels and had differing responsibilities while at

Chadbourne, and have contributed (or not) in a myriad of different ways to the Firm and to the

professional community.  The true gravamen of the Amended Complaint is not that "women

partners" were underpaid, but that these two Plaintiffs believe *they* were underpaid.  More to the

point, if a finding were made that Plaintiffs were underpaid, that conclusion would be irrelevant

to other female partners of the Firm.  Simply put, Plaintiffs' claims are *not* amenable to a class-

wide resolution.  These are all individual and nuanced claims that are in no way "common" to all

female Firm partners.

### C.     The Proposed Class Contains Unavoidable Intraclass Conflicts

Rule 23(a)(4) also requires the proposed class representatives to prove that they will

adequately represent the unnamed class members.  At a minimum, this requires a showing that

"the proposed class representative must have an interest in vigorously pursuing the claims of the

class, and must have no interests antagonistic to the interests of other class members."  *Denney v.*

*Deutsche Bank AG*, 443 F.3d 253, 268 (2d Cir. 2006).  Here, the very nature of the Firm's

22

partnership structure creates a potential for intra-class conflict because the allocation of

percentage profit-and-loss interests (as reflected in Chadbourne's points system) is by definition

a zero-sum game in which any additional percentage allocated to Plaintiffs (or any other Firm

partner) necessarily reduces the remaining profit percentage available for allocation among other

partners.  *See, e.g., Valley Drug Co. v. Geneva Pharms., Inc.*, 350 F.3d 1181, 1189 (11th Cir.

2003) ("A fundamental conflict exists where some party members claim to have been harmed by

the same conduct that benefited other members of the class."); *Pickett v. Iowa Beef Processors*,

209 F.3d 1276, 1280 (11th Cir. 2000) (reversing class certification because some members of the

class benefited from the contracts that were subject to plaintiff's challenge).  This classic

example of intraclass conflict warrants dismissal of the class claims.  *See Block v. First Blood

Assocs.*, 125 F.R.D. 39, 41 (S.D.N.Y. 1989); *Mechigian v. Art Capital Corp.*, 612 F. Supp. 1421,

1433 (S.D.N.Y. 1985).

### D.      Plaintiffs' Collective Action Allegations Are Insufficient

Plaintiffs also seek to proceed via collective action under the EPA.  In order to properly

allege a collective action, Plaintiffs must show that they and the other putative collective

members are "similarly situated."  29 U.S.C. § 216(b).  For the same reasons explained above

(e.g., claims of different skills, experience, tenure in the Firm), the Amended Complaint makes

no such showing, but instead contains specific factual allegations about each plaintiff and then

relies on a wholly conclusory assertion that they are similarly situated.  *See Cowell v. Utopia

Home Care, Inc.,* No. 14-cv-736 (LDW)(SIL), 2016 WL 4186976, at *6 (E.D.N.Y. Aug. 8,

2016) (where a complaint involves "very fact-specific inquiries," the claims are not "susceptible

... to a similarly-situated person analysis that would support the issuance of a collective action

notice.") (citation omitted).  Plaintiffs simply cannot satisfy their burden with unsupported

claims. *See Myers v. Hertz Corp.*, 624 F.3d 537, 555 (2d Cir. 2010).  Almost by definition,

partners in a law firm are not amenable to the phrase "similarly situated," and making that conclusory statement does not make it so.

## III.   THE COURT SHOULD NOT EXERCISE JURISDICTION OVER PLAINTIFFS' STATE LAW CLAIMS

Devoid of any viable federal claims, there is nothing left for a federal court to consider. After dismissing Plaintiffs' federal claims, the Court should decline to exercise supplemental jurisdiction over their remaining state claims.  28 U.S.C. § 1367(c)(3).  The factors to consider when deciding whether to exercise pendent jurisdiction include "judicial economy, convenience and fairness to litigants; if these are not present a federal court should hesitate to exercise jurisdiction over state claims."  *Seabrook v. Jacobson*, 153 F.3d 70, 71-72 (2d Cir. 1998) (quoting *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726 (1966)).  Indeed, "if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well."  *Id.*; *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988).

At this early stage in the case, before any pre-trial litigation has occurred (with the exception of the pleadings and the instant motion), the court should decline jurisdiction over state law claims where the federal claims are dismissed.[13]  *See, e.g., McGugan v. Aldana-Bernier*, No. 11-CV-00342 TLM, 2012 WL 1514777, at *8 (E.D.N.Y. Apr. 30, 2012), *aff'd*, 752 F.3d 224 (2d Cir. 2014) ("when all federal claims are eliminated in the early stages of litigation, the balance of factors generally favors declining to exercise pendent jurisdiction over remaining state law claims and dismissing them without prejudice"); *Jordan (Bermuda) Inv. Co. v. Hunter*

---

[13] In the Amended Complaint, Campbell only asks the Court to exercise supplemental jurisdiction over her claims under the DCHRA (Counts VII-X).  Assuming that she had intended, but neglected, to request that the Court extend subject matter jurisdiction over her common laws claims in Counts XI-XII, the same rationale recommends their dismissal. Neither convenience nor fairness to the parties warrants this Court's retention of this case given that it has only recently been filed and the parties can litigate Plaintiffs' state claims in another forum.

*Green Investments Ltd.*, 154 F. Supp. 2d 682, 695 (S.D.N.Y. 2001) (declining to exercise

pendent jurisdiction over state claims after granting defendants' motion to dismiss federal

claims); *Castellano v. Bd. of Trs. of Police Officers' Variable Supplements Fund*, 752 F. Supp.

98 (S.D.N.Y. 1990), *aff'd*, 937 F.2d 752 (2d Cir. 1991) (same).

## <u>CONCLUSION</u>

Putting aside the merits (or complete lack of merits) of Plaintiffs' allegations, the lawsuit

cannot continue for the variety of legal flaws it seeks to overlook – they are owners/employers of

and in the law firm Chadbourne & Parke LLP and not employees of the law firm Chadbourne &

Parke LLP; they are not numerous enough to bring a class action; they have no common issues to

sustain a class action; and there are inherent conflicts among their purported class.  Therefore,

judgment should be entered for Defendants and the case should be dismissed.


Dated: New York, New York
          November 14, 2016

Respectfully submitted,

PROSKAUER ROSE LLP

By: /s/ Kathleen M. McKenna
   Kathleen M. McKenna
   Evandro C. Gigante
   Rachel S. Fischer
   Eleven Times Square
   New York, New York 10036
   Ph.: (212) 969-3000
   Fax: (212) 969-2900
   kmckenna@proskauer.com
   egigante@proskauer.com
   rfischer@proskauer.com

   *Attorneys for Defendants*

25