**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **KERRIE CAMPBELL and JAROSLAWA Z. JOHNSON,** individually, and on behalf of others similarly situated,<br><br>    **Plaintiffs,**<br><br>**v.**<br>**CHADBOURNE & PARKE LLP, MARC ALPERT, ANDREW GIACCIA, ABBE LOWELL, LAWRENCE ROSENBERG, HOWARD SEIFE, and PAUL WEBER**<br><br>    **Defendants.** | **Civ. No. 1:16-cv-06832 (JPO)** |

**PLAINTIFFS' RESPONSE TO DEFENDANTS' LOCAL CIVIL RULE 56.1**
**STATEMENT AND PLAINTIFFS' STATEMENT OF ADDITIONAL MATERIAL**
**FACTS TO BE TRIED BY A FACTFINDER**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Civil Rule 56.1 of the Southern District of New York, Plaintiffs hereby submit this response to Defendants' Statement of Material Uncontested Facts in support of Defendants' Motion for Summary Judgment, including Plaintiffs' statement of additional material facts.

**Plaintiffs' Response to Defendants' Statement of Material Undisputed Facts**

1.   Defendant Andrew A. Giaccia ("Giaccia") is the Managing Partner of Chadbourne & Parke LLP ("Chadbourne" or the "Firm"), an international law firm of over 300 attorneys with eighty-eight (88) partners, which has ten (10) offices in eight (8) countries around the world. (Affidavit of Andrew A. Giaccia ("Giaccia Aff.") ¶ 1.)

**RESPONSE:** Disputed that Chadbourne has only eight-eight (88) partners. When last accessed on January 9, 2017, Chadbourne's website identified one hundred and three (103)

1

partners. (Campbell Decl. ¶ 5; Johnson Decl. ¶ 6.)  Further, Plaintiffs lack information with respect to the current status of Chadbourne's foreign offices, as Plaintiffs are not privy to the real-time operating status of all of Chadbourne's non-U.S. offices.  (Campbell Aff. ¶ 6; Johnson Decl. ¶ 7.)

2.      Giaccia joined Chadbourne in 1986, became a partner of the Firm in 1994, and became Managing Partner of the Firm in 2010.  (Giaccia Aff. ¶ 1.)

**RESPONSE**: Undisputed that Giaccia has been Managing Partner of the Firm since 2010. Plaintiffs lack information, however, as to when Giaccia first joined Chadbourne and then became a partner because no discovery has taken place in this action.  (Sanford Decl. ¶ 13.) Plaintiffs expect discovery to establish the dates when Giaccia joined Chadbourne and became a partner.  (Sanford Decl. ¶ 13.)

3.      Plaintiffs Kerrie Campbell ("Campbell") and Jaroslawa Z. Johnson ("Johnson") in this putative employment discrimination class action describe a proposed class of present and former female U.S. partners since August 2013 which they allege amounted to a purported class of 26 women. (First Amended Complaint ¶ 169.)

**RESPONSE**: Disputed. Plaintiff Kerrie Campbell has brought an employment discrimination class action on behalf of a proposed class of past, present, and future female partners at Chadbourne since August 2013. (Amend. Compl. Count I, ¶ 151.) Plaintiff Jaroslawa Z. Johnson is a proposed collective action representative only.  (Amend. Compl. Count II.)  The proposed class is estimated to contain at least 27 such women.  (Campbell Aff. ¶ 2; Johnson Decl. ¶ 4.)  Further, the class includes all female partners through the

date of final judgment, so more class members may be added going forward.  (Amend. Compl. ¶ 151.)  In addition, the declaratory and injunctive relief Plaintiffs seek in this action will benefit future female partners at Chadbourne.  (Amend. Compl. Prayer for Relief.)

4.      Two of Chadbourne's current female partners, and four of Chadbourne's former female partners, are non-U.S. citizens who are or were based outside the United States.  (Giaccia Aff. ¶ 2.)

> **RESPONSE:**  Undisputed that two of Chadbourne's current female partners are based primarily outside of the United States.  Plaintiffs lack information, however, regarding the extent to which the two female partners who are primarily based outside the United States also work for the Firm in the United States, how many former female partners (over an unspecified number of years) have ever been based outside the United States, and which female partners at Chadbourne are or were non-U.S. citizens, as discovery has not yet taken place in this action.  (Campbell Decl. ¶ 3; Johnson Decl. ¶ 5; Sanford Decl. ¶ 13.)  Plaintiffs expect that discovery will establish the place(s) of work of each of Chadbourne's current and former female partners and the citizenship of Chadbourne's current and former female partners.  (Sanford Decl. ¶ 13.)

5.      Effective November 1, 2016, the Firm elected to the partnership a new group of internally-promoted attorneys, three of whom were women and all of whom are located in the United States.  (Giaccia Aff. ¶ 2.)

3

**RESPONSE**: Undisputed that a group of attorneys, three of whom were women and all of whom are located in the United States, were recently internally promoted to become partners.  Plaintiffs dispute, however, the misleading characterization that "the Firm elected" a new group of partners.  At the Firm, the partnership selection and promotion process is controlled by the Management Committee.  (Campbell Decl. ¶¶ 18, 22; Johnson Decl. ¶¶ 22, 23.)  The Management Committee determines the individuals who are to be made partner prior to any vote of the broader partnership.   (Campbell Decl. ¶¶ 18, 22; Johnson Decl. ¶ 22, 23.)  Plaintiffs expect that discovery will show that the role of the full partnership in selecting and hiring partners is minimal and *pro forma*.  (Campbell Decl. ¶¶ 20, 22; Johnson Decl. ¶ 23; Sanford Decl. ¶ 13.)   Plaintiffs further expect discovery to establish that the Management Committee, in its decisions concerning promotions to the partnership, has granted preferential treatment to men and has discriminated against women. (Campbell Decl. ¶¶ 22; Johnson Decl. ¶ 23.)

6.       The number of current and former female partners at the Firm since August 2013 who are U.S. citizens or based in the United States presently totals 23.  (Giaccia Aff. ¶ 2.)

**RESPONSE:**  Disputed.  Plaintiffs calculate that there are at least 27 current and former female partners who are or were U.S. citizens or based in the United States since August 2013.  (Campbell Decl. ¶ 2; Johnson Decl. ¶ 4.)  Plaintiffs lack complete information as to which female partners at Chadbourne are or were non-U.S. citizens, as discovery has not yet taken place in this action.  (Campbell Aff. ¶ 3; Johnson Decl. ¶ 5; Sanford Decl. ¶ 13.)  Plaintiffs expect that discovery will establish the citizenship of Chadbourne's current and former female partners.  (Sanford Decl. ¶ 13.)

4

7.      Chadbourne is a New York limited liability partnership.  (Giaccia Aff. ¶ 3.)

**RESPONSE:**  Undisputed that Chadbourne & Parke LLP is a New York limited liability partnership.

8.      Each Chadbourne partner is a signatory to the Firm's Partnership Agreement. (Giaccia Aff. ¶ 4.)

**RESPONSE:**  Disputed, as Plaintiffs lack information as to whether all of the Firm's partners are signatories to Firm's Partnership Agreement.  The Management Committee did not provide Plaintiffs with copies of the Partnership Agreement containing the signature of all Chadbourne partners.  (Campbell Decl. ¶ 9; Johnson Decl. ¶ 10.)  The copy of the Partnership Agreement that Defendants submitted to the Court does not contain signatures for all partners and in fact contains numerous blank signature lines.  (Giaccia Aff. Ex. A.)  As Plaintiffs expect discovery to confirm, neither Plaintiffs nor other partners have had any opportunity to negotiate the terms of the Partnership Agreement.  (Campbell Decl. ¶ 8, 60; Johnson Decl. ¶ 9, 55; Sanford Decl. ¶ 13.)  Plaintiffs expect that discovery will establish whether all current partners have all signed the Partnership Agreement and whether any individuals have been given the status of partners prior to, or without, signing the Firm's Partnership Agreement or any amendments thereto.  (Sanford Decl. ¶ 13.) Plaintiffs further dispute any implication that being required to sign the Partnership Agreement entails a meaningful stake in determining the business of the Firm.  Plaintiffs anticipate that discovery will show that the Management Committee exercises complete control over the Firm's finances, operations, management, personnel, and administration,

and individual partners are effectively shut out of meaningful participation in the Firm's governance.  (Campbell Decl. ¶¶ 11, 1, 60; Johnson Decl. ¶¶ 12, 13, 55.).

9.      The Partnership Agreement states that the "property and business of the firm shall be managed by the partners."  (Giaccia Aff. Ex. A, Section 5(a).)

**RESPONSE:**   Undisputed that this is an excerpt from Paragraph 5(a) of the Firm's Partnership Agreement.  However, this partial except is misleading and contradicted by the rest of Paragraph 5(a) of the Partnership Agreement, which clearly states that, with limited exceptions, "*all the powers of the partners* in the management of the business of the firm and to make and carry out all decisions necessary therefor" *are vested in the Firm's Management Committee*. (Giaccia Aff. Ex. A, Section 5(a) (emphasis added).)   The Partnership Agreement further vests in the Firm's Managing Partner the power to "carry out the duties of the Management Committee with respect to the day-to-day operations, management and administration of the firm."   (Giaccia Aff. Ex. A, Section 5(e).) Throughout the Firm's more than 100 years of existence, the Managing Partner of the Firm has always been male.  (Campbell Decl. ¶ 13; Johnson Decl. ¶ 14.). Throughout the Firm's more than 100 years of existence, until shortly after Ms. Campbell's filing of an EEOC charge, the five-member Management Committee has always been exclusively male as well.  (Campbell Decl. ¶ 13; Johnson Decl. ¶ 14.)  In practice and in Plaintiffs' experience, the Managing Partner and Management Committee have exercised predominant control over all Firm business. (Campbell Decl. ¶ 11; Johnson Decl. ¶12.)   Plaintiffs expect that discovery will establish that the property and business of the Firm are actually managed by

the Management Committee (including the Managing Partner), and not by the partnership generally. (Campbell Decl. ¶ 11, 60; Johnson Decl. ¶ 12; 55; Sanford Decl.¶ 13.)

10.     The Partnership Agreement requires that—as owners of the Firm—all partners make capital contributions.  (Giaccia Aff. ¶ 6.)

**RESPONSE:**  Disputed. To the contrary, the Partnership Agreement expressly provides that the Management Committee may exempt partners from any obligation to make capital contributions to the Firm.  (Giaccia Aff. Ex. A, Section 7(d).)  Plaintiffs expect that discovery will establish that the Management Committee has made individual arrangements with partners with respect to their capital contributions. (Sanford Decl.¶ 13.)

11.     The Partnership Agreement provides:

> Except as otherwise provided by firm action, or by action of the Management Committee to the extent authority therefor has been delegated by the firm, each partner shall from time to time contribute to the capital of the firm, proportionately according to [his/her] profit percentage interest, such amounts as may be required to enable the firm to carry on its activities and maintain proper reserves for contingencies; provided, however, that a partner may refuse to make any such contribution to capital if such partner promptly gives written notice to the firm of the voluntary termination of [his/her] membership in the firm in accordance with the provisions of Section 4(a) hereof.  No capital shall be required to be contributed by any partner whose compensation is based on a fixed guaranteed amount. (Giaccia Aff. Ex. A, Section 7(d).)

**RESPONSE:** Undisputed that this is an excerpt from Paragraph 7(d) of the Firm's Partnership Agreement.  The quoted language expressly provides that the Management Committee may exempt partners from any obligation to make capital contributions to the Firm.  (Giaccia Aff. Ex. A, Section 7(d).)  Plaintiffs expect that discovery will establish that the Management

Committee has made individual arrangements with partners with respect to their capital contributions. (Sanford Decl.¶ 13.)

12.     After a partner ceases to be a partner in the Firm (due to death, incapacity, voluntary retirement or expulsion), that partner is entitled to the return of his or her capital.  (Giaccia Aff. Ex. A, Section 7(e)(3).)

**RESPONSE:**  Undisputed that the Partnership Agreement provides for the return of a partner's capital, according to specified terms, "upon termination of a partner's membership in the firm." (Giaccia Aff. Ex. A, Section 4(c), Section 7(e)(3).)  Plaintiffs, however, dispute that the circumstances resulting in a return to capital are limited to terminations "due to death, incapacity, voluntary retirement or expulsion," as the Partnership Agreement does not contain these limitations.  (Giaccia Aff. Ex. A, Section 4(c), Section 7(e)(3).)    Notwithstanding the terms of the Partnership Agreement, the Management Committee failed to promptly return Ms. Campbell's capital following her termination.  (Campbell Decl. ¶ 29.)  Plaintiffs expect that discovery will establish that the Firm has capital contributions from former, terminated, and/or de-equitized partners for an extended period of time even though the Partnership Agreement demands that such amount be paid "as soon as reasonably practicable."  (Sanford Decl.¶ 13.; Giaccia Aff. Ex. A, Section 4(c).)

13.     The Partnership Agreement does not entitle a partner to the return of all capital under any circumstances, except termination of the partner's interest in the Firm.  (Giaccia Aff. ¶ 7.)

**RESPONSE:**   Undisputed that the Partnership Agreement itself does not expressly "entitle" a partner to the return of capital except upon termination of the partner's interest in the Firm.  The Partnership Agreement, however, expressly empowers the Management Committee to adjust the level of partners' capital contributions.  (Giaccia Aff. Ex. A, Section 4(c), Section 8.)  Plaintiffs expect that discovery will establish that the Management Committee has made individual arrangements with partners with respect to their capital contributions.   (Sanford Decl.¶ 13.)  Plaintiffs expect discovery to establish that the Management Committee has secretly demoted, de-equitized and terminated partners without notice and a vote as required by the Partnership Agreement and therafter has withheld the demoted, de-equitized and/or terminated partner's capital contributions.  (Campbell Decl. ¶ 23, 60; Johnson Decl. ¶ 24, 55; Sanford Decl. ¶ 13.)

14.     Partners at the Firm all share in the Firm's profits and losses.  (Giaccia Aff. ¶ 8.)

**RESPONSE:**  Disputed.  The Partnership Agreement expressly provides that the allocation of profits and losses may be "*changed . . .  by action of the Management Committee*," and that "[d]istribution of profits shall be made from time to time *as determined by the Management Committee*."  (Giaccia Aff. Ex. A, Section 4(c), Section 8 (emphasis added).)  In practice, partners have no entitlement to any share of profits or losses, and the Management Committee exercises complete control over the allocation of income among firm partners.  (Campbell Decl. ¶¶ 43-45; Johnson Decl. ¶ 39-41.)  Plaintiffs expect that discovery will establish that not all firm partners share in profits or losses of the Firm, that the Management Committee has made individual arrangements with partners with respect to their compensation, and that the Management Committee has complete control over the allocation of profits or losses.  (Campbell Decl. ¶¶ 43-45, 60; Johnson Decl. ¶ ¶39-41, 55; Sanford Decl. ¶ 13.)

9

15.    The Partnership Agreement provides:

>    All profits and losses of the firm for each fiscal year, until changed by firm action or by action of the Management Committee, shall be shared or borne, as the case may be, by partners in accordance with their respective profit percentage interests, subject to the authority in the Management Committee to set aside a portion of the profits of the firm in any fiscal year for bonuses to partners in such amounts and at such times as may be determined by firm action or by the Management Committee to the extent authority therefor has been delegated by the firm.  Profit percentage interests shall be fixed from time to time by the firm by firm action or by the Management Committee to the extent authority therefor has been delegated by the firm.  Distribution of profits shall be made from time to time as determined by the Management Committee, subject to requirements for contribution to capital in accordance with Section 7 and subject to such withholding with respect to future requirements as may be determined by the Management Committee.  (Giaccia Aff. Ex. A, Section 8.)

**RESPONSE:** Undisputed that this is an excerpt from Paragraph 8 of the Firm's Partnership Agreement.  The quoted language expressly provides that the allocation of profits and losses may be "*changed . . .  by action of the Management Committee*," and that "[d]istribution of profits shall be made from time to time *as determined by the Management Committee*."  (Giaccia Aff. Ex. A, Section 4(c), Section 8 (emphasis added).)  Plaintiffs expect that discovery will establish that not all firm partners share in profits or losses of the Firm, that the Management Committee has made individual arrangements with partners with respect to their respective compensation, and that the Management Committee has complete control over the allocation of profits or losses.  (Campbell Decl. ¶¶ 43-45, 60; Johnson Decl. ¶¶ 39-41, 55; Sanford Decl. ¶ 13.)

16.     Firm partners meet at least once a month, and sometimes more than once a month, to receive reports concerning and to discuss Firm matters.  (Giaccia Aff. ¶ 9.)

**RESPONSE:**  Disputed.  While the Firm convenes meetings open to the general partnership, these meetings are not attended by the full partnership and are perfunctory and uninformative.  (Campbell Decl. ¶ 56; Johnson Decl. ¶ 52.)  These meetings do not involve substantive discussions or deliberations by non-Management Committee partners regarding Firm matters such as Firm operations, administration, or management; rather, the Management Committee leads and directs all discussions at partner meetings.  (Campbell Decl. ¶ 56; Johnson Decl. ¶ 52.)  Partners are discouraged from asking questions about the Management Committee's conduct and management of the Firm, and partners who have asked questions about or requested the disclosure of information concerning the Firm's finances have been criticized and rebuffed by members of the Management Committee.  (Campbell Decl. ¶ 56; Johnson Decl. ¶ 52.)

17.     At such meetings, partners receive reports from the Managing Partner and from other partners about Firm performance, policies or initiatives under development, events relating to the Firm, and other topics or issues that partners may wish to raise.  (Giaccia Aff. ¶ 9.)

**RESPONSE:**  Disputed.  The Managing Partner provides only perfunctory, limited, and selective disclosures regarding the Firm's performance and does not provide substantive updates regarding policies, initiatives, or events relating to the Firm until after the Management Committee has already reached a decision.  (Campbell Decl. ¶ 32, 56; Johnson Decl. ¶ 26, 52.)  In practice, partners are not free to initiate substantive discussions or deliberations without the approval of the Management Committee.  (Campbell Decl. ¶ 56; Johnson Decl. ¶ 52.)  Plaintiffs expect discovery to establish that the Management Committee does not provide material information to Firm

partners regarding the Firm's performance and that the Management Committee does not share information regarding policies, initiatives, or events relating to the Firm until after the Management Committee has already reached a decision. (Campbell Decl. ¶ 18, 32, 56; Johnson Decl. ¶ 19, 26, 52; Sanford Decl. ¶ 13.)

18.     Partners ask questions or participate in discussions concerning matters raised at partnership meetings.  (Giaccia Aff. ¶ 9.)

**RESPONSE:** Disputed.   In practice, partners rarely ask substantive questions at partnership meetings, and substantive discussions are discouraged or rebuffed by the Management Committee.   (Campbell Decl. ¶ 56; Johnson Decl. ¶ 52.)   Partners are reluctant to challenge or question decisions made by the Management Committee, which exercises complete control over partner compensation and other matters.   (Campbell Decl. ¶¶ 43, 57; Johnson Decl. ¶ 53.)

19.     Under the Partnership Agreement, the Firm's partners retain direct and exclusive responsibility for a significant number of important Firm decisions, identified in the Partnership Agreement as "major actions."  (Giaccia Aff. Ex. A, Section 12.)

**RESPONSE:** Disputed.  The Partnership Agreement does not specify that partners have "direct and exclusive" responsibility for "major actions."  (Giaccia Aff. Ex. A, Section 12.) In practice, the Management Committee initiates, implements, and controls important firm decisions, such as the hiring or promotion of partners, the de-equitization and termination of partners, the exploration of firm mergers, and the opening and closing of offices worldwide – without notice to or input from Firm partners.  (Campbell Decl. ¶ 18; Johnson Decl. ¶ 19.)  Plaintiffs expect discovery to establish, for example, that the Management

12

Committee has often extended offers of partnership, de-equitized or termination partners, made decisions to close Firm offices, and engaged in substantive merger discussions without notice to, substantive input from, or a vote of the full partnership.  (Campbell Decl. ¶¶ 18, 60; Johnson Decl. ¶¶ 19, 55; Sanford Decl. ¶ 13.)


20.     Major Actions of the Firm include the admission of new partners (including those taken to admit Campbell and Johnson), expulsion of a partner, termination of the Firm, change in the name of the firm, and amending the Partnership Agreement.  (Giaccia Aff. Ex. A, Section 12(a)(1)-(5).)

**RESPONSE:**  Undisputed that Paragraph 12(a)(1)-(5) of the Partnership Agreement defines "Major Actions" as the admission of additional partners, expulsion of a partner, termination of the Firm, change in the name of the firm, and making certain amendments to the Partnership Agreement.  Plaintiffs dispute, however, that partners have substantive responsibility for such "major actions."  (Campbell Decl. ¶¶ 18, 20; Johnson Decl. ¶¶ 19, 21.)  In practice, the Management Committee initiates, implements, and controls decisions regarding so-called "major actions," such as the hiring or promotion of partners, the termination and de-equitization of partners, and the exploration of firm mergers, without notice or input from Firm partners.  (Campbell Decl. ¶¶ 18, 20; Johnson Decl. ¶¶ 19, 21.)  Plaintiffs expect discovery to establish that the Management Committee has effectively circumvented the Firm's Partnership Agreement by taking unilaterally and secretly taking "major actions" without notice to, substantive input from, or a vote of the full partnership.  (Campbell Decl. ¶¶ 18, 20, 60; Johnson Decl. ¶ ¶ 19, 21, 55; Sanford Decl. ¶ 13.)

21.     Any partner may request that voting on a Major Action be done by secret ballot. (Giaccia Aff. ¶ 12.)

**RESPONSE**:  Disputed.  The Partnership Agreement provides that voting on all matters at firm meetings shall be "by an informal show of hands or, on major actions and otherwise if requested by any partner, by call of the roll."  (Giaccia Aff. Ex. A, Section 12(g).)  The Partnership Agreement only authorizes a secret ballot for a limited subset of "Major Actions."  (Giaccia Aff. Ex. A, Section 12(g).)  In practice, voting on that subset of "Major Actions" is not always conducted with secret ballots.  (Campbell Decl. ¶ 20.)  Moreover, even when voting takes place on so-called Major Actions, it is often *pro forma* because the Management Committee has already taken decisive action.   (Campbell Decl. ¶ 20.) Discovery is expected to establish these facts.  (Campbell Decl. ¶¶ 20, 60.)

22.     In practice, secret ballots are requested for all Major Actions.  (Giaccia Aff. ¶ 12.)

**RESPONSE**:  Disputed.  The Partnership Agreement only authorizes a secret ballot for a limited subset of "Major Actions."   (Giaccia Aff. Ex. A, Section 12(g).)   In practice, the Management Committee encourages secrecy in voting and resists disclosing the results of votes even when partners request such disclosure.  (Campbell Decl. ¶ 20; Johnson Dec. ¶21.)

23.     Partners may initiate discussion of and/or votes on any other action or policy relating to the management or operation of the Firm at any partner meeting.  (Giaccia Aff. ¶ 13.)

**RESPONSE**: Disputed.  At partner meetings, the Management Committee initiates and leads discussions and discourages, rebuffs, and declines to engage in substantive

14

discussions on issues relating to the management or operation of the Firm.  (Campbell Decl. ¶ 56; Johnson Decl. ¶ 52.)  Partners are not given the opportunity to discuss or challenge Firm policies before they are implemented by the Management Committee.  (Campbell Decl. ¶ 32; Johnson Decl. ¶ 26.)  Plaintiffs expect discovery to establish these facts and to further demonstrate that non-Management partners have only a limited, nominal role in Firm governance. (Campbell Decl. ¶ 12, 20, 55; Johnson Decl. ¶¶ 13, 21, 60; Sanford Decl. ¶ 13.)

24.     In order to effectuate a Major Action, the Firm's partnership must approve the action by a supermajority vote in accordance with the following provision of the Partnership Agreement:

> A major action may be taken only upon the affirmative vote of partners (or their proxies) the total of whose profit percentage interests exceeds two-thirds of the total of the profit percentage interests of all partners entitled to vote upon such action, except that the admission of any additional partner may be taken only upon the affirmative vote of partners (and not their proxies) and shall not be effective if there is a negative vote of partners whose profit percentage interests equal or exceed 20% of the total of the profit percentage interests of all partners entitled to vote upon such action.

(Giaccia Aff. Ex. A, Section 12(f).)

**RESPONSE:** Disputed, except that Plaintiffs admit that the block quote is excerpted from Paragraph 12(f) of the Partnership Agreement.  In practice, the Management Committee has initiated, implemented, and controlled major actions, such as the secret termination of Ms. Campbell, without any notice to, substantive input from, or vote of the full partnership. (Campbell Decl. ¶¶ 20, 23-27; Johnson Decl. ¶¶ 21, 24.)  Plaintiffs expect discovery to establish that the Management Committee has effectuated "Major Actions" such as these

without notice to, substantive input from, or a vote off the full partnership.   (Campbell Decl. ¶¶ 20, 60; Johnson Decl. ¶¶ 21, 55; Sanford Decl. ¶ 13.)

25.     The Partnership Agreement allows the Firm to "appoint a Management Committee consisting of such number of partners as the firm from time to time may determine, with such powers and duties as the firm from time to time may determine."  (Giaccia Aff. Ex. A, Section 5(a).)

> **<u>RESPONSE</u>:** Undisputed that this is an excerpt from Paragraph 5(a) of the Firm's Partnership Agreement.    In practice, the Firm's partners have no substantive input into the powers and duties of the Management Committee.  (Campbell Decl. ¶ 12; Johnson Decl. ¶ 13.)  Further, the firm's partners have limited knowledge about the actions of the Management Committee, which does not disclose its internal deliberations and discussions to the full partnership and often makes unilateral decisions in secrecy.  (Campbell Decl. ¶ 17-19, 22-23; Johnson Decl. ¶¶ 18-20, 23-24.)  Plaintiffs expect discovery to establish these facts. (Campbell Decl. ¶ 17-19, 22-23, 60; Johnson Decl. ¶¶ 18-20, 23-24, 55; Sanford Decl. ¶ 13.)

26.     The Partnership Agreement states that "[t]he Management Committee may be vested with all the powers of the partners in the management of the business of the firm and to make and carry out all decisions necessary therefor," with the exception of "major actions" of the Firm (as defined in Section 12(a)) and actions which "fix or change the composition, terms of office or method of election or removal of members of the Management Committee," which require a vote of the full partnership.  (Giaccia Aff. Ex. A, Section 5(a).)

16

**RESPONSE:** Undisputed that this quotes or otherwise summarizes language from Paragraph 5(a) of the Firm's Partnership Agreement.  In practice, however, the Management Committee has initiated, implemented, and controlled major actions, such as the termination of Ms. Campbell, without any notice to, substantive input from, or vote of the full partnership.  (Campbell Decl. ¶¶ 20, 23-27; Johnson Decl. ¶ 21, 24.)  Plaintiffs expect discovery to establish that the Management Committee has extended offers of partnership, de-equitized and effectively terminated partners, explored mergers of the Firm, and engaged in other significant decisions of its own accord – without notice to, substantive input from, or a vote of the full partnership. (Campbell Decl. ¶¶ 18-20; Johnson Decl. ¶¶ 19-21; Sanford Decl. ¶ 13.)

27.     The Firm's partners have, pursuant to Section 5 of the Partnership Agreement, delegated operational management of the Firm to a Management Committee that consists of five members who are elected by the full partnership in staggered annual elections.  (Giaccia Aff. ¶ 17.)

**RESPONSE:** Undisputed that operational management of the Firm is vested in a Management Committee consisting of five members.  Plaintiffs, however, dispute the misleading suggestion that the Firm's partners played any role in the "delegat[ion]" of operational management to the Management Committee.  Most of the Firm's current partners joined the Firm after its adoption of its original Partnership Agreement, and the Firm's incoming partners are presented with the Partnership Agreement on a take-it-or-leave-it basis and therefore have no alternative but to submit to the oversight and control of the Management Committee.  (Campbell Decl. ¶¶ 7-8; Johnson Decl. ¶¶ 8-9.)

28.     The Management Committee oversees the operations of the Firm and, pursuant to the Partnership Agreement, has delegated certain of those operations to the Managing Partner of the Firm.  (Giaccia Aff. ¶ 18.)

> **RESPONSE**: Undisputed.  Plaintiffs expect discovery to establish that the Management Committee and Managing Partner set comprehensive rules and regulations regarding partners' work at the Firm, exercise supervisory authority with respect to partners, and unilaterally set partner compensation.  (Campbell Decl. ¶¶ 30, 36, 41-45, 60; Johnson Decl. ¶¶ 25, 31, 34-36, 39, 55.)   Plaintiffs expect discovery to further establish that individual partners at the Firm do not meaningfully influence the Management Committee. (Campbell Decl. ¶¶ 12, 44, 50, 52, 59-60; Johnson Decl. ¶¶ 13, 40, 46, 48, 54-55: Sanford Decl. ¶ 13.)

29.     The Management Committee develops and implements the Firm's strategic goals (including whether to add practice areas, open or close offices, or merge with other firms) as well as selects partners to serve in leadership positions for offices outside the New York headquarters and for practice groups and certain committees.  (Giaccia Aff. ¶ 18.)

> **RESPONSE**: Undisputed, with the clarification that the Management Committee unilaterally exercises decision-making authority over the Firm in all aspects of its operations.  (Campbell Decl. ¶ 11; Johnson Decl. ¶ 12.)  Plaintiffs expect discovery to establish that the Management Committee has made decisions regarding the Firm's practice areas, offices, and potential mergers without notice to, substantive input from, or a vote of the full partnership.  (Campbell Decl. ¶¶ 18-20, 60; Johnson Decl. ¶¶ 19-21, 55;

18

Sanford Decl. ¶ 13.)   Plaintiffs expect discovery to establish that the Management Committee has made decisions regarding the Firm's leadership, including the selection of practice group and committee heads, that discriminate against the Firm's female partners. (Campbell Decl. ¶¶ 55, 60; Johnson Decl. ¶¶ 51, 55; Sanford Decl. ¶ 13.)

30.     In managing the Firm's business, the Management Committee and the Managing Partner are assisted by the Firm's Chief Operating Officer, Lisa Palestine ("Palestine").   (Giaccia Aff. ¶ 18.)

**RESPONSE:**   Undisputed that Lisa Palestine currently holds the title of Chief Operating Officer.   Ms. Palestine is not an attorney, is not a partner, is not an official member of the Management Committee, and has no voting power on matters affecting the Firm. (Campbell Decl. ¶ 14; Johnson Decl. ¶ 15.)   Plaintiffs expect discovery to establish that Ms. Palestine provided largely administrative support to the all-male Management Committee on matters affecting Firm partners.   (Campbell Decl. ¶ 14, 60; Johnson Decl. ¶¶ 15, 55; Sanford Decl. ¶ 13.)

31.     Palestine attends all Management Committee meetings, is an *ex officio* member of the Management Committee, manages the Firm's finances, and provides information and advice concerning the Firm's partners and finances, manages all non-legal functions of the Firm, including tax compliance, budgeting, and cash management, and supervises non-attorney administrative employees of the Firm.   (Giaccia Aff. ¶ 18.)

**RESPONSE:**   Plaintiffs lack information regarding Ms. Palestine's attendance at Management Committee meetings and the scope of her involvement in the Firm, as

discovery has not yet taken place in this action.  (Sanford Decl. ¶ X.)  Plaintiffs expect

discovery to establish that Ms. Palestine provided largely administrative support to the all-

male Management Committee on matters affecting Firm partners.  (Campbell Decl. ¶ ¶ 14,

60; Johnson Decl. ¶ 15, 55; Sanford Decl. ¶ 13.)


32.    The five members of the Management Committee are directly elected by the

partnership.  (Giaccia Aff. ¶ 19.)

> **RESPONSE:**    Undisputed, except that Plaintiffs dispute that suggestion that the
> Management Committee is elected by the partnership as a whole. The Management
> Committee members are elected by partners holding a majority of profit percentage interest
> in the Firm.  (Giaccia Aff. Ex. A, Section 5(a)). The partners' voting shares are unilaterally
> set by the Management Committee itself.  (Campbell Decl. ¶ 43; Johnson Decl. ¶ 39.)
> Further, the partners holding the highest voting shares at the Firm are predominantly and
> disproportionately male.  (Campbell Decl. ¶ 15; Johnson Decl. ¶ 16.)  In this way, the
> Management Committee has the power to perpetuate itself.


33.    Any Firm partner is eligible to run for a seat on and be elected to the Management

Committee for a two-year term pursuant to the following provisions of the Partnership Agreement:

> Until changed by firm action, the Management Committee shall be
> composed of five partners of the firm who are elected for two-year
> terms (except that the MP (as defined in Section 5(e)) shall be
> elected as the MP and a member of the Management Committee for
> a three-year term as provided in Section 5(e))…At the end of each
> term of office, the Management Committee or any partner may
> nominate partners for the following two-year terms and there shall
> be no prohibition against nomination of one or more of the existing
> members of the Management Committee.   Election to the
> Management Committee shall be by affirmative vote of partners

having a total of more than 50% profit percentage interest in the firm and, in the case of rejection, one or more substitute nominees, named by the Management Committee or any partner of the firm, shall be elected by such majority vote of the members thereof. The members of the Committee may resign or be removed by affirmative vote of partners having a total of more than 50% profit percentage interest in the firm. (Giaccia Aff. Ex. A, Section 5(b) as Amended November 18, 2010.)

**RESPONSE:** Disputed, except that Plaintiffs admit that the block quote is excerpted from Paragraph 5(b) of the Partnership Agreement. The Partnership Agreement itself provides that partners must be nominated to serve on the Management Committee. (Giaccia Aff. Ex. A, Section 5(b)). In practice, the Management Committee discourages certain partners from seeking leadership positions at the Firm, including positions on the Management Committee. (Campbell Decl. ¶ 55; Johnson Decl. ¶ 51.)

34.    In addition to electing the four other members of the Firm's Management Committee, partners also elect the Firm's Managing Partner, who is also a member of the Management Committee and to whom the Management Committee has delegated certain of its responsibility for the Firm's operations pursuant to express provisions in the Partnership Agreement. (Giaccia Aff. Ex. A, Section 5(e) as Amended November 18, 2010.)

**RESPONSE:** Disputed. The Managing Partner must be nominated by, and a member of, the Management Committee. (Giaccia Aff. Ex. A, Section 5(e).) Therefore, any "vote" held for a single candidate nominated by the Management Committee to be the Firm's Managing Partner is naturally a perfunctory and *pro forma* exercise. Further, the Management Committee members and Managing Partner are elected by partners holding a majority of profit percentage interest in the Firm. (Giaccia Aff. Ex. A, Section 5(e)). The partners' profit percentage interests are unilaterally set by the Management Committee

itself.  (Campbell Decl. ¶ 15; Johnson Decl. ¶ 16.)  Further, the partners holding the highest profit percentage interests at the Firm are predominantly and disproportionately male. (Campbell Decl. ¶ 15; Johnson Decl. ¶ 16.)

35.     Under the Partnership Agreement, the Managing Partner "shall, subject to the direction of the Management Committee, carry out the duties of the Management Committee with respect to the day-to-day operations, management and administration of the firm and perform such other duties as may be requested by the Management Committee from time to time."  (Giaccia Aff. Ex. A, Section 5(e) as Amended November 18, 2010.)

> **RESPONSE:** Undisputed.   Plaintiffs expect that discovery will establish that the Managing Partner and Management Committee exercise near exclusive control over Firm business and operations and that the full partnership has minimal influence. (Campbell Decl. ¶¶ 11-12, 60; Johnson Decl. ¶¶ 12-13, 55: Sanford Decl. ¶ 13.)

36.     Unlike other members of the Management Committee whose term on the Committee is two years, the Managing Partner's term is three years.  (Giaccia Aff. Ex. A, Section 5(e) as Amended November 18, 2010.)

> **RESPONSE:** Undisputed, with the clarification that Managing Partners often serve multiple, consecutive three-year terms. (Giaccia Aff. ¶ 2.)

37.     In addition to being removable by majority vote of the partnership at large under Section 5(b) of the Partnership Agreement, the Managing Partner "may be removed as MP and a

Management Committee member at any time by a vote of the majority of the members of the Management Committee." (Giaccia Aff. Ex. A, Section 5(e) as Amended November 18, 2010.)

**RESPONSE:** Undisputed, except that Plaintiffs dispute that these mechanisms provide a meaningful check on the power of the Managing Partner. Given that the Managing Partner must be nominated by, and a member of, the Management Committee, any right of the Management Committee to remove the Managing Partner is perfunctory and *pro forma*. (Giaccia Aff. Ex. A, Section 5(e).) Further, the Management Committee members and Managing Partner are elected by partners holding a majority of profit percentage interest in the Firm. (Giaccia Aff. Ex. A, Section 5(e)). The partners' profit percentage interests are unilaterally set by the Management Committee itself. (Campbell Decl. ¶ 15; Johnson Decl. ¶ 16.) Further, the partners holding the highest profit percentage interests at the Firm are predominantly and disproportionately male. (Campbell Decl. ¶ 15; Johnson Decl. ¶ 16.)

38.     All partners, including Campbell and Johnson, have signed and agreed to the Firm's Partnership Agreement. (Giaccia Aff. ¶ 22; Exs. B and C.)

**RESPONSE:** Disputed, except that Plaintiffs admit that after joining the Firm as partners, Ms. Campbell and Ms. Johnson were presented with and required to sign the Firm's Partnership Agreement. (Campbell Decl. ¶ 8; Johnson Decl. ¶ 9.) Plaintiffs lack information as to whether all of the Firm's partners are signatories to Firm's Partnership Agreement. (Campbell Decl. ¶ 9; Johnson Decl. ¶ 10.). The Firm did not provide Plaintiffs with copies of the Partnership Agreement containing the signature of all Chadbourne partners (Campbell Decl. ¶ 9; Johnson Decl. ¶ 10.). The copy of the Partnership Agreement

that Defendants submitted to the Court does not contain signatures for all partners and in fact contains numerous blank signature lines.  (Giaccia Aff. Ex. A.)   As Plaintiffs expect discovery to confirm, neither Plaintiffs nor other partners have had any opportunity to negotiate the terms of the Partnership Agreement.  (Campbell Decl. ¶ 8, 60; Johnson Decl. ¶ 9; 55; Sanford Decl. ¶ 13.)  Plaintiffs expect that discovery will establish whether all current partners have all signed the Partnership Agreement and whether any individuals have been given the status of partners prior to, or without, signing the Firm's Partnership Agreement or any subsequent amendments thereto.  (Sanford Decl. ¶ X.)  Plaintiffs further dispute any implication that being required to sign the Partnership Agreement entails a meaningful stake in determining the business of the Firm and anticipate that discovery will show partners lack such a meaningful stake.  (Campbell Decl. ¶¶ 11-12, 60; Johnson Decl. ¶¶ 12-13, 55: Sanford Decl. ¶ 13.)

39.     By so doing, they authorized the Firm (through its Management Committee) to manage the business of the Firm, including through establishing the Firm's policies, which exist for the partners' mutual benefit and protection given that the partners all share in the Firm's profits and losses.  (Giaccia Aff. ¶ 22.)

**RESPONSE:** Disputed, except that Plaintiffs admit that the Management Committee manages the business of the Firm and establishes the Firm's policies.  Plaintiffs dispute any implication that partners approve or ratify the Management Committee's management decisions or policy decisions.  Partners lack meaningful influence over the decisions of the Management Committee regarding Firm management and Firm policies.  (Campbell Decl. ¶¶ 12, 17-20, 32, 43-44, 50, 51, 59; Johnson Decl. ¶¶ 13, 18-21, 26, 39-40, 46, 47, 54.)

Plaintiffs also dispute that, in setting Firm policy and making management decisions, the Management Committee acts for the mutual benefit and protection of the partners. Female partners like Plaintiffs have been adversely affected by the Management Committee's discriminatory management and policy decisions.  (Campbell Decl. ¶¶ 22, 35, 54-55; Johnson Decl. ¶¶ 23, 30, 50-51.)   Moreover, in practice, partners have no entitlement to any share of profits or losses, and the Management Committee exercises complete control over the allocation of profits or losses among firm partners.  (Campbell Decl. ¶¶ 43-45; Johnson Decl. ¶¶ 39-41.)  Plaintiffs expect that discovery will establish that Firm partners are powerless to change or influence various Firm policies, even when they object; that not all Firm partners share in profits or losses of the Firm; and that the Management Committee has made individual arrangements with partners regarding their compensation and any allocation of profits or losses. (Campbell Decl. ¶¶ 11-12, 17-20, 32, 43-44, 50, 51, 59; Johnson Decl. ¶¶ 12-13, 18-21, 26, 39-40, 46, 47, 54; Sanford Decl. ¶ 13)

40.     One of the responsibilities with which the elected Management Committee is vested by the partnership is to set partner compensation.  (Giaccia Aff. ¶ 23.)

**RESPONSE:** Undisputed that the Management Committee sets partner compensation. Plaintiffs, however, dispute any implication that partners approve or ratify the Management Committee's decisions with respect to compensation.  Ms. Campbell and Ms. Johnson, like other partners, have been powerless to influence the compensation decisions of the Management Committee.  (Campbell Decl. ¶¶ 43-47, 50, 52-53; Johnson Decl. ¶¶ 39-43, 46, 48-49.)  Plaintiffs expect discovery to establish that partners lack meaningful influence

over the compensation decisions of the Management Committee.  (Campbell Decl. ¶¶ 43-47, 50, 51, 53, 60; Johnson Decl. ¶¶ 39-43, 46, 47, 49, 55; Sanford Decl. ¶ 13.)

41.     Under the Partnership Agreement, the Firm's partners all share in the profits and losses of the Firm "in accordance with their respective profit percentage interests."  (Giaccia Aff. Ex. A, Section 8.)

> **RESPONSE:** Disputed.  The Partnership Agreement expressly provides that the allocation of profits and losses may be "*changed . . .  by action of the Management Committee*," and that "[d]istribution of profits shall be made from time to time *as determined by the Management Committee*."  (Giaccia Aff. Ex. A, Section 4(c), Section 8 (emphasis added).)  In practice, partners have no entitlement to any share of profits or losses, and the Management Committee exercises complete control over the allocation of profits or losses among firm partners.  (Campbell Decl. ¶¶ 43-47, 50, 51, 53; Johnson Decl. ¶¶ 39-43, 46, 47, 49.)  Plaintiffs expect discovery to establish that not all firm partners share in profits or losses of the Firm and that the Management Committee has made individual arrangements with partners with respect to any allocation of profits or losses. (Campbell Decl. ¶¶ 43-47, 50, 51, 53, 60; Johnson Decl. ¶¶ 39-43, 46, 47, 49, 55; Sanford Decl. ¶ 13.)

42.     The profit percentage interests are "fixed from time to time by the firm . . . or by the Management Committee to the extent authority therefor has been delegated by the firm."  (Giaccia Aff. Ex. A, Section 8.)

> **RESPONSE:** Undisputed that this is an excerpt from Paragraph 8 of the Firm's Partnership Agreement.   In practice, profit percentage interests are fixed by the Management

Committee.  Individual partners have no entitlement to any share of profits or losses, and the Management Committee exercises complete control over the assignment of profit percentage interests to firm partners.  (Campbell Decl. ¶¶ 43-47, 50, 51, 53; Johnson Decl. ¶¶ 39-43, 46, 47, 49.)  Plaintiffs expect that discovery will establish that not all firm partners share in profits or losses of the Firm and that the Management Committee has made individual arrangements with partners with respect to any allocation of profits or losses. (Campbell Decl. ¶¶ 43-47, 50, 51, 53, 60; Johnson Decl. ¶¶ 39-43, 46, 47, 49, 55; Sanford Decl. ¶ 13.)

43.     Under the Firm's longstanding practice, compensation decisions are made by the Management Committee through a process that provides each partner with insight and input into how the Committee determines compensation for the partners.  (Giaccia Aff. ¶ 25.)

**RESPONSE:** Disputed, except that Plaintiff admit that compensation decisions are made by the Management Committee.  The Management Committee's process does not provide partners with insight or input into how the Committee determines compensation for partners.  (Campbell Decl. ¶¶ 43-53; Johnson Decl. ¶¶ 39-49.)  Partners generally receive no feedback on their year-end reviews and are provided with little to no information regarding the basis for the Management Committee's compensation decisions.  (Campbell Decl. ¶¶ 43-53; Johnson Decl. ¶¶ 39-49.)  Plaintiffs expect discovery to establish that partners lack insight or meaningful influence into compensation decisions, both for themselves and for other partners.  (Campbell Decl. ¶¶ 43-53, 60; Johnson Decl. ¶¶ 39-49, 55; Sanford Decl. ¶ 13.)

44.     The process begins each year with the request (not requirement) that partners submit memoranda describing their performance and that of other partners over the year. (Giaccia Aff. ¶ 26.)

> **RESPONSE:** Disputed as to the characterization that the submission of memoranda is a
> request and not a requirement.  The Management Committee requires each partner to
> submit a year-end memorandum, sets deadlines for the completion of the memorandum,
> and threatens that failure to timely complete the memorandum will have adverse
> consequences. (Campbell Decl. ¶ 36; Johnson Decl. ¶ 31.)  Partners are not provided with
> copies of the memoranda submitted to the Management Committee by other partners.
> (Campbell Decl. ¶ 48; Johnson Decl. ¶ 44.)   Plaintiff expects discovery to establish that
> this process is indistinguishable in kind from the employee evaluation process for non-
> partner attorneys and other employees, both at Chadbourne and elsewhere.  (Campbell
> Decl. ¶ 36; Johnson Decl. ¶ 31.)   This process vests full discretion in the Management
> Committee. (Campbell Decl. ¶ 43-54; Johnson Decl. ¶ 39-50.)   Plaintiffs further expect
> that discovery will show that partner submissions do not meaningfully influence the
> Management Committee's compensation decisions and are not afforded particular weight
> because of they are being submitted by partners.  (Campbell Decl. ¶¶ 48, 53; Johnson Decl.
> ¶¶ 44, 49.)

45.     Each partner annually receives two large books of data (known in the Firm as the "matrix"), one containing large amounts of detailed financial data on the Firm and its partners individually, and another containing a 5-year lookback on compensation and performance history by each partner during each fiscal year. (Giaccia Aff. ¶ 27.)

**RESPONSE:** Disputed.  The "matrix" books of data provided by the Firm do not include critical information. In particular, they omit individual financial data pertaining to the Firm's large Project Finance group, including individual billable hours, collections, or realization rates, or the compensation of partners in the Firm's large Project Finance group. (Campbell Decl. ¶ 49; Johnson Decl. ¶ 45.)  This results in the omission of compensation data pertaining to dozens of partners at the Firm.  (Campbell Decl. ¶ 49; Johnson Decl. ¶ 45.)

46.     Any partner can know the origination and supervision of work by any other partner and each partner's total compensation for the previous five years.  (Giaccia Aff. ¶ 27.)

**RESPONSE:**  Disputed.  The Firm does not provide all partners with critical information pertaining to partners in the Firm's large Project Finance group, including origination information and compensation information for these partners. (Campbell Decl. ¶ 49; Johnson Decl. ¶ 45.)

47.     The Committee is then available to meet with partners to discuss their compensation and the compensation of other partners and continues its analysis of each partner's compensation after those meetings.  (Giaccia Aff. ¶ 27.)

**RESPONSE:** Disputed, except that partners are permitted to meet with the Management Committee to discuss their compensation.  At meetings with the Management Committee, partners are provided with little to no information regarding the reasoning for its compensation decisions.  (Campbell Decl. ¶ 51; Johnson Decl. ¶ 47.)  Further, partner discussions with the Management Committee do not result in meaningful change to a

partner's compensation levels.  (Campbell Decl. ¶ 51; Johnson Decl. ¶ 47.)  Plaintiffs expect discovery to establish that that partners cannot meaningfully influence the Management Committee's compensation decisions through these meetings or otherwise. (Campbell Decl. ¶ 43-53, 60; Johnson Decl. ¶¶ 39-49, 55; Sanford Decl. ¶ 13.)

48.     In fact, both Campbell and Johnson availed themselves of such opportunities each year with memoranda and even meetings with the Management Committee.  (Giaccia Aff. ¶ 27.)

**RESPONSE:** Undisputed that Ms. Campbell and Ms. Johnson submitted year-end memoranda and that Ms. Campbell met with the Management Committee regarding her memoranda.  Despite their well-founded requests for an increase in their points and compensation, the Management Committee refused to alter its decisions.  (Campbell Decl. ¶ 53; Johnson Decl. ¶ 49.)  Instead, the Management Committee responded to Ms. Campbell and Ms. Johnson's requests by retaliating against them.  (Campbell Decl. ¶ 53; Johnson Decl. ¶ 49.)  Plaintiffs expect discovery to establish that partners cannot meaningfully influence the Management Committee's compensation decisions through these meetings and that challenges to the Committee's prerogatives are rebuffed and even met with retribution.  (Campbell Decl. ¶¶ 44, 46, 50, 51, 53, 60; Johnson Decl. ¶¶ 40, 42, 46, 47, 49, 55; Sanford Decl. ¶ 13.)

49.     Firm partners have shared in profits and losses through their receipt of distributions based on a "points" system, whereby each partner is allocated a number of points that translate into a percentage share of the Firm's profits and losses.  Each point has a nominal estimated value for planning purposes of $1,000 in year-end compensation.  (Giaccia Aff. ¶ 28.)

30

**RESPONSE:** Disputed, except that Plaintiffs admit that the Firm allocates "points" to partners which are used to determine annual compensation. Individual partners have no entitlement to any share of profits or losses, and the Management Committee exercises complete control over the assignment of "points" and profit percentage interests to firm partners.  (Campbell Decl. ¶¶ 15, 43-47; Johnson Decl. ¶¶ 16, 39-43.)  Plaintiffs lack information regarding the projected value of points, as discovery has not taken place in this action.  (Sanford Decl. ¶ 13.)  Plaintiffs expect that discovery will establish that not all firm partners share in profits or losses of the Firm and that the Management Committee has made individual arrangements with partners with respect to their allocation of points or any share of profits or losses.  (Campbell Decl. ¶¶ 43-47, 52, 60; Johnson Decl. ¶¶ 39-43, 48, 55; Sanford Decl. ¶ 13.)

50.     However, the ultimate actual value of a point will be subject to upward or downward variation from this nominal value each year, depending on the Firm's financial performance.  (Giaccia Aff. ¶ 28.)

**RESPONSE:** Disputed.   The Management Committee exercises complete control over the valuation of "points."  (Campbell Decl. ¶ 43; Johnson Decl. ¶ 39.)  The Management Committee does not disclose to the full partnership the basis for its valuation of "points."  (Campbell Decl. ¶ 48; Johnson Decl. ¶ 44.)  Plaintiffs expect discovery to establish that factors besides the Firm's financial performance affect the Management Committee's valuation of points, including the Management Committee's bonus decisions and other subjective factors.  (Campbell Decl. ¶¶ 43, 45, 47, 48, 54, 60; Johnson Decl. ¶¶ 39, 41, 43, 44, 50, 55; Sanford Decl. ¶ 13).

51.     In 2016, the Firm slightly modified this system such that partners each have "shares" rather than "points."  (Giaccia Aff. ¶ 28.)

**RESPONSE:** Undisputed that the Firm modified the terminology it uses, subject to the information supplied by Plaintiffs herein, including in response to Nos. 49 and 50 above.

52.     In making individual compensation decisions, the Management Committee (as it annually reminds the partners when it solicits their year-end memoranda) considers a great number of factors, including, but not limited to: efforts undertaken by partners to enhance revenues; instances of teamwork yielding new business or other positive results; instances where partners have referred work to other groups or attorneys in other U.S. or international offices; partners who have been of help to one another; client-related activities, including service to existing clients, obtaining new work from existing clients, obtaining new clients, and any other activities deemed noteworthy in this regard; assumption of Firm responsibilities and participation in Firm activities; efforts made by partners to attract lateral partners and other senior attorneys to the Firm; *pro bono* activities; activities aimed at improving attorney competence, including recruiting and training, diversity efforts, and morale; and activities outside the Firm that serve to enhance the reputation of the Firm and its partners.  (Giaccia Aff. ¶ 29; Ex. D.)

**RESPONSE:** Disputed.   Partner compensation does not result from an objective calculation but involves Management Committee discretion.  The Management Committee disregards objective factors in order to pay female partners like Ms. Campbell and Ms. Johnson less than similarly situated male partners.  (Campbell Decl. ¶ 54; Johnson Decl. ¶ 50.)  The Management Committee pays female partners less than male partners even when

they outperform them in generating revenue for the Firm.  (Campbell Decl. ¶ 54; Johnson Decl. ¶ 50.) The Management Committee minimizes positive information about female partners and systemically undervalues female partners.  (Campbell Decl. ¶ 54; Johnson Decl. ¶ 50.) Plaintiffs expect discovery to establish that the Management Committee systematically pays male employees more than similarly situated female employees and that its decisions cannot be attributed to the uniform and even-handed application of objective factors.  (Campbell Decl. ¶ 54, 60; Johnson Decl. ¶ 50, 55; Sanford Decl. ¶ 13.)

53.     After the partner memos are submitted and the meetings are held, the Management Committee also gathers information from others, including practice group heads, other Firm leaders, and managing partners of the Firm's international offices and formulates a preliminary allocation of points among the partners.  (Giaccia Aff. ¶ 30.)

**RESPONSE:** Undisputed, except that Plaintiffs dispute the implication that the preliminary allocation of points is influenced by the memoranda, meetings, and other information gathered by the Management Committee.  The Management Committee disregards objective factors in order to pay female partners like Ms. Campbell and Ms. Johnson less than similarly situated male partners.  (Campbell Decl. ¶ 54; Johnson Decl. ¶ 50.) The Management Committee pays female partners less than male partners even when they outperform them in generating revenue for the Firm and on other performance indicators.  (Campbell Decl. ¶ 54; Johnson Decl. ¶ 50.) The Management Committee minimizes positive information about female partners and systemically undervalues female partners.  (Campbell Decl. ¶ 54; Johnson Decl. ¶ 50.) Plaintiffs expect discovery to establish that the Management Committee disregards objective factors and systematically

33

pays male employees more than similarly situated female employees.  (Campbell Decl. ¶ 54, 60; Johnson Decl. ¶¶ 50, 55; Sanford Decl. ¶ 13. )

54.     The Management Committee then distributes a memorandum to the partners attaching a list (known as the "draft points list") showing the preliminary allocation of points for all the partners in the Firm.  (Giaccia Aff. ¶ 31.)

> **RESPONSE:**  Undisputed.  However, partners are not provided with substantive information as to the basis or reasoning for the Management Committee's points allocation and lack the information necessary to contest its determinations.  (Campbell Decl. ¶¶ 43-48; Johnson Decl. ¶¶ 39-44.)  For example, partners are not provided with the memoranda that partners submit or with other feedback purportedly considered by the Management Committee. (Campbell Decl. ¶ 48; Johnson Decl. ¶ 44.)  Plaintiffs further dispute the implication that the points allocation meaningfully changes based on partner input following the distribution of the points list.  Plaintiffs expect discovery to show that partners lack any meaningful ability to influence compensation decisions.   (Campbell Decl. ¶¶ 43-53, 60; Johnson Decl. ¶¶ 39-49, 55; Sanford Decl. ¶ 13.)

55.     After partners receive the draft points list, they have an opportunity to meet with the Management Committee and provide the Committee with comments, or raise concerns, about the preliminary allocation of points before a final list (the "points list") is distributed to each partner showing the points allocated to them and all the other partners of the Firm for the coming year. (Giaccia Aff. ¶ 31.)

**RESPONSE:** Undisputed, except that Plaintiffs dispute the misleading implication that partners have the opportunity to influence the points allocation.  At meetings with the Management Committee, partners are provided with little to no information regarding the basis for its compensation decisions.  (Campbell Decl. ¶¶ 51, 53; Johnson Decl. ¶ 47.) Further, partner discussions with the Management Committee do not result in meaningful change to a partner's compensation levels. (Campbell Decl. ¶ 51, 53; Johnson Decl. ¶ 47.) Plaintiffs expect discovery to establish that that partners cannot meaningfully influence the Management Committee's compensation decisions through these meetings or otherwise. (Campbell Decl. ¶¶ 43-53, 60; Johnson Decl. ¶¶ 39-49, 55; Sanford Decl. ¶ 13.)

56.     The points list distributed to partners also lists each partner's percentage of ownership.  (Giaccia Aff. ¶ 31.)

**RESPONSE:** Disputed. Although the points list distributed to partners contains columns for "%," the list does not specify what this column refers to and does not state that it corresponds to any partner's percentage of ownership in the firm. (Campbell Decl. ¶ 52; Johnson Decl. ¶ 48.)

57.     A partner's number of points for any given year can increase or decrease from, or stay the same as, that partner's level of points for the prior year, as determined by the Management Committee.  (Giaccia Aff. ¶ 31.)

**RESPONSE:** Undisputed.  The Management Committee wields unchecked authority to revise each partner's points from year to year.  (Campbell Decl. ¶ 43; Johnson Decl. ¶ 39.) Plaintiffs expect that discovery will show that the Management Committee manipulates the

points process to disfavor women. (Campbell Decl. ¶¶ 54, 60; Johnson Decl. ¶¶ 50, 55; Sanford Decl. ¶ 13.)

58.     The combination of the annual performance of the Firm, the number of points a partner is assigned, and any bonus to that partner determines that partner's year-end compensation. (Giaccia Aff. ¶ 32.)

> **RESPONSE:** Disputed that these are the only factors that determine a partner's year-end compensation.   The Management Committee determines each partner's points and compensation.  (Campbell Decl. ¶ 43; Johnson Decl. ¶ 39.)  The Management Committee disregards objective factors in order to pay female partners like Ms. Campbell and Ms. Johnson less than similarly situated male partners.  (Campbell Decl. ¶ 54; Johnson Decl. ¶ 50.)  Plaintiffs expect discovery to establish that the Management Committee employs no objective methodology to determine partners' points and compensation and bases decisions on gender. (Campbell Decl. ¶¶ 54, 60; Johnson Decl. ¶¶ 50, 55; Sanford Decl. ¶ 13.)

59.     Partners also receive a monthly draw during the year, which is an advance (usually based on the partner's "points" level) in order to provide partners with a steady stream of income during the year, because the total annual compensation of any partner is unknown and unknowable until the year is completed and the Firm's actual financial performance is quantified.  (Giaccia Aff. ¶ 32.)

> **RESPONSE:** Disputed, except that Plaintiffs admit that partners receive a so-called monthly "draw" during the year.  The Management Committee sets each partner's "draw," does not disclose the basis for computing each partner's "draw," and does not disclose each

partner's "draw" to the partnership at large.  (Campbell Decl. ¶ 46; Johnson Decl. ¶ 42.)

Plaintiffs expect discovery to establish that the Management Committee has made

individual arrangements with partners with respect to their so-called "draws" and that its

decisions systematically disfavor women.  (Sanford Decl. ¶ 13.)

60.     When the year is over and the Firm's profits are distributed, the draw each partner

already received with respect to that year is deducted to determine the net profit distribution that

remains to be made to that partner.  (Giaccia Aff. ¶ 32.)

> **RESPONSE**:  Disputed.  The Management Committee not disclose the basis for any net
>
> profit distribution assigned to partners.   (Campbell Decl. ¶ 45; Johnson Decl. ¶ 41.)
>
> Plaintiffs expect discovery to establish that the Management Committee employs no
>
> objective methodology to determine net profit distribution and bases decisions on gender.
>
> (Campbell Decl. ¶¶ 54, 60; Johnson Decl. ¶¶ 50, 55; Sanford Decl. ¶ 13.)

61.     All of the compensation paid to partners is reported on a Form K-1, which is the

IRS form used to report income paid to partners who are responsible for paying their individual

share of taxes on the Firm's overall income.  (Giaccia Aff. ¶ 33.)

> **RESPONSE:**   Undisputed that the Firm issues Forms K-1 to partners reflecting
>
> compensation paid to them.  Plaintiffs, however, lack information as regarding the tax
>
> reporting of *all* compensation paid to *all* partners, as discovery has not taken place yet.
>
> (Sanford Decl. ¶ 13.)

62.     Partners at the Firm have substantial autonomy over their work, including the

business that they bring into the Firm (subject to conflict checks, the Firm's client intake procedures, billing guidelines, collections and similar policies). (Giaccia Aff. ¶ 34.)

> **RESPONSE:** Disputed. The Management Committee sets comprehensive rules and regulations regarding partners' work. (Campbell Decl. ¶ 30; Johnson Decl. ¶ 25.) The Management Committee exercises significant oversight over partners' work, including overseeing, frustrating, and interfering with case staffing; requiring partners to prepare and submit detailed year-end evaluations; questioning partner strategy on cases; and instructing partners to decline to take on new matters. (Campbell Decl. ¶ 36-37; Johnson Decl. ¶¶ 31, 33.) The Management Committee further exercises control over partner work through decisions it makes concerning, *inter alia,* writing off bills owed to the Firm over the objection of the originating and/or billing partner for such matter. (Campbell Decl. ¶ 38.) Plaintiffs expect discovery to establish that the Management Committee sets comprehensive rules and regulations regarding partner work and substantially supervises and directs partner work. (Campbell Decl. ¶¶ 30-42, 60; Johnson Decl. ¶¶ 25-37, 55; Sanford Decl. ¶ 13.)

63.     To the extent partners are subject to such Firm policies, such rules are necessary to ensure that the Firm operates ethically and consistently so that it provides top-tier legal services to all of its clients, and is financially fair to all partners who share in the Firm's profits and losses. (Giaccia Aff. ¶ 34.)

> **RESPONSE:** Disputed. The Management Committee's policies and actions do not ensure that the Firm operates ethically and consistently with respect to all clients. (Campbell Decl. ¶ 35; Johnson Decl. ¶ 30.) The Management Committee's policies do not ensure that the

Firm is financially fair to all partners; instead, the Management Committee discriminates against female partners. (Campbell Decl. ¶¶ 35, 54-55; Johnson Decl. ¶¶ 30, 50-51.) Plaintiffs expect discovery to establish that the Management Committee discriminates against female employees by systematically paying them less than similarly-situated male employees. (Campbell Decl. ¶ ¶ 35, 54-55, 60; Johnson Decl. ¶¶ 30, 50-51, 55; Sanford Decl. ¶ 13.)

64.   Firm policies are either established or reviewed by the partners collectively or by the partner-elected Management Committee, which has been delegated the authority to manage the day-to-day operations of the Firm. (Giaccia Aff. ¶ 34.)

**RESPONSE:** Disputed that Firm policies are established or reviewed by the partners collectively and that the Firm's partners played any role in the "delegat[ion]" of operational management to the Management Committee. The Management Committee sets firm policies, and the partners collectively are rarely, if ever, given the opportunity to review, much less establish, Firm policies. (Campbell Decl. ¶ 32; Johnson Decl. ¶ 26.) The Management Committee develops and implements Firm policies without prior notice to, meaningful input from, or voting by partners. (Campbell Decl. ¶ 32; Johnson Decl. ¶ 26.) Partners have no recourse if they disagree with the Firm policies developed by the Management Committee. (Campbell Decl. ¶ 32; Johnson Decl. ¶ 26.) Plaintiffs expect discovery to establish that the Management Committee does not share information regarding policies, initiatives, or events relating to the Firm until after the Management Committee has already reached a decision. (Campbell Decl. ¶¶ 32, 60; Johnson Decl. ¶¶ 26, 55; Sanford Decl. ¶ 13.)

65.     Partners also enjoy wide latitude in the manner in which they provide services to their clients and manage their client matters.  (Giaccia Aff. ¶ 35.)

> **RESPONSE:** Disputed.   The Management Committee and its designated Head of Litigation, Defendant Abbe Lowell, have inserted themselves into and interfered with partners' work and management of client matters.  (Campbell Decl. ¶ 42; Johnson Decl. ¶ 36.)  For example, Defendant Lowell and the Management Committee have repeatedly denied Ms. Campbell staffing on her matters and has approved write-offs of hundreds of thousands of dollars of client bills without her authorization and over her objections.  (Campbell Decl. ¶ 38-39.)  Plaintiffs expect discovery to confirm that the Management Committee can and regularly does insert itself into and interfere with partners' work and management of client matters.  (Campbell Decl. ¶¶ 42, 60; Johnson Decl. ¶¶ 36, 55; Sanford Decl. ¶ 13.)

66.     Billing rates are set by the Firm, but partners wishing to deviate from such rates may request approval to do so.  (Giaccia Aff. ¶ 35.)

> **RESPONSE:** Undisputed, except that Plaintiffs dispute any misleading implication that partners have the autonomy to deviate from the Firm's set billing rate.  In fact, partners may not deviate from rate's set by the Firm without the approval of the Management Committee.  (Campbell Decl. ¶ 37; Johnson Decl. ¶ 32.)     Both Ms. Campbell and Ms. Johnson requested and were refused approval to deviate from the billing rates set by the Management Committee.  (Campbell Decl. ¶ 37; Johnson Decl. ¶ 32.)     Plaintiffs expect

discovery to confirm that the Management Committee discriminates against women when making decisions regarding deviations from the billing rates it sets.  (Sanford Decl. ¶ 13.)

67.     Partners decide what hours and days they will work and whether and when they will work remotely.  (Giaccia Aff. ¶ 35.)

> **RESPONSE**: Disputed.  The Management Committee expressed an expectation that Plaintiffs be present in their respective offices and available during the Management Committee's working hours.  (Campbell Decl. ¶ 31; *see also* Answer to First Amended Complaint ¶ 8(e) (scrutinizing Ms. Campbell's alleged work schedule and alleged absences from the office).)  The Management Committee also set billable hour expectations for partners.  (Campbell Decl. ¶ 41.)   Plaintiffs expect discovery to confirm that the Management Committee expects partners to maintain regular schedules, be present in the office on a regular basis, and report to the Firm regarding their hours and locations. (Sanford Decl. ¶ 13.)

68.     The Management Committee does not assign work to equity partners, nor is partners' work product required to be reviewed by other partners before it is submitted to clients or to courts or other tribunals, as partners are free to work independently and without direct oversight.  (Giaccia Aff. ¶ 36.)

> **RESPONSE:**  Disputed.  Partners are not free to work independently and without direct oversight.  (Campbell Decl. ¶ 42; Johnson Decl. ¶ 36.)  The Management Committee has inserted itself into and interfered with partners' work and management of client matters. (Campbell Decl. ¶ 42; Johnson Decl. ¶ 36.)  For example, the Management Committee has

repeatedly denied Ms. Campbell staffing on her matters and has approved write-offs on client bills without her authorization. (Campbell Decl. ¶¶ 27, 38-39.)  Plaintiffs expect discovery to confirm that the Management Committee can and does insert itself into and interfere with partners' work and management of client matters.  (Campbell Decl. ¶¶ 42, 60; Johnson Decl. ¶¶ 36, 55: Sanford Decl. ¶ 13.)

69.     This distinguishes partners from associates and senior counsel, to whom partners may assign work and whose work is subject to review by the Firm's partners.  (Giaccia Aff. ¶ 36.)

**RESPONSE:** Disputed.  Partners' assignment of work to associates and senior counsel is subject to the review and approval of the Management Committee; for example, the Management Committee has repeatedly denied Ms. Campbell staffing on her matters. (Campbell Decl. ¶ 39-40.) The work of partners is subject to review by the Firm's Management Committee. (Campbell Decl. ¶ 30-42; Johnson Decl. ¶ 25-36.)  Partners are required to complete detailed annual memoranda describing their work. (Campbell Decl. ¶ 36; Johnson Decl. ¶ 31.)  Plaintiffs expect that discovery will show that partners are not categorically distinct from associates and senior counsel with respect to supervision by the Firm.  (Sanford Decl. ¶ 13.)

70.     While there may be times when partners decide to work collaboratively with other partners, work product is not assigned or subject to review as it would be with non-partner attorneys. (Giaccia Aff. ¶ 36.)

**RESPONSE:** Disputed. The work of partners is subject to review by the Firm's Management Committee.   The work of partners is subject to review by the Firm's

Management Committee. (Campbell Decl. ¶ 30-42; Johnson Decl. ¶ 25-36.)  Partners are required to complete detailed annual memoranda describing their work. (Campbell Decl. ¶ 36; Johnson Decl. ¶ 31.)  Plaintiffs expect discovery to show that partners are subject to substantial supervision and oversight. (Campbell Decl. ¶¶ 42, 60; Johnson Decl. ¶ 36, 55; Sanford Decl. ¶ 13.)

71.    The Firm's partners also enjoy all the benefits of a true partnership, including participating in the Firm's governance and access to the Firm's financial information.  (Giaccia Aff. ¶ 37.)

**RESPONSE:** Disputed.   Partners who are not on the Management Committee are effectively shut out of meaningful participation in the Firm's governance.  (Campbell Decl. ¶ 12; Johnson Decl. ¶ 13.)  The Management Committee turns down requests from partners to participate on Firm committees and other aspects of Firm governance.  (Campbell Decl. ¶ 55; Johnson Decl. ¶ 51.)  For example, Defendants admit that Ms. Campbell requested to participate in leadership and to serve on Firm committees and that her requests were denied. (Answer to Amend. Compl. ¶ X.)  Partners who are not on the Management Committee lack access to much of the Firm's financial information: the Management Committee provides partners with only limited disclosures regarding the Firm's finances.  (Campbell Decl. ¶¶ 50, 56; Johnson Decl. ¶¶ 46, 52.)  Plaintiffs expect discovery to establish that the Management Committee's decisions regarding governance are not meaningfully influenced by individual partners, and individual partners lack access to complete information regarding the Firm's finances.  (Campbell Decl. ¶¶ 11, 12, 44, 50-51, 56, 59-60; Johnson Decl. ¶¶ 12, 13, 40, 46-47, 52, 54-55: Sanford Decl. ¶ 13.)  Plaintiffs further

43

expect discovery to show that other female partners sought and were discriminatorily denied positions of leadership within the Firm. (Campbell Decl. ¶ 55, 60; Johnson Decl. ¶¶ 51, 55; Sanford Decl. ¶ 13.)

72.     Under Section 7(c) of the Partnership Agreement, partners are entitled to receive the Firm's audited financial statements.  (Giaccia Aff. ¶ 38.)

**RESPONSE:** Undisputed to the extent that the Paragraph 7(c) of the Partnership Agreement speaks for itself. Plaintiffs, however, dispute the misleading implication that partners receive full financial disclosures from the Firm.  Partners receive only limited disclosures regarding the Firm's finances.  (Campbell Decl. ¶¶ 50, 56; Johnson Decl. ¶¶ 46, 52.)  Plaintiffs expect discovery to establish that the Management Committee does not provide complete information to Firm partners concerning the Management Committee's decisions impacting the Firm's finances and that they are routinely left in the dark as how the Management Committee runs Firm operations.  (Sanford Decl. ¶ 13.)

73.     Partners also routinely receive weekly, monthly and annual reports on the Firm's finances, including information about business generation, billings and collections, realization rates, hours worked, and the inventory of accounts receivable and work-in-progress, as well as the Firm's payroll expenses, disbursements and account balances.  (Giaccia Aff. ¶ 38.)

**RESPONSE:** Disputed.  To the extent the Management Committee provides financial information to partners, the reports are limited and do not detail the basis for the Management Committee's decisions affecting Firm operations and finances.  (Campbell Decl. ¶ 50; Johnson Decl. ¶ 46.)  The Management Committee's selective disclosure of

certain financial information does not confer on partners meaningful control over the Firm's operations and finances, including compensation decisions. (Campbell Decl. ¶¶ 11-12, 43; Johnson Decl. ¶¶ 12-13, 39.)

74.      There is also a financial report (delivered orally with PowerPoint slides) given at the monthly partnership meetings followed by a question and answer session.  (Giaccia Aff. ¶ 38.)

**RESPONSE:** Undisputed, except that Plaintiffs dispute the false implication that partners have insight or input into the Firm's finances.  To the extent  the Management Committee provides financial information to partners, the reports are limited and do not detail the basis for the Management Committee's decisions affecting Firm operations and finances. (Campbell Decl. ¶ 50; Johnson Decl. ¶ 46.)   The Management Committee's selective disclosure of certain financial information does not confer on partners meaningful control over the Firm's operations and finances, including compensation decisions. (Campbell Decl. ¶¶ 11-12, 43; Johnson Decl. ¶¶ 12-13, 39.)  The Management Committee discourages partners from asking substantive questions regarding Firm finances and rejects partners' requests for additional financial information. (Campbell Decl. ¶¶ 50, 56; Johnson Decl. ¶¶ 46,  52.)

75.      Non-partner attorneys and other employees of the Firm do not have access to such financial information.  (Giaccia Aff. ¶ 38.)

**RESPONSE:** Disputed.  Plaintiffs lack information as to the scope of financial information available to non-partner attorneys and other employees of the Firm, as discovery has not yet taken place.  (Sanford Decl. ¶ 13.)  Plaintiffs expect discovery to establish that non-

partner employees of the Firm such as Lisa Palestine and others have access to some or all of the financial information available to partners regarding the Firm. (Sanford Decl. ¶ 13.)

76.    Partners also receive detailed information on the compensation paid to all Firm partners through the above-described "matrix" books they receive at year-end, which provide details of the Firm profits paid to each partner for each particular year, including the base distributions and any bonus compensation.  (Giaccia Aff. ¶ 39.)

**RESPONSE:** Disputed.  The "matrix" books provided to partners do not include financial data pertaining to the compensation of partners in the Firm's large Project Finance group. (Campbell Decl. ¶ 49; Johnson Decl. ¶ 45.)  This results in the omission of compensation data pertaining to dozens of partners at the Firm.  (Campbell Decl. ¶ 49; Johnson Decl. ¶ 45.)  Plaintiffs expect that discovery will show that partners lack access to this and other key financial information regarding the Firm.  (Sanford Decl. ¶ 13.)

77.    Partners also receive compensation information on non-partner attorneys and also have access on their Firm computers to a software program called "Intellistat" that contains comprehensive real-time (and historic) Firm-wide, client, matter and individual attorney financial data, including realization and utilization data for all matters in the Firm.  (Giaccia Aff. ¶ 39.)

**RESPONSE:**  Disputed that partners have access to complete compensation information and other metrics concerning the Firm.  (Campbell Decl. ¶¶ 49-50, 56; Johnson Decl. ¶ 45-46, 52.)

78.     Partners additionally receive compensation information for all partners through the draft and final points lists distributed to them during the compensation process.  (Giaccia Aff. ¶ 39.)

>   **RESPONSE:** Undisputed that partners receive draft and final points lists distributed to them as part of the Management Committee's compensation process.  These points lists, however, do not set forth the actual compensation provided to all partners and do not provide partners with sufficient information to understand and challenge the basis for the Management Committee's decisions.  (Campbell Decl. ¶ 52, Johnson Decl. ¶ 48.)

79.     The Firm's partners also set the terms and conditions of employment for non-partner attorneys through the Professional Staff Committee ("PSC").  (Giaccia Aff. ¶ 40.)

>   **RESPONSE:**  Disputed.  Members of the Professional Staff Committee are selected by the Management Committee, not the full partnership.   (Campbell Decl. ¶ 58.)  Plaintiffs play no role in setting the terms and conditions of employment (including compensation and billable hour requirements) for non-partner attorneys.   (Campbell Decl. ¶ 58.)

80.     The PSC is comprised of partners who are not on the Management Committee, and among the PSC's primary functions are setting (and when necessary, adjusting) compensation for non-partner attorneys, including base compensation and bonuses.  (Giaccia Aff. ¶ 41.)

>   **RESPONSE:**  Disputed.  Plaintiffs lack information regarding the PSC, as discovery has not yet taken place.  (Campbell Decl. ¶ 58; Sanford Decl. ¶ 13.)   Members of the Professional Staff Committee are selected by the Management Committee.  (Campbell Decl. ¶ 58.)  Plaintiffs play no role in setting the terms and conditions of employment

47

(including compensation and billable hour requirements) for non-partner attorneys. (Campbell Decl. ¶ 58.)

81.     The PSC also works on setting billable hour requirements for non-partner attorneys and many policies pertaining to non-partner attorneys.  (Giaccia Aff. ¶ 41.)

**RESPONSE:**  Plaintiffs lack information regarding the PSC, as discovery has not yet taken place.  (Campbell Decl. ¶ 58; Sanford Decl. ¶ 13.)  Members of the Professional Staff Committee are selected by the Management Committee.  (Campbell Decl. ¶ 58.)  Plaintiffs have played no role in setting the terms and conditions of employment (including compensation and billable hour requirements) for non-partner attorneys. (Campbell Decl. ¶ 58.)

82.     Plaintiff Kerrie Campbell is to this day an equity partner in the Litigation Department at the Firm's Washington, D.C. office.  (Giaccia Aff. ¶ 42.)

**RESPONSE:**  Disputed.  On February 19, 2016, the Firm informed Ms. Campbell of its decision to terminate her employment.  (Campbell Decl. ¶ 25.)  The Firm demoted Ms. Campbell to so-called "partner in transition" and, in an April 6, 2016 memorandum distributed to partners firm-wide, the Management Committee stated that it "exclude[d] partners in transition" from its computation of total shares/points at the Firm.  (Campbell Decl. ¶ 26; Answer to Amend. Compl. ¶ 7.)   In connection with the Management Committee's termination decision, Managing Partner Giaccia informed Ms. Campbell that the Firm will no longer pay her the tax distribution payments paid to partners.  (Campbell Decl. ¶ 28.)  In connection with the Management Committee's termination decision, the

Management Committee has refused to communicate with Ms. Campbell regarding Firm business and the Firm has refused to respond to my requests for staffing support on my cases.  (Campbell Decl. ¶ 27.)  Plaintiff contends that discovery will establish that she is no longer a partner in any meaningful sense.

83.     Campbell alleges that she is still a partner at the Firm.  (First Amended Complaint ¶ 1).

**RESPONSE:** Disputed.  The First Amended Complaint states that Ms. Campbell *was* a partner at the time of her initial hire in January 2014.  (Amend. Compl. ¶¶ 1, 57, 60.).  Ms. Campbell further alleged that, after being informed of her termination, Managing Partner Andrew Giaccia indicated that she would remain a partner *in name only* to help facilitate her transition out of the Firm.  (Amend. Compl. ¶ 98, Campbell Decl. ¶ 27.)

84.     Campbell continues to have profit participation in the Firm in the form of shares, which, even if reduced from her levels from past years, is still higher than other partners at the Firm, both male and female.  (Giaccia Aff. ¶ 43.)

**RESPONSE:** Disputed.   The Firm demoted Ms. Campbell to so-called "partner in transition" and, in an April 6, 2016 memorandum distributed to partners firm-wide, the Management Committee stated that it "exclude[d] partners in transition" from its computation of total shares/points at the Firm.  (Campbell Decl. ¶ 26; Answer to Amend. Compl. ¶ 7.)  In connection with the Management Committee's termination decision, Managing Partner Giaccia informed Ms. Campbell that the Firm will no longer pay her the tax distribution payments paid to partners.   (Campbell Decl. ¶ 28.)  Plaintiffs expect

discovery to establish that Ms. Campbell no longer possesses points or shares in the Firm.
(Campbell Decl. ¶ 25-28, 60; Sanford Decl. ¶ 13.)

85.     Campbell also continues to receive a monthly draw from the Firm.  (Giaccia Aff. ¶
43.)

> **RESPONSE:** Undisputed that Ms. Campbell still receives certain compensation from the
> firm, but Plaintiffs dispute the misleading characterization of these minimal payments as a
> "draw."  Ms. Campbell has been terminated from the partnership and receives what is
> effectively a salary set by the Management Committee.  (Campbell Decl. ¶ 28.)   These
> payments are substantially less than the compensation she received prior to the
> Management Committee's announcement of her termination and if annualized are
> comparable to the salary of a first-year associate.  (Campbell Decl. ¶ 28.)

86.     As with all partners at the Firm, the ultimate value of Campbell's shares will only
be known at year-end based on the Firm's performance.  (Giaccia Aff. ¶ 43.)

> **RESPONSE:** Disputed.   The Firm demoted Ms. Campbell to so-called "partner in
> transition" and, in an April 6, 2016 memorandum distributed to partners firm-wide, the
> Management Committee stated that it "exclude[d] partners in transition" from its
> computation of total shares/points at the Firm.  (Campbell Decl. ¶ 26; Answer to Amend.
> Compl. ¶ 7.)  Plaintiffs expect discovery to establish that Ms. Campbell has no shares in
> the Firm's profits.  (Campbell Decl. ¶ 24-28, 60; Sanford Decl. ¶ 13.)   Plaintiffs further
> contest that the value of partner shares is based primarily on Firm performance and

maintain that discovery will show that it is manipulated by the Management Committee. (Campbell Decl. ¶ 43-44, 54.)

87.    While the Partnership Agreement provides for the expulsion of partners following a vote of the partnership, no such action has been taken with respect to Campbell.  (Giaccia Aff. ¶ 43.)

**RESPONSE:**  Disputed, except that Plaintiffs acknowledge that Partnership Agreement permits expulsion of partners following a vote of the partnership and the Firm has not convened a formal vote regarding Ms. Campbell's expulsion.  In contravention of the Partnership Agreement, the Management Committee secretly made the final decision to termination Ms. Campbell without prior notice to or holding a vote for the general partnership to decide whether to expel a partner.  (Campbell Decl. ¶ 24.)  Plaintiffs expect that discovery will confirm that Firm management has repeatedly made and communicated termination decisions unilaterally without following the formal expulsion procedures in the Partnership Agreement.   (Campbell Decl. ¶ 23, 60; Sanford Decl. ¶ 13.)

88.    Campbell remains today, as she has been since she joined the Firm in January 2014, an equity partner in the Firm.  (Giaccia Aff. ¶ 43.)

**RESPONSE:** Disputed, except that Plaintiffs admit that Ms. Campbell was hired as an equity partner in January 2014.  On February 19, 2016, the Firm informed Ms. Campbell of its decision to terminate her employment.  (Campbell Decl. ¶ 25.)  The Firm demoted Ms. Campbell to so-called "partner in transition" and, in an April 6, 2016 memorandum distributed to partners firm-wide, the Management Committee stated that it "exclude[d]

partners in transition" from its computation of total shares/points at the Firm.  (Campbell Decl. ¶ 26; Answer to Amend. Compl. ¶ 7.)   In connection with the Management Committee's termination decision, Managing Partner Giaccia informed Ms. Campbell that the Firm will no longer pay her the tax distribution payments paid to partners.   (Campbell Decl. ¶ 28.)  In connection with the Management Committee's termination decision, the Management Committee has refused to communicate with Ms. Campbell regarding Firm business and the Firm has refused to respond to my requests for staffing support on my cases.  (Campbell Decl. ¶ 27.)  Plaintiff contends that discovery will establish that she is no longer a partner in any meaningful sense. (Campbell Decl. ¶ 25-28, 60; Sanford Decl. ¶ 13.)

89.     Plaintiff Jaroslawa Z. Johnson joined the Firm in December 2003 as a partner in its Kiev, Ukraine office.  (Giaccia Aff. ¶ 44.)

**RESPONSE:** Undisputed that Ms. Johnson was hired by Chadbourne in December 2003 but Plaintiffs dispute the misleading characterization of Ms. Johnson's status when she joined the Firm.   Ms. Johnson joined the Firm as a "guarantee" partner, not an equity partner.  (Johnson Decl. ¶ 1; Answer ¶ 120.)  As a guarantee partner, Ms. Johnson had no partnership shares in the Firm.  (Johnson Decl. ¶ 2; Answer ¶ 120.)  Ms. Johnson was not promoted to equity partner until 2006.  (Johnson Decl. ¶ 2.)

90.     As a partner, Johnson enjoyed all the same privileges of partnership at the Firm described herein.  (Giaccia Aff. ¶ 45.)

**RESPONSE:** Disputed.   Defendants mischaracterize the "privileges of partnership" at the Firm. Ms. Johnson, like other partners, was effectively shut out of participation in the Firm's governance.  (Johnson Decl. ¶ 13.)  The Management Committee regularly turned down requests from Ms. Johnson to participate on Firm committees and other aspects of Firm governance.  (Johnson Decl. ¶ 51.)  Ms. Johnson, like other partners, did not have access to much of the Firm's financial information: the Management Committee provided her with only limited disclosures regarding the Firm's finances.   (Johnson Decl. ¶ 46.) Plaintiffs expect discovery to establish that Ms. Johnson, along with other partners, had no meaningful influence over the Management Committee's decisions regarding Firm governance; was subject to substantial supervision and control by Firm management' and lacked access to complete information regarding the Firm's finances (Sanford Decl. ¶ 13.)

91.     Johnson managed the Firm's Kiev office until the end of 2013.  (Giaccia Aff. ¶ 46.)

**RESPONSE:** Undisputed that the Firm gave Ms. Johnson the title of "managing partner" of the Kiev office but Plaintiffs dispute the misleading implication that Ms. Johnson was responsible for the management of the office.   The Management Committee and the international practice group heads, Claude Serfilippi and Ayse Yuksel, closely supervised Ms. Johnson's work and required her to seek approval for all significant management decisions.  (Johnson Decl. ¶ 35.)  Plaintiffs expect discovery will confirm Ms. Johnson's lack of management authority over the Kiev office.  (Johnson Decl. ¶ 35, 55; Sanford Decl. ¶ 13).

92.     As head of the Kiev office, Johnson also had wide latitude over the management of the office.  (Giaccia Aff. ¶ 46.)

**RESPONSE:** Undisputed that the Management Committee gave Ms. Johnson the title of "managing partner" of the Kiev office, but Plaintiffs dispute that Ms. Johnson had wide latitude over management of the office.  Ms. Johnson was subjected to significant oversight by the Management Committee and the international practice group heads.  (Johnson Decl. ¶ 35.)  She was not permitted to make any significant management decisions without approval from the Management Committee or international practice group heads.  (Johnson Decl. ¶ 35.)  The Management Committee also set the budget for the Kiev office and billing rates for matters that originated in the office.  (Johnson Decl. ¶ 32.)  Plaintiffs expect discovery will confirm Ms. Johnson's lack of management authority over the Kiev office. (Johnson Decl. ¶ 32; Sanford Decl. ¶ 13.)

93.     Among her many responsibilities and privileges, Johnson decided virtually all day-to-day issues for staff and attorneys.  (Giaccia Aff. ¶ 46.)

**RESPONSE:** Disputed.   Ms. Johnson carried out directives of the Management Committee and international practice group heads.  (Johnson Decl. ¶ 27.)   Ms. Johnson could not making any significant decisions for the Kiev office without prior approval from the Management Committee or international practice group heads.  (Johnson Decl. ¶ 35.) Plaintiffs expect discovery will confirm the lack of decision-making power Ms. Johnson had while employed in the Kiev office. (Johnson Decl. ¶ 35; Sanford Decl. ¶ 13.)

94.     Johnson directed business initiatives and interpreted policies.  (Giaccia Aff. ¶ 46.)

**RESPONSE:** Disputed, except that Plaintiffs admit that Johnson, as an employee of the Firm, read and interpreted policies to which she was subject.  Ms. Johnson carried out the directives of the Management Committee and international practice group heads.  (Johnson Decl. ¶ 27.)   To the extent Ms. Johnson led any business development efforts, she was required to inform the Management Committee or international practice group heads of such efforts.  (Johnson Decl. ¶ 36.)  Ms. Johnson did not have the authority to develop any significant policies for the Kiev office and instead was tasked with implementing with the policies developed by the Management Committee.  (Johnson Decl. ¶ 27.)  Plaintiffs expect discovery will confirm the lack of authority Ms. Johnson had to direct business initiatives or develop policies for the Kiev office.  (Johnson Decl. ¶¶ 27, 36; Sanford Decl. ¶13.)

95.     Johnson decided on the client work she wanted to pitch or otherwise take on. (Giaccia Aff. ¶ 46.)

**RESPONSE:** Disputed that Ms. Johnson could take on client matters without approval from the Management Committee.  Plaintiffs expect discovery will confirm Ms. Johnson's inability to initiate and pursue client matters without approval by the Management Committee (Sanford Decl. ¶ 13.)

96.     Johnson decided how such work would be performed and by whom.  (Giaccia Aff. ¶ 46.)

**RESPONSE:** Disputed.  The Management Committee and international practice group heads directed Ms. Johnson on how to utilize attorneys on Firm matters.   (Johnson Decl. ¶ 36.)  On multiple occasions, Ms. Johnson was told to use fewer attorneys to staff matters

in the Kiev office.  (Johnson Decl. ¶ 36.)  Plaintiffs expect discovery will confirm that Ms. Johnson lacked the authority to determine staffing for matters in the Kiev office.  (Johnson Decl. ¶ 36; Sanford Decl. ¶ 13.)

97.     Johnson handled the billings and collections for such work.  (Giaccia Aff. ¶ 46.)

**RESPONSE:**  Disputed.  The Management Committee set billing rates for the Kiev office and had the authority to make all decisions related to billing and collections for the office. (Johnson Decl. ¶ 32.)  On multiple occasions, Ms. Johnson requested lower billing rates or alternative fee structures for clients of the Kiev office but these requests were denied by the Management Committee.  (Johnson Decl. ¶ 32.)  Plaintiffs expect discovery will confirm the lack of authority Ms. Johnson had over billings and collections for work performed in the Kiev office.  (Johnson Decl. ¶ 32; Sanford Decl. ¶ 13.)

98.     Johnson hired and terminated personnel subject to Firm approval.  (Giaccia Aff. ¶ 46.)

**RESPONSE:**   Disputed. Plaintiff Johnson participated in the hiring and termination process but ultimate authority resided with the Management Committee.  The Management Committee exercised an essential substantive role over all decisions and did not merely act as a rubber stamp. On multiple occasions, Ms. Johnson pleaded with the Management Committee and international practice group heads to provide the Kiev office with additional staff and to increase the pay for attorneys hired in the office.  (Johnson Decl. ¶ 33.)  These requests were denied.  (Johnson Decl. ¶ 33.)  Furthermore, the Management Committee repeatedly demanded that Ms. Johnson fire staff over her vigorous objections.

(Johnson Decl. ¶ 33.)  Plaintiffs expect discovery will confirm that Ms. Johnson had limited

authority over hiring and termination decisions for the Kiev office.  (Johnson Decl. ¶ 33;

Sanford Decl. ¶ 13.)


99.    The Kiev office was closed in April 2014 and Johnson remained a partner of the

Firm until her resignation from the partnership in April 2014.  (Giaccia Aff. ¶ 47.)

> **RESPONSE:**  Undisputed as to the date when the Kiev office closed.  Plaintiffs clarify
>
> that the Management Committee made the unilateral decision to close the Kiev office
>
> without consulting with Ms. Johnson, the so-called "managing partner" of the office, prior
>
> to making and announcing its decision. Further, Plaintiffs dispute that the Firm treated Ms.
>
> Johnson as a full partner until April 2014.  For example, the Firm refused her access to any
>
> partner compensation data for 2013.  Plaintiffs expect discovery to establish that the
>
> Management Committee made the decision to close the Kiev office without prior notice to,
>
> substantive input from, or holding a vote of the full partnership.  (Sanford Decl. ¶ 13.)


100.    Thereafter Johnson served as a Senior Counsel of the Firm until December 31,

2014.  (Giaccia Aff. ¶ 47.)

> **RESPONSE:**  Undisputed.  Ms. Johnson had expected to continue working at the Firm
>
> after December 31, 2014, but she was forced to secure other employment after the
>
> Management Committee decided to close the Kiev office without consulting with Ms.
>
> Johnson.   (Johnson Decl. ¶ 37.)    Plaintiffs expect discovery to establish that the
>
> Management Committee has initiated the opening or closing of foreign offices without

receiving substantive input from or holding a vote of the full partnership.  (Sanford Decl. ¶ 13.)

101.    On September 12, 2016, after Campbell filed suit against Chadbourne, fourteen female partners at the Firm (U.S. and foreign based) sent a letter to Campbell's attorney, David W. Sanford, Esq. ("Sanford").  (Giaccia Aff. Ex. E.)

**RESPONSE:** Undisputed  that Campbell's attorney, David W. Sanford, Esq., received a letter dated September 12, 2016, after Campbell filed suit against Chadbourne, that was purportedly sent by fourteen female partners at the Firm.  Plaintiffs, however, lack information to confirm the authenticity of the letter or regarding the circumstances under which it was sent, as no discovery has taken place in this action.  Plaintiffs expect that discovery will establish that female partners felt pressured to sign the letter in order to please the Management Committee, which, *inter alia*, determines their compensation. (Sanford Decl. ¶ 13.)  Plaintiffs further dispute that this letter bears any relevance whatsoever to Defendants' motion for summary judgment on the issue of whether Plaintiffs and other partners are "employees" under applicable statutes. (Sanford Decl. ¶ 13.)  This paragraph should be stricken from Defendants Rule 56.1 statement.

102.    In the letter, these female partners of the Firm noted that Sanford "made no effort to speak to any of us before filing the lawsuit."  (Giaccia Aff. Ex. E.)

**RESPONSE:** Undisputed that this is a quote from the letter dated September 12, 2016, and purportedly sent by fourteen female partners at the Firm.   Counsel, however, had no obligation to contact these partners. Plaintiffs further dispute that this letter bears any

relevance whatsoever to Defendants' motion for summary judgment on the issue of whether Plaintiffs and other partners are "employees" under applicable statutes. This paragraph should be stricken from Defendants Rule 56.1 statement.

103.    The letter continues:

>    To proceed in this manner, given your obvious awareness of the identity of the women allegedly represented by the purported class action, is no less patronizing and patriarchal than what you accuse our male colleagues of having done.  The complaint you crafted makes a group of very accomplished, assertive and intelligent professional women look like they are victims unable to hold their own with their male colleagues.  Obviously, you have taken this approach in order to inflate the damages claim to $100 million so as to attract attention from the press in hopes that the negative publicity will force a large settlement.  Your intentional and calculated use of women – with whom your firm has neither met nor spoken – for your gain is unfair to each of us.  We reject your characterization of us as well as your claim to represent a class that purportedly includes us.  We insist that you withdraw the "class action" allegations suggesting that any of the undersigned partners are part of Ms. Campbell's proposed class.  (Giaccia Aff. Ex. E.)

**RESPONSE:**  Undisputed  that this is a quote from the letter dated September 12, 2016, and purportedly sent by fourteen female partners at the Firm.  Plaintiffs further dispute that this letter bears any relevance whatsoever to Defendants' motion for summary judgment on the issue of whether Plaintiffs and other partners are "employees" under applicable statutes. This paragraph should be stricken from Defendants Rule 56.1 statement.

104.    Twelve of the Firm's female partners work in the Firm's New York City office, which is within this Court's jurisdiction, and the remaining four U.S. based female partners work in the Firm's Washington, D.C. office.  (Giaccia Aff. ¶ 50.)

**RESPONSE:** Undisputed that female partners work both in the Firm's New York and

Washington, D.C. offices.  This Court has personal jurisdiction over the Firm and all of the named Defendants.  (Amend. Compl. ¶ 50.)  Plaintiffs further dispute that this letter bears any relevance whatsoever to Defendants' motion for summary judgment on the issue of whether Plaintiffs and other partners are "employees" under applicable statutes. This paragraph should be stricken from Defendants Rule 56.1 statement.

105.    The names, addresses, and contact information for these individuals are publicly posted on Chadbourne's website, are known to Campbell as her law partners, and three of them work in the same office as Campbell.  (Giaccia Aff. ¶ 51.)

**RESPONSE:** Undisputed that the names, office addresses, and office contact information for the Firm's current female partners are publicly posted on Chadbourne's website and known to Campbell and that several female partners work in the Firm's Washington, D.C. office.  Plaintiffs dispute, however, that Ms. Campbell knows the personal address and personal contact information for all of the Firm's current or former female partners. (Campbell Decl. ¶ 3.)   Plaintiffs further dispute that this letter bears any relevance whatsoever to Defendants' motion for summary judgment on the issue of whether Plaintiffs and other partners are "employees" under applicable statutes. This paragraph should be stricken from Defendants Rule 56.1 statement.

**Plaintiffs' Statement of Additional Material Facts to be Tried by a Factfinder**

Pursuant to Local Rule 56.1(b), Plaintiffs hereby submit a list of genuine issues of material fact on the subject of whether Plaintiffs and other similarly-situated employees are "employees" under applicable laws. Plaintiffs maintain that these facts will be borne out in discovery in this action.

60

106.    The Firm's Management Committee exercises complete control over the Firm's finances, operations, management, personnel, and administration.  (Campbell Decl. ¶ 11; Johnson Decl. ¶ 12.)

107.    Throughout its history until after Ms. Campbell filed her charge of discrimination with the United States Equal Employment Opportunity Commission, the Firm's Management Committee has been all-male.  (Campbell Decl. ¶ 13; Johnson Decl. ¶ 14.)

108.    The Firm's Managing Partner has always been male.  (Campbell Decl. ¶ 13; Johnson Decl. ¶ 14.)

109.    The Firm, through its Management Committee, determines which individuals are to be made partner without first putting these decisions to a vote of all Firm partners.  (Campbell Decl. ¶ 22; Johnson Decl. ¶ 23.)

110.    The Firm, through its Management Committee, has extended offers of partnership without first notifying, consulting with, or obtaining a vote of the full partnership.  (Campbell Decl. ¶ 22; Johnson Decl. ¶ 23.)

111.    The Firm, through its Management Committee, has effectively terminated partners without first notifying, consulting with, or obtaining a vote of the full partnership.  (Campbell Decl. ¶ 23; Johnson Decl. ¶ 24.)

112.    The Firm, through its Management Committee, has demoted partners without first notifying, consulting with, or obtaining a vote of the full partnership.  (Campbell Decl. ¶ 23; Johnson Decl. ¶ 24.)

113.    The Firm, through its Management Committee, has stripped partners of their equity interests without first notifying, consulting with, or obtaining a vote of the full partnership.  (Campbell Decl. ¶ 23; Johnson Decl. ¶ 24.)

114.    The Firm, through its Management Committee, made the decision to terminate Ms. Campbell's employment.  (Campbell Decl. ¶ 24.)

115.    On February 19, 2016, Managing Partner Andrew Giaccia and Head of Litigation Abbe Lowell informed Ms. Campbell of the Management Committee's decision to terminate her employment.  (Campbell Decl. ¶ 25.)

116.    In connection with the Management Committee's termination decision, the Firm began paying Ms. Campbell a fixed salary that is much less than the monthly draw that she received as a partner.  Additionally, Managing Partner Andrew Giaccia informed Ms. Campbell that the that she would no longer receive partner tax distribution payments.  (Campbell Decl. ¶ 28.)

117.    The Firm, through its Management Committee,  terminated Ms. Campbell without putting her expulsion to a vote of the partnership.  (Campbell Decl. ¶ 24.)

118.    The Firm, through its Management Committee, sets comprehensive rules and regulations regarding partners' work.  (Campbell Decl. ¶ 30; Johnson Decl. ¶ 25.)

119.    The Firm, through its Management Committee, has developed and implemented these rules and regulations without prior notice to, substantive input from, or holding a vote of the full partnership.  (Campbell Decl. ¶ 32; Johnson Decl. ¶ 26.)

120.    The Firm, through its Management Committee, sets policies and issues directives applicable to partners regarding, *inter alia*, the completion of performance evaluations, billings, and collections. (Campbell Decl. ¶ 30; Johnson Decl. ¶ 25.)

121.    The full partnership is not given the opportunity to discuss or challenge Firm policies developed by the Management Committee before the policies are implemented. (Campbell Decl. ¶ 32; Johnson Decl. ¶ 26.)

122.     Partners who disagree with or oppose policies developed by the Management Committee concerning partners or the Firm as a whole are nonetheless bound by those policies. (Campbell Decl. ¶ 32; Johnson Decl. ¶ 26.)

123.     The Firm, through its Management Committee, supervises and directs the work of partners.  (Campbell Decl. ¶ 36; Johnson Decl. ¶ 31.)

124.     The Firm, through its Management Committee, issues written reprimands to partners who do not comply with Firm policies.  (Campbell Decl. ¶ 33; Johnson Decl. ¶ 28.)

125.     The Management Committee threatens to withhold compensation from partners who fail to comply with Firm policies.  (Campbell Decl. ¶ 34; Johnson Decl. ¶ 29.)

126.     The Management Committee actually withholds compensation from partners who fail to comply with Firm policies.  (Campbell Decl. ¶ 34; Johnson Decl. ¶ 29.)

127.     The Firm, through its Management Committee, supervises the work of partners by, *inter alia*, requiring partners to complete annual self-evaluations detailing their work at and contributions to the Firm. (Campbell Decl. ¶ 36; Johnson Decl. ¶ 31.)

128.     The Firm employs a performance review process for its partners that is virtually indistinguishable from performance management processes used to evaluate non-partner employees.  (Campbell Decl. ¶ 36; Johnson Decl. ¶ 31.)

129.     Partners lack the authority to deviate from the billing rates set by the Management Committee without the Committee's approval.  (Campbell Decl. ¶ 37; Johnson Decl. ¶ 32.)

130.     Both Ms. Campbell and Ms. Johnson requested and were refused approval to deviate from the billing rates set by the Management Committee.  (Campbell Decl. ¶ 37; Johnson Decl. ¶ 32.)

131.    The Managing Partner and the Management Committee write off substantial bills on matters without seeking or obtaining the permission of the partner primarily responsible for the case.  (Campbell Decl. ¶ 38.)

132.    The Firm controls staffing on cases.  (Campbell Decl. ¶ 39.)

133.    Ms. Campbell regularly requested and was repeatedly denied staffing on her cases. (Campbell Decl. ¶ 39.)

134.    Ms. Campbell was reprimanded by the Management Committee when she attempted to solicit assistance from Firm associates without obtaining prior approval from the Managing Partner.  (Campbell Decl. ¶ 39.)

135.    The Management Committee directed Ms. Johnson on how to utilize attorneys on matters in the Kiev office.   (Johnson Decl. ¶ 36.)

136.    On multiple occasions, the Management Committee directed Ms. Johnson to use fewer attorneys to staff matters.  (Johnson Decl. ¶ 36.)

137.    Partners are not permitted to hire attorneys or non-attorney staff without approval from the Management Committee.  (Campbell Decl. ¶ 40; Johnson Decl. ¶ 33.)

138.    Partners' assignment of work to associates and senior counsel is subject to the review and approval of the Management Committee. (Campbell Decl. ¶ 40.)

139.    The Management Committee denied Ms. Johnson's requests that the Firm provide the Kiev office with additional staff and increase the pay for attorneys hired in the office.  (Johnson Decl. ¶ 33.)

140.    Partners are required to report to the Management Committee.  (Campbell Decl. ¶ 41; Johnson Decl. ¶ 34.)

141.    Partners report to the Management Committee regarding their performance. (Campbell Decl. ¶ 41; Johnson Decl. ¶ 34.)

142.    Partners report to the Management Committee regarding their billable hours. (Campbell Decl. ¶ 41; Johnson Decl. ¶ 34.)

143.    Partners report to the Management Committee regarding case staffing and other case management issues.  (Campbell Decl. ¶ 41; Johnson Decl. ¶ 34.)

144.    Partners report to the Management Committee regarding their billings. (Campbell Decl. ¶ 41; Johnson Decl. ¶ 34.)

145.    Partners report to the Management Committee regarding their collections. (Campbell Decl. ¶ 41; Johnson Decl. ¶ 34.)

146.    The Management Committee has inserted itself into and interfered with partners' work and management of client matters.  (Campbell Decl. ¶ 42; Johnson Decl. ¶ 36.)

147.    Partners have no influence over the management of the Firm.   (Campbell Decl. ¶ 12; Johnson Decl. ¶ 13.)

148.    Partners who are not on the Management Committee are effectively shut out of meaningful participation in the Firm's governance.  (Campbell Decl. ¶ 12; Johnson Decl. ¶ 13.)

149.    Partners are often denied access to information regarding Firm management. (Campbell Decl. ¶¶ 50, 56; Johnson Decl. ¶¶ 46, 52.)

150.    The Management Committee hand picks the practice group leaders and members of Firm committees.  (Campbell Decl. ¶ 55; Johnson Decl. ¶ 51.)

151.    The Management Committee has made decisions regarding the Firm's leadership, including the selection of practice group and committee heads, that discriminate against the Firm's female partners.  (Campbell Decl. ¶ 12; Johnson Decl. ¶ 51.)

152.    Partners rarely ask substantive questions at partnership meetings. (Campbell Decl. ¶ 56; Johnson Decl. ¶ 52.)

153.    The Management Committee discourages or rebuffs substantive discussions at partnership meetings.  (Campbell Decl. ¶ 56; Johnson Decl. ¶ 52.)

154.    Partners are reluctant to question or challenge decisions made by the Management Committee.  (Campbell Decl. ¶ 57; Johnson Decl. ¶ 53.)

155.    The Management Committee exercises complete control over partner compensation. (Campbell Decl. ¶ 43; Johnson Decl. ¶ 39.)

156.    The Management Committee does not provide partners with insight or input into how the Management Committee determines partner compensation.  (Campbell Decl. ¶ 48; Johnson Decl. ¶ 44.)

157.    Partners lack information regarding the basis for the Management Committee's compensation decisions.  (Campbell Decl. ¶ 45-48; Johnson Decl. ¶¶ 41-44.)

158.    The Management Committee does not provide partners with substantive information as to the basis for the Management Committee's allocation of points or valuation of points.  (Campbell Decl. ¶ 48; Johnson Decl. ¶ 44.)

159.    While the Management Committee requires partners to complete detailed year-end memoranda reviewing their work and the work of other partners, partners generally receive no feedback on their year-end reviews, and partners are not provided with the memoranda that other partners submit or with other feedback purportedly considered in the Management Committee's preliminary allocation of points.  (Campbell Decl. ¶ 48; Johnson Decl. ¶ 44.)

160.    Partners are denied access to important financial data regarding the Firm. (Campbell Decl. ¶¶  50, 56; Johnson Decl. ¶¶ 46, 52.)

161.    The Management Committee withholds information pertaining to partners in the Firm's Project Finance group.  (Campbell Decl. ¶ 49; Johnson Decl. ¶ 45.)

162.    The Management Committee initiates and explores potential mergers with other firms without disclosing this information to the general partnership.  (Campbell Decl. ¶¶ 18-19; Johnson Decl. ¶¶  19-20.)

163.     The Management Committee initiates the opening or closing of foreign offices without prior notice to, receiving substantive input from, or holding a vote of the full partnership. (Campbell Decl. ¶¶ 18-19; Johnson Decl. ¶¶  19-20.)

164.    The Management Committee agrees to settlement arrangements regarding litigation against the Firm without prior notice to, receiving substantive input from, or holding a vote of the full partnership. (Campbell Decl. ¶ 19; Johnson Decl. ¶  20.)

165.    The Management Committee exercises complete control over the allocation of profits or losses among firm partners.  (Campbell Decl. ¶45; Johnson Decl. ¶ 41.)

166.    Partners are provided with little to no information regarding the reasoning for the Management Committee's allocation of profits or losses.  (Campbell Decl. ¶ 45; Johnson Decl. ¶ 41.)

167.    The Management Committee sets aside a portion of the Firm's revenues each year to award bonuses to certain partners.  (Campbell Decl. ¶ 47; Johnson Decl. ¶ 43.)

168.    Partners have no say in the amount set aside for bonuses or the process to determine who receives a bonus.  (Campbell Decl. ¶ 47; Johnson Decl. ¶ 43.)

169.    The Management Committee sets partners' monthly "draws."  (Campbell Decl. ¶ 46; Johnson Decl. ¶ 42.)

170.    The Management Committee does not disclose the basis for computing each partner's "draw."  (Campbell Decl. ¶ 46; Johnson Decl. ¶ 42.)

171.    The Management Committee does not disclose each partner's "draw" to the partnership at large.  (Campbell Decl. ¶ 46; Johnson Decl. ¶ 42.)

172.    The Partnership Agreement contains no provisions exempting partners from the protections of federal, state, or local anti-discrimination laws.   (Campbell Decl. ¶ 10; Johnson Decl. ¶ 11.)

173.    Partners have signed no agreements or contracts specifying that they are exempt from the protections of federal, state, or local anti-discrimination laws.   (Campbell Decl. ¶ 10; Johnson Decl. ¶ 11.)

174.    Firm leadership, in particular the Management Committee and Managing Partner, is in a position to discriminate and take adverse actions against partners without the input or influence of the partnership. (Campbell Decl. ¶ 59; Johnson Decl. ¶ 54.)

Dated: January 9, 2017                    Respectfully submitted,

David W. Sanford (admitted *pro hac vice*)
Jeremy Heisler (JH-0145)
Andrew Melzer (AM-7649)
Alexandra Harwin (AH-3111)
Saba Bireda (admitted *pro hac vice*)
Kevin Love Hubbard (admitted *pro hac vice*)
**SANFORD HEISLER, LLP**
1350 Avenue of the Americas, 31st Floor
New York, New York 10019
Telephone: (646) 402-5650
Facsimile: (646) 402-5651
dsanford@sanfordheisler.com
jheisler@sanfordheisler.com

amelzer@sanfordheisler.com
aharwin@sanfordheisler.com
sbireda@sanfordheisler.com
khubbard@sanfordheisler.com
***Counsel for Plaintiffs and the Class***