UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

KERRIE CAMPBELL and
JAROSLAWA Z. JOHNSON,
individually, and on behalf of others similarly
situated,

    Plaintiffs,

v.

CHADBOURNE & PARKE LLP,
MARC ALPERT, ANDREW GIACCIA,
ABBE LOWELL, LAWRENCE
ROSENBERG, HOWARD SEIFE, and
PAUL WEBER

    Defendants.

Civ. No. 1:16-cv-06832 (JPO)

## DECLARATION OF KERRIE CAMPBELL IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND MOTION TO DISMISS CLASS ALLEGATIONS

I, KERRIE CAMPBELL, hereby declare under penalty of perjury that the following is true and correct:

1. I began my employment at Chadbourne & Parke LLP ("Chadbourne" or the "Firm") in the Firm's Washington, D.C. office in January 2014. I joined the Firm as a partner.

2. In this lawsuit, I bring an employment discrimination class action and collective action on behalf of a proposed class of past, present, and future female partners at Chadbourne. I believe that there are at least 27 such current and former female partners since August 2013.

3. I do not have information on the citizenship of Chadbourne's current and former female partners. I do not have detailed information on the work locations of Chadbourne's current and former female partners. I am unaware of the personal address and other personal contact information for all of the Firm's current or former female partners.

1

### Firm Partners and Offices[1]

4. Since joining the Firm in January 2014, I have heard the Firm's Managing Partner, Defendant Andrew Giacca, state on multiple occasions to me and other partners that Chadbourne's partners act as "employees" and not as "owners" of the Firm. I have also heard partners state on multiple occasions to me, to other partners, and to members of the Management Committee, that Chadbourne partners are treated like "employees" and not as "owners" of the Firm. For example, partners have expressed concerns that the Firm's Management Committee: does not regard or treat Chadbourne partners as "owners" of the Firm; refuses to divulge information that should be provided to "owners" of a business; refuses to answer partners' questions concerning the Firm's operations and financial condition; and does not consider partners to be capable of maintaining the confidentiality of "sensitive" information concerning the Firm's finances, operations, revenues, business objectives, hiring and firing decisions, the opening and closing of offices, and the Management Committee's decisions concerning the allocation of points and compensation.

5. When I last checked on January 9, 2017, the Firm's website identified 103 partners.

6. When I last checked on January 9, 2017, the Firm's website identified 10 offices. I lack information, however, regarding the real-time operating status of all of Chadbourne's offices located outside of the United States.

### The Firm's Partnership Agreement

7. Chadbourne adopted its Partnership Agreement before I joined the Firm. My understanding is that many of Chadbourne's current partners joined the Firm after the Firm's adoption of its original Partnership Agreement.

---

[1] These headings are provided for convenience only. This declaration should be read as a whole, and the headings in no way limit or qualify the assertions made herein.

2

8. Chadbourne presents its Partnership Agreement to incoming partners on a take-it-or-leave-it basis. After I joined the Firm as a partner, as part of the Firm's on-boarding process, I was presented with and required to sign the Firm's Partnership Agreement.

9. Chadbourne has never provided me with a copy of the Partnership Agreement containing the signatures of all Chadbourne partners. At present, I do not know the identity of all Chadbourne partners who are signatories to the Firm's Partnership Agreement.

10. The Partnership Agreement contains no provisions exempting partners from the protections of federal, state, or local anti-discrimination laws. Further, partners do not sign any agreements or contracts specifying that they are exempt from the protections of federal, state, or local anti-discrimination laws.

### The Firm's Management Committee

11. Chadbourne is controlled by a five-member Management Committee based in New York. The Management Committee exercises complete control over the Firm's finances, operations, management, personnel, and administration. The Management Committee makes important decisions affecting the Firm without prior notice to, full disclosure to, substantive input from, or votes of the full Firm partnership.

12. Partners who are not on the Management Committee are effectively shut out of meaningful participation in the Firm's governance. Partners who are not on the Management Committee are powerless to meaningfully influence the Management Committee. Further, partners who are not on the Management Committee do not have substantive input into the powers and duties of the Management Committee.

13. It is my understanding that Chadbourne's Management Committee had always been exclusively male until after the time I filed my charge of discrimination, alleging systemic gender

discrimination, with the United States Equal Employment Opportunity Commission. It is my understanding that the Firm's Managing Partner has always been male.

14. It is my understanding that the Firm's Chief Operating Officer, Lisa Palestine, provides administrative support to the Management Committee. Ms. Palestine is not an attorney, a Chadbourne partner, or a member of the Management Committee. It is my understanding that she has no voting power on matters affecting the Firm.

15. The Firm's Partnership Agreement requires that the Management Committee members be elected by partners holding a majority of profit percentage interests in the Firm. The partners' voting shares, however, are unilaterally set and exclusively controlled by the five-member Management Committee itself. Further, the partners holding the highest voting shares at the Firm are predominantly and disproportionately male.

16. Chadbourne does not have a partner compensation committee, an executive committee, or any comparable committees that serve as a check on the Management Committee's control over Firm finances, operations, management, personnel, and administration.

17. The Management Committee routinely operates in secret. The Management Committee does not disclose to the full partnership many of its internal deliberations, discussions, and actions concerning important Firm matters. The Firm's partners are not privy to many of the decisions and actions of the Management Committee concerning the Firm's finances, operations, management, personnel, and administration. I am not, and never have been, a member of the Management Committee and therefore lack access to the information described in the Declaration of David Sanford relating to the Management Committee's control over partners of the Firm, including documents reflecting the Management Committee's internal deliberations and the Management Committee's discussions and private communications with other partners.

18. The Management Committee initiates, implements, and controls important Firm decisions without prior notice to, consultation with, or input from Firm partners, including the hiring of lateral partners and promotion of internal partners, the de-equitization and termination of partners, the exploration of firm mergers, the opening and closing of offices worldwide, and the hiring and firing of attorneys and staff.

19. For example, the Management Committee does not inform partners (or only informs partners after the fact) regarding important Firm decisions, including the opening and closing of offices, write-offs of millions of dollars of receivables, claims made against the Firm for alleged wrongdoing, settlements agreed to or entered into by the Firm to resolve claims of alleged wrongdoing, severance or other payments made by the Firm upon partners' and other attorneys' departure from the Firm, and the initiation of merger discussions with other firms. On these matters, the Management Committee does not solicit or receive substantive input from, or obtain votes by, the full partnership. For example, the Management Committee did not inform partners that Chadbourne was engaged in serious merger discussions with another firm until the discussions were disclosed in the legal press; the Management Committee claimed that the Firm could not trust partners with this information. Additionally, the Management Committee did not inform partners that Chadbourne had agreed to pay over $30 million to settle class action litigation; partners first found out about the large settlement when they read about it in the legal press.

20. While some of the actions taken by the Management Committee are described in the Partnership Agreement as "major actions" requiring a vote of the full partnership, in practice the Management Committee initiates, implements, and controls these decisions in secrecy and without prior notice to, substantive input from, or a vote by Firm partners. On the limited occasions when votes of the full partnership are held, voting is often *pro forma* because the Management

5

Committee has already taken decisive action. The Management Committee encourages secret votes and resists disclosing the results of votes even when partners request disclosure.

### The Management Committee Controls the Hiring and Firing of Partners

21. The Management Committee controls the hiring and firing of partners in the Firm.

22. The Management Committee determines which individuals are to be made partner prior to any vote of the broader partnership. Based on my experience at the Firm, I believe that the Management Committee has extended offers of partnership without first notifying, consulting with, or obtaining a vote of the full partnership. The role of the full partnership in selecting and hiring partners is minimal and *pro forma*. Based on my experience at the Firm, I believe that the Management Committee grants preferential treatment to men and discriminates against women in its decisions concerning promotions and elections to the partnership.

23. Based on my experience, I believe that the Management Committee has secretly demoted, de-equitized, or effectively terminated partners without first notifying, consulting with, or obtaining a vote of the full partnership. It is my understanding that, following such secret actions, the Management Committee has withheld and refused to timely return the demoted, de-equitized, or terminated partners' capital contributions.

24. The Firm, through its Management Committee, secretly made a final decision to terminate me from the Firm without ever putting my effective expulsion to a vote of the partnership.

25. On February 19, 2016, the Firm, through its Managing Partner Andrew Giaccia and Head of Litigation Abbe Lowell, informed me that the Management Committee had decided to terminate my employment. Managing Partner Giaccia and Head of Litigation Lowell informed me that the Management Committee had decided during its deliberations in or about November

and December 2015, that I did not "fit" with the "strategic direction" of the Firm and that I would have to leave the Firm as soon as possible and no later than August 2016.

26. In connection with the Management Committee's termination decision, the Firm publicly re-labeled me as a "partner in transition." In an April 6, 2016 memorandum distributed to partners Firm-wide, the Management Committee made a special notation emphasizing that I was a "partner in transition" and that it "exclude[d] partners in transition" from its computation of total shares/points at the Firm.

27. In connection with the Management Committee's termination decision, Managing Partner Giaccia informed me that I would remain a partner in name only to help "facilitate" my transition out of the Firm and "preserve" my reputation. Following the Management Committee's termination decision, the Management Committee has refused to communicate with me regarding Firm business, and the Firm has refused to respond to my requests for staffing support on my cases.

28. Having been terminated from the partnership, I receive a salary set by the Management Committee. This fixed salary is much less than the compensation I received before the Management Committee announced my termination. In connection with the Management Committee's termination decision, Managing Partner Giaccia informed me that the Firm will no longer pay me the tax distribution payments paid to partners. My reduced net income, when annualized, is comparable to the salary of a first-year associate at the Firm.

29. Notwithstanding the Management Committee's final decision to terminate my tenure with the Firm, the Management Committee has refused to promptly return my capital, in disregard of the Partnership Agreement.

**The Management Committee Sets the Rules and Regulations for Partners' Work**

30. The Firm, through its Management Committee, sets comprehensive rules and regulations regarding partners' work. Partners must comply with a wide array of directives from the Firm, including directives from the Management Committee concerning case management procedures, billing actions, and performance reviews.

31. The Management Committee has expressed an expectation that I be present in my office on a regular basis and available during the Management Committee's working hours. The Management Committee has also set billable hour expectations for me.

32. The Management Committee develops and implements Firm policies without prior notice to, substantive input from, or votes of the full Firm partnership. Partners are rarely, if ever, given the opportunity to review, discuss, challenge, object to, or vote on Firm policies before they have been enacted by the Management Committee. Partners have no recourse if they disagree with the Firm policies developed by the Management Committee. Partners who disagree with or oppose policies developed by the Management Committee concerning partners or the Firm as a whole are nonetheless bound by those policies.

33. The Firm, through and at the direction of its Management Committee, issues written reprimands to partners who do not comply with Firm policies.

34. The Firm, through its Management Committee, threatens to withhold, and actually does withhold, compensation from partners who fail to comply with Firm policies and Management Committee directives. For example, the Firm withholds compensation from partners if they do not record or bill their time according to the schedule set by the Management Committee.

35. Policies enacted by the Management Committee do not ensure that the Firm operates ethically and consistently with respect to all clients. The Management Committee's policies do not ensure that the Firm is financially fair to all partners. Rather, the Management

Committee discriminates against female partners, and female partners, including myself, have been adversely affected by the Management Committee's discriminatory decisions.

### The Management Committee Supervises Partners, and Partners are Required to Report to the Management Committee

36. The Firm, through its Management Committee, supervises the work of partners. Among other things, the Management Committee requires partners to complete annual self-evaluations detailing their work at and contributions to the Firm. The Management Committee sets deadlines for the completion of the memorandum and threatens that failure to timely complete the memorandum will have adverse consequences. This performance review process is virtually indistinguishable from performance management processes used to evaluate non-partner employees. Based on my experience at the Firm and Defendants' filings in this case, I believe the Management Committee also solicits information from practice group leaders and non-partner attorneys concerning partners' professional conduct and/or performance.

37. Partners lack the authority to deviate from the billing rates set by the Management Committee without the Committee's approval. I have requested and was refused approval to deviate from the billing rates set by the Management Committee. For example, Managing Partner Giaccia told me I could not accept an engagement on a contingency basis. He also refused to accept a fixed fee arrangement that I sought to negotiate with one of my clients.

38. The Managing Partner and the Management Committee write off substantial bills on matters without seeking or obtaining the permission of the partner primarily responsible for the case. The Management Committee approved substantial write-offs on a matter for which I was the originating and billing partner, without my approval and over my express objections, and thereby reduced my total collections and compensation.

39. The Management Committee and its designated Head of Litigation, Abbe Lowell, exercise control over staffing on cases. They have interfered with and otherwise refused to provide adequate staffing for my matters. For example, as one of my major cases entered into discovery and prepared for trial, Head of Litigation Lowell abruptly removed an experienced senior associate from the case and reassigned him to a case managed by a male partner. In another instance, the Management Committee abruptly terminated a senior associate who had been assigned to my cases, leaving several matters without staffing after I had invested months training the associate. Additionally, I was reprimanded by the Management Committee when I attempted to solicit assistance from Firm associates without going through Defendant Lowell's staffing process.

40. By dictate of the Management Committee, partners are not permitted to hire attorneys or non-attorney staff without approval from the Management Committee. Additionally, partners' assignment of work to associates and senior counsel is subject to the review and approval of the Management Committee.

41. Partners are required to report to the Management Committee, including reporting to the Management Committee regarding their performance, their billable hours, their billings and collections (which are closely monitored), their case staffing, and other case management issues.

42. Partners are not free to work independently and without oversight. The Management Committee and its hand-picked Head of Litigation, Abbe Lowell, have inserted themselves into and interfered with partner work and management of client matters.

### The Management Committee Controls Partner Compensation

43. The Management Committee unilaterally sets and exclusively controls partner compensation, including the assignment of draws, the assignment of bonuses, the assignment of "points" or "shares," the valuation of "points" or "shares," and the allocation of any profits or

losses. The Management Committee wields unchecked authority to change from year to year any partner's draw, bonus, "points" or "shares," and/or share of profits or losses.

44. Partners who are not on the Management Committee do not have the opportunity to meaningfully influence the Management Committee's decisions regarding compensation, including the setting of draws, the assignment of bonuses, the assignment of "points" or "shares," and the allocation of compensation.

45. Individual partners have no entitlement to any share of profits or losses, and the Management Committee exercises complete control over the allocation of profits or losses and all compensation among Firm partners. Partners are provided with little to no information regarding the reasoning for the Management Committee's allocation of profits or losses. The Management Committee does not disclose the basis for any net profit distribution that it makes to individual partners. The Management Committee has refused to respond to my direct questions about how it determines partners' compensation.

46. The Management Committee sets each partner's "draw." The Management Committee does not disclose the basis for computing each partner's "draw" and each partner's "draw" to the partnership at large.

47. The Management Committee sets aside a substantial portion of the Firm's revenues each year to award bonuses to certain partners. Partners have no say in the amount set aside for bonuses or the process to determine who receives a bonus.

48. The Management Committee does not provide partners with insight or input into how the Management Committee determines partner compensation. The Management Committee does not provide partners with substantive information as to the basis for the Management Committee's allocation of points or valuation of points. While the Management Committee

requires partners to complete detailed year-end memoranda reviewing their work and the work of other partners, partners generally receive no feedback on their year-end reviews, and partners are not provided with the memoranda that other partners submit or with other feedback purportedly considered in the Management Committee's preliminary allocation of points.

49. Further, the Management Committee withholds crucial data and other information pertaining to the Firm's large Project Finance group from the full partnership. For example, the "matrix" books that the Management Committee has provided to partners omit individual financial data pertaining to the Project Finance group, including individual billable hours, collections, or realization rates, or the compensation of partners in the Project Finance group. The Project Finance group includes dozens of partners, who are predominantly male.

50. Like all other partners who were not on the Management Committee, I do not have access to all of the Firm's financial information. The Management Committee provides partners with only limited disclosures regarding the Firm's finances. The Management Committee rejects partners' requests for additional financial information. In the limited reports provided by the Management Committee, the Management Committee does not explain how the Management Committee makes decisions that impact Firm operations and finances.

51. While the Management Committee offer partners *pro forma* meetings regarding their allocation of points to partners, partners who request these meetings receive little to no information regarding the basis for the Management Committee's compensation decisions and do not appear able to meaningfully influence the Management Committee's compensation decisions.

52. The Management Committee distributes preliminary and final points lists to partners. While the preliminary and final points lists distributed to partners contain columns for "%," the points lists do not specify what this column refers to and do not state that it corresponds

to any partner's percentage of ownership in the Firm. The points lists do not contain the actual compensation provided to all partners.

53. I submitted the required year-end memoranda each year I was a partner and met with the Management Committee regarding the same. Despite my well-founded requests for an increase in my points and compensation at these meetings, the Management Committee refused to increase my compensation. Instead, the Management Committee responded to my requests for a compensation adjustment by retaliating against me.

54. The Management Committee disregards objective factors in order to pay female partners like me less than similarly situated male partners. The Management Committee pays female partners less than male partners even when, as in my case, they outperform them in generating revenue for the Firm. In my experience, the Management Committee minimizes positive information about female partners and systemically undervalues female partners.

### Partners are Powerless to Influence Firm Governance

55. The Management Committee hand picks the Firm's practice group leaders and members of Firm committees. The Management Committee discourages certain partners from seeking leadership positions at the Firm, including positions on the Management Committee. The Management Committee refused my requests to participate in Firm leadership and serve on Firm committees. I believe that the Firm's male management has discriminatorily refused other female partners' requests to participate in Firm leadership and serve on Firm committees.

56. While the Firm holds meetings that are open to the general partnership, these meetings are typically attended by relatively few partners. Based on my experience, the anemic attendance at the meetings is due in large part to their perfunctory and uninformative nature. At these meetings, the Management Committee and Managing Partner lead the discussions and

provide only limited and selective information regarding the Firm's performance and actions. The Management Committee discourages partners from asking substantive questions, especially regarding Firm finances, Firm operations, and partner compensation. Partners who have asked questions about or requested the disclosure of information concerning the Firm's finances have been criticized and rebuffed by members of the Management Committee. As a result, partners rarely ask substantive questions, and I have heard partners comment on the lack of information or the inaccuracy of information provided by the Management Committee at these meetings.

57. Partners are reluctant to question or challenge decisions made by the Management Committee.

58. Members of this Firm's Professional Staff Committee are selected by the Management Committee. I am not and have never been a member of this Committee, and I lack knowledge about the Committee's activities. I have not played any role in setting the terms and conditions of employment (including compensation and billable hour requirements) for non-partner attorneys.

59. The Firm's leadership, in particular the Management Committee and the Managing Partner, is in a position to discriminate and take adverse actions against partners without the input or influence of the full partnership.

60. I expect discovery to establish the facts detailed in this Declaration, as well as additional facts demonstrating that the Management Committee exercises control over the terms and conditions of partners' employment with the Firm.

Executed on January 9, 2017

KERRIE CAMPBELL