PROSKAUER ROSE LLP
Kathleen M. McKenna
Evandro C. Gigante
Rachel S. Fischer
Eleven Times Square
New York, NY 10036-8299
(212) 969-3000
kmckenna@proskauer.com
egigante@proskauer.com
rfischer@proskauer.com
*Attorneys for Defendants*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------X

KERRIE CAMPBELL and
JAROSLAWA Z. JOHNSON, Individually,
and on behalf of others similarly situated,

        Plaintiffs,              Civ. No. 1:16-cv-06832 (JPO)

    v.

CHADBOURNE & PARKE LLP, MARC ALPERT,
ANDREW GIACCIA, ABBE LOWELL, LAWRENCE
ROSENBERG, HOWARD SEIFE, and PAUL WEBER,

        Defendants.

--------------------------------------------------------------------X

## MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR CONDITIONAL CERTIFICATION AND COURT-AUTHORIZED NOTICE

## <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ......................................................................................... 1

STATEMENT OF FACTS ................................................................................................. 2

    A.   The Firm's Diverse Practice Areas .................................................................2

    B.   The Firm's Individualized Assessment of Partner Compensation ....................................3

    C.   The Terms of Campbell's Compensation Were Unique to Her Because They
        Were Guaranteed In Her Offer Letter .........................................................5

    D.   As Managing Partner of the Kiev Office, the Circumstances Surrounding
        Plaintiff Johnson's Compensation Were Distinct ...........................................6

    E.   Yelenick Does Not Allege Any Practice of Gender Based Discrimination and
        Her Compensation was Based on Unique Circumstances ..................................7

ARGUMENT ................................................................................................................... 9

  I.    As Partners of the Firm, Plaintiffs Cannot Pursue an EPA Collective Action ...................9

  II.   Even if Plaintiffs Could Assert Claims Under the EPA, They Fail the Test for
       Conditional Certification ..........................................................................12

    A.   The Standard for Conditional Certification.................................................13

    B.   Plaintiffs Have Failed to Proffer Any Evidence of a Common Unlawful Policy
        to Pay Women Less Than Men.................................................................15

    C.   The Circumstances Surrounding Compensation For Each of the Plaintiffs
        Demonstrate Unique and Individualized Considerations. ................................19

  III.  Plaintiffs' Proposed Notice is Improper .........................................................21

CONCLUSION................................................................................................................ 23

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Ahmed v. T.J. Maxx Corp.*,
No. 10-CV-3609 (ADS) (ETB), 2013 WL 2649544 (E.D.N.Y. June 8, 2013) .......................15

*Auffray v. FXFL, LLC*,
No. 1:15-CV-9379-GHW, 2016 WL 6810863 (S.D.N.Y. Nov. 16, 2016).............................13

*Barrett v. Forest Labs., Inc.*,
No. 12-CV-5224 (RA) (MHD), 2015 WL 5155692 (S.D.N.Y. Sept. 2, 2015) .......................16

*Brickey v. Dolgencorp, Inc.*,
272 F.R.D. 344 (W.D.N.Y. 2011).........................................................................................15

*Clackamas Gastroenterology Associates, P.C. v. Wells*,
538 U.S. 440 (2003)......................................................................................................10, 11

*Coates v. Farmers Grp., Inc.*,
No. 15-CV-01913-LHK, 2015 WL 8477918 (N.D. Cal. Dec. 9, 2015) ................................18

*Colozzi v. St. Joseph's Hosp. Health Ctr.*,
595 F. Supp. 2d 200 (N.D.N.Y. 2009)......................................................................12, 13, 14

*Diaz v. S&H Bondi's Dep't Store, Inc.*,
No. 10 Civ. 7676 (PGG), 2012 WL 137460 (S.D.N.Y. Jan. 18, 2012) ..................................13

*Dybach v. State of Fla. Dep't of Corr.*,
942 F.2d 1562 (11th Cir. 1991) ........................................................................................14

*EEOC v. Port Auth. of N.Y. & N.J.*,
768 F.3d 247 (2d Cir. 2014)................................................................................................11

*Gibson v. Jacob K. Javits Convention Ctr.*,
No. 95 Civ. 9728 (LAP), 1998 WL 132796 (S.D.N.Y. Mar. 23, 1998) ................................16

*Guillen v. Marshalls of MA, Inc.*,
750 F. Supp. 2d 469 (S.D.N.Y. 2010)............................................................................13, 15

*Guillen v. Marshalls of MA, Inc.*,
841 F. Supp. 2d 797 (S.D.N.Y. 2012)..................................................................................12

*Hart v. Dresdner Kleinwort Wasserstein Sec., LLC*,
No. 06 Civ. 0134 (DAB), 2006 WL 2356157 (S.D.N.Y. Aug. 9, 2006) ................................19

*Hoffman v. Sbarro, Inc.*,
   982 F. Supp. 249 (S.D.N.Y. 1997)..........................................................................14

*Jackson v. Bloomberg, L.P.*,
   298 F.R.D. 152 (S.D.N.Y. 2014) (Oetken, J.) ........................................................13

*Jenkins v. TJX Cos.*,
   853 F. Supp. 2d 317 (E.D.N.Y. 2012) ..............................................................14, 15

*Kassman v. KPMG LLP*,
   No. 11 Civ. 03743 (LGS), 2014 WL 3298884 (S.D.N.Y. July 8, 2014) ...........16, 18

*Korenblum v. Citigroup, Inc.*,
   195 F. Supp. 3d 475 (S.D.N.Y. 2016).....................................................................13

*Lifrak v. N.Y. City Council*,
   389 F. Supp. 2d 500 (S.D.N.Y. 2005).....................................................................10

*McLaughlin v. Richland Shoe Co.*,
   486 U.S. 128 (1988)...............................................................................................20

*Moore v. Publicis Groupe SA*,
   No. 11 CIV. 1279 (ALC) (AJP), 2012 WL 2574742 (S.D.N.Y. June 29, 2012)......18

*Myers v. Hertz Corp.*,
   624 F.3d 537 (2d Cir. 2010)....................................................................................14

*Pollis v. New Sch. for Soc. Research*,
   913 F. Supp. 771 (S.D.N.Y. 1996), *aff'd in part*, *rev'd in part on other*
   *grounds*, 132 F.3d 115 (2d Cir. 1997) ....................................................................16

*Prizmic v. Armour, Inc.*,
   No. 05-CV-2503 (DLI) (MDG), 2006 WL 1662614 (E.D.N.Y. June 12, 2006)......14

*Ramos v. Platt*,
   No. 13 Civ. 8957, 2014 WL 3639194 (S.D.N.Y. July 23, 2014) ............................21

*Rochlin v. Cincinnati Ins. Co.*,
   No. IP00-1898-CH/K, 2003 WL 21852341 (S.D. Ind. July 8, 2003)......................18

*Romero v. H.B. Auto. Grp., Inc.*,
   No. 11 Civ. 386 (CM), 2012 WL 1514810 (S.D.N.Y. May 1, 2012)......................14

*Scholtisek v. Eldre Corp.*,
   229 F.R.D. 381 (W.D.N.Y. 2005) ...........................................................................15

*Smith v. Merck & Co., Inc.*,
   Civ. No. 13-2970, 2016 WL 1690087 (D.N.J. Apr. 27, 2016) ................................16

*Tomka v. Seiler Corp.,*
    66 F.3d 1295 (2d Cir. 1995)..................................................................................................11

*Vargas v. HSBC Bank USA, N.A.,*
    No. 11 CIV. 7887 (DAB), 2012 WL 10235792 (S.D.N.Y. Aug. 9, 2012)..............................13

*Vasquez v. Vitamin Shoppe Indus. Inc.,*
    No. 10 Civ. 8820 (LTS) (THK), 2011 WL 2693712 (S.D.N.Y. July 11, 2011) ....................15

*Zerilli-Edelglass v. N.Y. City Transit Auth.,*
    333 F.3d 74 (2d Cir. 2003)...................................................................................................22

STATUTES

29 U.S.C. § 206(d)(1) ................................................................................................................10, 11

29 U.S.C. § 216(b) .........................................................................................................................10

29 U.S.C. § 255(a) .........................................................................................................................20

## PRELIMINARY STATEMENT

Plaintiffs' motion for conditional certification of a collective action by the equity partners of Chadbourne & Parke LLP ("Chadbourne" or the "Firm") should be denied because they are not entitled to bring claims under the Equal Pay Act ("EPA") as partners of the Firm, and in any event Plaintiffs fail to identify a policy susceptible to an equal pay action.

As a threshold matter, as partners and owners of the Firm, Plaintiffs are undoubtedly not "employees" under the EPA.  Thus, they may not assert claims under the EPA, much less avail themselves of the collective mechanism for bringing such claims on a group-wide basis.  There is already pending before the Court Defendants' motion for summary judgment seeking to dismiss Plaintiffs' claims precisely because they are partners, and not employees, of the Firm.  Because Defendants' motion is currently before the Court, and because that motion will likely result in the dismissal of this case on the grounds that Plaintiffs are not entitled to sue under the EPA and the other statutes they have invoked, the Court should deny Plaintiffs' premature motion for conditional certification.  At minimum, and so as not to needlessly expend judicial resources, the Court should hold this motion in abeyance until Defendants' summary judgment motion is decided.

Even if Plaintiff Kerrie Campbell ("Campbell") and EPA opt-in plaintiff Mary Yelenick ("Yelenick") were entitled to bring claims under the EPA, they have not met their burden of showing, as they must in order to justify the conditional certification of a collective action, that there is an unlawful policy at the Firm and that they are similarly situated to other female partners at the Firm with respect to the supposed policy.[1]  Plaintiffs have utterly failed to identify an unlawful policy that impacted the compensation of female partners because there is no such

---

[1] Plaintiff Jaroslawa Z. Johnson ("Johnson") was located outside of the United States as the head of the Kiev office and therefore would not have been covered by the EPA even if she were an employee.

policy.  Rather, the Firm's process for determining partner compensation entails assessing the contributions of *each partner* based on a multitude of individualized inquiries that take into account both qualitative and quantitative factors beyond simply revenue generation.  Plaintiffs disregard the fact that the Firm's female partners practice in a wide array of departments and maintain a variety of different practices, including litigation, transactional and regulatory practices, and that each partner is compensated based on their individual contributions to the Firm; all of which undermine Plaintiffs' allegation that the particular compensation decisions made as to them are representative of the decisions made as to others.  While ignoring these, and a myriad of other, factors Plaintiffs focus solely – and incorrectly – on claimed revenue generation and assume that their compensation is (or was supposed to have been) determined only by revenue.  The evidence, even at this preliminary stage of the case, shows otherwise. Indeed, Plaintiffs' own unique experiences and roles while at Chadbourne show that they are *not* representative of other female partners when it comes to how their compensation was determined.

For the reasons explained in detail below, the Court should deny Plaintiffs' motion for court-authorized notice of a collective action under the EPA.

## STATEMENT OF FACTS

### A.     The Firm's Diverse Practice Areas

Chadbourne & Parke LLP, a New York limited liability partnership, is an international law firm of over 300 attorneys with eighty-two (82) partners, which has 10 offices in 8 countries around the world.  (Affidavit of Andrew Giaccia dated March 10, 2017 in opposition to Motion for Conditional Certification ("3/10/17 Giaccia Opp. Aff."), at ¶ 1.)  Chadbourne's lawyers practice in many different areas of law.  For example, the Firm's website lists practice areas such

as Bankruptcy & Financial Restructuring, Capital Markets, Corporate/Mergers & Acquisitions,

Finance, Insurance & Reinsurance, Intellectual Property, Litigation & Arbitration, Project

Finance, Tax, and Trusts & Estates and Private Client Services.  Each of these areas in turn

encompasses various sub-areas.  For example, the website lists nine such sub-areas within the

Firm's Corporate/Mergers & Acquisitions practice, which range from compensation and benefits

law to environmental law to real estate.  (3/10/17 Giaccia Opp. Aff. at ¶ 3.)  Under the Firm's

Litigation & Arbitration practice, the website lists twelve such sub-areas, which range from

antitrust and trade regulation to white collar defense to appellate advocacy.  (*Id.*)  Chadbourne

also serves clients in a wide variety of diverse industries, such as telecommunications, mining,

energy and consumer products.  (*Id.*)  Without question, partners at the Firm represent different

clients, handle different cases, matters and transactions, work in different geographic locations,

appear in different courts or agency proceedings, and some may, at times, perform administrative

functions as office heads or in other administrative roles.  (*Id.* at ¶ 4.)

      **B.**    **The Firm's Individualized Assessment of Partner Compensation**

      Differences in each partner's contributions to the Firm, which are unique to each

individual, substantially impact their compensation.  (Affidavit of Andrew Giaccia dated

November 14, 2016 submitted in support of Defendants' Motion for Summary Judgment and

Motion to Dismiss Class Allegations ("Giaccia SJ Aff."), at ¶ 29; Ex. D (Dkt. No. 32)).  Pursuant

to the terms of the Firm's Partnership Agreement, Partner compensation is determined by the

partner-elected Management Committee.  (Giaccia SJ Aff. ¶ 23; Ex. A, Section 8.)  Such

decisions are made by the Management Committee through an individualized process.  The

annual process begins with the request (not requirement) that partners submit memoranda

describing their performance and that of other partners over the year.  (Giaccia SJ Aff. ¶ 26.)

Each partner also receives two large books of data (known in the Firm as the "matrix"), one containing extensive and detailed financial data on the Firm and the performance of its partners individually, and another containing a 5-year look back on partner compensation and performance history.[2]  (Giaccia SJ Aff. ¶ 27.)  The Management Committee is then available to meet with partners to discuss compensation issues.[3]  (Giaccia SJ Aff. ¶ 27.)

While the matrix data contains performance metrics including revenue production, there is no mathematical formula that determines Partner compensation.  Rather, the Management Committee considers a variety of factors beyond the "matrix" when determining compensation, including:

- Efforts undertaken by partners to enhance revenues;
- Instances of teamwork yielding new business or other positive results;
- Instances where partners have referred work to other groups or attorneys in other U.S. or international offices;
- Partners who have been of help to one another; client-related activities, including service to existing clients, obtaining new work from existing clients, obtaining new clients, and any other activities deemed noteworthy in this regard;
- Assumption of Firm responsibilities and participation in Firm activities;
- Efforts made by partners to attract lateral partners and other senior attorneys to the Firm;
- *Pro bono* activities;
- Activities aimed at improving attorney competence, including recruiting and training, diversity efforts, and morale; and
- Activities outside the Firm that serve to enhance the reputation of the Firm and its partners.

---

[2] Any partner can know the origination and supervision of work by any other partner and each partner's total compensation for the previous five years.  (Giaccia SJ Aff. ¶ 27.)  In addition, the matrix that Partners receive for the Project Finance Group is distinct from other groups because that Group has decided to treat its revenue efforts as a group effort and therefore the matrix reflects the Group's revenue in the aggregate rather than on a partner-by-partner basis. (Reply Affidavit of Andrew Giaccia dated January 30, 2017 submitted in support of Defendants' Motion for Summary Judgment and Motion to Dismiss Class Allegations ("Giaccia Reply SJ Aff."), at ¶ 10 (Dkt. No. 62).)

[3] These meetings are far from "pro forma," as Yelenick alleges.  The Management Committee makes changes to individual partners' compensation from time to time based on information discussed at these meetings.  (3/10/17 Giaccia Opp. Aff. ¶ 7.)

(3/10/17 Giaccia Opp. Aff. ¶ 6.)  This list is not exhaustive but rather indicative of the factors the Management Committee considers in determining partner compensation.

After the partner memos are submitted and the meetings are held, the Management Committee gathers information from practice group heads and managing partners of the Firm's international offices and formulates a preliminary allocation of points among the partners.[4] (Giaccia SJ Aff. ¶ 30.)  Compensation is determined not merely by revenue generation but also considers other quantitative productivity measures, such as billable hours and realization, and includes consideration of a number of qualitative factors described above.  (Giaccia SJ Aff. ¶ 29; 3/10/17 Giaccia Opp. Aff. ¶ 5.)

After gathering the relevant data, the Management Committee distributes a memorandum to the partners (known as the "draft points list") showing the preliminary allocation of points for each partner, taking into account the factors and considerations described above.  (Giaccia SJ Aff. ¶ 31.)  Thereafter, partners have an opportunity to provide the Management Committee with comments, or raise concerns, about the preliminary allocation of points before a final list (the "points list") is distributed to each partner showing the points allocated to them and to other partners of the Firm for the coming year.  (Giaccia SJ Aff. ¶ 31.)

**C.     The Terms of Campbell's Compensation Were Unique to Her Because They Were Guaranteed In Her Offer Letter**

Unlike most other Partners at the Firm, Campbell's compensation in 2014 and 2015 was set by the terms of her offer letter.  Campbell joined the Firm as an equity partner in the Litigation Department in the Firm's Washington, D.C. office in January 2014 and her practice

---

[4] Individual partner compensation is expressed using a "points" system.  In this system, each point has a nominal estimated value of $1,000 in year-end compensation as a starting point, which is subject to upward or downward variation depending on the Firm's financial performance through the end of the coming year.  (Giaccia SJ Aff. ¶ 28.) In 2016, the Firm slightly modified this system such that partners each have "shares" rather than "points."  (Giaccia SJ Aff. ¶ 28.)

focused on First Amendment litigation, consumer product safety and reputation protection.

(First Amended Complaint ¶ 1.)  When she joined as a lateral partner, she negotiated the terms of

her compensation for the first two years.  (*See* 3/10/17 Giaccia Opp. Aff. at ¶ 8; Ex. A.)  As a

result of those negotiations, the Firm guaranteed Campbell 500 points for calendar year 2014

irrespective of her revenue generation.  (*Id.*)  Campbell was also eligible to receive a guaranteed

bonus of $150,000 for 2014 if her collections reached $2 million and $200,000 if her 2014

collections equaled $2.5 million or more.  (*Id.*)  Pursuant to the terms of her offer letter, if

Campbell collected $2 million in business in 2014, she would also receive 550 points for 2015

and "the guaranteed bonus structure [described above would] continue to apply in 2015."[5]  (*Id.*)

### D. As Managing Partner of the Kiev Office, the Circumstances Surrounding Plaintiff Johnson's Compensation Were Distinct

Johnson joined the Firm in 2003 and managed the Firm's Kiev office as its only equity

partner until the end of 2013.  (3/10/17 Giaccia Opp. Aff. ¶ 10.)  After announcing her intention

to retire, Johnson transitioned from partner to senior counsel in April 2014.  (Giaccia SJ Aff. ¶

47.)  During Johnson's tenure with the Firm, and as the Ukraine went through periods of

economic, political, and military turmoil, the Kiev office became financially unsuccessful.

(3/10/17 Giaccia Opp. Aff. ¶ 11.)  In 2009, six years after Johnson joined the Firm, the Kiev

office posted ▇▇▇▇▇ in losses.  (*Id.*)  In 2010, the Kiev office generated only ▇▇▇▇ in

profit.  (*Id.*)  And, in 2011 the slim profits vanished and the Kiev office posted losses of

▇▇▇▇ .  (*Id.*)  The Kiev office lost ▇▇▇▇ for the Firm in 2012, ▇▇▇▇ in 2013, and then

---

[5] For the year 2016, Campbell's compensation is not subject to any guarantee.  (3/10/17 Giaccia Opp. Aff. ¶ 9.)
Campbell was advised by the Management Committee in early 2016 that she should depart from the Firm and that
her points would be reduced.  (*Id.*)  The Management Committee reduced Campbell's points from 550 to 400 for
2016. Campbell received a distribution in January 2017, consistent with its practices of paying an annual "top up"
distribution to each partner following the end of each calendar year.  (*Id.*)  Campbell has received monthly draws in
2017 as well.  The Management Committee typically finalizes and pays the remainder of partners' compensation for
a year that has ended by April of the following year.  (*Id.*)

*lost an additional* ███████ *in 2014.* (*Id.*)   Because Johnson was the sole partner in the Kiev office during her tenure as office head, she was given billing credit for all work that came into that office, regardless of how the work was actually generated.  (*Id.* at ¶ 13.)  Moreover, Johnson's billable hours were also quite low during this period:  she billed only 594 client-billable hours in 2009, 760 in 2010, 251 in 2011, 276 in 2012, and 600 in 2013.[6]  (*Id.* at ¶ 12.)  The Firm ultimately closed the Kiev office in October 2014 due to political unrest in the region and the poor financial performance of the office.  (*Id.* at ¶ 14.)

### E.   Yelenick Does Not Allege Any Practice of Gender Based Discrimination and Her Compensation was Based on Unique Circumstances

Like all Chadbourne partners, Yelenick's compensation was based on the full spectrum of her unique individual contributions to the Firm, and not simply on just the fees she billed.  (3/10/17 Giaccia Opp. Aff. ¶ 16.)  However, even when considering the fees that Yelenick claims to have generated, the vast majority of these actually represented collections from clients *of other partners* on whose matters Yelenick served as a "responsible partner," and not "billing partner."  (*Id.* at ¶ 17.)  Of the clients for which Yelenick was given "responsible partner" credit, the two largest were longstanding institutional clients for which Yelenick's male mentor offered to share the "responsible partner" credit with her.[7]  (*Id.* at ¶ 18.)  In fact, approximately two-thirds of Yelnick's billing credits as a responsible partner over the relevant time period were

---

[6] On October 16, 2013, Johnson sent a memorandum to the Firm's Managing Partner, Andrew Giaccia, notifying him of her intention to resign from the Chadbourne partnership effective January 1, 2014.  (3/10/17 Giaccia Opp. Aff. ¶ 15.)  Johnson asked to remain with the Firm as Senior Counsel for at least one year and ultimately remained a partner of Chadbourne through April 30, 2014.  (*Id.*)  She then worked as a senior counsel from May 1, 2014 through December 31, 2014, when she left the Firm.  (*Id.*)

[7] Although Yelenick's compensation declined in recent years, her compensation was at all times commensurate with her contributions to the Firm. (3/10/17 Giaccia Opp. Aff. ¶ 20.)

attributable to two Firm clients that her mentor agreed to share "responsible partner" credit with her.  (*Id.* at ¶ 19.)

Because compensation is not determined by a simple calculation based on a partner's billings, but rather objective and subjective factors concerning a partner's contributions to the Firm, none of Yelenick's alleged "comparators" are in fact similar to her because they have different skill sets, work in different practice groups, and have made unique contributions to the Firm.  For example, Yelenick (a career litigator) compares herself to a male partner, ███ ███ but ███ is clearly distinguishable from Yelenick, and is himself unique in what he contributes to the Firm.  ███ is a ███████████████████████ partner who serves as the lead ███ counsel on projects originated by Chadbourne's ████████ group, which is a premier practice at the Firm. (3/10/17 Giaccia Opp. Aff. ¶ 21.)  Yelenick and ███ have completely different practices and client bases, and their contributions to the Firm are vastly different.  (*Id.* at ¶ 22.)  The other "comparators" alleged by Yelenick also have practices and track records at the Firm that differ from hers.

Although Yelenick alleges that the Firm discriminates in "assigning" origination credit for client matters, the reality is that origination credit is determined by the partner who leads and holds the client relationship, not by the Management Committee.  (3/10/17 Giaccia Opp. Aff. ¶ 23.)  When a partner responsible for managing a particular client relationship retires or otherwise leaves the Firm, the departing partner and the client work together to decide which other partner at the Firm will assume responsibility for the client after the partner leaves.   (3/10/17 Giaccia Opp. Aff. ¶ 24.)  The client directs its affairs; it is *not* a decision made by the Management Committee.  (*Id.* at ¶ 25.)  Perhaps most important (and telling) on Yelenick's claim that the Firm discriminates in how it passes down clients, she makes no allegations that *she* was

8

subjected to such a practice.  Instead, she merely surmises that two other female partners of the

Firm should have been given billing credit for a certain client.  Although Yelenick states in

Paragraph 1 of her Declaration that her statements are made on information and belief "where

indicated", she proceeds to make a series of spurious allegations in paragraphs 54 and 55 of the

Declaration about the *bona fides* of the transfer of a longstanding Firm clients with whom she

had no relationship and consequently no basis for her averments.  (Declaration of Mary Yelenick

in support of Plaintiffs' Motion for Collective Action Certification ("Yelenick Cond. Cert.

Decl."), at ¶¶ 1, 54, 55.)  Contrary to Yelenick's claims, Marc Alpert prior to his departure

consulted with the clients he had managed about which partners would assume the billing partner

responsibilities for those relationships.  The result of those consultations was that those

responsibilities were given to those partners who had worked closely with those clients along

with Alpert over the years.  (3/10/17 Giaccia Opp. Aff. ¶ 26.)  Yelenick identifies two women

partners whom she alleges were bypassed by Alpert in this process.  (Yelenick Cond. Cert. Decl.

¶¶ 54, 55.)  One was introduced to various of Alpert's clients, but limited work in her area

developed with them.  (3/10/17 Giaccia Opp. Aff. ¶ 27.)  The other partner provided limited

representation on only a particularized subject matter.  (*Id.*)  By no means were either of these

women partners the primary partners who had been working most closely with Alpert on the

clients that were transitioned.  (*Id.*)

## ARGUMENT

## I.    AS PARTNERS OF THE FIRM, PLAINTIFFS CANNOT PURSUE AN EPA COLLECTIVE ACTION

As a threshold matter, Plaintiffs' motion fails because they purport to represent a

collective of "all female partners" under the Equal Pay Act even though neither Plaintiffs nor any

putative collective members are "employees" entitled to the protections of the Act. [8]   *See* 29 U.S.C. § 206(d)(1) (stating that it is unlawful for an employer to "discriminate, within any establishment in which such employees are employed, between *employees* on the basis of sex by paying wages to *employees* in such establishment at a rate less than the rate at which he pays wages to *employees* of the opposite sex in such establishment for equal work") (emphasis added); 29 U.S.C. § 216(b) (providing a private right "by any one or more *employees* for and in behalf of himself or themselves and *other employees* similarly situated." (emphasis added).[9] Tellingly, Plaintiffs' motion for conditional certification ignores their status as equity partners, and merely assumes Plaintiffs to be statutory employees.  In fact, none of the cases Plaintiffs rely on to support their request for court-authorized notice are relevant because none involve an ongoing legal dispute as to whether the putative collective is made up of employees or, as is the case here, law firm partners who operate as owners.  Plaintiffs' attempt to gloss over this threshold issue should be rejected and, for the reasons set forth in Defendants' motion for summary judgment (Dkt. No. 30), Plaintiffs' motion should be denied because they are not employees entitled to bring EPA claims under *Clackamas Gastroenterology Associates, P.C. v. Wells*, 538 U.S. 440 (2003).

---

[8] In the First Amended Complaint, Plaintiffs asserted claims on behalf of a purported class of present and former female U.S. partners since August 2013, which they allege amounted to a purported class of 26 women.  (First Amended Complaint ¶ 169.)  However, two of Chadbourne's current female partners, and four of Chadbourne's former female partners, are non-U.S. citizens who are or were based outside the United States.  In addition, effective November 1, 2016, the Firm elected to the partnership a new group of internally-promoted attorneys, three of whom were women and all of whom are located in the United States.   Thus, the number of current and former female partners at the Firm since August 2013 who are U.S. citizens or based in the United States presently totals 23. (Giaccia SJ Aff. ¶ 2.)

[9] Plaintiffs assert claims under the Equal Pay Act, which is a 1963 amendment to the FLSA.  As such, it "utilizes the FLSA's enforcement mechanisms and employs its definitional provisions."  *Lifrak v. N.Y. City Council*, 389 F. Supp. 2d 500, 503 (S.D.N.Y. 2005) (holding that the FLSA's definition of "employee" applies equally to an Equal Pay Act claim).

Throughout their motion and accompanying declarations, Plaintiffs concede that they seek to bring their claims as "partners" of the Firm and do not cite any authority supporting the notion that they can bring a collective action for equal pay as equity partners.[10]   Nowhere in their declarations – the only "evidence" submitted in support of their motion for court-authorized notice – do Plaintiffs proffer any facts refuting the application of *Clackamas*.   Indeed, insofar as they argue in opposition to Defendants' summary judgment motion that their work was subject to supervision by the Firm's Management Committee, Plaintiffs readily admit here that their primary responsibilities were "to generate and develop business and serve as the lead attorney on various client matters", and in that capacity they "served as the lead point of contact for clients, informed clients of Firm policies including billing and collections procedures, advised clients on a variety of strategic questions, developed and supervised strategy to achieve client goals, communicated on behalf of clients with opposing parties, and completed legal filings as necessary."   *See* Declaration of Kerrie Campbell in support of Plaintiffs' Motion for Collective Action Certification ("Campbell Cond. Cert. Decl."), at ¶ 10; Declaration of Jaroslawa Z. Johnson in support of Plaintiffs' Motion for Collective Action Certification ("Johnson Cond. Cert. Decl."), at ¶ 11; Yelenick Cond. Cert. Decl. at ¶ 10.  Because, as partners and owners of the

---

[10] Plaintiffs will not possibly be able to show that they (as female partners at the Firm) all perform "equal work" to their male comparators under the EPA.  Equal work, under the EPA, means work that "requires equal skill, effort, and responsibility, and which [is] performed under similar working conditions".  29 U.S.C. § 206(d)(1).  Under the case law in this Circuit, having a similar title plus similar generalized responsibilities is not the same as having equal skill, effort and responsibilities.  *See EEOC v. Port Auth. of N.Y. & N.J.*, 768 F.3d 247, 255 (2d Cir. 2014) (describing the "equal work" standard for an EPA claim as "demanding, requiring evidence that the jobs compared are 'substantially equal,'" meaning "the jobs compared entail common duties or content, and do not simply overlap in titles or classifications"); *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1310 (2d Cir. 1995) (noting that "jobs which are 'merely comparable' are insufficient to satisfy a plaintiff's prima facie burden" under the EPA's "substantially equal" requirement.)  Given the varied practice areas, offices, geographic locations and conditions under which, and the varied clients on whose behalf, the Firm's partners practice law, and the numerous qualitative factors taken into account when determining their compensation, Plaintiffs cannot possibly show that they perform substantially equal work to all of the Firm's partners.

11

Firm, Plaintiffs and the putative members of the collective are not "employees," they are not

covered by the EPA and thus cannot avail themselves of the statutory mechanism for court-

authorized notice.  *See generally* Dkt. No. 59 at 5-7.

For these reasons, the Court should deny Plaintiffs' motion for conditional certification.

At the very least, the Court should hold any decision on this motion for conditional certification

in abeyance pending the resolution of Defendants' summary judgment motion on the issue of

Plaintiffs' partner status.

## II.     EVEN IF PLAINTIFFS COULD ASSERT CLAIMS UNDER THE EPA, THEY FAIL THE TEST FOR CONDITIONAL CERTIFICATION

Assuming Plaintiffs were able to bring claims under the EPA, their motion nevertheless

should be denied because they fail to shoulder even their purportedly "low burden" for

conditional certification.  Plaintiffs fail to identify an unlawful policy by which their pay was

determined and they fail to show that they are similarly situated to one another and to the other

members of the putative collective.  In addition, the circumstances surrounding the compensation

of Plaintiffs Campbell and Johnson were unique and dispel any notion of any single policy –

unlawful or otherwise – that was applied to all female partners at the Firm when setting partner

compensation.

The Court should "take a measured approach when addressing a request for collective

action certification, mindful of the potential burden associated with defending against an FLSA

claim involving a broadly defined collective group of plaintiffs."  *Colozzi v. St. Joseph's Hosp.

Health Ctr.*, 595 F. Supp. 2d 200, 207 (N.D.N.Y. 2009) (internal citations omitted).  *See also

Guillen v. Marshalls of MA, Inc.*, 841 F. Supp. 2d 797, 803 (S.D.N.Y. 2012) (explaining that it

would be a waste of the court's and the litigants' time and resources to notify a class of

individuals "only to later determine that the matter should not proceed as a collective action

because the class members are not similarly situated").  Accordingly, the Court has broad

discretion in deciding whether Plaintiffs have made the requisite showing for court-authorized

notice and should exercise that discretion here to deny Plaintiffs' motion.  *See Auffray v. FXFL,*

*LLC*, No. 1:15-CV-9379-GHW, 2016 WL 6810863, at *2 (S.D.N.Y. Nov. 16, 2016) (denying

conditional certification without prejudice pending adjudication of defendant's motion to dismiss

plaintiffs' FLSA claims); *Korenblum v. Citigroup, Inc.*, 195 F. Supp. 3d 475, 479 (S.D.N.Y.

2016) (denying conditional certification); *see also Vargas v. HSBC Bank USA, N.A.*, No. 11 CIV.

7887 (DAB), 2012 WL 10235792, at *4 (S.D.N.Y. Aug. 9, 2012) (in exercising its discretion, the

court may consider the entirety of the record, including declarations submitted by defendant).

Most importantly, while Plaintiffs tout what they perceive as their "very low" burden at

the conditional certification stage, they completely overlook the threshold obstacle they face –

*i.e.*, that they are *not* statutory employees entitled to bring suit under the EPA.  This critical

distinction between the facts at issue here as compared to all of the cases Plaintiffs rely on in

their motion completely undermines their reliance on cases where the court was *not* confronted

with the threshold question of whether the law even applied to the plaintiffs.[11]

A.      <u>The Standard for Conditional Certification.</u>

Plaintiffs carry the burden of proof at the conditional certification stage and must come

forward with evidence of "some substance" that they are similarly situated to all the putative

members of the collective.  *See Guillen v. Marshalls of MA, Inc.*, 750 F. Supp. 2d 469, 480

(S.D.N.Y. 2010).  *See also Colozzi*, 595 F. Supp. 2d at 200, 207.  To grant conditional

---

[11] None of the cases Plaintiffs rely on involve partners of a law firm who are *not* statutory employees.  *See, e.g.*,
*Diaz v. S&H Bondi's Dep't Store, Inc.*, No. 10 Civ. 7676 (PGG), 2012 WL 137460, at *3-4 (S.D.N.Y. Jan. 18, 2012)
(claims were brought by manual laborers at a department store whose duties were well-defined); *Jackson v.*
*Bloomberg, L.P.*, 298 F.R.D. 152 (S.D.N.Y. 2014)  (Oetken, J.)  (customer support representative claims that he was
misclassified as exempt under the FLSA).

certification, the Court must find "'some identifiable factual nexus which binds the named plaintiffs and potential class members together as victims' of a particular practice." *Jenkins v. TJX Cos.*, 853 F. Supp. 2d 317, 322 (E.D.N.Y. 2012) (*quoting Hoffman v. Sbarro, Inc.*, 982 F. Supp. 249, 261 (S.D.N.Y. 1997)); *Colozzi*, 595 F. Supp. 2d at 207 ("For the proposed class members to be deemed similarly situated… there must be demonstra[ble] similarity among the individual situations, …some identifiable factual nexus which binds the named plaintiffs and potential class members.") (internal quotations omitted); *Prizmic v. Armour, Inc.*, No. 05-CV-2503 (DLI) (MDG), 2006 WL 1662614, at *2-3 (E.D.N.Y. June 12, 2006) (plaintiff must provide "actual evidence" of a link between plaintiff's situation and those in the proposed collective action); *Jenkins*, 853 F. Supp. 2d at 322 (collecting cases). "[Plaintiffs'] 'modest factual showing' cannot be satisfied simply by 'unsupported assertions'" – which is all Plaintiffs have submitted here. *See Myers v. Hertz Corp.*, 624 F.3d 537, 555 (2d Cir. 2010) (*quoting Dybach v. State of Fla. Dep't of Corr.*, 942 F.2d 1562, 1567 (11th Cir. 1991)).

To meet their burden of demonstrating that they are "similarly situated" to the class they desire to represent, Plaintiffs must show that all of the putative collective members "were victims of a common policy or plan *that violated the law*." *Myers*, 624 F.3d at 555 (*quoting Hoffman v. Sbarro, Inc.*, 982 F. Supp. 249, 261 (S.D.N.Y. 1997) (Sotomayor, J.)) (emphasis added). "The similarly situated analysis, then, centers upon the features which make the particular policy or practice *unlawful*." *Colozzi*, 595 F. Supp. 2d at 207 (emphasis added). Contrary to Plaintiffs' belief that very little is required of them on this motion, they in fact do have to meet their burden at the conditional certification stage with a modest factual showing that goes beyond the allegations in their complaint. *See Romero v. H.B. Auto. Grp., Inc.*, No. 11 Civ. 386 (CM), 2012 WL 1514810, at *10 (S.D.N.Y. May 1, 2012). Simply put, conditional certification is "not

14

automatic." *Jenkins v. TJX Cos.*, 853 F. Supp. 2d 317, 322 (E.D.N.Y. 2012) (*quoting Vasquez v.*

*Vitamin Shoppe Indus. Inc.*, No. 10 Civ. 8820 (LTS) (THK), 2011 WL 2693712, at *3 (S.D.N.Y.

July 11, 2011)).

**B.**   **Plaintiffs Have Failed to Proffer Any Evidence of a Common Unlawful Policy to Pay Women Less Than Men.**

Plaintiffs do not, and cannot, point to a Firm policy governing the payment of partner

compensation that is *per se* discriminatory.  Instead, they rely on relative revenue production

(whether originated or allegedly "inherited") and argue, incorrectly, that partner compensation is

a function of collections.[12]  In fact, documentary evidence shows that the Firm's expressed

policy is to determine compensation by a number of qualitative and quantitative factors that

differ from partner to partner given their individualized contributions to the Firm and to the

community.  Plaintiffs also cannot demonstrate the existence of a policy by relying on their own

conclusory allegations or assumptions about the experiences of other female partners.  Such

allegations, which are devoid of personal knowledge, do not support the notion that female

partners are subjected to an unlawful policy to pay women less than men.

Plaintiffs' motion should be denied because they fail to identify a common policy or

plan of the Firm that violates the law.  *Brickey v. Dolgencorp, Inc.*, 272 F.R.D. 344, 347

(W.D.N.Y. 2011) (*quoting Scholtisek v. Eldre Corp.*, 229 F.R.D. 381, 387 (W.D.N.Y. 2005)).

*See also Guillen*, 750 F. Supp. 2d at 475.  Plaintiffs do not allege that the Firm's policy for

partner compensation was discriminatory on its face and they have not proffered any evidence of

a *de facto* illegal policy, which is required for conditional certification.  *See Ahmed v. T.J. Maxx*

*Corp.*, No. 10-CV-3609 (ADS) (ETB), 2013 WL 2649544, at *14 (E.D.N.Y. June 8, 2013)

---

[12] Although not directly relevant to this motion, Defendants deny the accuracy of Plaintiffs' allegations concerning the distributions of points among Firm partners and further deny that gender played any role in determining compensation.

(finding that plaintiffs were not similarly situated to putative members of the collective where they identified only a facially neutral policy and there was no basis to conclude there was evidence of a *de facto* illegal policy based on the testimony of two individuals).  Rather, they allege that, based solely on their calculations, the Management Committee, on average, allocated more points to male partners than to female partners and therefore they "believe that these substantial disparities are indicative of systematic gender-based discrimination by Chadbourne's Management Committee." (Campbell Cond. Cert. Decl. ¶ 63; Johnson Cond. Cert. Decl. ¶ 50; Yelenick Cond. Cert. Decl. ¶ 51.)  This conclusory allegation is legally insufficient to evidence a Firm policy to pay men more than women.

Plaintiffs' perfunctory comparison of revenue generation and the average points allocated to male and female partners is insufficient to serve as the kind of serious statistical pay equity study that might justify a conditional certification. [13]  *See Gibson v. Jacob K. Javits Convention Ctr.*, No. 95 Civ. 9728 (LAP), 1998 WL 132796, at *4 (S.D.N.Y. Mar. 23, 1998) ("'[I]t is doubtful whether statistics tending to demonstrate a difference between the average salaries paid to male and female employees can satisfy [a] plaintiff's prima facie burden' under the EPA.") (*citing Pollis v. New Sch. for Soc. Research*, 913 F. Supp. 771, 784 (S.D.N.Y. 1996), *aff'd in*

---

[13] Plaintiffs' reliance on the decisions in *Kassman v. KPMG LLP*, No. 11 Civ. 03743 (LGS), 2014 WL 3298884, 2014 U.S. Dist. LEXIS 93022 (S.D.N.Y. July 8, 2014) and *Barrett v. Forest Labs., Inc.*, No. 12-CV-5224 (RA) (MHD), 2015 WL 5155692, 2015 U.S. Dist. LEXIS 117203 (S.D.N.Y. Sept. 2, 2015) to demonstrate that the evidence they have proffered is sufficient because they have performed a "statistical analysis" is misguided.  In both of those cases, the plaintiffs submitted expert reports concluding there was a statistically significant difference between the pay of male and female employees in similar positions after controlling for a number of variables. Plaintiffs' simplistic calculations here cannot be compared to expert analysis and render the decisions in *Kassman* and *Barrett* entirely inapposite.  Plaintiffs' assertion that they have established a "factual nexus" as defined by the court's decision in *Smith v. Merck & Co., Inc.*, Civ. No. 13-2970, 2016 WL 1690087, 2016 U.S. Dist. LEXIS 56166 (D.N.J. Apr. 27, 2016) fails for similar reasons.  In *Merck*, the plaintiffs submitted an expert report analyzing the pay data and the defendant had a much more formulaic compensation policy.

*part*, *rev'd in part on other grounds*, 132 F.3d 115 (2d Cir. 1997)).  Such "evidence" wholly fails

because it is based on a false predicate – *i.e.*, that compensation decisions are purely

mathematical and only involve an analysis of partner billings and collections.  Plaintiffs do not

offer any information about, nor do they control for, or even consider, the numerous other factors

the Firm expressly states in writing that affect partner compensation beyond collections,

including efforts made by partners to enhance revenues, instances of teamwork between partners,

the assumption of Firm-wide responsibilities, *pro bono* activities and other activities outside the

Firm that serve to enhance the Firm's reputation.

Plaintiffs' motion fails because it is based on a straw man.   Plaintiffs claim (contrary to

the documentary evidence) that the Firm's practice is to determine compensation solely on the

basis of collections.  Plaintiffs then accuse the Firm of acting improperly for failing to adhere to

this practice, which is purely Plaintiffs' own invention.  Plaintiffs fail to properly identify a

policy or practice that would justify a conditional certification.

Plaintiffs' self-serving declarations containing allegations about *other* female partners

also cannot stand as evidence that current and former female partners are (or were) subjected to

an unlawful policy.  For example, Plaintiffs conclusorily allege that "the Management

Committee routinely overvalues the anticipated revenue of male Partners, resulting in

disproportionately fewer points for female Partners even when they outperform their male

peers."  (Campbell Cond. Cert. Decl. ¶ 35; Johnson Cond. Cert. Decl.  ¶ 36; Yelenick Cond.

Cert. Decl. ¶ 35.)  However, Plaintiffs fail to allege any facts about any other female partners'

performance (and also conveniently omit critical facts regarding their performance and the

circumstances surrounding their compensation).  Plaintiffs also allege that "[p]artners who

request meetings with the Management Committee receive little to no information regarding the

basis for the Committee's compensation decisions and do not appear able to meaningfully influence the Committee's compensation decisions." (Campbell Cond. Cert. Decl. ¶ 30; Johnson Cond. Cert. Decl.  ¶ 31; Yelenick Cond. Cert. Decl. ¶ 30.)  Yet, they do not allege a single fact regarding any other partners' meetings with the Management Committee, the information they received during such meetings and what, if any, actions were taken following those meetings. These conclusory statements, about which Plaintiffs have *no personal knowledge*, are legally insufficient because they are not probative of the experiences of other female partners at the Firm, and certainly do not suggest the existence of an unlawful policy to pay women less than men.[14]

The Firm's partners – including the female partners – have widely different professional resumes and histories at the Firm, perform at different levels in different practice areas and have differing responsibilities at the Firm.  They also have contributed in a myriad of ways to the Firm and the professional community.  These factors, among others, require fact-intensive inquiries by the Management Committee when setting partner compensation, and certainly dispel any notion

---

[14] The cases Plaintiffs cite in support of their conditional certification request are also inapposite.  Of the cases they rely on, only a handful involve Equal Pay Act claims brought on behalf of employees who could arguably be viewed as high-level.  Yet the facts in those cases render them entirely distinguishable because the nature of the jobs at issue in those cases cannot compare to the autonomy and discretion enjoyed by partners at the Firm and/or because the plaintiffs in those cases actually proffered evidence regarding other female employees to show they were similarly situated as to a common unlawful policy.  *See Coates v. Farmers Grp., Inc.*, No. 15-CV-01913-LHK, 2015 WL 8477918 (N.D. Cal. Dec. 9, 2015) (involved attorneys in a Claims Litigation Department at an insurance company); *Rochlin v. Cincinnati Ins. Co.*, No. IP00-1898-CH/K, 2003 WL 21852341 (S.D. Ind. July 8, 2003) (involved attorneys at an insurance company (as well as various other positions, such as claims examiner, associate manager of claims development, supervising claims examiner, etc.)).  *See Kassman v. KPMG LLP*, No. 11 Civ. 03743 (LGS), 2014 WL 3298884 (S.D.N.Y. July 8, 2014) (involved individuals employed in tax and advisory functions); *see  also Moore v. Publicis Groupe SA*, No. 11 CIV. 1279 (ALC) (AJP), 2012 WL 2574742 (S.D.N.Y. June 29, 2012) (the court granted conditional certification of claims brought by public relations professionals after a significant amount of discovery had taken place and where plaintiffs submitted declarations from potential class members, and individuals with knowledge of the defendants' practices).

that the Firm applies a single unlawful policy, grounded only in revenue production, when making individual pay determinations.

> **C.**     **The Circumstances Surrounding Compensation For Each of the Plaintiffs Demonstrate Unique and Individualized Considerations.**

At a minimum, each of the Plaintiffs had unique circumstances and experiences at the Firm. These factors demonstrate that individualized considerations impacted their compensation, such that they are not similarly situated to the putative collective members or to each other.

Campbell joined as a lateral partner in January 2014 and was guaranteed a certain number of points in her offer letter as well as bonus compensation that was dependent on her collections. (First Amended Complaint ¶¶ 58, 60.) Although Campbell claims that the Firm should have awarded her more points from the outset, Campbell had the ability to negotiate the terms of her offer letter and compensation, unlike certain other long-standing partners at the Firm such as those who were promoted internally. This fact alone demonstrates that her compensation was based on factors unique to her.

Similarly, the circumstances surrounding Johnson's compensation were also unique due to her position as the Managing Partner and sole equity Partner of the Kiev Office. As a threshold matter, Johnson worked overseas and, even if she were an "employee," which she is not, she cannot assert claims under the EPA because the EPA does not apply extraterritorially. *See Hart v. Dresdner Kleinwort Wasserstein Sec., LLC,* No. 06 Civ. 0134 (DAB), 2006 WL 2356157 (S.D.N.Y. Aug. 9, 2006) (granting the defendant's motion to dismiss an employee's EPA claim to the extent it arose out of work performed outside of the United States). In any event, any claims that Johnson could otherwise assert would be time-barred given that she

stepped down from the Firm's partnership in April 2014, more than 2 years before she joined this action.[15]  *See* 29 U.S.C. § 255(a).

Additionally, the circumstances impacting Johnson's compensation were highly distinct and individualized.  As head of the Kiev office, she oversaw the office, managed the work performed and was responsible for hiring and terminating employees, subject to the Firm's approval.  (Giaccia SJ Aff. ¶ 46.)  She was also credited with the financial performance of the office overall, even in cases where she was not responsible for generating the office's collections, and her compensation took into account the factors unique to a partner who was overseeing a foreign office in a politically unstable region of the world.

Determinations as to Yelenick's compensation were also distinct and based on the Management Committee's objective and subjective determinations of her contributions to the Firm.  (3/10/17 Giaccia Opp. Aff. ¶ 16.)  Yelenick is not similarly situated to other female partners because, as with all Chadbourne partners, the considerations taken into account in determining her compensation were unique to her.  Yelenick's attempt to compare herself to other partners only underscores the fact that compensation decisions at Chadbourne are completely individualized, and are not based on any formula or percentage of a partner's revenues.  (*Id.* at ¶ 6.)  Further, Yelenick's allegation concerning the "inheritance" of client-matters from partner to partner should be completely disregarded.   First, such allegations do not pertain to Yelenick herself and thus are not made based on personal knowledge.  Second, any

---

[15] The statute of limitations for an FLSA claim is two years, or three years if and only if plaintiffs establish a "willful" violation of the statute.  *See* 29 U.S.C. § 255(a); *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 135 (1988) (holding that it is the plaintiff's burden to "prove that the employer's conduct was willful").  Plaintiffs, however, have made no showing that they are entitled to the three-year statute of limitations.  Even if this more generous limitations period were to apply, then the only allegations made by Johnson that would be relevant to her claims are those that cover the time period from October 2013 to April 2014, when she resigned from the partnership.

such decisions about transitioning clients are made by the transitioning partner in consultation with the client, and not by the Management Committee.  (3/10/17 Giaccia Opp. Aff. ¶¶ 24-25.) Indeed, Yelenick is herself differently situated from many of the other women partners  because most of the client billings for which she claims credit were obtained because her male partner (and mentor) elected to share that credit with her.  (3/10/17 Giaccia Opp. Aff. ¶ 18.)

These individualized considerations demonstrate that Plaintiffs are unique and thus undermine any attempt Plaintiffs make to draw a factual nexus, or establish similarities, between their experiences and those of the other members of the alleged collective.

## III.    PLAINTIFFS' PROPOSED NOTICE IS IMPROPER

While the Court should not conditionally certify any collective, were it to do so, the Court should reject Plaintiffs' proposed Notice, Dkt. No. 63-2, because it is improper in many respects.   First and foremost, Plaintiffs improperly define the collective as including "all women partners *employed* by the Firm" despite the fact that putative members of the collective are partners of the Firm, and not statutory employees.  Plaintiffs' proposed definition of the collective to include "employees" highlights a threshold flaw in their case, and makes it clear that their motion is premature and should be held in abeyance until Defendants' summary judgment motion is decided.

Second, Plaintiffs' notice assumes that they are entitled to equitable tolling back to the time the Complaint was filed (both for their individual claims and the claims of the putative collective) and that the three-year statute of limitations for willful violations of the EPA applies.[16]  Plaintiffs have made no showing that they are entitled to equitable tolling and their

---

[16] As explained above, Plaintiffs not shown that they are entitled to the three-year statute of limitations under the FLSA, and thus the Court should restrict any collective time period to commence no more than two years back from the Court's Order on this Motion.  *See Ramos v. Platt*, No. 13 Civ. 8957, 2014 WL 3639194, at *4 (S.D.N.Y. July 23, 2014) ("Because the only purpose of permitting notice in these circumstances is to 'notify and inform those

entire argument is contained in a footnote where they reference "the possibility of equitable tolling."  *See* Pl. Mot. at n.2.  In this Circuit, "equitable tolling is only appropriate in rare and exceptional circumstances in which a party is prevented in some extraordinary way from exercising his rights."  *Zerilli-Edelglass v. N.Y. City Transit Auth.*, 333  F.3d 74, 80 (2d Cir. 2003) (citations and internal quotation marks omitted).  Plaintiffs cannot make a cognizable argument in support of equitable tolling because most of the putative members of the collective are current partners at the Firm, and are well aware of the lawsuit and their ability to join it, as recently retired partner Mary Yelenick just did.

Finally, should the Court grant Plaintiffs' motion for conditional certification in whole or in part, the Court should direct the parties to meet and confer in good faith to prepare a mutually agreeable notice for joint submission to the Court in advance of the issuance of any notice. [17]

---

eligible to opt in to the collective action,' there is 'no purpose' in sending notice to employees whose claims would be time-barred under the FLSA").

[17] Plaintiffs provide no basis for the notice mechanism they propose, which contemplates notice being distributed using three distinct methods, including posting the Notice in a conspicuous location in the Firm. Such provision is entirely unwarranted where, as here, the putative members of the collective are current and former law firm partners who are undoubtedly aware of the widely publicized class and collective action lawsuit filed against their firm. Plaintiffs' request for the contact information for all putative members of the collective is similarly unjustified and should be denied because the contact information for the current female partners is publicly available on the Firm's website.

## CONCLUSION

Because Plaintiffs are not employees of the Firm eligible to bring suit, and have failed to

establish that they are similarly situated to each other, their purported comparators, and the other

members of the collective they seek to certify, the Court should deny Plaintiffs' motion for

conditional certification and court-authorized notice in its entirety.

Dated:  New York, New York
            March 10, 2017

PROSKAUER ROSE LLP


*/s/ Kathleen M. McKenna*
Kathleen M. McKenna
Evandro C. Gigante
Rachel S. Fischer
Eleven Times Square
New York, NY 10036-8299
(212) 969-3000
kmckenna@proskauer.com
egigante@proskauer.com
rfischer@proskauer.com
*Attorneys for Defendants*

23