PROSKAUER ROSE LLP
Kathleen M. McKenna
Evandro C. Gigante
Rachel S. Fischer
Eleven Times Square
New York, NY 10036-8299
(212) 969-3000
kmckenna@proskauer.com
egigante@proskauer.com
rfischer@proskauer.com
*Attorneys for Defendants*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
KERRIE CAMPBELL and
JAROSLAWA Z. JOHNSON, Individually,
and on behalf of others similarly situated,                    Civ. No. 1:16-cv-06832 (JPO)

                         Plaintiffs,

             v.


CHADBOURNE & PARKE LLP, MARC ALPERT,
ANDREW GIACCIA, ABBE LOWELL, LAWRENCE
ROSENBERG, HOWARD SEIFE, and PAUL WEBER,

                         Defendants.
-------------------------------------------------------------------X

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' EMERGENCY MOTION FOR CORRECTIVE ACTION AND RELATED RELIEF

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ................................................................................................. 1

STATEMENT OF FACTS ...................................................................................................... 2

    A.  Campbell Is Currently An Equity Partner of Chadbourne and Has Known For
        Many Months of the Firm's Intention to Expel Her. .............................................. 2

    B.  The Management Committee Reduced The Number of "Points" Assigned to
        Campbell in 2017. ................................................................................................. 6

    C.  Campbell Is Not Responsible For Any Legal Matters for Firm Clients. ..................... 7

ARGUMENT ...................................................................................................................... 7

    I.       RULE 23(d) PROVIDES ONLY NARROW RELIEF TIED TO
            SPECIFIC ABUSIVE CIRCUMSTANCES. ..................................................... 7

    II.      PLAINTIFFS' REQUEST TO ENJOIN THE PARTNERSHIP VOTE
            SHOULD BE DENIED. ........................................................................... 8

          A.     No Caselaw Supports Plaintiffs' Request To Suspend The
                Partnership Vote. ................................................................... 10

          B.     The Firm's Press Statement Is Not Abusive, Coercive or
                Misleading And Therefore Does Not Warrant Suspending The
                Vote. ................................................................................... 12

          C.     The Court Should Not Grant Plaintiffs' 'Alternative' Request for a
                Rule 65 Injunction Suspending the Vote. .................................... 14

    III.     PLAINTIFFS ARE NOT ENTITLED TO AN ORDER RESTRICTING
            THE FIRM'S COMMUNICATIONS WITH FIRM PARTNERS OR THE
            MEDIA. .............................................................................................. 18

          A.     Firm Partners Have An Obligation To Communicate With Each
                 Other. ................................................................................. 18

           B.     The Press Statement Made by the Firm Is Not Abusive, Coercive
                 or Misleading And Therefore There Is No Basis Under Rule 23(d)
                To Impose A Restriction On The Firm's Communications. ............. 20

          C.     A Restriction On Defendants' Speech Would Also Violate Their
                First Amendment Rights. ........................................................ 22

    IV.     THE COURT SHOULD DENY PLAINTIFFS' REQUEST FOR A
            "CORRECTIVE NOTICE" UNDER THE FAIR LABOR STANDARDS
            ACT. ................................................................................................... 23

i

V.    PLAINTIFFS HAVE NOT ESTABLISHED ANY "EXTRAORDINARY
CIRCUMSTANCES" TO JUSTIFY THEIR REQUEST FOR
EQUITABLE TOLLING........................................................................................ 25

CONCLUSION................................................................................................................... 25

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Abdallah v. Coca-Cola Co.*,
   186 F.R.D. 672 (N.D. Ga. 1999)......................................................................23

*Agerbrink v. Model Serv. LLC*,
   No. 14-cv-7841, 2015 WL 6473005 (S.D.N.Y. Oct. 27, 2015)..................8, 21, 24

*Altebrando v. Gozdziewski*,
   13 Misc. 3d 1241(A), 831 N.Y.S.2d 351 (Sup. Ct. N.Y. County 2006), *aff'd*,
   47 A.D.3d 520, 849 N.Y.S.2d 550 (1st Dep't 2008) ...................................11, 12, 16

*Ayco Co., L.P. v. Feldman*,
   No. 10-cv-1213, 2010 WL 4286154 (N.D.N.Y. Oct. 22, 2010) ............................15

*Bagley v. Yale Univ.*,
   No. 13-cv-1890 CSH, 2014 WL 7370021 (D. Conn. Dec. 29, 2014)....................16

*Beasley v. Custom Commcn's, Inc.*,
   No. 15-cv-583, 2016 WL 6684206 (E.D.N.C. Nov. 14, 2016)..........................8, 22

*Belt v. Emcare Inc.*,
   299 F. Supp. 2d 664 (E.D. Tex. 2003)................................................................24

*Burrell v. Crown Cent. Petroleum, Inc.*,
   176 F.R.D. 239 (E.D. Tex. 1997).....................................................................8, 22

*Camp v. Alexander*,
   300 F.R.D. 617 (N.D. Cal. 2014).......................................................................24

*Citibank, N.A. v. Citytrust*,
   756 F.2d 273 (2d Cir. 1985)...............................................................................15

*Clincy v. Galardi*,
   No. 1:09-cv-2082, 2009 WL 2913208 (N.D. Ga. Sept. 2, 2009)...........................17

*Cobell v. Kempthorne*,
   455 F.3d 317 (D.C. Cir. 2006) ............................................................................9

*Fuentes v. Roher*,
   395 F. Supp. 1225 (S.D.N.Y. 1975), *modified*, 519 F.2d 379 (2d Cir. 1975)........15

*Garcia v. Lee*,
   No. 10-cv-1618, 2010 WL 2102903 (E.D.N.Y. May 26, 2010)...........................17

*Giblin v. Sechzer*,
    97 A.D.2d 833 (2d Dep't 1983) ........................................................................15

*Gill v. Mallory*,
    274 A.D. 84 (1st Dep't 1948) ..........................................................................16

*Guitard v. U.S. Sec'y of Navy*,
    967 F.2d 737 (2d Cir. 1992) ............................................................................16

*Gulf Oil Co. v. Bernard*,
    452 U.S. 89 (1981) .................................................................................7, 8, 12, 20

*Hampton Hardware v. Cotter & Co.*,
    156 F.R.D. 630 (N.D. Tex. 1994) ....................................................................21

*Hanson Trust PLC v. SCM Corp.*, 774 F.2d 47, 60 (2d Cir. 1985) ............................15

*Hickerson v. City of New York*,
    146 F.3d 99 (2d Cir. 1998) ..............................................................................15

*Hishon v. King & Spalding*,
    467 U.S. 69 (1984) ...........................................................................................11

*Hoffmann-La Roche v. Sperling*,
    493 U.S. 165 (1989) ...........................................................................................8

*In re Sch. Asbestos Litig.*,
    842 F.2d 671 (3d Cir. 1988) .......................................................................22, 23

*JSG Trading Corp. v. Tray-Wrap, Inc.*,
    917 F.2d 75 (2d Cir. 1990) ..............................................................................15

*Khan v. Airport Mgmt. Servs., LLC*,
    2011 WL 5597371 (S.D.N.Y. Nov. 16, 2011) ................................................25

*Li v. A Perfect Day Franchise, Inc.*,
    270 F.R.D. 509 (N.D. Cal. 2010) ....................................................................24

*Maddy v. Gen. Elec. Co.*,
    No. 14-cv-490, 2015 WL 1344626 (D.N.J. Mar. 15, 2015) .............................24

*McLaughlin v. Liberty Mut. Ins. Co.*,
    224 F.R.D. 295 (D. Mass. 2004) .....................................................................19

*Mendoza v. Ashiya Sushi 5, Inc.*,
    No. 12-cv-8629, 2013 WL 5211839 (S.D.N.Y. Sept. 16, 2013) .....................25

*Miltland Raleigh-Durham v. Myers*,
    807 F. Supp. 1025 (S.D.N.Y. 1992) ................................................................18

*NCAS Realty Mgmt. Corp. v. Nat'l Corp. for Hous. P'ships*,
  143 F.3d 38 (2d Cir. 1998)...............................................................11, 19

*Ojeda-Sanchez v. Bland Farms*,
  600 F. Supp. 2d 1373 (S.D. Ga. 2009)..................................................22

*Santalucia v. Sebright Transp., Inc.*,
  232 F.3d 293 (2d Cir. 2000)..............................................................18

*Scott v. Chipotle Mexican Grill, Inc.*,
  No. 12-cv-8333, 2014 WL 4852063 (S.D.N.Y. Sept. 29, 2014) ..........................22

*Shady v. Tyson*,
  5 F. Supp. 2d 102 (E.D.N.Y. 1998) ....................................................16

*Silverman v. Caplin*,
  541 N.Y.S.2d 546 (2d Dep't 1989) .....................................................11

*Thurmond v. Compaq Comput. Corp*,
  No. 99-cv-711, 2000 WL 33795080 (E.D. Tex. Feb 28, 2000)............................23

*Transperfect Translations Int'l, Inc. v. Merrill Corp.*,
  No. 03-cv-10146, 2004 WL 2725032 (S.D.N.Y. Nov. 30, 2004), *aff'd*, 159 F.
  App'x 313 (2d Cir. 2005)................................................................14

*Urtubia v. B.A. Victory Corp.*,
  857 F. Supp. 2d 476 (S.D.N.Y. 2012)..............................................10, 21

*Weinberger v. Romero-Barcelo*,
  456 U.S. 305 (1982)....................................................................15

*Williams v. State Univ. of N.Y.*,
  635 F. Supp. 1243 (E.D.N.Y. 1986) .....................................................16

*Wright v. Adventures Rolling Cross Country, Inc.*,
  No. 12-982, 2012 WL 2239797 (N.D. Cal. June 15, 2012)............................21, 24

*Zerilli-Edelglass v. New York City Transit Auth.*,
  333 F.3d 74 (2d Cir. 2003)..............................................................25

**STATUTES**

29 U.S.C. § 255(a) ........................................................................25

29 U.S.C. § 256(b) ........................................................................25

**OTHER AUTHORITIES**

Fed. R. Civ. P. 23(d) ................................................................. passim

Fed. R. Civ. P. 65 ...................................................................................................................14, 16

## PRELIMINARY STATEMENT

Plaintiffs' "Emergency Motion for Corrective Action and Related Relief," brought pursuant to Fed. R. Civ. P. 23(d) – a rule that does not even afford Plaintiffs a procedural mechanism to seek such "emergency" relief – should be denied.

Plaintiffs' urgent request to enjoin a vote of the partnership of Chadbourne & Parke LLP ("Chadbourne" or the "Firm") rings hollow, as Plaintiff Kerrie Campbell has known for many months that the Firm would eventually hold a vote regarding her expulsion should she not voluntarily depart. Indeed, Campbell's complaint of a sudden emergency conflicts with her own core allegation she already was "terminated" as a partner over 14 months ago when she was asked by management of the Firm to leave voluntarily and transition her practice elsewhere. She, of course, chose not to do so and now, with the specter of expulsion looming, she improperly seeks emergency relief from the Court to enjoin a vote of the partnership.

The partners' right to vote Campbell out of the Firm is rooted is the Firm's partnership agreement, which entrusts to the partners the authority to manage the affairs of the Firm. The Firm's partnership agreement – which was signed by Campbell – permits the expulsion of a partner under Sections 4 and 12(a) upon a vote of the partnership. The right to hold such a vote – *i.e.*, to expel a partner – is among the fundamental rights of a partnership to self-govern, along with the right to communicate amongst partners. In other words, it is for partners to decide who they wish to have as a partner, and who they wish *not* to have as a partner. Plaintiff has no intrinsic, or otherwise protectable, right to partnership.

Plaintiffs center their motion around a statement to the press made by the Firm on April 5, 2017 regarding the upcoming vote to consider Campbell's expulsion. Plaintiffs repeatedly misrepresent that statement to seek significant restrictions on Defendants' future

communications about this highly-publicized matter with the media and among the partnership, an injunction to halt the partnership vote, as well as other relief.  The statement provides no basis for this relief, as it is not abusive, intimidating or coercive in any way toward members of the putative class and collective.  Irrespective of this, Plaintiffs fail to cite a single Rule 23(d) case that supports enjoining the partnership vote or restricting the Firm's ability to communicate with its own partners or with the media.  Rather, they rely on a host of inapplicable cases involving threatening conduct and abusive communications made directly to the members of a class, as if that were the situation here.  It is not.

Simply put, the relief sought by Plaintiffs is designed to forestall purely financial loss to Campbell while at the same time stifling Defendants' rights to communicate among its partners and their First Amendment rights to communicate to the press.  And, even if relief of any kind were warranted, there is no question that the relief sought by Plaintiffs is anything but the type of "narrowly tailored" relief required by the case law.

As discussed in further detail below, the Court should deny Plaintiffs' Emergency Motion and should not grant any of the relief requested.

## STATEMENT OF FACTS

**A.**     **Campbell Is Currently An Equity Partner of Chadbourne and Has Known For Many Months of the Firm's Intention to Expel Her.**

Although Campbell repeatedly has alleged in this action that she was "terminated" from the Firm in February 2016, the reality is that she remains an equity partner of Chadbourne to this day.   (Declaration of Andrew Giaccia, dated April 14, 2017 ("Giaccia Decl.") ¶ 2; *see also* Dkt. No. 32, ¶ 43.)[1]  Campbell was asked in February 2016 to work to transition her practice

---

[1] Plaintiff repeatedly has averred that she was terminated in February, 2016.  *See* Dkt. No. 12,  ¶¶ 78-95; Dkt. No. 42 at n.1 and at 3; Dkt. No. 52 at 13-14; Dkt. No. 55,  ¶¶ 24,26, 82-88; Dkt. No. 56, ¶¶ 25-29; Dkt. No. 60 at 3, n.4; Dkt. No. 64 at 7; Dkt. No. 72,  ¶¶ 8-9.

elsewhere voluntarily by August 31, 2016.  (*Id.* ¶ 3.)  She was asked to leave because, among other things, she generated relatively little business and proved to have little potential for cross-selling to other departments at the Firm, contrary to the expectations she set when interviewing with the Firm and thereafter.  (Dkt. No. 27, ¶ 5.)  In addition, it had become clear to the Management Committee in the short time that she was with the Firm, that Campbell was seemingly unable to manage her practice, mistreated associates, and acted in ways that raised serious questions about her legal knowledge and judgment as well as her technical competence in litigation matters.  (*Id.*)

Despite the Management Committee's request, Campbell did not leave the Firm voluntarily.  (Giaccia Decl. ¶ 3.)  Campbell was, as she claims, noted as a "partner in transition" on the Firm's 2016 points list, which was a clear reference to her *anticipated* departure from the Firm.  (Dkt. No. 62, ¶ 4.)

Campbell filed the instant lawsuit on August 31, 2016, asserting, *inter alia*, discrimination under Title VII of the Civil Rights Act ("Title VII"), the Equal Pay Act ("EPA"), the Fair Labor Standards Act ("FLSA") and the Washington D.C. Human Rights Act ("DCHRA"), on behalf of herself and similarly situated female partners of the Firm.  (Dkt. No. 1.)  On September 12, 2016, fourteen (14) female partners of the Firm signed a letter to Plaintiffs' counsel "reject[ing] . . . [counsel's] claim to represent a class that purportedly includes [them]", and insisting that the class allegations be withdrawn.[2]  (Dkt. No. 32, ¶ 49.)

On October 27, 2016, Plaintiff filed an Amended Complaint adding Jaroslawa Johnson as a party plaintiff and various current and former members of Firm leadership as individual defendants.  (Dkt. No. 12.)  On November 3, 2016, the Defendants filed an Answer to Plaintiffs'

---

[2] Plaintiffs' hearsay allegation that unidentified persons claimed that female partners were pressured to sign the letter is not entitled to any weight or credence.

First Amended Complaint and a Counterclaim against Campbell arising out of her breaches of fiduciary duty to the Firm (Dkt. No. 27), including notably Campbell's campaign "to impugn, malign, and denigrate Chadbourne outside the Court in the press, online, and at speaking engagements," (*id.*) "wholly separate from the filings made and judicial proceedings in the lawsuit." (*Id.* at Counterclaim ¶ 7.) As the counterclaim alleges, Campbell's efforts to stoke the media's attention in this case from the outset were undoubtedly aimed at conveying "the extortionate threat that this campaign of falsity would continue unless Chadbourne were to agree to a large settlement in this factually baseless and legally defective litigation." (*Id.* at ¶ 9.)

On November 14, 2016, Defendants filed a Motion to Dismiss and Motion for Summary Judgment based, *inter alia*, on the fundamental threshold issue that Plaintiffs are assuredly *not* employees entitled to coverage and redress under Title VII, the EPA, the FLSA and the DCHRA.

Contrary to Plaintiffs' allegation that the Firm's public statement would chill putative collective members from joining the case, Mary Yelenick filed a consent to join the lawsuit on February 27, 2017. (Dkt. No. 68.)   In response to Yelenick's decision to join the lawsuit, the Firm simply stated:  "Mary Yelenick was a longtime and respected partner in this firm who retired last year. We are saddened that she has joined Kerrie Campbell's lawsuit. Nevertheless, when this case is litigated in a court of law, the facts will show the claims being made against the firm and the individual defendants are false." (Dkt. No. 87-3.)  Contrary to Plaintiffs' claim in this motion, the Firm's statement did not 'denounce' the lawsuit or express 'dismay' at Yelenick's decision to join.  Rather, the statement was made in response to the news of Yelenick joining and at a time when *Plaintiffs' counsel* was provoking the media that Yelenick "knows everything there is to know about the firm . . . and will have lots to say at a deposition and at trial."   In these circumstances, Plaintiffs' claim that the Firm in making its statement about

4

Yelenick "acted swiftly to discourage other partners from participating in this action" (Dkt. No. 86 at 4) is plainly false.

On or about February 21, 2017, the Firm announced its planned combination with the global law firm Norton Rose Fulbright in the second quarter of 2017.  (Giaccia Decl. ¶ 4.)  Once the combination is formally effected in the second quarter, Chadbourne will begin winding down its affairs.  (*Id.*)  It is thus now in the Firm's interest to formally separate from Campbell.  (*Id.*)

On April 5, 2017, notice was sent to all equity partners, including Campbell, pursuant to Sections 4(a) and 12 of the Partnership Agreement calling for a meeting on April 19, 2017 to consider the expulsion of Campbell from the Firm.  (Giaccia Decl. ¶ 5.)  Also on April 5, 2017, in anticipation of Plaintiffs' continued efforts to malign the Firm in the press, and to ensure the accurate reporting of the Firm's reasons for the anticipated vote, Chadbourne issued the following statement to the media:

> A meeting of the partnership of Chadbourne & Parke LLP will be scheduled to consider and vote upon a motion to expel Kerrie Campbell from the partnership. Early last year, Chadbourne's Management Committee asked Ms. Campbell to voluntarily leave the Firm when it became impossible to ignore, even after a very short time with the Firm, her failure to deliver in the way she represented when she joined Chadbourne, her exhibiting questionable legal judgment, her serious and disruptive failures in practice management, and her displaying poor personal judgment, among other things.  This was done quietly and carefully in order to give her the chance to achieve better results with a fresh start elsewhere.  She decided not to do so and, instead, chose to pursue baseless claims in the cynical pursuit of a big and underserved payday.  The Firm has been exceedingly patient and sought to avoid having a formal expulsion vote if other outcomes were possible.  As Chadbourne prepares for a new future, the choices Ms. Campbell has made have left the Firm no alternative but to seek to bring this relationship to an end in this manner.  No matter how she will try to mischaracterize it, this decision is the inevitable result of the choices Ms. Campbell has made.

(Dkt. No. 87-6.)

Wholly apart from this recent public statement by the Firm, Campbell has known for many months of the Firm's intention to expel her from the partnership if she did not leave

Chadbourne voluntarily as she was expressly apprised in August 2016, and again in February 2017.  (Giaccia Decl. ¶ 6.)

> ### B.   The Management Committee Reduced The Number of "Points" Assigned to Campbell in 2017.

With respect to the issue of Campbell's compensation, as has been discussed in earlier filings, partners of the Firm receive a monthly draw during the year, which is an advance of profits made in order to provide partners with cash flow during the year.  (Giaccia Decl. ¶ 7.) (*See also* Dkt. No. 32 ¶ 32.)  Each year, generally in April, the Firm's Management Committee finalizes each partner's compensation for the prior calendar year (i.e., by finalizing bonus determinations) and allocating the number of "points" to each partner for the current calendar year.  (*Id.* ¶ 8.)

Because, for the first few months of the calendar year, each partner's points for that year are not yet final, the partners' monthly draws are typically just based upon whatever amount of monthly draw they were receiving at the end of the prior calendar year.  (*Id.*)  When the Management Committee determines the final number of points allocated to each partner, it will sometimes be necessary (if a partner's points level has changed) to reconcile that partner's distributions for the first few months of the year (that were based on the prior year's points level) to bring the partner's year-to-date distributions in line with the number of points he or she has been allocated for the current year.  (*Id.* ¶ 9.)

In the beginning of 2017, the Management Committee underwent its usual process of determining each partner's points for that calendar year.  (Giaccia Decl. at ¶ 10.)  Campbell received a monthly draw of $15,000 in December 2016.  (*Id.* at ¶ 11.)  Campbell's monthly distributions for January through March of 2017 were thus made in the same amount, which was

based on her prior allocation of 400 points for 2016.  (*Id.*)  For 2017, however, Campbell was assigned 200 points, which is the lowest level of points for the Firm's partners.  (*Id.*)

In April 2017 Campbell's distributions for the first three months of the year (*i.e.*, at the 400 point level) were reconciled with the amount of distributions she was entitled to have received through that point in the year at her 2017 points level of 200 points.  (Giaccia Decl. at ¶ 12.)  That reconciliation showed that Campbell had been overpaid for the period January through March 2017 by an amount that already exceeded her new 2017 monthly draw level, and therefore on net balance no distribution was due to her for April 2017, and indeed there is still a net overpayment position on her year-to-date draws.  (*Id.*)

### C.   Campbell Is Not Responsible For Any Legal Matters for Firm Clients.

Although Campbell is an equity partner of Chadbourne, she has not recorded any billable hours on client work this year or indeed since early November 2016.  She has not sent any bills to any clients this year.  She does not appear to have opened any new matters for any client this year.  (Giaccia Decl. at ¶ 13.)  She has been out of the office for nearly six months.  (*Id.*) If Campbell is expelled from Chadbourne's partnership, none of Chadbourne's clients, including any clients for whom Campbell previously did work, will be jeopardized by her departure.  (*Id.*)

### ARGUMENT

## I.   RULE 23(d) PROVIDES ONLY NARROW RELIEF TIED TO SPECIFIC ABUSIVE CIRCUMSTANCES.

While Federal Rule of Civil Procedure 23(d) provides the Court with authority to exercise control over a class action to address procedural matters, that "discretion is not unlimited, and indeed is bounded by the relevant provisions of the Federal Rules."  *Gulf Oil Co. v. Bernard,* 452 U.S. 89, 100 (1981).  Rule 23(d)(1) provides that a court may issue orders that: (a) determine the course of proceedings; (b) require notice be given to parties to protect class

7

members and fairly conduct the action; (c) impose conditions on the representatives; (d) require

the pleadings to be amended; and (e) deal with similar procedural matters.[3]

The Supreme Court held in *Gulf Oil Co.* that a court "may not exercise the power" to

restrict communications in accordance with Fed. R. Civ. P. 23(d) "without a ***specific record***

showing by the moving party of the ***particular abuses*** by which it is threatened." 452 U.S. at 102

(*quoting Coles v. Marsh*, 560 F.2d 186, 189 (3d Cir. 1977), *cert. denied*, 434 U.S. 985 (1977))

(*Emphasis added*).   A court cannot intervene to restrict communications of parties based on "the

mere possibility of abuses."  *Agerbrink v. Model Serv. LLC*, No. 14-cv-7841, 2015 WL 6473005

at *4 (S.D.N.Y. Oct. 27, 2015).  *See also Burrell v. Crown Cent. Petroleum, Inc.*, 176 F.R.D.

239, 244 (E.D. Tex. 1997) ("Absent a clear record and specific findings of realized or threatened

abuses, an order cannot be justified under the relevant standard.").  "[T]he district court must

find that the showing provides a satisfactory basis for relief and that the relief sought would be

consistent with the policies of Rule 23 giving explicit consideration to the ***narrowest possible***

***relief which would protect the respective parties***."  *Gulf Oil Co.*, 452 U.S. at 102 (*emphasis*

*added*).  Courts have found that "abusive communications" are those that are "false, misleading,

intimidating, and coercive."  *Beasley v. Custom Commcn's, Inc.*, No. 15-cv-583, 2016 WL

6684206 at *3 (E.D.N.C. Nov. 14, 2016).

## II.   PLAINTIFFS' REQUEST TO ENJOIN THE PARTNERSHIP VOTE SHOULD BE DENIED.

Under this standard, the Court should deny Plaintiffs' legally unjustified request for an

order suspending the Firm's vote to expel Campbell from the partnership.  The suspension (or

cancellation) of a partnership vote is an extraordinary remedy; one which is not only

unwarranted but simply unavailable under Rule 23(d).  *See Cobell v. Kempthorne*, 455 F.3d 317,

---

[3] This authority also extends to collective actions.  *See Hoffmann-La Roche v. Sperling*, 493 U.S. 165, 171 (1989).

324-325 (D.C. Cir. 2006) (holding that Rule 23(d) does not authorize substantive relief because it "authorizes notice to protect class members' right [sic] to participate in the litigation; it does not authorize substantive orders protecting the very rights class members seek to vindicate"). Indeed, none of the case law Plaintiffs rely on would support the broad relief they seek.

Plaintiffs' request under Rule 23(d) to suspend the vote is predicated entirely on the Firm's statements to the partnership noticing its intention to hold a vote on Campbell's expulsion, and to the media informing the media of the impending vote.  The Firm's notice to its partners is a communication that was required to be made under the Firm's partnership agreement in order to take a "major action" such as the expulsion of a partner (Partnership Agreement at § 12(a).)  It is essential to the Firm's self-governance.  The Firm's statement to the press simply advised of the upcoming vote and the reasons why the Firm now finds itself in the position of having to take such action.  Neither of these two communications are abusive, misleading or coercive, and thus they do not warrant any relief under Rule 23(d), let alone court ordered suspension of the upcoming partnership vote.

Plaintiffs' arguments that the vote would threaten the proper functioning of the litigation and that the resulting damage will be "irrevocable" do not withstand scrutiny.  Plaintiffs offer no basis for their speculative claim that the partnership vote, to be taken not long before the Firm is set to wind down, would somehow jeopardize the proper functioning of the litigation.  Any possible resulting monetary injury to plaintiffs would hardly be irreparable even if they were to prevail on their claims, since any such supposed injury could be adequately remedied by an award of money damages.

A.      **No Caselaw Supports Plaintiffs' Request To Suspend The Partnership Vote.**

Plaintiffs have shown no basis why the Court should order the Firm to suspend, or cancel, its upcoming partnership vote under Rule 23(d).  Moreover, granting such relief would severely encroach on the Firm's right to operate as a partnership and self-govern under the terms of its Partnership Agreement, which all partners (including Campbell) have signed.

Plaintiffs have not cited a single case in which a court enjoined the expulsion of a partner, or for that matter the discharge of an employee, under Rule 23(d).  In fact, the only case law Plaintiffs rely on for their request to suspend the vote is completely inapposite to the type of relief sought here.  They point to *Urtubia v. B.A. Victory Corp.*, 857 F. Supp. 2d 476 (S.D.N.Y. 2012), where the court issued an order prohibiting defendants from retaliating (or threatening retaliation) against plaintiffs, and from communicating with potential class members about the lawsuit, or the subject matter of the lawsuit, absent permission from the Court.  But that case involved evidence that defendants *threatened* members of the putative class (low-wage restaurant workers), such as by telling one that he would be "reported to immigration authorities and possibly deported" for his involvement in the lawsuit, causing him to revoke his consent to join the case as a plaintiff.  *Id.* at 484-85.   In issuing relief under Rule 23(d), the court in *Urtubia* found that defendants' "knowledge of sensitive information about current and former employees[] put them in a position to exercise strong coercion" over the potential class members. *Id.* at 485.  Such facts are completely distinguishable from the facts here where the Firm did not make any threats – direct or otherwise – to putative class and collective members, all of whom are current or former partners at a large law firm and readily distinguishable from the vulnerable putative plaintiffs in *Urtubia*.[4]

_____

[4] In fact, the only conceivable allegation of 'intimidation' by Plaintiffs here is Plaintiff Mary Yelenick's claim that she was told that certain female partners felt "pressured" to sign the letter to Plaintiffs' counsel rejecting the claims

Tellingly, none of the cases cited by Plaintiffs involve a request to infringe on the right of a partnership to expel a partner under the terms of a partnership agreement.  The reason why is obvious.  Partnerships are voluntary, self-governing entities that are entitled to enforce their partnership agreements as written.  Where a written partnership agreement is a complete expression between parties and is unambiguous, as it is here, the language of the partnership agreement controls and should be enforced.  *See NCAS Realty Mgmt. Corp. v. Nat'l Corp. for Hous. P'ships,* 143 F.3d 38, 45 (2d Cir. 1998) ("[w]hen a partnership agreement contains clear and unambiguous terms, New York courts enforce the plain meaning of those terms, without resorting to extrinsic aids of interpretation"); *Silverman v. Caplin,* 541 N.Y.S.2d 546, 547 (2d Dep't 1989) ("[i]f, as in the instant case, it is evident that a written partnership agreement is a complete expression of the parties' intention, the language of the partnership agreement controls and will not be questioned.").

Among the hallmarks of a true partnership is the notion that partners may choose with whom they wish to be associated, and when a partnership agreement expressly provides terms for the removal of a partner, members of the partnership should be free to exercise that right.[5] *See Altebrando v. Gozdziewski*, 13 Misc. 3d 1241(A), 831 N.Y.S.2d 351 (Sup. Ct. N.Y. County 2006), *aff'd*, 47 A.D.3d 520, 849 N.Y.S.2d 550 (1st Dep't 2008) ("[t]he provisions of the Partnership Agreement permitting expulsion of a partner without cause are 'clear, unequivocal and understandable,' and thus the Partnership Agreement 'must be enforced without resort to

---

that counsel had asserted in this case purportedly on their behalf.  Yelenick's statements, however, are hearsay allegations devoid of any detail, including who allegedly felt pressured, by whom they felt pressured, or what the circumstances were surrounding such "pressure", or indeed who even supposedly spoke to Yelenick on this subject.

[5] For this reason, among others, courts recognize that partners (as opposed to employees) are business owners operating a "shared enterprise" to which the employment discrimination laws do not apply.  *See Hishon v. King & Spalding*, 467 U.S. 69, 79-80 (1984) (J. Powell, concurring) ("[t]he relationship among law partners differs markedly from that between employer and employee—including that between the partnership and its associates[…] The essence of the law partnership is the common conduct of a shared enterprise. The relationship among law partners contemplates that decisions important to the partnership normally will be made by common agreement.").

extrinsic evidence.'") (*quoting Non-Linear Trading Co. v. Braddis Assocs., Inc.*, 243 A.D.2d

107, 114 (1st Dep't 1998).  As is the case here, partnership agreements may provide for the

expulsion of a partner with or without cause, and such expulsion provisions are considered by

courts to be "common and acceptable."  *See Altebrando v. Gozdziewski*, 13 Misc. 3d 1241(A),

831 N.Y.S.2d 351 (Sup. Ct. N.Y. County 2006), *aff'd*, 47 A.D.3d 520, 849 N.Y.S.2d 550 (1st

Dep't 2008).  Thus, in the absence of case law holding that Rule 23(d) permits the enjoining of a

vote to expel a partner from a partnership, and given the authority endorsing a partnership's right

to self-govern, including the right to expel partners under the terms of a partnership agreement,

the Court should reject Plaintiffs' request to enjoin the Firm's upcoming vote on Campbell's

expulsion.[6]

### B.  The Firm's Press Statement Is Not Abusive, Coercive or Misleading And Therefore Does Not Warrant Suspending The Vote.

Neither the Firm's notice to the partners about the upcoming meeting, nor its recent

public statement – which allegedly prompted Plaintiffs to make this motion – provides any

"specific record showing by the moving party of the particular abuses by which it is threatened."

*Gulf Oil Co.*, 452 U.S. at 102.  As explained above, the notice to the partners was simply a

contractually-required notice under Sections 4 and 12(a) of the Partnership Agreement of the

kind required whenever the Firm seeks to vote on a "major action" such as the expulsion of a

partner.  The Agreement requires advance notice of the meeting to be given (which was done

here) and the notice merely informed the partners that the meeting was being called "to consider

the expulsion of Kerrie Campbell from the Partnership."  Such a message is purely neutral and

non-inflammatory, and is not at all abusive, coercive or misleading; it was simply a notification

---

[6] Plaintiffs' request that the Court direct the Firm to "reinstate Ms. Campbell's compensation" at the level she received in 2016 should also be denied.  As explained above, Campbell's monthly draw reflects the reduced level of points she has been awarded for 2017, which (after the April 2017 reconciliation process) has led to Campbell having been *overpaid* on a year-to-date basis.  (Giaccia Decl. ¶ 12.)

required by the terms of the Partnership Agreement.  Likewise, the Firm's statement to the press that a vote would be scheduled was neither coercive nor misleading.  The Management Committee issued the statement because it was appropriate to notify the press of the upcoming vote so that the inevitable news coverage (which Plaintiffs were sure to elicit, given their consistent track record in running to the media) would give fair coverage to the reasons why the Firm is taking this step, rather than focusing on the inflammatory distortions that would surely have been offered by Campbell and her counsel.

More importantly, though, none of the plaintiffs or putative plaintiffs could possibly claim that the fact that this vote is now being scheduled or Firm's public statement about it was unexpected or otherwise came as a surprise, much less a threat.  Campbell has known since at least August 2016 (and was reminded as recently as this past February) that the Firm was prepared to put her expulsion to a vote if she did not withdraw, as she was asked to do over 14 months ago.  Given the allegations in Plaintiffs' Complaint (filed in August 2016) and the media interest that has surrounded this case, anyone who reads the legal press would know that in February 2016 the Firm asked Plaintiff to transition her practice elsewhere and that, over the past 14 months, she has refused to do so.  It should come as no surprise *to anyone*, and particularly to Firm partners who are aware of the upcoming wind-down of the Firm, that Chadbourne would now take the step of putting Campbell's expulsion to a vote of the partners.  Certainly, the context in which the press statements were made – including the timing of the vote over 14 months after Plaintiff  was first asked to leave the Firm – do not support Plaintiffs' request to suspend the vote.

In addition, the substance of the statement also is not abusive and does not justify enjoining the upcoming vote.  The Firm's statement accurately and appropriately explains that:

13

(i) a vote was to be scheduled to consider a motion to expel Campbell from the partnership; (ii) the vote was called more than a year after the Management Committee asked Campbell to leave voluntarily due to serious concerns over her performance and judgment (all of which had previously been made public in the parties' court filings); (iii) the Firm's request to Campbell was made "quietly and carefully in order to give [Campbell] the chance to achieve better results with a fresh start elsewhere", and (iv) despite this request Campbell did not depart voluntarily, leaving the Firm with no "alternative but to seek to bring this relationship to an end in this manner."

This press statement is not at all threatening or coercive to the putative class and collective members.  And, contrary to Plaintiffs' mischaracterizations, the reference in the statement to the "choices" Campbell made refers to her choice to remain at the Firm rather than leave on her own accord, as she was asked to do *long* before she ever filed her lawsuit, and how she conducted herself at the Firm prior to being asked to leave,.  The choices referred to in the statement have *nothing* to do with Campbell's pursuit of this action.   Thus, the statement cannot be characterized as abusive, and certainly does not warrant an order suspending the vote.

C. **The Court Should Not Grant Plaintiffs' 'Alternative' Request for a Rule 65 Injunction Suspending the Vote.**

Plaintiffs' backhanded alternative request for injunctive relief under Rule 65 should also be denied because Plaintiffs cannot show that a vote to expel Campbell will result in irreparable harm either to Campbell or to the putative class and/or collective members – many of whom (as current partners) would be eligible to vote on whether to expel Campbell.  (*See* Dkt. No. 90.) Injunctive relief under Rule 65 is "one of the most drastic tools in the arsenal of judicial remedies' and should not be routinely granted." *Transperfect Translations Int'l, Inc. v. Merrill Corp.*, No. 03-cv-10146, 2004 WL 2725032, at *4 (S.D.N.Y. Nov. 30, 2004), *aff'd*, 159 F.

App'x 313 (2d Cir. 2005) (quoting *Deal, LLC v. Korangy Publ'g, Inc.*, 309 F. Supp. 2d 512, 520 (S.D.N.Y. 2004); *Hanson Trust PLC v. SCM Corp.*, 774 F.2d 47, 60 (2d Cir. 1985)).[7]

"Perhaps the single most important prerequisite for the issuance of a preliminary injunction is a demonstration that if it is not granted the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered." *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 275 (2d Cir. 1985) (internal citation and quotation marks omitted); *see also Ayco Co., L.P. v. Feldman*, No. 10-cv-1213, 2010 WL 4286154, at *5 (N.D.N.Y. Oct. 22, 2010) ("A movant's failure to establish irreparable harm is alone sufficient for a court to deny injunctive relief."). Essential to a showing of irreparable harm is the unavailability or at least inadequacy of a money damages award. *See, e.g., Weinberger v. Romero-Barcelo,* 456 U.S. 305, 312 (1982) ("The Court has repeatedly held that the basis for injunctive relief in the federal courts has always been irreparable injury and the inadequacy of legal remedies"). Also, the applicant must establish more than a mere "possibility" of irreparable harm, but rather, she must show that irreparable harm is "likely" to occur. *See JSG Trading Corp. v. Tray-Wrap, Inc.,* 917 F.2d 75, 79 (2d Cir. 1990). Such harm must also be "immediate." *Fuentes v. Roher*, 395 F. Supp. 1225, 1234 (S.D.N.Y. 1975), *modified*, 519 F.2d 379 (2d Cir. 1975).

In the partnership context, courts have routinely denied requests to enjoin a vote to expel a partner where the votes were permitted by the applicable partnership agreements. *See Giblin v. Sechzer*, 97 A.D.2d 833 (2d Dep't 1983) (finding partners were not entitled to preliminary injunction given a valid and binding partnership agreement that expressly permitted expulsion by

---

[7] The party seeking such drastic relief bears the burden of establishing that, (1) absent such relief, it will suffer an irreparable injury; and (2) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits and a balance of hardships tipping in the moving party's favor. *Hickerson v. City of New York*, 146 F.3d 99, 103 (2d Cir. 1998).

majority vote upon determination that a partner's continued membership is undesirable); *Gill v. Mallory*, 274 A.D. 84 (1st Dep't 1948) (declining to enjoin expulsion vote of firm partners under the partnership agreement, notwithstanding plaintiffs' contention that decision to expel was made selfishly or that expulsion threatened irreparable damage to the expelled members).  Indeed, New York courts have recognized that provisions in a partnership agreement that provide for the expulsion of a partner are "common and acceptable."  *See, e.g., Altebrando v. Gozdziewski*, 13 Misc. 3d 1241(A), 831 N.Y.S.2d 351 (Sup. Ct. 2006), *aff'd*, 47 A.D.3d 520, 849 N.Y.S.2d 550 (2008).

Knowing the high burden they must meet, Plaintiffs make their request for Rule 65 injunctive relief "in the alternative" and all but concede that they have no basis for such relief because they cannot show that the vote would result in irreparable harm to Campbell – who could conceivably, if wrongfully expelled, be fully compensated by monetary damages.  (Dkt. No. 91 at p. 2)  *See e.g., Guitard v. U.S. Sec'y of Navy*, 967 F.2d 737, 742 (2d Cir. 1992) ("[T]he Supreme Court held that the injuries that generally attend a discharge from employment—loss of reputation, loss of income and difficulty in finding other employment—do not constitute the irreparable harm necessary to obtain a preliminary injunction."); *Shady v. Tyson*, 5 F. Supp. 2d 102, 109 (E.D.N.Y. 1998) ("[with] respect to plaintiff's . . . professional reputation, absent 'extraordinary circumstances' irreparable harm is not established by loss of income or position . . . ."); *Bagley v. Yale Univ.,* No. 3:13-CV-1890 CSH, 2014 WL 7370021, at *7 (D. Conn. Dec. 29, 2014) ("[D]amage to a plaintiff's reputation in his or her chosen field does not constitute irreparable harm, in the sense that it cannot be compensated by monetary damages at trial.").  Nor are Campbell's speculative claims of being rendered "destitute" sufficient to warrant injunctive relief.  *See Williams v. State Univ. of N.Y.*, 635 F. Supp. 1243, 1248 (E.D.N.Y.

1986) (to establish irreparable harm a plaintiff "must quite literally find [herself] being forced into the streets or facing the spectre of bankruptcy before a court can enter a finding or irreparable harm."). Campbell also cannot claim that her expulsion would lead to irreparable harm (either to her or the Firm's clients) given that she is currently not performing any legal work for the Firm's clients and does not appear to have opened any new client matters in nearly six months. (Giaccia Decl. ¶ 13.)

Instead, plaintiffs argue that if the vote were allowed to proceed the putative collective members would be chilled from joining the case. (Dkt. No. 86 at 18.) Yet, this is not an adequate basis on which to obtain injunctive relief for a myriad of reasons. First, since the Firm's announcement to the partners notifying them of the upcoming vote was required by the Partnership Agreement, it undoubtedly would not change anything for partners who would have already anticipated, for the reasons explained above, that the Management Committee would call a vote to expel Campbell. Second, the Firm's press statement simply cannot be read as a communication to prospective litigants intended to dissuade them from joining the lawsuit; it says nothing of the kind, does not even address the subject of anyone other than plaintiff Campbell, and certainly would not have had any "chilling" effect on others whose situations are entirely unlike Campbell's unique circumstances. Plaintiffs cannot possibly show that female partners would feel threatened or be somehow irreparably harmed by an announcement that the Firm was planning to vote on Campbell's expulsion from the Firm in her particular circumstances.[8] Putative class and collective members would remain free to join the case and

---

[8] Plaintiffs' reliance on *Garcia v. Lee*, No. 10-cv-1618, 2010 WL 2102903 (E.D.N.Y. May 26, 2010) and *Clincy v. Galardi*, No. 1:09-cv-2082, 2009 WL 2913208 (N.D. Ga. Sept. 2, 2009) is misplaced. In *Garcia*, the court ordered defendant not to retaliate against plaintiffs for joining in the lawsuit or complaining that defendants failed to pay them properly under the Fair Labor Standards Act, after defendant terminated one employee and reduced the hours of another employee after they filed suit. 2010 WL 2102903 at *3. In *Clincy*, the court ordered the reinstatement of eight (8) plaintiffs who were terminated after they brought suit, where the defendants "not only fired Plaintiffs for their participation in this suit, but also informed other entertainers at Onyx that Plaintiffs had been fired because of

seek relief even after a vote is held and even if Campbell is expelled.  Under these

circumstances, Plaintiffs cannot possibly show that the putative class and collective members

would be irreparably harmed by a vote.[9]

### III.   PLAINTIFFS ARE NOT ENTITLED TO AN ORDER RESTRICTING THE FIRM'S COMMUNICATIONS WITH FIRM PARTNERS OR THE MEDIA.

#### A.   <u>Firm Partners Have An Obligation To Communicate With Each Other.</u>

First and foremost, Plaintiffs are not entitled to an order restricting the Firm's

communications with the putative class and collective members most of whom are Firm partners

for the simple reason that communications between and among members of a partnership should

not be stifled.

"It is beyond cavil in New York that a member of a law firm owes a fiduciary duty to the

other members of the firm."  *Santalucia v. Sebright Transp., Inc.*, 232 F.3d 293, 297 (2d Cir.

2000).  That duty requires co-partners to have "the finest loyalty…Not [just] honesty alone, but

the punctilio of an honor the most sensitive, is…the standard of behavior."  *Miltland Raleigh-*

*Durham v. Myers*, 807 F. Supp. 1025, 1058 (S.D.N.Y. 1992).  As such, Chadbourne's partners

have an obligation to communicate openly and candidly with one another about matters of Firm

concern, such as this litigation.  Here, should the Court enter the order proposed by Plaintiffs, it

would dismantle that most basic of duties amongst partners.  Tellingly, Plaintiff cites no support

whatsoever for the proposition that a Court can prevent a partner from making certain statements

to another partner.

---

their participation." 2009 WL 2913208 at *2.  These cases are inapposite because here the Management
Committee's request to Campbell that she leave the Firm was made long before she ever filed suit, and the Firm has
never made statements to Campbell, or others, indicating an intention to retaliate against partners who join the case.

[9] Nor can Plaintiffs show that they are likely to succeed on the merits of their claims, or that sufficiently serious
questions exist about the merits, given that they fail to meet the threshold criterion for the relief that they seek
because they are equity partners of the Firm, and not employees entitled to the protections of Title VII and the
FLSA.  *See* Dkt. No. 30.

Indeed, a restriction on the Firm's communications with its partners would cause substantial prejudice to Defendants in this litigation.  To Defendants' paramount detriment, a restriction of the type sought by Plaintiffs would interfere with the ability of the Firm and its counsel to defend the case, including, but not limited to, gathering information from Firm partners, discussing strategy with Firm partners and conducting interviews about Plaintiffs' allegations.  *See, e.g., McLaughlin v. Liberty Mut. Ins. Co.*, 224 F.R.D. 295, 299 (D. Mass. 2004) (denying plaintiffs' motion for an order precluding defendant from conducting ex parte interviews with putative class members because, absent some showing of past or future abuse, there was no reason to chill defendant in its investigations about the lawsuit).

Even a more limited restriction on the Firm's communications – such as a restriction on communications with members of the putative class – would impede Defendants' ability to defend this litigation.  In this regard, a restriction on communications with members of the putative class would create a perverse gender-discriminatory result, in which the Firm would be able to communicate about the case with its male partners, but its female partners would be left in the dark.  Certainly, such an inappropriate result would be yet another display of the "patronizing and patriarchal" activity decried by the fourteen female partners of the Firm in their letter to Plaintiffs' counsel.   (Dkt. No. 32-5.)

The requested relief also fails the balance of equities because it would interfere with the Firm's right to self-govern pursuant to its Partnership Agreement.  *See NCAS Realty Mgmt. Corp.* 143 F.3d at 45 (ruling that "the rights and obligations of the partners as between themselves arise from, and are fixed by, their agreement").  In accordance with the express language of the Partnership Agreement, "[t]he property and business of the firm shall be managed by the partners," and the Firm may "appoint a Management Committee." (Dkt. No. 32-

19

1 at pp. 3-4).  The management of the firm cannot be accomplished without communication among and between the partners and the Management Committee.  This includes, but is not limited to the right – and, indeed, the obligation – of the Firm to notify its partners of the impending vote to expel Campbell (pursuant to Section 12(a) of the Partnership Agreement) and any views that the Management Committee or any other partners may have concerning that matter.

Accordingly, the Court should not enter an order that places restrictions on the Firm's ability to communicate with its partners.

**B.**      **The Press Statement Made by the Firm Is Not Abusive, Coercive or Misleading And Therefore There Is No Basis Under Rule 23(d) To Impose A Restriction On The Firm's Communications.**

Plaintiffs' request for an order under Rule 23(d) controlling communications with the media and between Firm partners should be denied because the communications are not "abusive."  *See Gulf Oil Co.*, 452 U.S. at 102.

To begin, Plaintiffs' allegation that Defendants have "sugges[ed] or threaten[ed]" that a Plaintiff or other partner will be "targeted, penalized or retaliated against" is false and without support.  (Dkt. No. 86 at 13).  Plaintiffs point only to the Firm's statement to the press, which speaks for itself notwithstanding Plaintiffs' attempt to misrepresent it, take its words out of context and incorrectly label them as "intimidating" and "coercive" toward other potential class members.  (*See* Dkt. No. 87-6.)  The press statement simply does not contain a "threat" that partners who join the lawsuit will risk their membership in the Firm or their livelihoods, and is in no way even directed at potential class members.

Moreover, Plaintiffs' baseless assertion that the Defendants' statement was "coercive" is unsupported by the case law.  While Plaintiffs cite a potpourri of cases in which a court deemed a party's communications to be "abusive," those cases all involved facts radically distinguishable

20

from the present situation.  None involved communications made to the media, nor do any of them involve communications among partners.

Instead, Plaintiffs cite to cases in which there was a direct, overt statement or threat made to potential class members about the litigation.  *See Agerbrink v. Model Servs. LLC*, No. 14-cv-7841, 2015 WL 6473005 at *6 (S.D.N.Y. Oct. 27, 2015) (email sent by COO directly to the members of the putative collective in which he discouraged them from joining, telling them that the plaintiffs' attorney only wants others to join the suit "so he can earn more legal fees" and misleading them about their tax status); *Wright v. Adventures Rolling Cross Country, Inc.*, No. 12-982, 2012 WL 2239797 (N.D. Cal. June 15, 2012) (numerous communications sent directly to putative class members to discourage them from participating in the lawsuit by, among other things, telling them how their lives will be subject to public scrutiny and stating that plaintiffs' counsel are only interested in a "payoff" and have acted unethically); *Urtubia v. B.A. Victory Corp.*, 857 F. Supp. 2d 476 (S.D.N.Y. 2012) (threat to report former employee who was an undocumented alien to immigration authorities if he did not cease participation in the suit); *Hampton Hardware v. Cotter & Co.*, 156 F.R.D. 630, 631 (N.D. Tex. 1994) (defendant sent letters directly to potential class members about the lawsuit, stating, *inter alia*, "What can you do to avoid this waste of time and money?  Decide not to participate in this lawsuit.").

What these cases actually show is that courts are concerned with truly abusive communications, not communications like the ones at issue here.  The Firm's statement plainly is not "intimidating" or "coercive" toward any class members and, as such, it clearly does not rise to the level of an abusive communication under the law.

Even more, Plaintiffs cannot demonstrate "evidence beyond the mere possibility of abuses."  *Agerbrink v. Model Servs. LLC*, 2015 WL 6473005 at *4.  For instance, in accordance

with this standard, in *Beasley*, 2016 WL 6684206 at *13, the court denied plaintiffs' motion to regulate communications under Rule 23(d) because the plaintiffs did "not provide[] evidence that would lead to a 'clear record and specific findings' tending to show 'a likelihood of serious abuse.'"  Similarly, in *Burrell v. Crown Cent. Petroleum*, 176 F.R.D. 239, 245 (E.D. Tex. 1997), the Court ruled that even though the employer sent direct e-mails to its employees about a filed class action lawsuit and that it believed the lawsuit was a "union strategy," there was no need to restrict the employer's communications because it did not contain a threat not to join the lawsuit. Significantly, in finding that no abuse existed, the court ruled "[i]t is not enough that a *potentially* coercive situation exists."[10]  *Id*. at 244.  Here, Plaintiffs acknowledge that they cannot meet the applicable standard, as even they will not go beyond arguing that the Firm's press statement was, at most, an "implicit" threat.  (Dkt. No. 86 at 5).

Accordingly, the Court should not restrict the communications of Defendants.

### C.      A Restriction On Defendants' Speech Would Also Violate Their First Amendment Rights.

Plaintiffs additionally are not entitled to an order restricting Defendants' communications because doing so would be a prior restraint in violation of Defendants' First Amendment rights. It is well-settled that when a court considers whether to curtail a party's communications under Rule 23(d), it must take into consideration that party's First Amendment rights.  The Third Circuit in *In re Sch. Asbestos Litig.*, 842 F.2d 671, 680 (3d Cir. 1988) made clear that both the policies underlying Rule 23 and the First Amendment generally must be considered when issuing

---

[10] Moreover, unlike *Burrell* and the vast majority of the cases cited by Plaintiffs, in which there exists an employer-employee relationship, here, the members of the putative class are all partners who are themselves the co-owners of the defendant partnership.  As such, there is no relationship that is inherently coercive.  *See Scott v. Chipotle Mexican Grill, Inc.*, No. 12-cv-8333, 2014 WL 4852063, at *4 (S.D.N.Y. Sept. 29, 2014) (ruling that it was because the "defendant is also the employer of members of the [class]" that the defendant was "in a position to exercise strong coercion"); *Ojeda-Sanchez v. Bland Farms*, 600 F. Supp. 2d 1373, 1379-1380 (S.D. Ga. 2009) ("[T]here is a past as well as a potential future employment relationship between the parties which increases the risk that communications between them will have a coercive effect.").

such constraining orders:  "Orders regulating communications between litigants . . . also pose a grave threat to first amendment freedom of speech" and "a district court's discretion to issue such orders must be exercised within the bounds of the first amendment and the Federal Rules."

First Amendment rights are of even more profound import when the communications sought to be regulated are communications to the press.  *See, e.g.*,  *In re Sch. Asbestos Litig.*, 842 F.2d at 684 (refusing to limit defendant's statements to media even while limiting direct communications with members of the class); *Abdallah v. Coca-Cola Co.*, 186 F.R.D. 672 (N.D. Ga. 1999) (weighing First Amendment rights and ruling not to limit "in any manner the parties' right to speak with the media regarding the substance of this lawsuit, so long as no attempts are made by either side to overtly solicit participation or nonparticipation by potential class members").  *See also Thurmond v. Compaq Comput. Corp*, No. 99-cv-711, 2000 WL 33795080, at *1-2 (E.D. Tex. Feb 28, 2000) (in denying a "gag order" restricting the Plaintiffs from making statements to the media, referring to judicial restrictions on statements to the media as "one of the most extraordinary remedies known to our jurisprudence.")  Tellingly in view of these First Amendment principles, Plaintiffs have not cited a single case in which a court restricted a party's communications with the press on a Rule 23(d) motion.[11]

## IV.   THE COURT SHOULD DENY PLAINTIFFS' REQUEST FOR A "CORRECTIVE NOTICE" UNDER THE FAIR LABOR STANDARDS ACT.

Plaintiffs' request for corrective notice should be denied.  To begin with, the Court has not granted Plaintiffs' earlier motion for the issuance of conditional notice under the Fair Labor Standards Act, and Plaintiffs have not shown that such notice – corrected or otherwise – should be issued now.  *See generally* Dkt. No. 82.  All the arguments made by Defendants in opposition

---

[11]In arguing that an order should issue prohibiting Defendants from retaliating against plaintiffs (or putative plaintiffs) for pursuing claims against Chadbourne or Norton Rose Fulbright ("NRF"), Plaintiffs erroneously assert or assume without providing any evidentiary basis that NRF is or will be Chadbourne's "successor."  (Dkt. No. 86, at 13).  This is incorrect.

to that motion (lack of employee status, no unlawful policy of pay discrimination, partners not similarly situated, etc.) likewise argue against ordering any notice on this motion too.  *Id.*

Defendants also have not engaged in any communications with putative class or collective members that would warrant the type of "corrective notice" sought by Plaintiffs.  None of the cases Plaintiffs cite support the notion that corrective notice is proper where FLSA conditional notice has not already been issued and no communications have been directed to putative class members about their participation in the lawsuit.  In fact, many of the cases Plaintiffs cite involve communications that directly encouraged class members to opt-out of the litigation *after* conditional notice had already been authorized by the court.[12]  In the cases that involve communications sent *prior to* the issuance of conditional notice, the communications were directed at putative class members and expressly cautioned them against participating in the lawsuit.[13]  The press communication at issue here was not directed at putative class members, and in any event surely did not caution such individuals (directly or otherwise) against participating in the lawsuit.

_____

[12] *See, e.g.*, *Li v. A Perfect Day Franchise, Inc.*, 270 F.R.D. 509 (N.D. Cal. 2010) (notice had already been issued and defendants had solicited class members to opt-out.); *Maddy v. Gen. Elect. Co.*, No. 14-cv-490, 2015 WL 1344626 at *3 (D.N.J. Mar. 15, 2015) (the communication in question was sent during the notice period and "a lay reader" who received the communication "would reasonably believe that opting into the litigation was pointless based on the definition of 'work,' or, worse, that they would risk their jobs by admitting to that kind of activity, a necessary consequence of opting in."); *See also e.g., Belt v. Emcare Inc.*, 299 F. Supp. 2d 664 (E.D. Tex. 2003) (After the court approved notice but just before it had been issued, the defendant unilaterally mailed their own letter to the absent class members, which misrepresented many of the issues in the action to encourage absent class members not to join.).

[13] *See, e.g. Agerbrink*, 2015 WL 6473005, at *3 (ordering that defendant issue a 'corrective notice' to employees who had previously received an email from the defendant cautioning putative collective members against communicating with plaintiffs' counsel or joining the lawsuit  because of the discovery they may be asked to provide after doing so); *Wright v. Adventures Rolling Cross Country, Inc.*, 2012 WL 2239797 at *5 (the defendants sent multiple targeted communications to individual potential class members and advised them that the "[p]laintiffs' lives would be subject to public scrutiny as a result of the litigation – including future employers."); *Camp v. Alexander*, 300 F.R.D. 617 (N.D. Cal. 2014), (the defendant solicited opt-outs by sending an inflammatory letter with repeated warnings that the practice would close and employees would lose their jobs if the litigation proceeded.).

24

## V.   PLAINTIFFS HAVE NOT ESTABLISHED ANY "EXTRAORDINARY CIRCUMSTANCES" TO JUSTIFY THEIR REQUEST FOR EQUITABLE TOLLING.

Plaintiffs assert claims under the FLSA, which carries a two-year statute of limitations period, or three years for willful violations.   *See* 29 U.S.C. § 255(a).  The statute of limitations runs back from the date that each individual plaintiff files with the Court a form consenting to join the action.  29 U.S.C. § 256(b).  Plaintiffs' request to equitably toll the limitations period for all putative collective members fails for a number of reasons:  (1) whatever the merits of Plaintiffs' request for equitable tolling, such relief cannot possibly be needed on an "emergency" basis; (2) requests for equitable tolling are premature where, as here, the "plaintiff has not adequately demonstrated that there are similarly situated prospective plaintiffs for whom equitable tolling may be justified",  *Khan v. Airport Mgmt. Servs., LLC*, 2011 WL 5597371 (S.D.N.Y. Nov. 16, 2011); and (3) Plaintiffs fail to meet the heavy burden placed on parties seeking to toll limitations periods in this Circuit because they have not shown that this is one of the "rare and exceptional circumstances in which a party is prevented in some extraordinary way from exercising his rights."  *Zerilli-Edelglass v. New York City Transit Auth.*, 333 F.3d 74, 80 (2d Cir. 2003) (citations omitted).[14]

### CONCLUSION

For the reasons stated above, the Court should deny Plaintiffs' "Emergency Motion" for Corrective Action and Related Relief.

---

[14] Plaintiffs have also failed to identify any potential Plaintiffs who will be barred from this action if the statute of limitations is not tolled.  *See Mendoza v. Ashiya Sushi 5, Inc.*, No. 12-cv-8629, 2013 WL 5211839 (S.D.N.Y. Sept. 16, 2013) (holding that it was unnecessary to determine the issue of equitable tolling before plaintiffs had established that any potential plaintiffs will be barred from the action due to a delay in notice).

Dated:  New York, New York
        April 14, 2017

Respectfully submitted,

PROSKAUER ROSE LLP

By:     /s/ Kathleen M. McKenna
         Kathleen M. McKenna
         Evandro C. Gigante
         Rachel S. Fischer
         Eleven Times Square
         New York, New York 10036
         Ph.: (212) 969-3000
         Fax: (212) 969-2900
         kmckenna@proskauer.com
         egigante@proskauer.com
         rfischer@proskauer.com

         *Attorneys for Defendants*

26