**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **KERRIE L. CAMPBELL, JAROSLAWA Z. JOHNSON, and MARY T. YELENICK, individually, and on behalf of others similarly situated,** | **SECOND AMENDED CLASS ACTION, COLLECTIVE ACTION, AND INDIVIDUAL COMPLAINT** |
| **Plaintiffs,** | **JURY TRIAL DEMANDED** |
| **v.** | **Civ. No. 1:16-cv-06832 (JPO)(BCM)** |
| **NORTON ROSE FULBRIGHT US LLP, CHADBOURNE & PARKE LLP, MARC ALPERT, ANDREW GIACCIA, ABBE LOWELL, LAWRENCE ROSENBERG, HOWARD SEIFE, and PAUL WEBER,** | |
| **Defendants.** | |

Plaintiffs Kerrie L. Campbell, Jaroslawa Z. Johnson, and Mary T. Yelenick ("Plaintiffs"), by their attorneys Sanford Heisler Sharp, LLP, bring this action in their individual capacities and on behalf of a proposed class and collective action of female attorneys at Chadbourne & Parke LLP ("Chadbourne" or "the Firm") to redress the Firm's systematic gender discrimination.

Plaintiffs allege upon knowledge as to themselves and their own acts, and otherwise upon information and belief, as follows:

## I.   INTRODUCTION

1.       Until recently, Chadbourne was a storied international law firm which employed over 300 attorneys in 10 offices worldwide.  In 2016, *The American Lawyer* listed Chadbourne as the 124th largest revenue-grossing law firm in the United States.

2.       However, a specter haunted the halls of Chadbourne: a "boys' club" atmosphere and a standard operating procedure to discriminate against the Firm's female partners in the terms

and conditions of employment.  To Chadbourne's male leadership, camaraderie and networking among male attorneys outweighed the superior performance and impressive revenue generated by the female partners represented in this action.

3.      On or about June 30, 2017, Chadbourne combined with global law firm Norton Rose Fulbright ("Norton Rose").  Since the merger, the former leadership of Chadbourne has assumed a leadership role at Norton Rose.  For instance, the former Managing Partner of Chadbourne, Defendant Andrew Giaccia, is now Vice Chair of Norton Rose's U.S. Management Committee, and two former members of Chadbourne's Management Committee, including Defendant Howard Seife, now serve on Norton Rose's Global Executive Committee.  Abbe Lowell, former Head of Chadbourne's Litigation Practice Group, now serves as Co-head of Regulations, Investigations, Securities and Compliance for Norton Rose's United States offices. As the successor to Chadbourne, Norton Rose is liable for the conduct complained of in this litigation.  Furthermore, upon information and belief, Norton Rose aided and abetted Chadbourne's discriminatory, retaliatory, and otherwise unlawful expulsion of Plaintiff Kerrie L. Campbell.

4.      Plaintiff Kerrie L. Campbell ("Campbell") is a seasoned trial lawyer and leading practitioner in the defamation/product disparagement, First Amendment, and consumer product safety fields.  Campbell's productivity and revenue generation were consistent with the Firm's top performing male Partners, but her pay consistently placed her at the bottom ranks of male Partners who originated far less, and in some instances, zero revenue as a billing Partner.  Campbell called out and opposed gender-based pay and power inequities at Chadbourne and asked the Firm's all-male five-member Management Committee, Managing Partner, and Head of the Litigation Department to address and rectify these issues.  Instead, Chadbourne's Managing Partner, Andrew Giaccia, and Head of the Litigation Department, Abbe Lowell, directed Campbell to leave the

Firm. Giaccia and Management Committee member Marc Alpert subsequently informed Campbell that the Committee's decision that she must leave the Firm was "final" and would not be revisited.

5.      Campbell's experience was emblematic of the experience of other female Partners at Chadbourne.  For example, Plaintiff Jaroslawa Z. Johnson ("Johnson"), an experienced attorney with more than 20 years leading corporate expansion in emerging markets, brought in millions of dollars as the Head of the Firm's Kiev office, yet was paid less than male Partners without managerial responsibilities and who had lower collections.  During her productive tenure at Chadbourne, Johnson consistently ranked in the top 20 of Partners in terms of collections yet, like Campbell, her compensation consistently ranked her among the Firm's lowest paid Partners. Johnson repeatedly raised the issue of her pay disparity with the all-male Management Committee. Her complaints were brushed aside and ignored.

6.      Plaintiff Mary T. Yelenick ("Yelenick"), who spent her entire 35-plus year legal career at Chadbourne, was underpaid for years as a Partner even as she led the Firm's Products Liability Group and advised numerous companies in some of the largest and most complex matters ever undertaken by that practice group.  Yelenick repeatedly, both through written memoranda to the Management Committee and by making oral statements to the Management Committee at partnership meetings, raised the issue of pay disparities and other gender discrimination at Chadbourne.   The Management Committee ignored Yelenick's internal complaints, and after this case was filed, she faced pressure to disavow this litigation.

7.      Plaintiffs filed this lawsuit to rectify the gender inequities perpetrated by the Firm and seek relief on behalf of themselves and other female partners who have been disparately underpaid; systematically shut out of Firm leadership; and demoted, de-equitized, or terminated after they complained about gender discrimination at the Firm.

## II. OVERVIEW OF CHADBOURNE'S DISCRIMINATION AGAINST FEMALE PARTNERS

8.      Women continue to encounter the "glass ceiling" at large law firms.  A recent American Bar Association study found that at law firms nationwide, female attorneys comprise 44.7 percent of law firm associates, but only 18 percent of equity partners.[1]  In the last decade, large law firms have made almost no progress towards increasing women's paltry representation among the ranks of equity partners – the current 18% figure is only 2 percent higher than the 16% rate in 2006.[2]

9.      The small percentage of women who do advance to law firm partnership discover that they are often paid significantly less than their male counterparts.  A 2016 survey by Major, Lindsey, & Africa found a 44 percent pay gap between female partners and their male counterparts.[3]  The survey found that female partners earned an average of $659,000 annually compared with an average of $949,000 for male partners.[4]

10.     Yet even in a field where inequities between male and female attorneys persist, Chadbourne stood out for its culture of discrimination against female attorneys.  While the Firm advertised a commitment to equal opportunity for female attorneys, the reality was far different. During its last year of operations, Chadbourne was conspicuously absent from both the *National Law Journal*'s list of the top 100 law firms on its "Women in Law Scorecard"[5] and *Law360*'s list

---

[1] Commission on Women in the Profession, American Bar Association, *A Current Glance at Women in the Law 2016* (May 2016), *available at* http://www.americanbar.org/groups/women/resources/statistics.html.

[2] National Association of Women Lawyers, *Women Lawyers Continue to Lag Behind Male Colleagues: Report of the Ninth Annual NAWL National Survey on Retention and Promotion of Women in Law Firms* (2015), *available at* http://www.nawl.org/p/cm/ld/fid=506.

[3] Major, Lindsey, & Africa, *2016 Partner Compensation Survey, available at* https://www.mlaglobal.com/publications/research/compensation-survey-2016.

[4] *Id.*

[5] The American Lawyer, *The Best Firms in Big Law for Women*, AMERICANLAWYER.COM (August 30, 2016, 7:58 PM), http://www.americanlawyer.com/home/id=1202762963381 (citing the top 100 firms on the *National Law*

of 100 large law firms recognized for being "Best Law Firms for Female Attorneys."[6]

11.     Female attorneys at Chadbourne were paid less compensation than similarly-situated male attorneys.  This pay disparity was the direct result of Chadbourne's male-dominated Firm leadership.  Women partners at Chadbourne earned less than men and were virtually shut out of influential decision-making positions at the Firm.

12.     Chadbourne's gender disparities were neither coincidental nor limited to any one office.  For most of the relevant time period, a Committee of five men in Chadbourne's New York office made all compensation decisions for *each and every* Chadbourne Partner worldwide. Together, these five men made up Chadbourne's Management Committee, a centralized brotherhood with complete control over Partner compensation and Firm decisions.

13.     At Chadbourne, base compensation for Partners was largely determined by the number of Partnership "points" awarded by the Management Committee.  Chadbourne typically awarded female Partners fewer points than it awarded comparable male Partners even when female Partners substantially outperformed their male peers.

14.     Partnership points were supposed to be tied to the anticipated revenues that a Partner was expected to generate for the Firm, or "collections."   However, the Management Committee routinely overvalued the anticipated contributions of male Partners, even where female Partners had a demonstrated record of outperforming them.  Point allocation was left entirely to the subjective will of the Management Committee.

15.     Point distribution directly affected a Partner's long-term compensation.  Partners who were assigned a low number of points generally did not have an opportunity to make up the

_____

*Journal*'s Women in Law scorecard).

[6] Jacqueline Bell, *The 100 Best Law Firms for Female Attorneys*, LAW360.COM (August 15, 2016, 2:35 PM), http://www.law360.com/articles/784729/the-100-best-law-firms-for-female-attrneys.

deficit, even if their collection levels increased, because the Management Committee rarely increased point totals by a significant amount from year to year.  Upon information and belief, the Committee even *decreased* point totals for female Partners from year to year, further limiting their opportunity to obtain a higher level of compensation.

16.     Chadbourne routinely awarded female Partners low numbers of points while assigning similarly or less productive males higher points.

17.     Upon information and belief, in 2013, the number of points allotted to male Partners ranged up to 2,250, while those allotted to female Partners ranged from 400-900.  Chadbourne compensated 8 of 15 female Partners at or below ▇ points.

18.     Upon information and belief, in 2014, the number of points allotted to male Partners ranged up to 2,250, while those allotted to female Partners ranged from 375-1,000.  Chadbourne compensated 10 of 17 female Partners at or below ▇ points.

19.     Upon information and belief, in 2015, the number of points allotted to male Partners ranged up to 2,100, while those allotted to female Partners ranged from 375-1,000.  Chadbourne compensated 11 of 18 female Partners at or below ▇ points.  Chadbourne also routinely compensated female Partners less than similarly situated male Partners in terms of merit bonus pay.  Female Partners often received smaller bonuses than their lower-performing male peers or no bonus at all.

20.     The underpayment of female Partners was in part a function of the discriminatory origination credit system that Chadbourne utilized.  The Management Committee allowed departing Partners to hand-select other Partners to receive credit for their client matters as "billing partner." Partners designated "billing partner" received origination credit for any revenues generated from the matter, regardless of the role they played in the matter, even if it was miniscule

or non-existent.  Most, if not all, of the transfers of longstanding Firm clients were from a male Partner to another male Partner.  In this way, the Management Committee routinely overcompensated male Partners and undercompensated female Partners for their business origination efforts.

21.     The experience appeared to be no better for female associates at the Firm.  Women in the associate ranks were subject to discriminatory pay decisions and their success hampered by an inability to move into Partner positions.  Chadbourne's hostility towards women resulted in the significant attrition of female associates and counsel.  In the two-year period from January 2014 through December 2015, in the Litigation Department alone, no less than approximately 20 non-partner attorneys left the Firm.  Of these 20 departing attorneys, approximately 17 were female and only three were male.  Female attorneys comprised a substantially disproportionate percentage – approximately 85% – of the attorneys who left Chadbourne's Litigation Department in 2014 and 2015 under the leadership of the Litigation practice group.

22.     The 115-year-old Firm elected its first and only female Partner to the Management Committee in July 2016 – after Campbell notified Managing Partner Andrew Giaccia and the Management Committee of her gender-based discrimination claims and after Campbell filed a class charge of discrimination with the EEOC.

23.     Chadbourne's all-male dictatorship made its decisions regarding Firm Partners in a black box, generally without input or scrutiny from the Partnership at large.  The Management Committee rendered a number of influential decisions in complete secrecy, including decisions to open costly and unprofitable foreign offices and hire/fire international Partners, decisions regarding potential mergers with other firms that Partners learned about only from media reports, and decisions to terminate the employment of female attorneys, such as Campbell, who challenged

the Committee's decisions.  Its decision-making processes and methodology were kept under wraps.  This wall of silence reinforced the Firm's glass ceiling by shielding the Management Committee from meaningful oversight and giving it unchecked dominion over the compensation and employment of Firm Partners.  And it also enabled the Committee to routinely disfavor female Partners – including by granting them disproportionately fewer Partnership "points," purportedly a key component of the secret formula used to determine base salary for Chadbourne Partners.

24.     Upon information and belief, Chadbourne male leadership created and facilitated an inequitable "boys' club" culture, in which a deeply ingrained and pervasive double standard was applied to male and female Partners.

* * *

25.     This action arises out of Chadbourne's systemic, Firm-wide discriminatory treatment of its female partners on the basis of their gender.  Chadbourne discriminated against female partners through its policies, practices, and procedures, in violation of Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991 and the Lilly Ledbetter Fair Pay Act of 2009 ("Fair Pay Act"), 42 U.S.C. §§ 2000e, *et seq.* ("Title VII"); the Equal Pay Act, 29 U.S.C. § 206(d) ("EPA"); the District of Columbia Human Rights Act ("DCHRA"), D.C. Code §§ 2-1401, *et seq.*; the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. L. § 296; the New York Equal Pay Law ("NYEPL"), N.Y. Labor Law § 194; and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-107.

26.     Chadbourne unlawfully discriminated and retaliated against Plaintiffs.  The Firm retaliated against Johnson by reducing her points and compensation in response to her complaints about gender discrimination.  The Firm retaliated against Campbell by notifying her that her employment at the Firm was being terminated after she complained about pay discrimination.  The

Firm pressured Yelenick and other female Partners to disavow the gender discrimination alleged in this very lawsuit.  Then, the Firm retaliated against Yelenick for joining this suit by releasing a disparaging statement about her that contrasted starkly with the laudatory memorandum that the Firm had sent partners about Yelenick's career, achievements, and contributions just months before, when she retired from her Partner position.  The individual defendants aided and abetted the Firm's discriminatory and retaliatory acts against Plaintiffs.

27.     Furthermore, the Firm, and each of the named individual Defendants, engaged in bad faith, knowing, and intentional acts and omissions in breach of their fiduciary duties of honesty, loyalty, transparency, and fairness to Plaintiffs, including by failing to share important information related to the Firm's finances with them, and for Campbell, by terminating her employment in breach of the procedures specified in the Firm's Partnership Agreement.  Finally, the Firm was unjustly enriched when it reaped the financial benefits of Plaintiffs' work and Campbell's multiple capital contributions to the Firm, without fairly compensating them, without providing them with the benefits of the Firm's Partnership Agreement, and withholding over $440,000 in Campbell's capital account as of December 2015.

28.     On behalf of themselves and the class and collective action they seek to represent, the Plaintiffs request declaratory and monetary relief to redress Chadbourne's pervasive and discriminatory employment policies, practices, and procedures.  Plaintiffs and the Class seek, *inter alia*, back pay; front pay; nominal, liquidated, and punitive damages; and attorneys' fees and costs.

### III.   PARTIES

29.     **Plaintiff Kerrie L. Campbell** has been a resident and citizen of Montgomery County, Maryland at all times relevant to this action.  Campbell began her employment at Chadbourne's Washington, D.C. office as a lateral Partner in January 2014.  The Management

Committee informed Campbell that she was being terminated in February 2016, designated her a "Partner in Transition" out of the Firm with no shares in the Firm's profits, and then formalized her expulsion in April 2017.   At all relevant times, Campbell was a female "employee" as defined by Title VII, the EPA, and the DCHRA.

30.   **Plaintiff Jaroslawa Z. Johnson** maintained a home in Chicago, Illinois and worked part-time in her office in Washington, D.C. at all times relevant to this action.   Johnson managed the Kiev office until the end of 2013 when she asked to step down as Managing Partner, turning over managerial responsibility for the office to another attorney.   She then transitioned to Senior Counsel and continued to work in the Kiev office on a reduced schedule.   In April 2014, the Firm informed Johnson that it was closing the Kiev office and, thereafter, Johnson performed wind-down activities until the Kiev office formally closed in October 2014.   At all relevant times, Johnson was a female "employee" as defined by the EPA.

31.   **Plaintiff Mary T. Yelenick** has been a resident and citizen of New York, New York at all times relevant to this action.   Yelenick began her employment at Chadbourne in June 1981 as an associate in the Litigation practice group.   She was subsequently made Counsel and was promoted to Partner in 1996.   She retired from her Partner position on December 31, 2016, and was made "Of Counsel" to the Firm, a designation offered to Chadbourne partners in good standing upon their retirement.   Since the completion of Chadbourne's merger with Norton Rose, Yelenick has been "Of Counsel" to Norton Rose.   At all relevant times, Yelenick has been a female "employee" as defined by Title VII, the EPA, the NYSHRL, the NYEPL, and the NYCHRL.

32.   **Defendant Norton Rose Fulbright US LLP** ("Norton Rose") is a Texas limited liability partnership registered in New York.   On or about June 30, 2017, Chadbourne merged with Norton Rose Fulbright US LLP, and the combined firm is known as Norton Rose Fulbright US

LLP.  Norton Rose is part of the global law firm Norton Rose Fulbright, which is one of the largest law firms in the world, employing thousands of lawyers across dozens of offices worldwide. Norton Rose continues to operate the New York City office formerly operated by Chadbourne, where Yelenick worked, and the Washington, D.C. office formerly operated by Chadbourne, where Campbell and Johnson worked.  At all relevant times, Norton Rose has been an "employer" as defined by Title VII, the EPA, the DCHRA, the NYHRL, the NYEPL, and the NYCHRL.

33.     **Defendant Chadbourne & Parke LLP** is a registered New York limited liability partnership.  When this action was originally filed, Chadbourne had offices worldwide, and Chadbourne's New York office was also the locus of operations of the Firm's Management Committee, comprised of five males for most of the relevant time period.  On or about June 30, 2017, Chadbourne merged with Norton Rose Fulbright US LLP, and the combined firm is known as Norton Rose Fulbright US LLP.  At all relevant times, Chadbourne was an "employer" as defined by Title VII, the EPA, the DCHRA, the NYHRL, the NYEPL, and the NYCHRL.  Unless otherwise specified, the terms "Defendant" and "Chadbourne" as used in this Complaint refers to Chadbourne, as well as Norton Rose as Chadbourne's successor in interest.

34.     **Defendant Marc Alpert** ("Alpert") was a Partner at Chadbourne and a member of the Firm's Management Committee until June 2016.  Upon information and belief, Alpert actively and knowingly engaged in acts or omissions in breach of his fiduciary duties to Campbell and Yelenick and took actions that aided and/or abetted discriminatory and/or retaliatory actions against Campbell and Yelenick.

35.     **Defendant Andrew Giaccia** ("Giaccia") was the Managing Partner of Chadbourne and a member of the Firm's Management Committee at the time this action was filed.  Since Chadbourne combined with Norton Rose, Giaccia has been Vice Chair of Norton Rose's U.S.

Management Committee.  Upon information and belief, Giaccia actively and knowingly engaged in acts or omissions in breach of his fiduciary duties to Campbell and Yelenick and took actions that aided and/or abetted discriminatory and/or retaliatory actions against Campbell and Yelenick.

36.     **Defendant Abbe Lowell** ("Lowell") was the Head of the Litigation Practice Group at Chadbourne at the time this action was filed.  Since Chadbourne combined with Norton Rose, Lowell has been Co-head of Regulations, Investigations, Securities and Compliance for Norton Rose's U.S. offices.  Upon information and belief, Lowell actively and knowingly engaged in acts or omissions in breach of his fiduciary duties to Campbell and Yelenick and took actions that aided and/or abetted discriminatory and /or retaliatory actions against Campbell and Yelenick.

37.     **Defendant Lawrence Rosenberg** ("Rosenberg") was a Partner at Chadbourne and a member of the Firm's Management Committee at the time this action was filed.  Since Chadbourne combined with Norton Rose, Rosenberg has been a partner in Norton Rose's Corporate, Mergers and Acquisitions, and Securities group.  Upon information and belief, Rosenberg actively and knowingly engaged in acts or omissions in breach of his fiduciary duties to Campbell and Yelenick and took actions that aided and/or abetted discriminatory and/or retaliatory actions against Campbell and Yelenick.

38.     **Defendant Howard Seife** ("Seife") was a Partner at Chadbourne and a member of the Firm's Management Committee at the time this action was filed.  Since Chadbourne combined with Norton Rose, Seife has been a member of Norton Rose's Global Management Committee. Upon information and belief, Seife actively and knowingly engaged in acts or omissions in breach of his fiduciary duties to Campbell and Yelenick and took actions that aided and/or abetted discriminatory and/or retaliatory actions against Campbell and Yelenick.

39.     **Defendant Paul Weber** ("Weber") was a Partner at Chadbourne and a member of the Firm's Management Committee at the time this action was filed.  Since Chadbourne combined with Norton Rose, Weber has been a Partner in Norton Rose's Project Finance group.  Upon information and belief, Weber actively and knowingly engaged in acts or omissions in breach of his fiduciary duties to Campbell and Yelenick and took actions that aided and/or abetted discriminatory and/or retaliatory actions against Campbell and Yelenick.

## IV.     JURISDICTION AND VENUE

40.     This Court has subject matter jurisdiction over this suit pursuant to 28 U.S.C. § 1331 because this action is based on Title VII of the Civil Rights Act of 1964, as amended, and the Equal Pay Act of 1963.  This Court has supplemental jurisdiction over Plaintiffs' other claims pursuant to 28 U.S.C. § 1367.  This Court has personal jurisdiction over Defendants under N.Y. CPLR §§ 301 and 302(a), because Defendants all worked in or have otherwise transacted significant business in the State of New York.

41.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and 42 U.S.C. § 2000e-5(f)(3).  Chadbourne transacted a substantial portion of its business in this District, maintained its largest office in this District, and governed the Firm and its operations from its New York office.  From this District, Chadbourne sent Plaintiffs their employment offer letters, and, once hired, reviewed their performance on at least an annual basis.  Chadbourne also committed the alleged unlawful employment practices at issue in this case in this District.  The Firm's New York-based Management Committee and other members of the male Firm leadership made all of the decisions relevant to this action – including systematically discriminating against Plaintiffs and the Class in compensation and terminating Campbell after she complained about pay discrimination.  Further, Norton Rose transacts a substantial portion of its business in this District

and maintains a large office in this District, where it employs numerous former Chadbourne partners.

42.     A substantial part of the events or omissions giving rise to the claims in this action occurred in the Southern District of New York.

43.     Campbell and Yelenick have standing to bring claims under Title VII pursuant to the Right to Sue letter obtained by Campbell.  Campbell timely filed an EEOC charge which contained both individual and class charges on behalf of all female employees at Chadbourne.

## V.     FACTUAL ALLEGATIONS

### A.     KERRIE L. CAMPBELL'S FACTUAL ALLEGATIONS

### 1.     Background

44.     Campbell is a graduate of George Mason University, with distinction, and of the Washington College of Law of the American University, *cum laude*.

45.     Campbell has 29 years of litigation experience.  She is a recognized expert in the consumer product safety and defamation/product disparagement fields.   Prior to joining Chadbourne, she spent 17 years at Collier Shannon (now Kelley Drye), where she worked her way up from litigation associate, to counsel, and finally to partner and chair of the Consumer Product Safety group.  Following Collier Shannon's merger with Kelley Drye in 2007, Campbell moved her growing practice to Manatt, Phelps, and Phillips, LLC ("Manatt"), where she spent seven years as a partner and chair of the Consumer Product Safety group and was designated as a "Best Lawyer in America" for First Amendment Litigation.

46.     After bumping into conflicts at Manatt, Campbell undertook a focused search to join a firm where she could fully realize her professional objective to nationally brand her highly specialized First Amendment, reputation protection, and consumer product safety expertise.

14

47.     In November 2013, Chadbourne extended an offer to Campbell to join the Firm as an "equity" Partner.  Before and after receiving Chadbourne's offer, Campbell requested and received confirmation about her expected base compensation and the availability of merit bonuses.

48.     In the November 26, 2013 offer extended to Campbell, Giaccia represented that Campbell's base annual compensation would be 500 points, and that she would also receive a signing bonus and additional guaranteed compensation based on collections markers.  Campbell would be entitled to a signing bonus of $50,000, a guaranteed bonus of $150,000 if her collections for 2014 were $2.0 million, and a total guaranteed bonus of $200,000 if her collections were $2.5 million.  Giaccia also informed Campbell that she would be eligible for "merit bonus" consideration at the discretion of the Management Committee.

49.     After receiving the offer, Campbell sought clarification about the value of the points with Chadbourne's Chief Operating Officer, Lisa Palestine.  Palestine explained that the value of 500 points equaled $500,000.  By meeting the collections markers, the compensation offer for 2014 totaled $750,000, plus the availability of a merit bonus based on performance.

50.     Campbell joined the Firm on January 8, 2014.  As a new lateral Partner, Campbell performed exceptionally well at Chadbourne.  In her time at Chadbourne, Campbell originated no fewer than 40 new matters for over 20 clients she brought to the Firm, altogether generating as billing Partner over $5 million in total collections for the Firm.  Clients praised the quality of her work.  Campbell's broad client base included global manufacturers of iconic brands, public and political figures, high-net worth individuals and innovative companies comprising 80% of the multi-billion dollar "As Seen on TV" market.

51.     During her time at Chadbourne, Campbell garnered positive attention for the Firm through articles published in *The American Lawyer*, *Bloomberg BNA's Product Safety & Liability*

*Reporter*, and *Law360*.  In 2015, Campbell was selected as a Member of the *Law 360 Media & Entertainment* Editorial Advisory Board.  She was recognized as a "Best Lawyer" in America for First Amendment litigation in 2014, 2015, and 2016.  On June 15, 2016, Campbell testified before the United States Consumer Product Safety Commission regarding "*The Need for Transparency in the Commission's Civil Penalty Determinations.*"

> **2.** **Marc Alpert, Andrew Giaccia, Lawrence Rosenberg, Howard Seife, and Paul Weber Wielded Complete Control Over Campbell's Practice and Compensation**

52.     For the majority of Campbell's tenure, five men—Marc Alpert, Andrew Giaccia, Lawrence Rosenberg, Howard Seife, and Paul Weber—sat on the Firm's Management Committee. All five men were Partners based in the Firm's New York office.

53.     The Management Committee controlled all significant aspects of the Firm's operations.  In addition to compensation decisions, the Committee made all decisions regarding the Firm's finances, including expenditures related to opening expensive and unprofitable foreign offices.   The  Committee  managed  membership  on  Firm  committees – a  gateway  to  Firm leadership.  The Committee signed off on and was privy to information related to the Firm's rankings in various legal trade publications that it refused to make available to Partners, such as Campbell.  Discussions regarding mergers with other firms, decisions with significant implications for all Partners, were and are under the complete purview of the Management Committee.

54.     The Management Committee also exercised control over Partners with regard to management of their individual matters.  For example, Campbell was not permitted to take on any client  engagement  that  deviated  from  a  certain  hourly  rate  without  Management  Committee approval.  She was not permitted to write-off time and/or fees without the approval of the billing person designated by the Management Committee.  She also was not permitted to hold off on

sending out any bills for any reason without Management Committee approval.

55.     The Management Committee also heavily supervised Campbell's performance at the Firm.  Campbell was required to submit annual performance evaluations for the Management Committee's consideration.

56.     Despite repeated attempts to take on leadership roles at the Firm, Campbell was refused positions on Firm committees.  Giaccia also denied Campbell's requests to be named chair of the Firm's Consumer Product Safety & Risk Management practice group or Reputation Protection and Defamation practice group, even though she held that title at two previous law firms, a fact touted by the Firm in its press release announcing Campbell's lateral move to Chadbourne.

### 3.     Chadbourne Assigned Campbell Less Base Pay than Similarly or Less Productive Male Partners

57.     In 2014, when Chadbourne hired Campbell, it awarded her 500 points, even though she demonstrated that she could generate in excess of $2 million in revenues for the Firm based on her collections at Manatt.  She exceeded that estimate by a considerable margin in 2014.  At the same time, the Firm assigned similarly or less productive male Partners points in the 1,000-1,400 range.  From her first day at the Firm, the deck was stacked against Campbell.  She was destined to make two to three times less than her male counterparts did.

58.     Upon information and belief, in 2014, when Campbell joined Chadbourne, a male Partner with similar collections in the previous year ($▇▇▇▇▇▇  ▇▇▇▇▇▇▇▇▇▇  was awarded ▇▇▇ points.

59.     Male Partners with significantly lower collections were still awarded more points than Campbell in 2014. For example, another male Partner in the New York office, ▇▇▇▇▇▇, had only $▇▇▇▇▇ in collections in the previous year and was awarded ▇▇ points. ▇▇▇▇▇

██████████ a male Partner in the Firm's New York office, had ████ points yet only brought $ █████ in collections.

60.     Campbell asked for a point increase at the end of 2014 after generating more than $2.5 million in collections for the Firm.  Giaccia responded that Campbell had to "prove" her ability to generate revenue at Chadbourne for an indeterminate period before the Management Committee would consider giving her a significant point increase.  Chadbourne had no similar expectations for male Partners.

### 4.     Chadbourne Failed to Award Merit Bonuses to Campbell

61.     During the relevant period, the all-male Management Committee made the exclusive determination as to whether a Partner would be awarded a merit bonus and in what amount.  Partners were not informed of the reasons for the Management Committee's decisions.

62.     Although Campbell was one of the Firm's top performers, she never received a discretionary merit bonus.  The Management Committee awarded other less productive men discretionary merit bonuses in the same years that Campbell was denied such bonuses.

### 5.     Chadbourne Refused to Implement its Existing Compensation Policies Fairly or Consistently Even as Campbell Provided Exemplary Performance

63.     During her tenure at Chadbourne, Campbell generated more than $5,000,000 in collections for the Firm.  Despite her exemplary performance, the Firm underpaid her relative to her male peers.

64.     During the lateral hiring process, Campbell provided Chadbourne with documentation confirming her ability to produce collections upwards of $2 million a year for Manatt.  Specifically, Campbell's collections at Manatt were above $2 million for 2013 and just over $3 million for 2012.  Campbell conservatively informed Chadbourne that she would bring in upwards of $1.5 million during her first transition year with the Firm.

65.     Unbeknownst to Campbell, her predicted collections would place her in the top ranks of the Firm's most productive business-generating Partners. The Firm disregarded Campbell's demonstrated ability to generate business that produced high collections and awarded her only 500 points. Upon information and belief, this point total relegated Campbell to the bottom 20 percent of Partners at Chadbourne. This decision resulted in her being compensated among the bottom third of Partners from 2014 to the present even though she has performed in the top quintile.

66.     For the 10-month period from March to December 2014, Campbell's total collections surpassed $2.8 million. Even though Campbell originated almost *twice* her predicted collections goal, Chadbourne only increased her points by 50 for a total 550 points in 2015. Her points still lagged behind comparable male Partners by a considerable margin.

67.     The disparity in points resulted in Campbell earning significantly less than similarly productive male Partners and even those she substantially outperformed.

68.     Furthermore, the Firm significantly undervalued Campbell's points in contravention of her offer letter. In 2014, the Management Committee valued Campbell's 500 points at approximately $▮▮▮▮▮▮▮, about ▮▮ of what she was promised in the November 26, 2013 offer letter and was told she could expect after she sought clarification on the terms of the offer.

69.     Even though she made more than $2.8 million in collections for the Firm in 2014, the Firm refused to pay Campbell the guaranteed bonus of $200,000 it promised in her offer letter for "collections over $2.5 million."

### 6. Campbell Raised Well-Founded Concerns Regarding Gender-Based Pay Disparities

70.     In her 2014 year-end memorandum, Campbell raised her concerns to the Management Committee about her assigned Partnership points and the resulting disparities in

19

compensation.  In both her memorandum and at an in-person January 2015 meeting with the Management Committee in New York, Campbell requested a substantial point increase and noted that most partners at the 500-point level did not possess the significant client relationships or collections history that she brought to the Firm.  Based on her review of the Partners' 2014 compensation (based on information published by the Management Committee), Campbell explained to the Management Committee that the average number of points for a Partner who generated comparable collections to her was about ▄▄▄ points – almost ▄▄▄ times the 500 points allotted to her.

71.     Campbell again raised these concerns in a meeting with Giaccia on February 13, 2015.  Campbell brought to his attention the fact that her 500-point level was not in line with the points and compensation of comparable male Partners.  She explained that her point level was disparately and unjustifiably low, and that it would remain so even at 550 points.  Expressing her desire to be a part of the solution to a significant problem, Campbell conservatively requested that her points for 2015 be increased to 850.  She also expressed her strong interest in participating on Firm committees and having a role in Firm leadership, particularly because it was apparent that female partners were under-represented in Firm leadership.

72.     Giaccia rejected Campbell's requests and dismissively represented that the Management Committee viewed her 2014 collections as nothing more than a "fluke."  Giaccia informed Campbell that she would have to "prove" her ability to generate revenue at Chadbourne for an indeterminate period before she would be allotted any more than the 50 points the Firm was required to give her for hitting her $2 million collections marker in 2014.  Giaccia chided Campbell, telling her "you're no ▄▄▄▄▄▄ a new lateral Partner recently sponsored by Giaccia after ▄▄▄▄ previous failed attempt to become a Partner.  In the second go-round, the Firm

guaranteed ███████ points for two years, along with significant additional guaranteed compensation based on collections markers. Giaccia explained that Campbell was no ███ because according to Giaccia, ████ would generate annual revenues at or above $█████

73.     While Campbell's total collections originated for the Firm exceeded $5 million, Campbell is informed and believes that ██████ total collections as a Partner were approximately $███████ – or about ████ of her contributions to the Firm's revenues. Nevertheless, under Chadbourne's male-dominated leadership and compensation system, ██████ easily made many ████████████████ dollars more than Campbell.

74.     The Firm's respective treatment of Campbell and █████ exemplifies Giaccia's and the Management Committee's entrenched gender bias.

75.     Giaccia and the Management Committee were empowered to significantly increase Campbell's points for 2015 to bring her into parity with similarly performing male Partners yet declined to do so.

**7.      Chadbourne Retaliated Against Campbell**

76.     The Firm actively retaliated against Campbell because she stood up to Chadbourne's and Lowell's discrimination and retaliatory conduct.

77.     Following her complaints of discrimination, Lowell affirmatively sabotaged Campbell's compensation and status with the Firm in a litigation matter she brought from Manatt. Over Campbell's objections based on a clear fee arrangement, Lowell wrongly wrote-off hundreds of thousands of dollars in collections due to Campbell as the originating and billing Partner in the matter. Lowell did this with Management's blessing, notwithstanding Lowell's explicit agreement at the initial stages of Chadbourne's work on the case that Campbell should be and, in fact, was designated the originating and billing attorney.

78.     To increase his own collections, Lowell later incorrectly argued, with Giaccia agreeing, that Campbell did not originate the case.  Lowell's write-offs were uniformly approved by the all-male Management Committee over Campbell's reasonable objections.  These overt actions prevented Campbell from hitting the $2 million bench mark that guaranteed her a $150,000 bonus in 2015.  The male leadership's manipulation of Campbell's collections was imperative to prevent her from receiving her guaranteed $150,000 bonus for 2015, because even in the face of the Firm's and Lowell's retaliation and huge write-offs, Campbell's total collections for 2015 still exceeded $1.9 million.  Moreover, had Campbell hit the $2 million collections mark in 2015 – as she should and would have absent the Firm's discriminatory and retaliatory acts – the Management Committee would have been required by the terms of the Firm's offer letter to grant Campbell an additional 50-point increase for 2016.

79.     Campbell also undertook a high-value litigation matter for which she repeatedly asked Lowell and Giaccia for adequate staffing.  Campbell notified Lowell and other Firm leaders that the Firm would likely lose the client and substantial work in the pending litigation if the staffing issue was not satisfactorily addressed.  Despite her efforts and warnings, Lowell and Giaccia disregarded Campbell's requests and concerns.  Instead, without any valid basis, Lowell and Giaccia questioned and criticized Campbell's evaluation of potential claims and defenses at issue, which, in fact, have been advanced in the litigation by three other law firms.

80.     In further retaliation for Campbell's complaints, the Firm refused the marketing support it had promised to Campbell and failed to acknowledge her successes in its marketing materials. As one example, the Firm's 2015-2016 "Litigation Highlights" brochure, touts the fact that Chadbourne received recognition as a "Best Law Firm" and "Best DC Office" for First Amendment Litigation.  What the Firm failed to acknowledge, however, is the fact that only one

attorney in the entire Firm has been recognized as a "Best Lawyer" for First Amendment litigation: Kerrie L. Campbell.  Additionally, in 2014, 2015, and 2016, the Firm's internal "In the Know" publication applauded male Partners' "Best Lawyers" recognition – but conspicuously omitted Campbell who each year had received such recognition.

81.     As another example, while Chadbourne touted Campbell's status as Chair of Manatt and Collier Shannon's Product Safety Practice groups, Giaccia refused to designate Campbell as the Chair or Head of the Firm's Consumer Product Safety & Risk Management practice group or Reputation Protection and Defamation practice group.  When Campbell repeated her request, Giaccia responded that he did not want a "proliferation" of practice group Chairs because it was embarrassing if they left the Firm.  Giaccia and the Management Committee had no problem, however, bestowing similar titles on similarly situated or less experienced male Partners.

82.     Increasingly, Campbell was isolated and ignored by her colleagues following her requests for fair and non-discriminatory treatment.  During Campbell's tenure at Chadbourne, litigation associates that were once in offices near Campbell's office were all relocated to the other side of the office where Lowell's office is located.  Litigation associates in the D.C. office were thus realigned in a row of offices on the opposite side of the building from Campbell, anchored on one end by Lowell and the other by Giaccia.  Moreover, as the Head of Litigation, Lowell not only tolerated, but facilitated, derogatory gossip with and among his cadre of male lieutenants, to demean, diminish, and disrespect the sole remaining female Partner in the Litigation Department in the D.C. office, Kerrie L. Campbell.

**8.     Chadbourne Punctuated Its Campaign of Retaliation by Secretly Terminating Campbell's Employment**

83.     Despite Campbell's demonstrable productivity at the Firm, on February 19, 2016,

Chadbourne wrongfully terminated her employment.

84.     On that date, Giaccia and Lowell came to Campbell's office to inform her that the Management Committee had determined her practice did not fit with Chadbourne and that she had to leave the Firm as soon as possible and could take "no more than six months" to find another Firm.  Giaccia told her that the Committee had reached this decision during its 2015 deliberations – at a time while Campbell was logging over 200 billable hours per month.

85.     Giaccia also informed Campbell that her pay would be decreased to about $9,000 a month and the Firm would no longer pay her tax distributions paid to Partners in the Firm. Despite Campbell's 29 years of experience and established record of success, the Management Committee punitively slashed her pay, without any benefits, while the Firm retained her capital account exceeding approximately $440,000 as of December 2015.

86.     During the termination meeting, Giaccia specifically instructed Campbell that she was not to take on new matters.  He instructed her to "bill" her time looking for a new job as "business development" and that was to be her "sole focus."

87.     Campbell's involuntary discharge was an act of retaliation against the only female Litigation Department Partner in the D.C. office.

88.     Shocked by her unexpected termination, Campbell sent Giaccia an email on February 23, 2016, in which she expressed her astonishment at the "extraordinary turn of events" and sought clarity about the details of "whatever remaining tenure [she had] with the Firm."

89.     In a February 25, 2016 email, Giaccia reiterated to Campbell that her tenure at the Firm had reached its end: "the goal," he wrote, "is for you to move your practice successfully to another Firm as soon as possible, and this will be our sole focus."    Campbell was to remain a "Partner" in name only to facilitate her "transition" out of the Firm "without incident."

90.     On March 29, 2016, Campbell traveled to New York City to meet with the all-male Management Committee and Chief Operating Officer Palestine to attempt to save her job.

91.     In the meeting with the Management Committee, Campbell emphasized her successes at Chadbourne, including her ongoing high collections during the first quarter of 2016 and recent positive publicity her practice had garnered for the Firm.  Within the first quarter of 2016, Campbell had already generated another $700,000 in total collections for the Firm – notwithstanding the hostile environment.

92.     The Management Committee disregarded Campbell's successes and the business she had generated, criticized her for not setting up interviews for positions at other firms and laughed out loud as she left the meeting.

93.     Three days later, on April 1, 2016, Campbell met with Giaccia and Management Committee Member Marc Alpert.   Again, they reiterated that the Management Committee's decision was "final."  Chadbourne then laid out two "options" for Campbell, one of which required her to depart before April 15 and the other which would require her departure by the end of August.

94.     Giaccia stressed once again that these "options" were designed to "incentivize" Campbell to leave the Firm as soon as possible.  Giaccia again scolded Campbell for working on behalf of her clients instead of devoting her time to seeking other employment.  Giaccia insisted that Campbell's quiet "transition" out of the Firm was integral to preserving her reputation in the legal marketplace.

95.     Upon information and belief, Giaccia, Lowell, and other members of the Management Committee actively concealed Campbell's "final" termination from other Partners and attorneys at the Firm until April 6, 2016.  On that date, in a memorandum distributed to Partners Firm-wide, the Management Committee disclosed its secret action to de-equitize and oust

Campbell from the Firm.  In the memorandum, the Management Committee specifically called out Campbell's de-equitized status by specially designating her as a "Partner in transition."  Clarifying the import of its "Partner in transition" designation, the Management Committee specifically noted that its list of "2016 total [shares and points by partner] excludes partners in transition" and excluded Campbell from tax distributions made to Firm Partners.  Notwithstanding the fact that the all-male Management Committee explicitly demoted, de-equitized, and excluded Campbell from the Partnership, the Committee nevertheless required Campbell to make all mandatory payments required of so-called "equity" Partners.

96.     The Management Committee terminated Campbell in violation of the procedures required to expel a Partner per the Firm's Partnership Agreement.  The Partnership Agreement states that a "major action," such as expulsion of a Partner, requires an affirmative vote of Partners (or their proxies) whose total profit percentage interests exceeds two-thirds of the total of the profit percentage interests of all Partners entitled to vote on the action.

97.     Again, in an April 13, 2016 email, Giaccia restated Chadbourne's position that Campbell was expected to depart the Firm no later than the end of August 2016.

98.     Between February 19, 2016 and April 13, 2016, Chadbourne informed Campbell that she had to leave the Firm by the end of August 2016 on no fewer than five occasions.

99.     In response to the Firm's discriminatory termination of her employment, Campbell was forced to look for a position at another firm.  Campbell's diligent efforts to secure comparable employment have been thwarted by the Firm's conduct including its disparate and substantial under-compensation of Campbell compared to her productivity, total collections, and client base. Furthermore, prospective firms and recruiters have been reluctant to work with a partner in a dispute with her current law firm.  The Firm's conduct not only caused Campbell significant

financial hardship and irreparably damaged her client relationships and book of business but also threatens to completely undermine her 29-year legal career.

> **9.      Chadbourne, Giaccia, and Lowell Continued to Retaliate Against Campbell After Complaint is Filed**

100.    After the Complaint was filed in August 2016, Chadbourne, Giaccia, and Lowell continued to engage in recalcitrant discriminatory, retaliatory, and demeaning conduct against Campbell, including by failing to timely or adequately respond to multiple communications from Campbell seeking Giaccia's and Firm management's direction regarding staffing for client matters and billing protocol as a so-called "Partner in Transition" out of the Firm – a circumstance of management's own making.

101.    Additionally, Firm management, Giaccia, and Lowell refused to engage in any direct oral communication with Campbell for an extended period after April 1, 2016, when Giaccia and Alpert informed Campbell that the Management Committee's decision to terminate her tenure with the Firm was "final."  On information and belief, Firm management admonished attorneys not to talk to, and to stay away from, Campbell.

102.    Chadbourne's punishing "boys' club" culture was perpetuated and facilitated by Firm management and Lowell.  Since the Complaint was filed, actions were taken to harass Campbell and thwart her First Amendment rights to express legitimate concerns about gender disparities at the Firm.

103.    After Campbell filed her suit against Chadbourne, she arrived at her office one morning to discover that after she had left the previous evening, someone had anonymously torn down a 5" by 7" postcard Campbell had placed next to her nameplate beside the door to her office. The postcard contained the eloquent words of the legendary social justice leader Nelson Mandela: "*It will forever remain an accusation and a challenge to all men and women of conscience that it*

*took as long as it has before all of us stood up to say: 'enough is enough.'"* Upon information and belief, Lowell removed the postcard, without Campbell's knowledge or consent, and then he taped an 8 ½" by 11" piece of paper with a large smiley face graphic onto Campbell's office wall in an attempt to make a mockery of Mandela's words. The message Lowell and Chadbourne conveyed to women at the Firm was clear – at this law firm, men run the show. Women at Chadbourne who refuse to smile in the face of gender inequality will suffer the same fate as Campbell.

104.    Video footage from the evening of September 16, 2016 then shows that Lowell personally taped onto Campbell's office wall an 8 ½" by 11" piece of paper with a cartoon figure of a fat man in a bowler hat alongside the smiley face that had previously been taped to Campbell's office wall. Lowell taped the cartoon below a 5" by 7" postcard with the Mandela quote that Campbell had replaced next to her nameplate.

105.    Subsequent video footage shows Lowell then returned to Campbell's office and removed both the cartoon image of the fat man and the smiley face graphic.

106.    Video from the same evening shows Lowell ultimately tore down the replacement postcard with the Mandela quote as well. Lowell returned to Campbell's office for a third time, the video shows, apparently to remove tape he had left behind on Campbell's office wall.

### B.    JAROSLAWA Z. JOHNSON'S FACTUAL ALLEGATIONS

#### 1.    Background

107.    Johnson is a graduate of Goucher College and of the University of Wisconsin-Madison Law School. She served as the first female editor-in-chief of the *Wisconsin Law Review*.

108.    After law school, Johnson served as a law clerk to Chief Judge Thomas E. Fairchild of the U.S. Court of Appeals for the Seventh Circuit.

109.    Johnson has practiced law for more than 35 years.  Throughout Johnson's impressive career, including partnership in four major law firms, she represented and advised many Fortune 500 companies, such as Philip Morris, McDonald's, and AT&T, doing business in Europe, Asia, and North America.  Johnson is recognized for her expertise in counseling clients on expansions and operations in emerging markets such as the Ukraine and other locations in Eastern Europe.

110.    Prior to joining Chadbourne, Johnson was a partner at Hinshaw & Culbertson and partner and director of the Kiev office of Altheimer & Gray.  Chadbourne attempted to recruit Johnson while she was at Altheimer but she was not looking to change firms at that time.  A few years later, as Altheimer was closing down its operations, Johnson reached out to a contact at Chadbourne, Laura Brank, then Head of the Moscow office, to determine whether a position might still be available.

111.    In August 2003, Chadbourne extended an offer to Johnson to join the Firm as a "guarantee" Partner.  Johnson was not granted equity Partner status, and, therefore, was not provided with Partnership shares in the Firm.  Instead, she was to receive a guaranteed compensation of $325,000 in 2004 and 2005 with an annual bonus of $25,000 if revenues at the Kiev office were at least $1.75 million and $50,000 if revenues were $2.5 million.  Johnson was also entitled to an additional $25,000 bonus annually for 2004 and 2005 if the Firm performed at 135% of par.

112.    After two years of the Kiev office performing at exemplary levels, Johnson was granted an offer to join the Partnership in 2006.

113.    In the ten years she served as Managing Partner of the Firm's Kiev office, Johnson represented more than 16 high-profile domestic and international companies that make up a

significant portion of the global economic market.  Johnson's commanding ability and expertise garnered positive attention in the international legal community.  *Chambers Global* characterized her as a "US-educated '*powerhouse*'" who is seen as "an important and well-connected figure in the market."  In 2013, *IFLR 1000* described Johnson in her capacity as Managing Partner of Chadbourne's Ukraine office, writing that "lawyers have a great deal of respect for Johnson and emphasize her importance to the US Firm's Kiev office."

114.    As head of the Kiev office, Johnson managed a staff of 15-20 attorneys (and 10 support staff) who regularly provided indispensable support for Chadbourne's Moscow, London, New York, and Washington offices.  Johnson collected over $24 million dollars in revenue for the Firm including collecting over $5 million in a single year (2008).

115.    Johnson's success and prominence earned her an appointment by President Clinton to the Western NIS Enterprise Fund in 1994.  She now serves as President and Chief Executive Officer of the Fund.

## 2.    The Management Committee Wielded Complete Control Over Johnson's Practice

116.    The Management Committee, composed only of men during Johnson's entire tenure, controlled significant aspects of the Firm's operations including Johnson's practice and management of the Kiev office during the relevant time period.

117.    The Management Committee determined staffing for Johnson's matters and for the Kiev office in general.  She was often overruled on decisions related to budgets for her matters and the Management Committee had complete control over the budget for the Kiev office.

118.    Despite the success of the Kiev office, the Management Committee determined, without Johnson's input, to close the Kiev office and, in April 2014, informed Johnson of its intent to do so.

3.     **Chadbourne Assigned Johnson Less Base Pay than Similarly or Less Productive Male Partners**

119.     In 2006, when Chadbourne hired Johnson as an equity Partner, it awarded her 450 points.  Upon information and belief, Johnson was never awarded more than 675 points during her tenure at Chadbourne even as she collected more than $24 million in revenues as a billing Partner. The Management Committee decreased Johnson's points several times despite her strong performance.

120.     In 2013, her last year as a Partner at Chadbourne, the Management Committee granted her 450 points—the same amount she was awarded seven years earlier as a first-time Partner and a decrease from the 525 points it awarded her in 2012.  Johnson received a demotion in points after collecting $1.465 million in 2012.  Upon information and belief, Johnson received fewer points, and therefore less in base compensation, than males with lower collections and fewer achievements at the Firm.

121.     Like Campbell, Johnson asked the Management Committee for a point increase *every year* she was a Partner and provided data to justify her request.  For example, in 2012, she noted that she ranked ninth in revenue production but was 67th in points.  None of the partners with higher revenues than Johnson had managerial duties and none of the other partners with the same number of points as Johnson had managerial duties.

122.     The Management Committee ignored Johnson's justified requests for pay increases.

4.     **Chadbourne Awarded Low Merit Bonuses to Johnson or None at All**

123.     During Johnson's entire tenure, the all-male Management Committee made the exclusive determination as to whether a Partner was awarded a merit bonus and in what amount.

124.     Johnson was repeatedly one of the Firm's top performers but received lower

bonuses than her male counterparts or was denied bonuses altogether.  The Management Committee did not award Johnson a merit bonus in 2013 despite her bringing in more than $1.4 million in 2012.  Notably, in 2013, Chadbourne refused to grant Johnson a bonus when she completed the type of managerial and business activities other male attorneys were rewarded for performing.  For example, in 2013, male Partners received bonuses for reasons such as "increased responsibility," "for extensive work" on particular matters, and "office management."

### 5. Chadbourne Retaliated Against Johnson for Questioning Discriminatory Compensation Practices

125.     Johnson questioned her comparatively low pay year after year in the annual reviews she was required to provide to the Management Committee.  Each year, Johnson would point out her collections and responsibilities in comparison to lower performing male Partners.

126.     In 2012, Johnson once again questioned her pay in her annual review.  In 2013, Chadbourne retaliated against Johnson by reducing her points from 525 to 450 even though she brought in over $1.4 million in 2012.  Upon information and belief, Johnson's points were decreased as other male Partners with lower collections, and few, if any, managerial responsibilities saw their points increase or maintained at the same level.

127.     There was no justifiable reason for the reduction in Johnson's points.  Chadbourne reduced Johnson's points as punishment for her repeated questioning of the Firm's discriminatory compensation practices.

128.     In April 2014, Giaccia called Johnson to tell her that the Firm planned to close the Kiev office.  Johnson was not consulted prior to this decision.  Upon information and belief, the Management Committee made the decision to close the Kiev office without informing the Partnership.

129.     Johnson transitioned from Partner to Senior Counsel at the beginning of 2014.  In

the transition, Johnson lost her equity shares and was instead paid $250,000 to shut down the Kiev

office.

### C.     MARY YELENICK'S FACTUAL ALLEGATIONS

### 1.     Background

130.     Yelenick is a *magna cum laude*, Phi Beta Kappa graduate of Colorado College and

a *cum laude* graduate of Georgetown University Law Center.  After law school, Yelenick served

as a clerk to Judge John F. Doyle of the Superior Court for the District of Columbia.

131.     Yelenick joined Chadbourne in June 1981 as an associate in the Litigation Practice

group in the Firm's New York office.   She was subsequently made Counsel and was promoted to

Partner in 1996.

132.     Yelenick spent more than 35 years at Chadbourne.  At Chadbourne, Yelenick

represented and advised numerous companies in high-profile products liability litigation and trials

— including some of the largest and most complex matters ever undertaken by the Products

Liability group.  Her clients included Purdue Pharma, the American Tobacco Company, Jim Beam,

Miele, LG, Clarins, and other major companies.   Yelenick later chaired the Products Liability

group for several years.

133.     Yelenick has been nationally and internationally recognized, year after year, by

*Chambers*, *Legal 500*, Manhattan Super Lawyers, LMG Life Sciences, Euromoney, The

International Who's Who of Products Liability Defence Lawyers (London), and other legal trade

publications for her work in the products liability arena. *Chambers USA* has recognized her as a

"National - Leading Individual" and as described her as having 'vast experience" and "lead[ing]

nationally on tobacco, alcohol, and pharmaceutical cases." *Legal 500* has recognized Yelenick as

being "very responsive," and noted that her clients had reported that her work was of "very high quality." Yelenick has been interviewed and quoted by legal publications on numerous occasions regarding her high-profile litigation successes. She has published dozens of legal articles and is the principal author of the chapter on products liability in a respected treatise. Yelenick has chaired or spoken at several national legal conferences, and has moderated international legal panels on products liability issues in countries outside the United States.

134.    During Yelenick's more than 35-year tenure at the Firm, she observed Chadbourne retain and promote women at a far lower rate than men. For much of her tenure as a Chadbourne partner, Yelenick was the sole female Partner in the Litigation Department in the Firm's New York office, despite the Litigation Department being one of the largest departments in the Firm.

135.    Yelenick collected many tens of millions of dollars for the Firm on the matters on which she originated or worked on during her tenure. In addition to her ability to generate revenues from existing clients, Yelenick was one of the few partners in the Products Liability group who ever brought new clients to the Firm. Yelenick was responsible for originating matters for clients such as LG, Gazprom Neft, Clarins, and others, and she introduced the Firm to opportunities with the African Development Bank.

136.    For nearly two decades, Yelenick repeatedly, both through written memoranda to the Management Committee and by making oral statements to the Management Committee at partnership meetings, raised the issue of pay disparities and other gender discrimination at Chadbourne. Her written and oral protests and observations were uniformly met by the Management Committee with silence and inaction. She was frustrated to find, as Campbell and Johnson later encountered, that gender-based pay and promotion discrepancies were ingrained into the culture of Chadbourne, and that no one in a position of power was interested in disrupting the

34

status quo. Yelenick circulated numerous articles and wrote memos to the Management Committee containing data analysis highlighting gender-based disparities; attempted to initiate work groups and discussions regarding gender disparities at the Firm; and spoke up about these issues at partnership meetings. Nothing improved.

137.    Yelenick retired from her Partner position on December 31, 2016, and was made "Of Counsel" to Chadbourne, a designation offered to Chadbourne partners in good standing upon their retirement. Since the completion of Chadbourne's merger with Norton Rose, Yelenick has been "Of Counsel" to Norton Rose.

## 2.    The Management Committee Yielded Complete Control Over Yelenick's Practice

138.    Chadbourne's Management Committee, composed only of men for almost all of Yelenick's more than 35-year tenure at the Firm, controlled significant aspects of Yelenick's practice.

139.    The Management Committee determined the billing rates for Yelenick's matters, and on specific occasions, overrode her objections to rates, litigation budgeting for her clients, or other aspects of the representation of her clients.

140.    Over the years, the Management Committee regularly withheld information regarding Firm finances, including expenditures related to opening and maintaining expensive and unprofitable foreign offices, from Yelenick and other Partners. Yelenick requested, but was often refused, information regarding the profitability of these offices as well as the utilization and realization rates and compensation of Partners working in these offices. The Management Committee also refused to discuss information regarding potential mergers with Yelenick and other Partners.

141.    The Management Committee provided no effective internal recourse for Partners, such as Yelenick, if they disagreed with the Firm policies developed by the Management Committee or disagreed with other Management Committee actions.  For example, Yelenick repeatedly witnessed female senior associates passed over for promotion to Partner in favor of less qualified and less experienced male associates.  For instance, several years ago, three senior male associates were promoted to Partner in the ▓▓▓▓▓ department (which had never had a female member) in a single year, while the sole senior woman associate was not made a candidate for Partnership.  It was only after two of those new male Partners had left the firm that the female associate was nominated, and promoted, to Partner.  Yelenick repeatedly voiced her concern that numerous female associates and Partners were leaving the Firm because they were deeply dissatisfied with what they viewed as a lack of promotional opportunities and fair compensation for women.  The Management Committee did not heed these concerns.

142.    Throughout her time at the Firm, Yelenick consistently raised gender equity issues – surrounding compensation, promotions, training and advancement opportunities for women, and similar concerns – with the partnership and management of the Firm.  However, the Management Committee did not heed her complaints.

### 3.    Chadbourne's Origination Credit System Perpetuated Discrimination Against Female Partners such as Yelenick

143.    Chadbourne employed the same system for assigning origination credit regarding longstanding Firm clients during Yelenick's entire career at the Firm.  Specifically, the Management Committee allowed departing Partners to hand-select other Partners to receive credit for their client matters as "billing partner" for purposes of the Firm's internal performance metrics and compensation determinations.  In most, if not all, such transfers of longstanding Firm clients, both the transferring Partner and receiving Partner were male.

144.     During Yelenick's tenure at Chadbourne, she was one of the few partners in the Products Liability group who ever brought new clients to the Firm. Most partners in the group depended on inherited client matters to generate revenue.  Despite Yelenick's proven ability to originate new clients even well into the latter years of her career, the Firm refused to adequately compensate Yelenick for her business origination efforts.  The Firm instead rewarded male Partners who inherited business matters with increased compensation even while they failed to originate any new matters.

145.     Yelenick herself was passed over for origination credits.  She worked on several inherited cases for years only to see her male colleagues awarded "origination" credit for these matters upon the departure of the male Partners in charge of the cases.  Upon information and belief, being bypassed for origination credit in favor of hand-tapped male successors was a common experience among female Partners.

146.     For example, when Management Committee member and Partner Marc Alpert prepared to leave the Firm in June 2016, he selected two male Partners to receive origination credit for major Firm clients – including a longstanding institutional client of the Firm, which Mr. Alpert had himself inherited from a series of male Partners years earlier.  Mr. Alpert tapped these two male Partners to receive "origination" credit even though there were also female Partners who had also handled significant work for those clients.  In fact, Mr. Alpert designated one of the male Partners as his origination-credit successor for all litigation matters for the longstanding Firm client, even though that Partner was not a litigator and had only been at the Firm for a short time.

147.     As a result of this favorable treatment, the two "successor" Partners' collections numbers and compensation dramatically increased.  These men did nothing to merit this result.

4.  **Chadbourne Assigned Yelenick Less Base Pay than Similarly or Less Productive Male Partners**

148.  During Yelenick's tenure as a Partner, she frequently ranked in the lower tiers of Partners in terms of points despite decades of exemplary service in which she brought in significant new blue-chip clients and generated many tens of millions of dollars in revenue.  In the last three years of her career, she was never awarded more than 525 points – essentially no greater than compensation she had received decades earlier as a junior Partner – even though during the intervening decades she had brought in new clients, significant new business, and generated millions of dollars in revenue. The Management Committee even decreased her points several times despite her strong performance.  Yelenick's point allocations were disproportionately low compared to those of men demonstrating equivalent or lesser performance.

149.  For example, in 2014, the Firm granted ▮▮▮▮▮ a similarly-productive male Partner, ▮▮ points.  Despite Yelenick having higher collections both as billing Partner and responsible Partner in 2013, ▮▮ received ▮ more points than she did.  In 2015, Yelenick again outpaced ▮▮ in both categories, yet the Firm granted ▮▮ ▮▮ points while granting her only ▮▮ points.  In 2016, ▮▮ again received more points than Yelenick did, ▮ shares (under the new system) compared to her ▮ shares, even though she continued to generate and collect more in revenues than he did.

150.  Yelenick submitted required year-end memoranda to the Management Committee each year she was a Partner. She asked the Management Committee for a point increase during each of the last six years when she was a Partner at the Firm (2010-2016) and provided data to justify her requests.  Despite her well-founded requests for a compensation increase, the Management Committee refused to adequately increase Yelenick's compensation.

151.  In January 2015, after Yelenick raised concerns in her year-end memorandum about

38

the blatant disparities in her pay as compared to similarly or lesser-performing male Partners at Chadbourne, the Management Committee decreased her points from 525 to 475.   Yelenick received a demotion in points even after collecting $1.25 million as responsible Partner for the Firm in 2014.   And she was paid roughly the same amount in 2016, despite having collected approximately $1.6 million as billing partner that year and obtaining a significant new client for the Firm the year before.  There was no justifiable reason for the reduction in Yelenick's points.

152.   Upon information and belief, similar compensation disparities affected other female Partners at the Firm.  These women were grossly underpaid as compared to men who had similar or even less experience. Yelenick repeatedly brought these issues to the attention of the Management Committee, to no avail.

### 5.   Chadbourne Pressured Female Partners to Disavow this Lawsuit and Retaliates Against Yelenick

153.   On or about September 6, 2016, Yelenick was approached, in person, in the New York office by Joy Langford, Managing Partner of Chadbourne's Washington, D.C. office. Langford requested that Yelenick review and sign a draft letter disavowing this lawsuit.

154.   Yelenick reviewed the draft letter and disagreed strongly with its content.  She informed Langford that the letter contained inaccuracies and mischaracterized the process by which female Partners at the Firm could join any potential class-action or collective action certified by the Court.  She informed Langford that she would not sign the proposed letter.

155.   On or about September 7, 2016, Yelenick received a message from Defendant Abbe Lowell requesting that she call him. When she called him back, Lowell indicated that he was aware of her concerns with the proposed letter and her decision not to sign the letter. Yelenick was taken aback that Lowell knew about the letter and had been apprised of Yelenick's refusal to sign.

156.   Shortly thereafter, Yelenick was notified that all female Partners were being asked

to attend a meeting in person in the New York office to discuss the lawsuit.  She volunteered to participate by telephone but was told that the meeting would be held in person and that she need not participate by phone.  Upon information and belief, the women Partners in attendance were repeatedly directed to sign the letter.  Some of the women who signed the letter subsequently expressed to Yelenick that they hesitated, but felt great pressure to sign the letter.

157.    Yelenick did not sign the letter because she disagreed strongly with its content. Yelenick had experienced the same type of gender discrimination that was alleged in this lawsuit and knew of other female Partners with similar experiences.

158.    The Firm retaliated against Yelenick after she joined the collective action on February 27, 2017.  In response to her joining the suit, Chadbourne issued a statement to the press stating, *inter alia*, that that Yelenick's record and accomplishments were exaggerated and that her claims were "erroneous, self-serving, and baseless." This characterization starkly contrasted with the Firm's strong praise of Yelenick's career and performance in a memorandum issued by Defendant Giaccia upon Yelenick's retirement from her partner position in December 2016.

## V.    NORTON ROSE IS LIABLE FOR CHADBOURNE'S UNLAWFUL ACTS, INCLUDING ITS DISCRIMINATORY ACTS AND OMISSIONS

159.    On or about June 30, 2017, Chadbourne combined with law firm Norton Rose.  The merged successor firm is known as Norton Rose Fulbright.

160.    Norton Rose has had ample notice of Plaintiffs' claims against Chadbourne. Norton Rose and Chadbourne announced their intent to merge on February 21, 2017, five months after the initial complaint in this action was filed.  This litigation has been widely covered by national media outlets, including *The New York Times*, the *ABA Journal*, and *Law360*, and since the intended merger was announced, various articles about this litigation have expressly mentioned Norton Rose.  Further, on February 25, 2017, Plaintiffs' counsel informed Chadbourne's counsel

of Plaintiffs' intent to file an amended complaint against Norton Rose.

161.    Upon information and belief, Norton Rose aided and abetted Chadbourne's discriminatory, retaliatory, and otherwise unlawful conduct by communicating to Chadbourne to that it should formally expel Campbell from the Firm prior to the completion of the merger with Norton Rose.   In fact, the transaction was not announced as finalized until after Chadbourne publicly announced that the Firm would, and in fact did, expel Campbell from the Firm.

162.    There is continuity between the operations and workforces of the predecessor Chadbourne and successor Norton Rose, notwithstanding a change in corporate structure.   In fact, Norton Rose is operating substantially the same business as Chadbourne.   Like Chadbourne, Norton Rose is a global law firm, and many of Chadbourne's legal practice areas migrated wholesale or were otherwise subsumed by Norton Rose.   Upon information and belief, Norton Rose retained at least 150 attorneys from Chadbourne, including dozens of Partners.   Norton Rose has taken over many of Chadbourne's former offices, including its New York City, Washington, D.C., Istanbul, and São Paulo offices.   Further, numerous members of Chadbourne's management hold leadership positions at Norton Rose, including former Chadbourne Managing Partner Andrew Giaccia (now the Vice Chair of Norton Rose's U.S. Management Committee), former Chadbourne Management Committee members Howard Seife and Ayse Yuksel (now members of Norton Rose's Global Executive Committee), and former Chadbourne Litigation Department Head Abbe Lowell (who now co-chairs Norton Rose's U.S. Regulations, Investigations, Securities, and Compliance group).

163.    Chadbourne, which reportedly had revenues of $232.5 million in 2016, could have provided relief to Plaintiffs before its merger with Norton Rose.   Upon information and belief, however, Chadbourne's assets and liabilities have been assumed by Norton Rose through the

merger and therefore Chadbourne is no longer able to provide relief to Plaintiffs.   Upon information and belief, Chadbourne's successor, Norton Rose, which reportedly had revenues of $1.685 billion in 2016, has the capability to provide relief to Plaintiffs including for conduct they experienced prior to the merger.

## VI.   ALLEGATIONS OF SYSTEMIC GENDER DISCRIMINATION AGAINST FEMALE PARTNERS

164.   Plaintiffs incorporate all allegations from this Complaint alleging class-based discrimination against female Partners.

### 1.   The Firm's Historically Male Management Committee Controlled Decision-Making at Chadbourne.

165.   The Management Committee exercised complete control over the Firm's finances, operations, management, personnel, and administration.   The Management Committee made important decisions affecting the Firm without prior notice to, full disclosure to, substantive input from, or votes of the full Firm Partnership.

166.   Chadbourne's Management Committee was exclusively male for the Firm's entire history until the Firm's last year of operations.   The Firm's Managing Partner was always male.

167.   Voting for the Management Committee is a point-weighted process.   Thus, the votes of Partners who received more points had a greater say in who was elected to the Management Committee.   Men, who were historically awarded more points than women at the Firm, thus had greater effective voting power – both by reason of their greater numbers in the partnership and by virtue of their greater earnings.   In this way, it was possible for those wielding the most points at Chadbourne (*i.e.*, men) to effectively determine the composition of the Management Committee – and thus perpetuate gender-based points disparities, in their own favor.

168.   Partners who were not on the Management Committee were effectively shut out of

meaningful participation in the Firm's governance.  Partners who were not on the Management Committee were generally powerless to meaningfully influence the Management Committee.  Further, Partners who were not on the Management Committee did not have substantive input into the powers and duties of the Management Committee.

169.    The Firm, through its Management Committee, set comprehensive rules and regulations regarding Partners' work.  Partners had to comply with a wide array of directives from the Firm, including directives from the Management Committee concerning case intake, fee arrangements, management procedures, time entry, billing actions, and performance reviews.

170.    The Management Committee developed and implemented Firm policies without prior notice to, substantive input from, or votes of the full Firm Partnership.  Partners were rarely, if ever, given the opportunity to review, discuss, challenge, object to, or vote on Firm policies before they were enacted by the Management Committee.  Partners had no effective internal recourse if they disagreed with the Firm policies developed by the Management Committee.  Partners who disagreed with or opposed policies developed by the Management Committee concerning Partners or the Firm as a whole were nonetheless bound by those policies.

171.    Chadbourne did not have a Partner compensation committee, an executive committee, or any comparable committees that served as a check on the Management Committee's control over Firm finances, operations, management, personnel, and administration.

172.    The male-dominated Management Committee's complete control over the Firm facilitated a male-dominated culture that resulted in female Partners being discriminated against at the Firm.

2.     **Chadbourne Used Common, Centralized Compensation Policies and Procedures, Which Vested Exclusive Decision-Making Authority in the Management Committee**

173.    The Management Committee unilaterally set and exclusively controlled Partner compensation, including the assignment of draws, the assignment of bonuses, the assignment of "points" or "shares," the valuation of "points" or "shares," and the allocation of any profits or losses.  The Management Committee wielded unchecked authority to change from year to year any Partner's draw, bonus, "points" or "shares," and/or share of profits or losses.

174.    At Chadbourne, base compensation for Partners was largely determined by the number of Partnership "points" or "shares" awarded to each Partner by the Management Committee.  In setting partner pay, the Management Committee stressed and purported to consider a Partner's revenue generation (otherwise known as "collections") especially prominently. However, the Management Committee downplayed or disregarded objective factors in order to award female Partners fewer points than similarly situated male Partners.

175.    Upon information and belief, these points were multiplied by a percentage, unilaterally set by the Management Committee on a yearly basis, to determine t

176.    Upon information and belief, these points were multiplied by a percentage, unilaterally set by the Management Committee on a yearly basis, to determine the monthly compensation a Partner received. At the end of the calendar year, the Management Committee provided Partners with an additional payment, again unilaterally set by the Management Committee on a yearly basis, to bring them up to a final set percentage of the value of their points. Additionally, the Management Committee unilaterally decided to award certain Partners an additional percentage of their point value. Finally, in certain years, the Management Committee choose the Partners it determined would be awarded a separate lump sum "merit" bonus.

177.    The Committee's decisions about a Partner's "points" or "shares" directly affected his or her compensation; the more points or shares a Partner was assigned, the more compensation that Partner received.

178.    As part of its annual determination of Partner compensation, the Management Committee required all Partners, regardless of office or practice group, to complete self-evaluations detailing their work at and contributions to the Firm.  In particular, the Management Committee asked Partners to discuss their past efforts to "enhance revenues."  Furthermore, the Management Committee stressed that "revenue enhancement must continue to be [the Firm's] highest priority" and requested that Partners discuss their individual plans for revenue enhancement for the upcoming year.  The Management Committee warned Partners that failure to timely complete their annual evaluations would have adverse consequences.

179.    The Management Committee did not provide Partners with insight or input into how it determined Partner compensation – including its decisions in any particular instance.  The Management Committee did not provide Partners with substantive information as to the basis for its allocation of points or valuation of points.  While the Management Committee requires Partners to complete detailed year-end memoranda reviewing their work and the work of other Partners, Partners generally received no feedback on their year-end reviews, and Partners were provided with neither the memoranda that other Partners submitted nor other feedback purportedly considered by the Management Committee. Further, upon information and belief, the Management Committee did not fully disclose to all Partners the final amounts earned by each Partner.

180.    Point allocation was supposed to be tied to a Partner's anticipated revenues for the Firm, but, upon information and belief, the Management Committee routinely overvalued the anticipated revenue of male Partners, resulting in disproportionately fewer points for female

Partners even when they outperformed their male peers.  Even if a Partner's collection level increased, a Partner who was assigned a low number of points generally did not have an opportunity to have her points adjusted correspondingly: the Management Committee rarely increased point totals significantly each year.

181.    Point allocation also reflected origination credit for client matters.  As set forth below, Chadbourne's system for assigning origination credits resulted in further pay discrimination against female Partners relative to their male peers.

182.    Partners lacked any meaningful opportunity to influence or challenge the Management Committee's compensation decisions.

183.    The Management Committee set aside a portion of the Firm's revenues each year to award bonuses to certain Partners.  Partners had no say in the total amount set aside for bonuses or the process to determine who received a bonus or the amount of the allocated bonuses.  The Management Committee further exercised unfettered discretion over which Partners to give bonuses to and in what amounts.

184.    As set forth below, the Management Committee exercised its discretion in discriminatory fashion, resulting in female Partners being underpaid relative to their male peers.

### 3.    Chadbourne Systematically Underpaid Female Partners

185.    By assigning women low numbers of points, the Firm denied its female Partners, such as Plaintiffs, compensation to which they were otherwise entitled.

186.    Chadbourne's Management Committee demonstrated that it had no objective, equitably-administered criteria for awarding points to Partners.

187.    Chadbourne's "system" for awarding points to its Partners lacked sufficient standards, quality controls, implementation metrics, transparency, and oversight.  On information

and belief, Chadbourne never conducted a pay equity analysis to determine whether or to what extent female Partners were underpaid relative to their male peers.

188.    Accordingly, Chadbourne's Management Committee exploited the Firm's compensation system to offer higher compensation to male Partners who were often less productive than their female counterparts.  The Management Committee awarded underperforming male Partners more points than female Partners like Plaintiffs with higher collections rates, more significant and lucrative client relationships, managerial responsibilities, and a better record of business development.

189.    To justify its discriminatory decisions, Chadbourne often made pretextual excuses such as claiming female lateral Partners needed to be at the Firm longer before their collections potential could be assessed adequately (despite having no similar tenure requirements for lateral male Partners) or contending that male Partners made other contributions to the Firm unrelated to their collections totals.

190.    Chadbourne's system for awarding merit bonus pay to Partners lacked sufficient standards, quality controls, implementation metrics, transparency, and oversight.

191.    Moreover, the Firm disproportionally allocated resources to male Partners at the expense of female Partners.  As a result of male Partners' monopoly of staff and associates, female Partners were often forced to delegate work to outside counsel or to forgo profitable matters due to a lack of staffing.

192.    The Firm also underpaid female Partners by depriving them of credit for their work on matters that are shared with other male Partners.  By assigning various designations, such as "Billing Partner" and "Responsible Partner" to male Partners, the Firm systematically denied female Partners revenues that they were rightfully owed.

193.    The distribution of Partner compensation at Chadbourne was heavily skewed in favor of men.  Upon information and belief, female Partners were generally in the bottom half of Partners in terms of compensation even though they often outperformed their male counterparts.

### 4.    Chadbourne Utilized an Origination Credit System that Systematically Favored Men

194.    Upon information and belief, Chadbourne employed a discriminatory system for assigning origination credit regarding longstanding Firm clients for at least its last 35 years of operations.  Specifically, the Management Committee allowed departing Partners to choose other Partners to receive credit for their client matters as "billing partner" for purposes of the Firm's internal performance metrics and compensation determinations.  Upon information and belief, in most, if not all, such transfers of longstanding Firm clients, both the transferring Partner and receiving Partner were male.

195.    Partners designated as "billing partner" on a matter received origination credit for any revenues generated from the matter.  Those Partners selected to be the billing partner for large institutional clients were essentially guaranteed credit for millions of dollars in collections, *even if they billed little to no time on the matter.*  The Management Committee rewarded these Partners handsomely for their billing partner "collections" and for any new work streams developed for the client even though the Committee understood that the Partner may not have played any role in originating the matter or completed any significant work on the matter.

196.    In this way, the Management Committee routinely overcompensated male Partners by treating those who were designated as "billing partners" for institutional clients as though they had originated the business themselves.

197.    Furthermore, the Management Committee consistently undervalued the efforts of female Partners who did in fact originate new clients for the Firm.  Upon information and belief,

the Firm's origination inheritance system routinely and systematically disfavored women by allowing men to pass on "billing partner" status over existing matters to their favored male successors in perpetuity.

198.    Chadbourne is liable for adopting an origination credit inheritance system with a disparate effect on female Partners.

### 4.    Chadbourne Retaliated Against Female Partners Who Questioned the Firm's Discriminatory Practices

199.    Chadbourne dismissed, demeaned, harassed, and retaliated against female attorneys who dared to question or raise concerns about the Firm's discriminatory compensation practices.

200.    As discussed above, the Management Committee exercised complete control over compensation decisions for Partners.  This meant any female Partner with concerns about her compensation during the relevant period was forced to confront the all-male Committee at its seat in New York. Partners were provided scant information about the secret process used to determine compensation, further frustrating their ability to advocate for themselves.  Chadbourne's male leadership ignored, bullied, and/or retaliated against female attorneys who questioned the Firm's gender discrimination practices, thereby sending a message to women that complaining about gender discrimination would negatively impact their career at the Firm and professional reputation in the legal marketplace.

201.    The Firm purported to have a system in place to receive and investigate complaints of discrimination, but the process was woefully inadequate because the ultimate arbiters of such complaints were the wrongdoers themselves – the Management Committee.

202.    As a result, female Partners were left with the untenable options of (a) not challenging deeply ingrained and systematic gender discrimination or (b) risking their careers and compensation by challenging the practices and decisions of the Management Committee.

### 5.    Chadbourne's Anti-Discrimination and Anti-Retaliation Obligations

203.    Chadbourne and its Management Committee had legal, ethical, contractual, and fiduciary duties not to discriminate or retaliate against the Firm's partners.  Chadbourne partners had a right to a work environment free of discrimination and retaliation.

204.    At all times relevant, Chadbourne was subject to the New York Rules of Professional Conduct and the D.C. Rules of Professional Conduct, in addition to disciplinary rules in the other jurisdictions where Chadbourne maintained offices or otherwise represented clients.

205.    Refraining from gender discrimination and retaliation in the practice of law and in the terms of employment are fundamental ethical duties for lawyers.  The New York Rules of Professional Conduct prohibit discrimination in the practice of law on the basis of sex.  The D.C. Rules of Professional Conduct prohibit discrimination in conditions of employment on the basis of sex.  All Chadbourne partners were entitled to protection from gender discrimination by the Firm and its Management Committee under the New York Rules of Professional Conduct. Additionally, Chadbourne partners who worked in Washington, D.C. were entitled to protection from gender discrimination by the Firm and its Management Committee under the D.C. Rules of Professional Conduct.

206.    Further, Chadbourne partners were entitled to the protections set forth in Chadbourne's Discrimination, Harassment & Retaliation Policy.  In that policy, Chadbourne promised, "The Firm will not tolerate discrimination or harassment toward ***any individual*** in any work-related setting . . . .  The Firm also will not tolerate retaliation against ***anyone*** who complains in good faith about such discrimination or harassment" (emphasis added).  As Chadbourne made

clear: "The Firm's policy against discrimination, harassment and retaliation ***applies to all partners***" (emphasis added).

207.    Female partners would not have joined the Firm if they believed that Chadbourne and its Management Committee claimed the unfettered right to discriminate against them based on their gender, or to retaliate against them for raising concerns about discrimination.  In fact, female partners left Chadbourne when they realized the Firm was not satisfying its obligations not to discriminate against them.

## VII.    CLASS ACTION ALLEGATIONS UNDER TITLE VII

208.    Plaintiffs Kerrie L. Campbell and Mary T. Yelenick ("Class Representatives") incorporate all allegations from this Complaint alleging class-based discrimination against female Partners.

209.    Class Representatives represent a class consisting of all female Partners who were employed by Chadbourne from August 2013 to the date of judgment.  Class Representatives and the Class of Chadbourne attorneys they seek to represent have been subjected to a systemic pattern and practice of gender discrimination and disparate impact gender discrimination by Chadbourne.

210.    Class Representatives bring this action pursuant to Fed. R. Civ. P. 23 seeking declaratory and monetary relief for the systemic pattern and practice of gender discrimination to which Defendant has subjected Plaintiffs and the class of female partners.

211.    Defendant Chadbourne tolerated and cultivated a work environment that discriminated against female partners.  The Firm was managed by a five-member Management Committee, which was composed entirely of male executives until the Firm's last year of operations.  Furthermore, a disproportionately large percentage of the Firm's offices, Committees and Department Heads were men.

212.    Chadbourne's discriminatory policies, practices, and procedures included vesting the Committee with total dominion over Partner compensation, resulting in systematic gender-based disparities in "points" allocation, base pay, merit bonuses, and other forms of compensation. Consequently, female Partners routinely made less than their male colleagues.   Further, Chadbourne ignored, disregarded, minimized, covered up, mishandled, or otherwise failed to respond properly to evidence of gender discrimination in the workplace.

213.    In general, the policies, practices, and procedures that governed the management of the Firm lacked the sufficient standards, quality controls, implementation metrics, transparency, and oversight to ensure equal opportunity at Chadbourne.

214.    Chadbourne's uniform nationwide policies, practices, and procedures resulted in lower compensation for female Partners than similarly situated male Partners.

215.    Female Partners were subjected to continuing unlawful disparate treatment. Moreover, Chadbourne's policies and procedures, including its origination credit inheritance system, while facially neutral, had an ongoing disparate impact on female Partners.

216.    Because Chadbourne's management did not provide sufficient oversight or safety measures to protect against intentional and overt discrimination or the disparate impact of facially neutral policies and procedures, female Partners suffering from discrimination were without recourse.   Where complaint and compliance policies existed, they lacked meaningful controls, standards, implementation metrics, and means of redress such that upper management could ignore, disregard, minimize, cover up, mishandle, or otherwise fail to respond properly to evidence of discrimination in the workplace.

217.    There was no meaningful separation between complaint reporting channels and Firm management (including the Committee) responsible for creating discriminatory conditions

for women. This meant that complaints did not remain confidential and victims of discrimination often faced retaliation or were dissuaded from raising concerns altogether.  Chadbourne's failure to address rampant retaliation left the targets of discrimination further vulnerable.

218.    Chadbourne thus condoned, fostered, and encouraged discrimination.  Within this environment, female Partners who questioned the Firm's norms or raised concerns about its practices were pushed out of the Firm, demoted, or terminated.

219.    Chadbourne demonstrated a reckless disregard—a deliberate indifference—to its female Partners by overlooking or otherwise dismissing even blatant evidence of gender discrimination.

220.    Chadbourne's policies, practices, and procedures were not valid, job-related, or justified by business necessity.  Alternative, objective, and more valid procedures were available to Chadbourne that would avoid such a disparate impact on female Partners.  Chadbourne failed or refused to use such alternative procedures.

221.    Upon information and belief, the discriminatory employment policies, practices, and procedures to which Class Representatives and the Class they seek to represent are subject were centrally established and implemented at Chadbourne's corporate headquarters in New York. The Management Committee, based in the New York office, made the relevant decisions regarding Class Representatives and the Class Members they seek to represent.  All practice group heads reported to the Management Committee.

222.    Upon information and belief, the Management Committee made final compensation decisions, including base pay and merit bonus determinations, for all Partners at Chadbourne.

223.    It was Chadbourne's standard operating procedure to compensate female Partners

at levels far below those of male Partners.  Chadbourne's employment policies, practices, and procedures were not unique or limited to any office or practice group; rather, they applied uniformly and systematically to Chadbourne attorneys throughout the Firm, occurring as a pattern and practice throughout all office locations and practice groups.

224.    Because of Chadbourne's systemic pattern and practice of gender discrimination, the Class Representatives and members of the proposed Class suffered harm including lost compensation, back pay, and employment benefits.

225.    Chadbourne failed to enact policies to ensure the Management Committee did not violate the Firm's fair employment policies and equal opportunity laws and failed to create adequate incentives for others in Firm leadership to comply with such policies and laws.

A.    **Class Definition**

226.    The proposed Rule 23 Class consists of all female Partners who were employed by Chadbourne from August 2013 until the date of judgment.

227.    The Class Representatives are members of the Class they seek to represent.

228.    The systemic gender discrimination described in this Complaint was continuing in nature.

229.    Plaintiffs reserve the right to amend the class definition based on discovery or legal developments.

B.    **Efficiency of Class Prosecution of Class Claims**

230.    Certification of a nationwide class of female Partners similarly situated to the Class Representatives is the most efficient and economical means of resolving the questions of law and fact that are common to the claims of the Plaintiffs and the proposed Class.

231.    The individual claims of the Class Representatives require resolution of the

common questions of whether Chadbourne has engaged in a systemic pattern and practice of gender discrimination against female Partners.  Plaintiffs seek remedies to eliminate the adverse effects of such discrimination in their own lives and careers and to eliminate the adverse effects of gender discrimination in the lives and working conditions of the proposed Class members.

232.   Two essential class-wide facts support certification: (i) the Management Committee's discretion and control over compensation decisions for all partners; and (ii) the Firm's adoption of a discrete origination inheritance system with a disparate effect on women. Plaintiffs allege that the Firm effectuated pay discrimination through a discrete, common set of actors applying common practices and procedures.

233.   The Class Representatives have standing to seek relief from these practices because of the adverse effect that such discrimination has on them individually and on female Partners generally.  Chadbourne caused Plaintiffs' injuries through its discriminatory practices, policies, and procedures and through the disparate impact its policies, practices, and procedures have on female attorneys.  These injuries are redressable through a class-wide liability finding and associated relief.  In addition, proper relief for Campbell's individual termination claim can include reinstatement.  Accordingly, the Class Representatives have personal interest in the policies, practices, and procedures implemented at Chadbourne.

234.   To obtain relief for themselves and the Class members, the Class Representatives will first establish the existence of systemic gender discrimination as the premise for the relief they seek.  Without class certification, the same evidence and issues would be need to be relitigated in a multitude of individual lawsuits with an attendant risk of inconsistent adjudications and conflicting obligations.

235.   The Class Representatives' individual and class claims are premised upon the

traditional bifurcated method of proof and trial for disparate impact and systemic disparate treatment claims of the type at issue in this case. Such a bifurcated method of proof and trial is the most efficient method of resolving such common issues.

236.    Certification of the proposed Class is the most reasonable and efficient means of presenting the evidence and arguments necessary to resolve such questions for the Class Representatives, the Class members, and Chadbourne.

C.    **Numerosity and Impracticability of Joinder**

237.    The Title VII Class that the Class Representatives seek to represent is so numerous that joinder of all members is impracticable. The members of the proposed Class are diffused throughout the country, and a number have left the Firm since its combination with Norton Rose. Fear of retaliation on the part of Chadbourne's female attorneys is also likely to undermine the possibility of joinder. The Class Representatives' colleagues are aware of their situations and may be unlikely to come forward and assert their own claims. In addition, joinder is impractical as Chadbourne's female attorneys are dispersed throughout the United States and some were employed in some of the Firm's international offices.

D.    **Common Questions of Law and Fact**

238.    The prosecution of the claims of the Class Representatives will require the adjudication of numerous questions of law and fact common to their individual claims and those of the Class they seek to represent.

239.    The common issues of law include, *inter alia*: (a) the proper standards for proving a pattern and practice of discrimination by Chadbourne against its female Partners under both a disparate treatment and disparate impact theory of liability; (b) whether Chadbourne has engaged in unlawful, systemic gender discrimination through its policies, practices, and procedures

56

affecting compensation and other terms and/or conditions of employment; (c) whether Chadbourne's failure to institute adequate standards, quality controls, implementation metrics or oversight of those policies, practices, and procedures violates Title VII and/or other statutes; (d) whether the lack of transparency and of opportunities for redress at Chadbourne violates Title VII and/or other statutes; (e) whether Chadbourne's failure to prevent, investigate, or properly respond to evidence and complaints of discrimination in the workplace violates Title VII and/or other statutes; and (f) whether Chadbourne is liable for continuing systemic violations of Title VII and/or other statutes.

240.    The common questions of fact include, *inter alia*: whether Chadbourne has: (a) used a compensation system that lacks meaningful or appropriate standards, implementation metrics, quality controls, transparency, and opportunities for redress; (b) through the use of that compensation system compensated female Partners less than similarly-situated male Partners in base salary and/or merit bonuses; (c) systematically, intentionally, or knowingly compensated female Partners less than similarly-situated male Partners, including in base salary and/or merit bonus pay; (d) allocated Firm resources, including staff, in ways that undermined and/or frustrated the work of female Partners; (e) minimized, ignored, or covered-up evidence of gender discrimination in the workplace and/or otherwise mishandled the investigation of and response to complaints of discrimination brought to the attention of the Management Committee and other Firm leadership; (h) systematically, intentionally, knowingly, or deliberately sowed an indifference to evidence of discrimination in the workplace or otherwise minimized, ignored, mishandled, or covered up evidence of or complaints of gender discrimination; and (g) otherwise discriminated against female attorneys in the terms and conditions of employment.

241.    The employment policies, practices, and procedures to which the Class

Representatives and the Class members were subjected were set by the Firm's Management Committee and applied universally to all Class members.  These employment policies, practices, and procedures are not unique or limited to any office or practice group; rather they apply to all offices and practice groups and, thus, affect the Class Representatives and Class members in the same ways regardless of the office location or practice group in which they work.  Discrimination in compensation occurred as a pattern and practice throughout all Chadbourne offices and practice groups.

E.    **Typicality of Claims and Relief Sought**

242.    The Class Representatives' claims are typical of the claims of the proposed Class. The Class Representatives possess and assert each of the claims they assert on behalf of the proposed Class.  They pursue the same factual and legal theories and seek similar relief.

243.    Like members of the proposed Class, the Class Representatives are female Partners who were employees of Chadbourne during the liability period.

244.    Differential treatment between male and female Partners occurred as a pattern and practice throughout all office and practice groups of Chadbourne.  Chadbourne discriminated against female Partners in compensation and subjects them to a work culture predominated by an executive circle comprised of men.  This differential treatment affected the Class Representatives and the Class members in the same or similar ways.

245.    Chadbourne failed to respond adequately or appropriately to evidence and complaints of discrimination.  The Class Representatives and Class members have been affected in the same or similar ways by Chadbourne's failure to implement adequate procedures to detect, monitor, and correct this pattern and practice of discrimination.

246.    Chadbourne failed to create adequate procedures to ensure its Management

58

Committee complied with equal employment opportunity laws regarding each of the policies, practices, and procedures referenced in this Complaint, and the Firm failed to discipline adequately others in Firm leadership when they violated anti-discrimination laws. These failures have affected the Class Representatives and the Class members in the same or similar ways.

247. The relief necessary to remedy the claims of the Class Representatives is the same as that necessary to remedy the claims of the proposed Class members.

248. The Class Representatives seek the following relief for their individual claims and for the claims of the members of the proposed Class: (a) a declaratory judgment that Chadbourne engaged in systemic gender discrimination against female Partners by (i) paying female Partners less than their male counterparts in base compensation and/or merit bonus pay, (ii) failing to investigate or respond to evidence of discrimination in the workplace against female attorneys, and (iii) otherwise exposing female Partners to differential treatment; (b) back pay, front pay, reinstatement, and other remedies necessary to make female Partners whole from Chadbourne's past discrimination; (c) punitive and nominal damages to deter Chadbourne from engaging in similar discriminatory practices in the future; and (d) attorneys' fees, costs, and expenses.

F.    **Adequacy of Representation**

249. The Class Representatives' interests are coextensive with those of the members of the proposed Class. The Class Representatives seek to remedy Chadbourne's discriminatory policies, practices, and procedures so female attorneys will no longer receive disparate pay and disparate treatment.

250. The Class Representatives are willing and able to represent the proposed Class fairly and vigorously as they pursue their similar individual claims in this action.

251. The Class Representatives have retained counsel sufficiently qualified,

experienced, and able to conduct this litigation and to meet the time and fiscal demands required to litigate an employment discrimination class action of this size and complexity.  The combined interests, experience, and resources of the Class Representatives and their counsel to litigate competently the individual and class claims at issue in this case clearly satisfy the adequacy of representation requirement of Federal Rule of Civil Procedure 23(a)(4).

G.     **Requirements of Rule 23(b)(3)**

252.     The common issues of fact and law affecting the claims of the Class Representatives and proposed Class members – including, but not limited to, the common issues identified above – predominate over any issues affecting only individual claims.  The common issues include: (1) whether Chadbourne has engaged in gender discrimination against female Partners by paying female Partners less than their male counterparts; (2) whether Chadbourne's origination credit inheritance system had an unlawful disparate impact on female Partners; and (3) whether Chadbourne has engaged in gender discrimination against female Partners by denying female Partners opportunities for advancement.

253.     A class action is superior to other available means for fairly and efficiently adjudicating the claims of the Class Representatives and members of the proposed Class.

254.     By virtue of the pattern and practice of discrimination at Chadbourne, the Class Representatives and Class members are eligible for monetary remedies for losses caused by the systemic discrimination, including back pay, front pay, reinstatement, and other relief.

255.     Additionally or in the alternative, the Court may grant "partial" or "issue" certification under Rule 23(c)(4).  Resolution of common questions of fact and law would materially advance the litigation for all Class members.

**VIII.   <u>COLLECTIVE ACTION ALLEGATIONS UNDER THE EQUAL PAY ACT</u>**

256.    Plaintiffs incorporate all allegations of the Complaint alleging class-based discrimination against female Partners.

257.    Plaintiffs bring collective claims under the Equal Pay Act pursuant to Section 16(b) of the Fair Labor Standards Act (FLSA), 29 U.S.C. § 216(b), on behalf of all members of the EPA Collective Action Class, which consists of: all female Partners of Chadbourne during the applicable liability period, who opt into the EPA action by filing a Consent to Join with the Court.

258.    Plaintiffs and the Collective Action members are similarly situated with respect to their claims that Chadbourne paid them less than their male counterparts.

259.    There is a common nexus of fact and law suggesting that Plaintiffs and the Collective Action members were discriminated against in the same manner.  Questions at issue in the case include:

(a)     Whether Chadbourne unlawfully awarded less in base pay to female Partners, thus affecting their compensation, than similarly qualified male Partners;

(b)     Whether Chadbourne unlawfully awarded less in merit bonus pay to female Partners, thus affecting their compensation, than similarly qualified male Partners;

(c)     Whether Chadbourne's resulting failure to compensate female Partners on par with comparable male Partners was willful within the meaning of the EPA.

260.    Counts for violations of the EPA may be brought and maintained as an "opt-in" collective action pursuant to 29 U.S.C. § 216(b), for all claims asserted by the EPA Collective Action Plaintiffs who opt-in to this action because the claims of the Plaintiffs are similar to the claims of the EPA Collective Action Class.

261.    Plaintiffs and the EPA Collective Action Plaintiffs (a) are similarly situated and (b) were subject to Defendant's common policy and practice of gender discrimination in failing to

compensate female attorneys on par with male attorneys who perform substantially equal work.

### IX.   COUNTS

### CLASS AND COLLECTIVE ACTION COUNTS

### COUNT I

**VIOLATION OF TITLE VII,**
**42 U.S.C. §§ 2000e, *et seq.***
**PAY DISCRIMINATION**
**(On behalf of Class Representatives Campbell and Yelenick and Class members against Defendants Chadbourne and Norton Rose)**

262.    Class Representatives Campbell and Yelenick re-allege and incorporate each and every allegation in this Complaint as if fully set forth herein.

263.    This Count is brought on behalf of the Class Representatives and all members of the Class.

264.    Defendant Chadbourne, an employer of Class Representatives and Class members within the meaning of Title VII, has discriminated against the Class Representatives and the Class by treating them differently from, and less preferably than, similarly situated males by subjecting them to discriminatory pay in violation of Title VII.

265.    Defendant's policies, practices, and procedures have produced a disparate impact on the Class Representatives and the Class with respect to their terms and conditions of employment.

266.    Defendant's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of the Class Representatives and the Class, entitling the Class Representatives and the members of the Class to punitive damages.

267.    By reason of the continuous nature of Defendant's discriminatory conduct regarding compensation, which persisted throughout the employment of the Class Representatives and the Class, the Class Representatives and the Class are entitled to application of the continuing

violations doctrine to all violations alleged herein.

268.     As a result of Defendant's conduct alleged in this Complaint, the Class Representatives and the Class have suffered and continue to suffer harm, including but not limited to lost earnings, lost benefits and other financial loss, including interest.

269.     By reason of Defendant's discrimination, the Class Representatives and the Class are entitled to all legal and equitable remedies available for violations of Title VII, including an award of punitive damages.

270.     As a further result of Defendant's unlawful conduct, the Class Representatives and the members of the Class have suffered and continue to suffer, *inter alia*, impairment to their name and reputation, humiliation, embarrassment, emotional and physical distress, and mental anguish. Class Representatives are entitled to recover damages for such injuries from Defendant under Title VII.

271.     As the successor to Chadbourne, Norton Rose is liable for the damages resulting from the discriminatory acts and omissions of its predecessor firm.

272.     Attorneys' fees and costs should be awarded under 42 U.S.C. § 2000e-5(k).

## COUNT II

### VIOLATION OF THE FAIR LABOR STANDARDS ACT OF 1938, AS AMENDED BY THE EQUAL PAY ACT OF 1963, 29 U.S.C. § 206(d); 29 U.S.C. § 216(b) (On Behalf of the Plaintiffs and the EPA Collective Action Plaintiffs Against Defendants Chadbourne and Norton Rose)

273.     Plaintiffs re-allege and incorporate each and every allegation of this Complaint.

274.     This Count is brought on behalf of the Plaintiffs and the EPA Collective Action Class, including all EPA Collective Action Plaintiffs who "opt in" to this action.

275.     Defendant Chadbourne has discriminated against the Plaintiffs and all EPA Collective Action Plaintiffs within the meaning of the Equal Pay Act of 1963 in violation of the

Fair Labor Standards Act of 1938, 29 U.S.C. §§ 206, *et seq*., as amended by the EPA, by providing them with lower pay than similarly situated male colleagues on the basis of their gender even though Plaintiffs and all others similarly situated performed similar duties requiring the same skill, effort, and responsibility as their male counterparts.

276.    Plaintiffs, all EPA Collective Action Plaintiffs, and similarly situated male Partners all perform similar job duties and functions as Chadbourne attorneys.   Plaintiffs, all EPA Collective Action Plaintiffs, and similarly situated male attorneys all performed jobs that required equal skill, effort, and responsibility.

277.    Defendant discriminated against Plaintiffs and all EPA Collective Action Plaintiffs by subjecting them to discriminatory pay in violation of the Equal Pay Act.

278.    The differential in pay between male and female attorneys was not due to seniority, merit, quantity or quality of production, or a factor other than sex, but was due to gender.

279.    Defendant caused, attempted to cause, contributed to or caused the continuation of pay discrimination based on gender, in violation of the EPA.

280.    The foregoing conduct constitutes a willful violation of the EPA within the meaning of 29 U.S.C. § 255(a).  Because Defendant has willfully violated the EPA, a three-year statute of limitations applies to such violations, pursuant to 29 U.S.C. § 255.

281.    As a result of Defendant's conduct as alleged in this Complaint, Plaintiffs and all EPA Collective Action Plaintiffs have suffered and continue to suffer harm, including but not limited to: lost earnings, lost benefits and other financial loss, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

282.    By reason of Defendant's discrimination, Plaintiffs and all EPA Collective Action Plaintiffs are entitled to all legal and equitable remedies available for violations of the EPA,

including liquidated damages, interest, and other compensation pursuant to 29 U.S.C. § 216(b).

283.    As the successor to Chadbourne, Norton Rose is liable for the damages resulting from the discriminatory acts and omissions of its predecessor firm.

284.    Attorneys' fees should be awarded under 29 U.S.C. §216(b).

## INDIVIDUAL COUNTS

## COUNT III

### VIOLATION OF TITLE VII,
### 42 U.S.C. § 2000e-3(a), 42 U.S.C. § 2000e-5(f)(3)
### RETALIATION
### (On behalf of Campbell Against Defendants Chadbourne and Norton Rose)

285.    Campbell re-alleges and incorporates each and every allegation contained in this Complaint.

286.    Campbell engaged in protected activity that included, but is not limited to, complaining to Chadbourne about gender discrimination in compensation.  She complained to members of the Firm on numerous occasions, including but not limited to, Management Committee member and Managing Partner Andrew Giaccia; Management Committee member Marc Alpert; Management Committee member Lawrence Rosenberg; Management Committee member Howard Seife; Chief Operating Officer Lisa Palestine; Head of Litigation Abbe Lowell; and former Managing Partner of the D.C. office Dana Frix.  She also engaged in protected activity by filing an EEOC Charge alleging gender discrimination on June 30, 2016.

287.    Chadbourne terminated Campbell's employment in retaliation for her discrimination complaints.   Chadbourne also retaliated against Campbell by, *inter alia*: undermining her client relationships; refusing her staffing on her matters; failing to promote her practice; and denying her the ability to participate in Firm committees.  Chadbourne further retaliated against Campbell by facilitating and maintaining an environment in which Firm

leadership engaged in acts intended to humiliate and demean her.  These adverse employment actions materially and adversely changed Campbell's overall terms and conditions of employment.

288.    Chadbourne's retaliatory acts against Campbell were a direct and proximate result of her protected activities.

289.    A reasonable employee would find Chadbourne's retaliatory acts materially adverse and such acts would dissuade a reasonable person from making or supporting a charge of discrimination.

290.    Defendant's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard to Campbell's rights, entitling her to punitive damages.

291.    Defendant's actions and failures to act have caused Campbell to suffer harm, including without limitation lost earnings, lost benefits, and other severe financial losses, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

292.    Campbell is therefore entitled to all legal and equitable remedies available for violations of Title VII, including an award of punitive damages.

293.    As the successor to Chadbourne, Norton Rose is liable for the damages resulting from the retaliatory acts and omissions of its predecessor firm.

294.    Attorneys' fees should be awarded under 42 U.S.C. § 2000e-5(k).

## COUNT IV

### VIOLATION OF TITLE VII
### WRONGFUL TERMINATION
### (On behalf of Campbell Against Defendants Chadbourne and Norton Rose)

295.    Campbell re-alleges and incorporates each and every allegation contained in this Complaint.

296.    Chadbourne wrongfully terminated Campbell's employment because of her gender and in retaliation for her discrimination complaints.

297.    Chadbourne's wrongful termination of Campbell was a direct, proximate and pretextual result of gender discrimination and her protected activities.

298.    Defendant's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard to Campbell's rights, entitling her to punitive damages.

299.    Chadbourne's wrongful termination of Campbell has caused her to suffer harm, including without limitation lost earnings, lost benefits, and other severe financial losses, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

300.    Campbell is therefore entitled to all legal and equitable remedies available for violations of Title VII, including an award of punitive damages.

301.    As the successor to Chadbourne, Norton Rose is liable for the damages resulting from the discriminatory and retaliatory acts and omissions of its predecessor firm.

302.    Attorneys' fees should be awarded under 42 U.S.C. § 2000e-5(k).

### COUNT V

**VIOLATION OF TITLE VII,**
**42 U.S.C. § 2000e-3(a), 42 U.S.C. § 2000e-5(f)(3)**
**RETALIATION**
**(On behalf of Yelenick Against Defendants Chadbourne and Norton Rose)**

303.    Yelenick re-alleges and incorporates each and every allegation contained in this Complaint.

304.    Yelenick engaged in protected activity that included, but is not limited to, complaining to Chadbourne about gender discrimination in compensation and joining the EPA collective action to challenge Chadbourne's discriminatory pay practices.  She complained, both orally and in writing, to members of the Firm on numerous occasions, including but not limited to, Managing Partner Andrew Giaccia; Management Committee member Marc Alpert; Management Committee member Lawrence Rosenberg; Management Committee member Howard Seife; and

Management Committee member Paul Weber.

305.    On February 27, 2017, Yelenick joined this EPA collective action to challenge Chadbourne's discriminatory pay practices.

306.    Chadbourne retaliated against Yelenick by, *inter alia*, making public statements demeaning her and questioning her successful record at the Firm after she joined this lawsuit.

307.    Chadbourne's retaliatory acts against Yelenick were a direct and proximate result of her protected activities.

308.    A reasonable employee would find Chadbourne's retaliatory acts materially adverse and such acts would dissuade a reasonable person from making or supporting a charge of discrimination.

309.    Defendant's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard to Yelenick's rights, entitling her to punitive damages.

310.    Defendant's actions and failures to act have caused Yelenick to suffer harm, including without humiliation, embarrassment, emotional and physical distress, and mental anguish.

311.    Yelenick is therefore entitled to all legal and equitable remedies available for violations of Title VII, including an award of punitive damages.

312.    As the successor to Chadbourne, Norton Rose is liable for the damages resulting from the retaliatory acts and omissions of its predecessor firm.

313.    Attorneys' fees should be awarded under 42 U.S.C. § 2000e-5(k).

## COUNT VI

**VIOLATION OF THE FAIR LABOR STANDARDS ACT OF 1938,
AS AMENDED BY THE EQUAL PAY ACT OF 1963,
29 U.S.C. § 215(a)(3); 29 U.S.C. § 216(b)
RETALIATION**

**(On Behalf of Campbell Against Defendants Chadbourne and Norton Rose)**

314.     Campbell re-alleges and incorporates each and every allegation contained in this Complaint.

315.     Campbell engaged in protected activity under the Equal Pay Act by complaining to Chadbourne about gender discrimination in compensation.

316.     Because of these complaints, Chadbourne discriminated against Campbell by denying her staffing on her matters, writing off client bills without her permission, and refusing to publicize her practice in Firm materials in violation of 29 U.S.C. § 215(a)(3).  Chadbourne further discriminated against Campbell by facilitating and tolerating an environment where she was targeted for harassment and humiliation by Firm leadership.

317.     Furthermore, Chadbourne terminated Campbell in violation of 29 U.S.C. § 215(a)(3) – slashing her compensation, ousting her from the partnership ranks, and then discharging her from the Firm.

318.     Under 29 U.S.C. § 216(b), Campbell is entitled to back pay, liquidated damages, reinstatement, and other relief.

319.     As the successor to Chadbourne, Norton Rose is liable for the damages resulting from the retaliatory acts and omissions of its predecessor firm.

320.     Attorneys' fees should be awarded under 29 U.S.C. §216(b).

## COUNT VII

**VIOLATION OF THE FAIR LABOR STANDARDS ACT OF 1938,
AS AMENDED BY THE EQUAL PAY ACT OF 1963,
29 U.S.C. § 215(a)(3); 29 U.S.C. § 216(b)
RETALIATION
(On Behalf of Johnson Against Defendants Chadbourne and Norton Rose)**

321.     Johnson re-alleges and incorporates each and every allegation contained in this Complaint.

322.     Johnson engaged in protected activity under the Equal Pay Act by complaining to Chadbourne about gender discrimination in compensation.

323.     Because of these complaints, Chadbourne discriminated against Johnson by decreasing her base compensation and denying her discretionary merit bonuses in violation of 29 U.S.C. § 215(a)(3).

324.     Under 29 U.S.C. § 216(b), Johnson is entitled to back pay, liquidated damages, and other relief.

325.     As the successor to Chadbourne, Norton Rose is liable for the damages resulting from the retaliatory acts and omissions of its predecessor firm.

326.     Attorneys' fees should be awarded under 29 U.S.C. §216(b)

## COUNT VIII

**VIOLATION OF THE FAIR LABOR STANDARDS ACT OF 1938,
AS AMENDED BY THE EQUAL PAY ACT OF 1963,
29 U.S.C. § 215(a)(3); 29 U.S.C. § 216(b)
RETALIATION
(On Behalf of Yelenick Against Defendants Chadbourne and Norton Rose)**

327.     Yelenick re-alleges and incorporates each and every allegation contained in this Complaint.

328.     Yelenick engaged in protected activity under the Equal Pay Act by complaining to Defendant Chadbourne about gender discrimination in compensation and joining the EPA collective action to challenge Chadbourne's discriminatory pay practices.

329.     Because of her protected activity, Chadbourne discriminated against Yelenick by, *inter alia*, demeaning her in public statements in violation of 29 U.S.C. § 215(a)(3).

330.     Yelenick is entitled to relief as provided by 29 U.S.C. § 216(b).

331.     As the successor to Chadbourne, Norton Rose is liable for the damages resulting from the retaliatory acts and omissions of its predecessor firm.

332.    Attorneys' fees should be awarded under 29 U.S.C. §216(b).

## COUNT IX

### VIOLATION OF THE DISTRICT OF COLUMBIA HUMAN RIGHTS ACT
### D.C. Code §§ 2-1401, *et seq.* AS AMENDED
### PAY DISCRIMINATION
### (On behalf of Campbell Against Defendants Chadbourne and Norton Rose)

333.    Campbell re-alleges and incorporates each and every allegation of this Complaint.

334.    Defendant Chadbourne, an employer within the meaning of the DCHRA, has discriminated against Campbell by treating her differently from, and less preferably than, similarly situated males by subjecting her to pay discrimination in violation of the DCHRA.

335.    Defendant's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of Campbell entitling her to punitive damages.

336.    As a result of Defendant's conduct alleged in this Complaint, Campbell has suffered and continues to suffer harm, including but not limited to lost earnings, lost benefits, and other financial loss, including interest.

337.    By reason of Defendant's discrimination, Campbell is entitled to all legal and equitable remedies available for violations of the DCHRA, including an award of punitive damages.

338.    As the successor to Chadbourne, Norton Rose is liable for the damages resulting from the discriminatory acts and omissions of its predecessor firm.

339.    Attorneys' fees should be awarded under D.C. Code §2-1403.13(e).

## COUNT X

### VIOLATION OF THE DISTRICT OF COLUMBIA HUMAN RIGHTS ACT
### D.C. Code § 2-1401, *et seq.* AS AMENDED
### RETALIATION
### (On behalf of Campbell Against Defendants Chadbourne and Norton Rose)

340.    Campbell re-alleges and incorporates each and every allegation of this Complaint.

341.     Defendant Chadbourne, an employer within the meaning of the DCHRA, has discriminated against Campbell by retaliating against her for opposing the discriminatory compensation of women in violation of the DCHRA.

342.     Defendant's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of Campbell entitling her to punitive damages.

343.     As a result of Defendant's conduct alleged in this Complaint, Campbell has suffered and continues to suffer harm, including but not limited to lost earnings, lost benefits and other financial loss, including interest.

344.     By reason of Defendant's discrimination, Campbell is entitled to all legal and equitable remedies available for violations of the DCHRA, including an award of punitive damages.

345.     As the successor to Chadbourne, Norton Rose is liable for the damages resulting from the retaliatory acts and omissions of its predecessor firm.

346.     Attorneys' fees should be awarded under D.C. Code §2-1403.13(e).

## COUNT XI

**VIOLATION OF THE DISTRICT OF COLUMBIA HUMAN RIGHTS ACT**
**D.C. Code §§ 2-1401, *et seq.* AS AMENDED**
**WRONGFUL TERMINATION**
**(On behalf of Campbell Against Defendants Chadbourne and Norton Rose)**

347.     Campbell re-alleges and incorporates each and every allegation of this Complaint.

348.     Defendant Chadbourne, an employer within the meaning of the DCHRA, wrongfully terminated Campbell's employment due to gender discrimination and in retaliation for her discrimination complaints.  Chadbourne's wrongful termination was an adverse employment action that materially and adversely affected Campbell's employment in violation of the DCHRA.

349.     Defendant's conduct has been intentional, deliberate, willful, malicious, reckless,

and conducted in callous disregard of the rights of Campbell entitling her to punitive damages.

350.    As a result of Defendant's conduct alleged in this Complaint, the Campbell has suffered and continues to suffer harm, including but not limited to lost earnings, lost benefits and other financial loss, including interest.

351.    By reason of Defendant's discrimination, Campbell is entitled to all legal and equitable remedies available for violations of the DCHRA, including an award of punitive damages.

352.    As the successor to Chadbourne, Norton Rose is liable for the damages resulting from the discriminatory and retaliatory acts and omissions of its predecessor firm.

353.    Attorneys' fees should be awarded under D.C. Code §2-1403.13(e).

## COUNT XII

### VIOLATION OF THE DISTRICT OF COLUMBIA HUMAN RIGHTS ACT
### D.C. Code §§ 2-1401, *et seq.* AS AMENDED
### AIDING AND ABETTING
### (On behalf of Campbell against Individual Defendants)

354.    Campbell re-alleges and incorporates each and every allegation of this Complaint.

355.    On information and belief, Defendants Alpert, Giaccia, Lowell, Rosenberg, Seife, and Weber ("Individual Defendants") all actively and knowingly participated in practices that resulted in pay discrimination, retaliation, and wrongful termination based on Campbell's gender.

356.    By aiding, abetting, inviting, compelling and/or coercing Defendant Chadbourne in its discriminatory practices and decisions, each Individual Defendant has aided and abetted both Defendant Chadbourne and each of the other Individual Defendant's discrimination against Plaintiff Campbell, in violation of D.C. Code § 2-1402.62.

357.    Defendants' conduct has been intentional, deliberate, willful, reckless, and conducted in callous disregard of Campbell's rights.

358.   By reason of Defendants' discrimination, Campbell is entitled to all legal and equitable remedies available for violations of the DCHRA, including an award of punitive damages.

359.   Attorneys' fees should be awarded under D.C. Code § 2-1403.13(e).

**COUNT XIII**

**VIOLATION OF NEW YORK EXECUTIVE LAW § 296, subd. 1(a)**
**GENDER DISCRIMINATION**
**(On Behalf of Yelenick Against Defendants Chadbourne and Norton Rose)**

360.    Yelenick re-alleges and incorporates each and every allegation of this Complaint.

361.   Defendant Chadbourne discriminated against Yelenick in violation of Section 296, subdivision 1(a) of the New York Executive Law, by subjecting her to different treatment on the basis of her gender.

362.   Defendant discriminated against Yelenick by treating her differently from and less preferably than similarly-situated male employees and by subjecting her to discriminatory pay, discriminatory performance evaluations, disparate terms and conditions of employment, and other forms of discrimination, in violation of New York Executive Law.

363.   As a result of Defendant's conduct alleged in this complaint, Yelenick has suffered and continues to suffer harm, including but not limited to lost earnings, other financial loss, and non-economic damages.

364.   By reason of Defendant's discrimination, Yelenick is entitled to all remedies available for violations of the New York State Human Rights Law.

365.   As the successor to Chadbourne, Norton Rose is liable for the damages resulting from the discriminatory acts and omissions of its predecessor firm.

366.   Further, attorneys' fees and costs should be awarded.

## COUNT XIV

**VIOLATION OF NEW YORK EXECUTIVE LAW § 296, subd. 7**
**RETALIATION**
**(On Behalf of Yelenick Against Defendants Chadbourne and Norton Rose)**

367.    Yelenick re-alleges and incorporates each and every allegation of this Complaint.

368.    Yelenick repeatedly complained to Chadbourne about gender discrimination in compensation.  She complained, both orally and in writing, to members of the Firm on numerous occasions, including but not limited to, Management Committee member and Managing Partner Andrew Giaccia; Management Committee member Marc Alpert; Management Committee member Lawrence Rosenberg; Management Committee member Howard Seife; and Management Committee member Paul Weber.

369.    On February 27, 2017, Yelenick joined this EPA collective action to challenge Chadbourne's discriminatory pay practices.

370.    The issues raised by Yelenick constitute colorable violations of the New York State Human Rights Law prohibiting discrimination on the basis of gender.

371.    Defendant retaliated against Yelenick for engaging in protected activities by, *inter alia*, making disparaging remarks about her work history in public statements.

372.    Defendant's retaliatory act or acts would be reasonably likely to deter a person from engaging in protected activity.

373.    By reason of Defendant's conduct as alleged herein, Yelenick is entitled to all remedies available under the New York State Human Rights Law.

374.    As the successor to Chadbourne, Norton Rose is liable for the damages resulting from the retaliatory acts and omissions of its predecessor firm.

## COUNT XV

### VIOLATION OF NEW YORK EXECUTIVE LAW § 296, subd. 6
### AIDING AND ABETTING
### (On behalf of Yelenick against Individual Defendants)

375.    Yelenick re-alleges and incorporates each and every allegation of this Complaint.

376.    On information and belief, Alpert, Giaccia, Lowell, Rosenberg, Seife, and Weber ("Individual Defendants") all actively and knowingly participated in practices that resulted in pay discrimination and retaliation based on Yelenick's gender.

377.    By aiding, abetting, inciting, compelling and/or coercing Defendant Chadbourne in its discriminatory practices and decisions, each Individual Defendant has aided and abetted both Defendant Chadbourne and each of the other Individual Defendant's discrimination against Plaintiff Yelenick, in violation of New York Executive Law § 296, subd. 6.

378.    Defendants' conduct has been intentional, deliberate, willful, reckless, and conducted in callous disregard of Yelenick's rights.

379.    By reason of Defendants' conduct as alleged herein, Yelenick is entitled to all remedies available under the New York State Human Rights Law.

## COUNT XVI

### VIOLATION OF THE NEW YORK EQUAL PAY LAW
### N.Y. LABOR LAW § 194
### DENIAL OF EQUAL PAY FOR EQUAL WORK
### (On behalf of Yelenick Against Defendants Chadbourne and Norton Rose)

380.    Yelenick re-alleges and incorporates each and every allegation of this Complaint.

381.    Defendant Chadbourne, the employer of Yelenick within the meaning of the New York Equal Pay Law, has discriminated against Yelenick in violation of New York Labor Law § 194, by subjecting her to unequal pay on the basis of her sex.

382.   Defendant has discriminated against Yelenick by treating her differently from and less preferably than similarly-situated male employees who performed jobs which required equal skill, effort, and responsibility, and which were performed under similar working conditions. Defendant so discriminated by subjecting her to discriminatory pay and other forms of discrimination in violation of the New York Equal Pay Law.

383.   Defendant caused, attempted to cause, contributed to, or caused the continuation of, the wage rate discrimination based on sex in violation of the New York Equal Pay Law. Moreover, Defendant willfully violated the New York Equal Pay Law by intentionally paying Yelenick less than similarly-situated men.

384.   Yelenick is therefore entitled to all remedies available for violations of New York Labor Law § 194, including liquidated damages and attorneys' fees and costs for all willful violations.

385.   As the successor to Chadbourne, Norton Rose is liable for the damages resulting from the discriminatory acts and omissions of its predecessor firm.

## COUNT XVII

**VIOLATION OF THE NEW YORK EQUAL PAY LAW**
**N.Y. LABOR LAW § 215**
**RETALIATION**
**(On Behalf of Yelenick Against Defendants Chadbourne and Norton Rose)**

386.   Yelenick re-alleges and incorporates each and every allegation of this Complaint.

387.   Yelenick repeatedly complained to Defendant Chadbourne about gender discrimination in compensation.  She complained, both orally and in writing, to members of the Firm on numerous occasions, including but not limited to, Management Committee member and Managing Partner Andrew Giaccia; Management Committee member Marc Alpert; Management Committee member Lawrence Rosenberg; Management Committee member Howard Seife; and

Management Committee member Paul Weber.

388.    On February 27, 2017, Yelenick joined this EPA collective action to challenge Chadbourne's discriminatory pay practices.

389.    The issues raised by Yelenick constitute colorable violations of the New York Equal Pay Law prohibiting pay discrimination on the basis of gender.

390.    Defendant retaliated against Yelenick for engaging in protected activities by, *inter alia*, making disparaging remarks about her work history in public statements.

391.    Defendant's retaliatory or discriminatory act or acts would be reasonably likely to deter a person from engaging in protected activity.

392.    By reason of Defendant's conduct as alleged herein, Yelenick is entitled to all remedies available under the New York Equal Pay Law.

393.    As the successor to Chadbourne, Norton Rose is liable for the damages resulting from the retaliatory acts and omissions of its predecessor firm.

## COUNT XVIII

### VIOLATION OF NEW YORK CITY
### ADMINISTRATIVE CODE § 8-107, subd.1(a)
### GENDER DISCRIMINATION
### (On behalf of Yelenick Against Defendants Chadbourne and Norton Rose)

394.    Yelenick re-alleges and incorporates each and every allegation of this Complaint.

395.    Defendant Chadbourne has discriminated against Yelenick in violation of the New York City Human Rights Law, Section 8-107, subdivision 1(a) of the New York City Administrative Code, by subjecting her to different treatment on the basis of her gender.

396.    Defendant has discriminated against Yelenick by treating her differently from and less preferably than similarly-situated male employees and by subjecting her to discriminatory pay,

discriminatory performance evaluations, disparate terms and conditions of employment, and other forms of discrimination, in violation of the New York City Administrative Code.

397.    As a result of Defendant's conduct alleged in this complaint, Yelenick has suffered harm, including but not limited to lost earnings, other financial loss, and non-economic damages.

398.    By reason of Defendant's conduct as alleged herein, Yelenick is entitled to all remedies available for violations of the New York City Human Rights Law, including back pay, front pay, compensatory damages, punitive damages, attorneys' fees, costs, and other appropriate relief.

399.    As the successor to Chadbourne, Norton Rose is liable for the damages resulting from the discriminatory acts and omissions of its predecessor firm.

### COUNT XIX

### VIOLATION OF NEW YORK CITY ADMINISTRATIVE CODE § 8-107, subd. 7 RETALIATION
**(On Behalf of Yelenick Against Defendants Chadbourne and Norton Rose)**

400.    Yelenick re-alleges and incorporates each and every allegation of this Complaint.

401.    Yelenick repeatedly complained to Defendant Chadbourne about gender discrimination in compensation.  She complained, both orally and in writing, to members of the Firm on numerous occasions, including but not limited to, Management Committee member and Managing Partner Andrew Giaccia; Management Committee member Marc Alpert; Management Committee member Lawrence Rosenberg; Management Committee member Howard Seife; and Management Committee member Paul Weber.

402.    On February 27, 2017, Yelenick joined this EPA collective action to challenge Chadbourne's discriminatory pay practices.

403.    The issues raised by Yelenick constitute colorable violations of the New York City

Human Rights Law prohibiting discrimination on the basis of gender.

404.    Defendant retaliated against Yelenick for engaging in protected activities by making disparaging remarks about her work history in public statements.

405.    Defendant's retaliatory act or acts would be reasonably likely to deter a person from engaging in protected activity.

406.    By reason of Defendant's conduct as alleged herein, Yelenick is entitled to all remedies available for violations of the New York City Human Rights Law, including compensatory damages, punitive damages, attorneys' fees, costs, and other appropriate relief.

407.    As the successor to Chadbourne, Norton Rose is liable for the damages resulting from the retaliatory acts and omissions of its predecessor firm.

## COUNT XX

### VIOLATION OF NEW YORK CITY ADMINISTRATIVE CODE § 8-107, subd. 6 AIDING AND ABETTING
#### (On Behalf of Yelenick Against Individual Defendants)

408.    Yelenick re-alleges and incorporates each and every allegation of this Complaint.

409.    On information and belief, Alpert, Giaccia, Lowell, Rosenberg, Seife, and Weber ("Individual Defendants") all actively and knowingly participated in practices that resulted in pay discrimination and retaliation based on Yelenick's gender.

410.    By aiding, abetting, inciting, compelling and/or coercing Defendant Chadbourne in its discriminatory practices and decisions, each Individual Defendant has aided and abetted both Defendant Chadbourne and each of the other Individual Defendant's discrimination against Yelenick, in violation of Section 8-107, subdivision 6 of the New York City Administrative Code

411.    Defendants' conduct has been intentional, deliberate, willful, reckless, and conducted in callous disregard of Yelenick's rights.

412.    By reason of Defendants' conduct as alleged herein, Yelenick is entitled to all remedies available for violations of the New York City Human Rights Law, including compensatory damages, punitive damages, attorneys' fees, costs, and other appropriate relief.

### COUNT XXI

**BREACH OF CONTRACT**
**(On Behalf of Campbell Against Defendants Chadbourne and Norton Rose)**

413.    Campbell re-alleges and incorporates each and every allegation of this Complaint.

414.    In the November 26, 2013 offer letter extended to Campbell, Chadbourne represented that Campbell's base annual compensation would be 500 points. CFO Lisa Palestine verbally committed that the 500 points equaled $500,000.

415.    The Firm intentionally withheld information regarding the power of the Management Committee to determine the value of points and the fact that Campbell's salary could fluctuate based upon the Committee's valuation of her points. The Firm later significantly undervalued Campbell's points at approximately $▇▇▇ to $▇▇▇ less than she was promised in the November 26, 2013 Letter Offer.

416.    The Firm also committed to paying Campbell a total guaranteed bonus of $200,000 if her collections were $2.5 million in 2014. Campbell collected more than $2.8 million in revenues but the Firm refused to pay her the full $200,000 guaranteed bonus per her offer letter.

417.    The Firm breached its agreement to pay Campbell a base salary of $500,000 annually and pay a guaranteed bonus of $200,000 for meeting her collections markers.

418.    Campbell suffered substantial damages as a result of Chadbourne's breach.

419.    As the successor to Chadbourne, Norton Rose is liable for the damages resulting from the contractual breaches of its predecessor firm.

**COUNT XXI**
**BREACH OF CONTRACT/BREACH OF IMPLIED COVENANT OF GOOD**
**FAITH AND FAIR DEALING**
**(On behalf of Yelenick Against Chadbourne and Norton Rose)**

420.     Yelenick re-alleges and incorporates each and every allegation of this Complaint.

421.     Every contractual arrangement inherently carries with it a covenant of good faith and fair dealing.

422.     Encompassed within Chadbourne's obligation to act in good faith were any promises which a reasonable person in Yelenick's shoes would be justified in understanding were included. The covenant embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract. Even where a contract contemplates the exercise of discretion by one party, this pledge includes a promise not to act arbitrarily or irrationally in exercising that discretion.  Rather, the party must exercise its discretion reasonably and in good faith.

423.     It was an implicit and material term of Chadbourne's Partnership Agreement that Chadbourne partners, including Chadbourne's Managing Partner and Management Committee, would adhere to their basic ethical obligations under all applicable Rules of Professional Conduct. In particular, it was an implicit and material part of Chadbourne's Partnership Agreement that Chadbourne, Chadbourne's Managing Partner, and the Firm's Management Committee would not otherwise discriminate against partners on the basis of gender or retaliate against them.

424.     Under the Firm's Partnership Agreement, Chadbourne's Management Committee determined the allocation of profits to the Firm's partners.  It was an implied term of the Chadbourne Partnership Agreement that the Management Committee would not make profit allocation decisions in a manner that was discriminatory or retaliatory.

425.     Because the obligation not to discriminate or retaliate was embedded in the parties'

contract, Chadbourne is contractually liable for engaging in such conduct against Yelenick.

426.    Chadbourne breached the covenant of good faith and fair dealing by arbitrarily discriminating and retaliating against Yelenick.

427.    Yelenick has been damaged by Chadbourne's breach of its contractual obligations, including the covenant of good faith and fair dealing, in an amount to be determined at trial.

428.    As the successor to Chadbourne, Norton Rose is liable for the damages resulting from the contractual breaches of its predecessor firm.

## COUNT XXII
## BREACH OF FIDUCIARY DUTY
### (On behalf of Campbell and Yelenick against Individual Defendants)

429.    Campbell and Yelenick re-allege and incorporate each and every allegation of this Complaint.

430.    A fiduciary relationship existed between Campbell and Yelenick and the Individual Defendants based on Campbell and Yelenick's status as members of the Firm Partnership.

431.    The Individual Defendants had a duty to disclose essential information affecting the Partnership to Campbell and Yelenick and to deal fairly, honestly, and openly with them.  The Individual Defendants breached these duties.

432.    The Individual Defendants breached their fiduciary duty to Campbell and Yelenick by failing to disclose material financial information, including information related to Partner compensation, to them.

433.    Further, the Individual Defendants had a duty to deal with Campbell and Yelenick in an open and honest manner and refrain from discrimination and retaliation.

434.    Instead, the Individual Defendants covertly terminated Campbell's employment without providing her with the benefit of demonstrating the profitability and fit of her practice to

83

her fellow Partners.  The Individual Defendants further violated their duty to Campbell by firing her without following the expulsion procedures articulated in the Firm's Partnership Agreement.

435.    Campbell and Yelenick suffered substantial damages as a result of the Individual Defendants' breaches of their fiduciary duties, including reputational harm.

## COUNT XVII

### UNJUST ENRICHMENT
**(On behalf of Plaintiffs Against Defendant Chadbourne)**

436.    Plaintiffs re-allege and incorporate each and every allegation of this Complaint.

437.    Under the common-law doctrine of unjust enrichment, Chadbourne, by its policies and actions, benefited from, and increased its profits by failing to pay Plaintiffs all compensation due to them as Partners.

438.    Furthermore, Chadbourne received $217,250 in capital contributions from Campbell and held more than $440,000 in Campbell's capital account, and yet failed to provide her the compensation and benefits promised to her as a Partner of the Firm.

439.    Chadbourne accepted and received the benefits of the work performed by Plaintiffs, the business and revenues they generated for the Firm, and their annual capital contributions and were unjustly enriched.  It is inequitable and unjust for Chadbourne to reap the benefits of Plaintiffs' work and financial contribution without proper remuneration.

440.    Plaintiffs are entitled to relief for this unjust enrichment in an amount equal to the benefits and contribution unjustly retained by Chadbourne, plus interest on these amounts.

441.    As the successor to Chadbourne, Norton Rose is liable for the damages resulting from the tortious conduct of its predecessor firm.

## VIII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the members of the Class and Collective Action they seek to represent, requests the following relief:

A.      Certification of this case as a class action under Federal Rule of Civil Procedure 23, on behalf of the proposed Plaintiff Class; designation of the proposed Class Representatives as representatives of this Class; and designation of Plaintiffs' counsel of record as Class Counsel;

B.      Designation of this action as a collective action on behalf of the proposed EPA Collective Plaintiffs (asserting EPA claims); designation of Plaintiffs as representatives of the EPA Collective Action; promptly issuing notice pursuant to 29 U.S.C. § 216(b) to all similarly situated members of the EPA Opt-In Class, which (a) apprises them of the pendency of this action and (b) permits them to assert timely EPA claims in this action by filing individual Consent to Sue forms pursuant to 29 U.S.C. § 216(b); and tolling the statute of limitations on the claims of all members of the EPA Opt-In Class from the date the original Complaint was filed until the Class members are provided with reasonable notice of the pendency of this action and a fair opportunity to exercise their right to opt in as Plaintiffs;

C.      A declaratory judgment that Chadbourne's employment policies, practices, and procedures challenged herein are illegal and in violation of the rights of Class Representative and Class members under Title VII;

D.      Award Plaintiffs all legal and equitable remedies available for violations of the causes of action invoked in this case, including an award of back pay, front pay, liquidated damages, and all other damages for lost compensation and job benefits suffered by Plaintiffs, the Rule 23 Class and the § 216(b) Collective action members, to be determined at trial;

E.      An award of back pay and front pay in an amount not less than $25 million;

F.      An award of punitive damages in an amount not less than $125 million;

G.      An award of compensatory damages in an amount not less than $5 million;

H.       An award of litigation costs and expenses, including reasonable attorneys' fees, to

Plaintiffs, Rule 23 Class, and the § 216(b) Collective action members;

I.       Pre-judgment interest; and

J.       Such other and further relief as the Court may deem just and proper.

## IX.     DEMAND FOR JURY

The Plaintiffs demand trial by jury of all issues triable of right to a jury.

Respectfully submitted,

**David W. Sanford (admitted *pro hac vice*)**
**Jeremy Heisler (JH-0145)**
**Kevin Sharp (admitted *pro hac vice*)**
**Andrew Melzer (AM-7649)**
**Alexandra Harwin (AH-3111)**
**Saba Bireda (admitted *pro hac vice*)**
**SANFORD HEISLER, LLP**
1350 Avenue of the Americas, 31st Floor
New York, New York 10019
Telephone: (646) 402-5650
Facsimile: (646) 402-5651
dsanford@sanfordheisler.com
jheisler@sanfordheisler.com
ksharp@sanfordheisler.com
amelzer@sanfordheisler.com
aharwin@sanfordheisler.com
sbireda@sanfordheisler.com

***Counsel for Plaintiffs and the Class***